UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:05CV02183 EGS |
| DONALD H. RUMSFELD, SECRETARY, UNITED STATES DEPARTMENT OF DEFENSE, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF PLAINTIFF AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, BY MARK E. GIBSON**

I, Mark E. Gibson, do hereby declare:

1. My name is Mark E. Gibson. I am over eighteen years of age. This declaration states matters within my personal knowledge.

2. I am a Labor Relations Specialist employed by the American Federation of Government Employees, AFL-CIO (AFGE), which is a plaintiff in the above-captioned case.

3. Plaintiff AFGE, is a labor organization as defined in 5 U.S.C. § 7103(a)(4), and an unincorporated association having its headquarters at 80 F Street N.W., Washington, D.C. 20001. AFGE is the exclusive bargaining representative of federal employees pursuant to 5 U.S.C. §§ 7111 and 7112, including civilian employees of the Department of Defense (DoD). It currently represents approximately 600,000 federal employees nationwide and around the world. According to recent DoD figures, AFGE currently represents approximately 261,521 of DoD employees nationwide.

1

4. AFGE represents the interests of its members and bargaining units, including

   Councils and Local Unions, by, inter alia, negotiating collective bargaining

   agreements, arbitrating grievances under such agreements, filing unfair labor practice

   charges, lobbying Congress for favorable working conditions, pay and benefits for its

   members, and litigating employees' collective and individual rights before federal

   agencies and courts.

5. AFGE is composed of 12 geographical districts, consisting of some 1,100 Local

   Unions.  Many of these individual Local Unions are certified as the exclusive

   bargaining units representing employees at individual installations, such as bases,

   forts, garrisons, shipyards, hospitals, arsenals, depots or other facilities.  Over one-

   half of AFGE's members are represented by joint interest bargaining units, known as

   Councils.  Some of these Councils within the Department of Defense include: the

   Defense Finance and Accounting Service (DFAS) Council of DFAS Locals, Council

   171; the Defense Contract Management Agency (DCMA), Council 170; the Defense

   Commissary Agency (DeCA), Council 172; the Defense Logistics Agency (DLA),

   Council 169; the Air Force Materiel Command Locals, Council 214; the US Marine

   Corps Council, Council 240: and Army Air Force Exchange Services (AAFES)

   Council, Council 235.

6. I am currently employed by AFGE Field Services Department of the AFGE National

   Office in Washington, D.C.  I have been employed by AFGE since December 4, 2002

   and have held my current position since that time.

7. Prior to my full time employment by AFGE, I served as the Local President of AFGE

   Local 1882 for thirteen years, representing DoD employees in multiple AFGE

   bargaining units.  One was at Fort McCoy, Wisconsin.  I represented employees of the

2

88th Regional Support Command, United States Army Reserve (USAR), who were headquartered in Fort Snelling, MN, but worked in a six-state area. At the time that I held the position of AFGE Local President of Local 1882 I was also employed full-time as a DoD civilian employee Pipefitter with the Department of the Army, Fort McCoy, Wisconsin. I held that position for 26 years.

8. One of my current and primary responsibilities as Labor Relations Specialist at AFGE is to administer the bargaining relationships between AFGE and the various components, services and agencies within DoD. I provide collective bargaining advice to individual AFGE locals and AFGE bargaining councils with respect to declarations of negotiability and subsequent appeals, bargaining impasses, unfair labor practices, and review and respond to DoD notices in connection with DoD's national consultation obligations.

9. I also advise and assist local AFGE Unions in enforcing their contracts and in processing grievances over violations of various DoD-AFGE Agreements.

10. I have performed these duties in connection with AFGE's DoD bargaining units since December 2002.

11. Between 1997 and 2002, I also served as a leader of AFGE's Defense Conference, known as DEFCON. I served as the Army Caucus Chair within DEFCON from 1997 through 1999, and as Steering Group Chair from 1999 until 2002.

12. DEFCON was founded in 1997 as a coalition of over 300 AFGE local unions representing DoD employees, in order to meet the growing challenges faced by federal employees working for DoD. DEFCON addresses issues of interest to all DOD locals, including organizational realignments and reorganizations, Base Re-Alignments and Closures (BRAC), and other regional and national issues where

3

appropriate. The coalition also serves as an advisory body to AFGE's National President and National Executive Committee.

13. DEFCON is structured along DoD Service and defense agency lines, and includes representatives and Caucuses from each of the Services and major agencies within DoD. Each Caucus is represented by a Caucus chair; these chairs serve as the members of DEFCON's Steering Group.

14. The collective bargaining agreements negotiated by AFGE, its councils and its local unions govern the terms and conditions of employment for the employees covered by the agreements, as defined by 5 U.S. C. § 7103(a)(14). These agreements include terms that were negotiated, *inter alia,* under 5 U.S.C. § 7106(b) and that establish procedures with respect to the exercise of management rights and/or appropriate arrangements governing the impact of the exercise of management rights.

15. In addition to other employee groups, AFGE represents certain employees of Non-Appropriated Fund Instrumentalities (AFGEs) within the Department of Defense (DoD). NAFI employees are entitled to negotiate pay, benefits, and other working conditions, to the extent that negotiation of such matters is not precluded by Chapter 71 of Title 5 of the United States Code. For over 25 years, AFGE has represented NAFI employees in negotiating pay, benefits, and other working conditions not specifically provided for by statute. From my review of DoD statements and briefing, DoD has expressed a view that the provisions of the National Security Personnel System (NSPS) will have the effect of relieving DoD of the obligation to bargain over these matters.

16. As part of my duties, I participate and advise on negotiations between certain AFGE Agreements and a variety of DoD components and agencies. I also participate in and

{00212577.DOC}

**0004**

advise AFGE Council and Local officers and staff in negotiations over proposed changes to conditions of employment and other issues which arise during the term of a multi-year Agreement.

17. Many, if not all, of these agreements will be immediately and significantly impacted if and when the Department of Defense implements the final regulations establishing the National Security Personnel System as published in the Federal Register on November 1, 2005 (to be codified as 5 C.F.R. Part 9901-02).

18. I carefully reviewed the proposed regulations describing the new system that were published in the Federal Register at 70 Fed. Reg. 7552 *et seq.* (February 1, 2005). During 2004 and 2005.

19. I participated, as one of AFGE's representatives, in numerous pre-statutory meetings and in the "meet and confer" process mandated by Section 9902(f) and (m) of the NSPS.

20. Both before and during the "meet and confer" process, I and other Union representatives reviewed and discussed the proposed regulations of representatives with DoD and the Office of Personnel Management (OPM).

21. During those meetings, DoD and OPM officials consistently asserted that they intended to completely eliminate the statutory right to collective bargaining as developed over the last fifty years and as set forth in 5 U.S.C.§ 7114. DoD and OPM described this as the Administration's rigid position.

22. In addition to eliminating the statutory right to collective bargaining, DoD also evaded the statutory requirement that DoD and OPM provide unions a written description of the proposed [personnel] system and that it *later* meet and confer with unions in an attempt to reach agreement. 5 U.S.C. § 9902(f)(1)(A)(i) and (B)(ii).

5

DoD did not provide the unions with a written description prior to meeting with the Unions, and it did not attempt to reach agreement with the Union's as required by law.

23.  The regulations, as written, assert that the Secretary of Defense has the authority to waive or modify every provision of chapter 71.  *See* § 9901.104(f).

24.  The regulations also declare that the Secretary has unlimited authority to determine what, if any, future bargaining will be allowed; that management's nonnegotiable rights include an unlimited right to take whatever action may be necessary to carry out the Department's mission at any time; and that any negotiations that the Secretary may choose to allow would be supervised not by an independent third party, but by an internal labor board handpicked by the Secretary.  *See, e.g.* Sections 9901.907, 910(a),(b), (c) and (f).

25.  Although the proposed regulation has been in development for over 18 months, and the meet and confer period is over, the final regulations written by DoD leave many aspects of the new labor relations and human resources systems unclear and undefined.  For example, it claims to have repealed sections of 5 U.S.C. Chapter 71 and case law interpreting those sections with regard to DoD employees, but does not define the sections or cases, or point to any replacement legislation.  Instead, the regulations refer to implementing issuances and other issuances which have not yet been published and which may or not may have the force of law, or even regulation. See §§ 9901.103, .903.  Such vague promises make it extremely difficult to determine which of our existing legal rights will survive and which are to be erased at the stroke of midnight on the effective date.

26. The regulations also declare that DoD will no longer honor any provision of a

6

collective bargaining agreement that is inconsistent with this part and/or with these unpublished implementing issuances on the effective date of the applicable subpart(s) or such issuances, §9901.905(a), aka November 28, 2005.

27. Upon my personal knowledge and belief, it appears that literally thousands of pages of AFGE's existing contract provisions are inconsistent with the new NSPS regulations as published, and according to DoD representatives, may become void upon the implementation of the NSPS.   However, since we have not been shown these issuances, we cannot determine which parts, if any, of our existing contracts DoD will refuse to honor on the effective date.  However, we must assume that the number will also be in the thousands.

28. Section 9901.905(b) allows only 60 days in which to identify and to bring into conformance, upon request by an exclusive representative, the few existing contract provisions which remain negotiable and enforceable.  This language puts the burden on the union to demand to bargain those provisions that the employer has deemed unenforceable, but places no specific notice requirements on DoD.

29. The regulations also restrict the parties to the new impasse provisions of § 9901.920 to assist in resolving any impasses. It appears that the parties will have no recourse since the National Security Labor Relations Board (NSLRB) is very unlikely to begin functioning for several months, at the earliest.  In the meantime, it is unclear who would resolve any disputes or enforce any such provisions, leaving the Unions completely without any remedy in law.

30. DoD further asserts in its regulations that the Secretary of Defense in his sole and exclusive discretion may continue all or part of a particular provision in certain contracts covering certain DoD employees, but that he or she may elect to withdraw

7

such voluntary continuation at any time. § 9901.905(a). It thus appears that some provisions of some contracts may remain in effect for some time, in some places, and covering some employees, but again the Union's do not know which ones. As a practical matter this means that none of AFGE's contracts are enforceable except at the whim of the Secretary.

31. Finally, DoD has also expressly reserved to itself a second, separate, right to change terms and conditions of employment by issuing issuances on any subject at any time, and has declared in advance that it will refuse to bargain over any such future changes. *9901.903, 914(d)(5), 917(d)(1).* Although DoD has suggested that it might continue to honor certain existing, inconsistent contract provisions until their expiration, it has also taken all such matters off the bargaining table, and has prohibited any future bargaining over them, even as to procedures and/or appropriate arrangements. The effect of these pronouncements will also be to eventually supersede existing contract provisions, as our contracts shrink beyond all recognition.

32. DoD has also told the Unions that it will not comply with either the existing national consultation and collective bargaining rights required by chapter 71 or with the new meet and confer process in determining which contract provisions to cancel, in developing these implementing issuances, or in developing any future issuances. *See* § 9901.106, 917(d)(1). It will allow something called continuing collaboration, but clearly states that such collaboration is meaningless: *Nothing in the continuing collaboration process will affect the right of the Secretary, Deputy Secretary, Principal Staff Assistants, or Secretaries of the Military Departments to determine the content of implementing issuances and to make them effective at any time.* 9901.106(a)(5).

33. In addition to voiding existing contracts, DoD has tried to totally eliminate the Union's statutory rights by expanding management's rights beyond all recognition, taking formerly permissive subjects off the table, and effectively eliminating Impact and Implementation (I & I) bargaining over procedures and appropriate arrangements to assist employees adversely affected by management's actions. *See* §§*9901.910*. It also prohibits collective bargaining on any matter that the Secretary of Defense chooses to prescribe by regulation, policy, or other issuance. Under the proposed regulation, all bargaining on most subjects is solely at the sufferance of the Secretary, who may eliminate any and all bargaining by the stroke of a pen. See, e.g. §§9901.910, .917(d)(1). 917(f)(2). This will effectively eliminate the Union's right to collectively bargain over working conditions.

34. The proposed regulation also provides unlimited management authority to take whatever . . . actions may be necessary to carry out the Department's mission. 9901.910(a)(2). DoD and OPM representatives told us that this provision is intended as an emergency clause, but its text is not qualified by either of the two criteria in existing law that define a genuine emergency warranting a short-term suspension of labor rights that the need to act be urgent and unforeseen. Instead, the proposed regulation provides management power to do whatever it wants whenever it wants in its sole, exclusive, and unreviewable discretion, with no obligation to bargain over procedures, substance, or consequences. *See,* §9901.910(a)(2).

35. In effect, even if the Secretary fails to eliminate bargaining of a particular subject by regulation, policy, implementing issuance or other issuance, management can invoke this section to bar bargaining over that subject. For example, bargaining over routine assignment to specific duties, shifts, . . . or overtime is now prohibited DoD-wide and

{00212577.DOC}

worldwide, unless expressly and personally approved by the Secretary of Defense. It
does not matter whether the worker in question is mowing lawns on an Army base in
Wisconsin or washing windows in Italy; the personal intervention of the Secretary of
Defense is required to permit the negotiation of procedures for setting up a voluntary
overtime roster or assigning overtime by seniority. This is neither flexible nor fair,
and effectively eliminates that employees' statutory right to collectively bargain over
any aspect of their working conditions.

36. Even if the Secretary never exercises his unreviewable discretion to publish issuances
that further restrict the scope of bargaining, other provisions of the new DoD
management rights regulation effectively restrict bargaining to about 25 percent of the
subjects that are currently negotiable under chapter 71. These provisions are
draconian, one-sided, and unfair.

37. Contradicting the DoD's professed desire for management flexibility, § 9901.910
prohibits management from negotiating any of the permissive subjects of bargaining
that currently are negotiable at the election of the agency under §7106(b)(1). Section
9901.910 also effectively prohibits negotiation of procedures with respect to over
twenty specified management rights, including the catch-all right to take whatever
actions may be necessary. This contrasts with § 7106(b)(2) of chapter 71, which
allows negotiation of procedures by which management will exercise any
management right. For example, some installations have negotiated contract
provisions stating that volunteers who are deemed qualified by management may be
assigned to lengthy details far from home, rather than tearing a single mother away
from her children for no apparent reason. Chapter 71 has long permitted such
appropriate arrangements. DoD now proposes to ban all such contract terms, even

where qualified volunteers are available and the substitution of personnel would have no impact on national security whatsoever.

38. These changes will also eliminate contract provisions which allow for employees to rotate work shifts, to request and obtain certain shifts, work hours and work schedules, including Alternate Work Schedules, Flextime, Compressed Work Schedules) and other ways to balance work and family obligations. They will also eliminate essential safety provisions, such as limiting performance of hazardous work to hours when fire and Emergency crews are more readily available, disconnection of electrical power to buildings when working on areas around a power mast or entrance, assignment to difficult or dangerous tasks in pairs when safety is of imminent concern, so that one employee can act as look-out or run for help if the first employee is trapped or immobilized.

39. Instead, the NSPS regulations may allow negotiation of appropriate arrangements and procedures, but only with respect to layoffs, discipline, and hiring and only when the Secretary so elects and, moreover, only to the extent that these actions do not overlap with other management rights as to which no procedures are negotiable at all. *See* §§9901.910(c),(f) and (h). Further, if layoffs, discipline, and hiring are deemed to be actions that may be necessary, or if the Secretary by issuance prescribes procedures for these actions, no procedures at all are negotiable and the rights formerly provided by § 7106(a)(2) of chapter 71 and/or by contract are entirely wiped out. The proposed regulation also grants management authority to change its mind at will, since any agreements regarding these procedures will be non-precedential and can be revoked at any time by management in its unreviewable discretion. § 9901.910(h).

40. By contrast, existing law under Section 7106(b)(3) of chapter 71 allows negotiation of

{00212577.DOC}

appropriate arrangements for employees adversely affected by exercise of

management rights, in order to, among other things, mitigate employee hardships and

reduce the health and safety risks of dangerous work assignments. Arrangements, for

example, can include training over new technology, so that employees may work

effectively and safely.

41. The NSPS, however, ends all bargaining over appropriate arrangements. Under

§9901.910(f)(2), arrangements with respect to routine assignment to specific duties,

shifts, or work on a regular or overtime basis are totally banned; and under

§9901.910(h), any negotiated arrangement can be totally negated by unilateral

management action. The latter section also gives management sole, exclusive, and

unreviewable discretion both to take any action without delay and to determine

whether an arrangement will be retroactively applied or binding on subsequent acts.

9901.910 (h),(i). In other words, management may act without regard to a negotiated

arrangement, then determine unilaterally both whether the arrangement will be

applied retroactively to the action taken and whether the arrangement will apply to

any future agency action.

42. Under §9901.910(h), the right to negotiate arrangements is illusory, since there is no

right to demand implementation of any negotiated arrangement. A negotiated

arrangement is implemented only if management in exercise of sole, exclusive, and

unreviewable discretion chooses to implement it.

43. NSPS also excuses itself from any obligation to bargain or consult over a change to a

condition of employment unless the change is otherwise negotiable pursuant to these

regulations and is foreseeable, substantial, and significant in terms of both impact and

duration on the bargaining unit, or on those employees in that part of the bargaining

unit affected by the change. 9901.917(d)(2). Such a test goes well beyond the *de*

*minimis* threshold recently adopted by the FLRA; instead, it sets the bar so high it

may be impossible to meet.

44. Finally, the DoD regulations make a mockery of the statutory requirement that all

review of labor-management disputes be by an independent third party.

§ 9902(m)(6). Instead, all disputes regarding DoD's sharply eroded duty to bargain,

including resolution of disputes as to the effect of the regulations themselves on

thousands of existing contracts and contract provisions will be by the brand new

internal DoD labor board (NSLRB) whose members are to be hand-picked by the

Secretary of Defense at his sole and exclusive discretion. § 9901.907(b),(c).

45. Resolution of negotiability appeals, bargaining impasses and most unfair labor

practices, as well as enforcement and review of arbitrators' decisions, will be subject

to the NSLRB.

46. The NSPS limits the Board's ability to issue *status quo ante* remedies, except for

egregious violations. As far as we can tell, this means that we will lose recourse to

the FLRA for unfair labor practices and will, instead, get little or no meaningful relief

from the new NSLRB even it if agrees that DoD has broken the law.

47. The Secretary will also have power to overturn the decisions of arbitrators and

administrative judges, and the authority of any independent adjudicator to remedy

Department errors, order corrective action and/or mitigate penalties will be sharply

restricted.

48. Overall, the new regulations seem to grant the Secretary of Defense infinite power

and discretion over almost every aspect of collective bargaining. The most damaging

provisions are those which now exclude day to day operational issues such as work

schedules, work assignments, tours of duty, rotation of overtime, and the host of other issues from the definition of terms and conditions of employment over which management had a duty to bargain, at least with regard to procedures and appropriate arrangements.

49. Prior to NSPS, DoD managers could take actions within their rights, but had to bargain over the procedures they would use and arrangements they would make for employees harmed by their actions, such as single parents suddenly deployed away from their children. Under NSPS, this will change. Under § 9901.910(c) bargaining over procedures following the exercise of management rights is now within the sole, and unreviewable discretion of the Secretary of Defense. Under § 9901.910(d) management may consult with the union but such consultation does not have to reach agreement. Terms and conditions of employment set forth in current contracts may be ignored at the Secretary's option whenever he or she deems it necessary. No third party review of such decisions will be permitted.

50. Subpart I of NSPS significantly alters or otherwise changes key provisions of Chapter 71 concerning collective bargaining and the scope of bargaining.

51. The most basic premise of collective bargaining is for the parties to reach mutual agreement and understanding. In any collective bargaining agreement, the parties mutually agree to apply, cover, extend, modify, apply or exempt employees and subjects covered by an agreement. This language specifically gives the Secretary sole and exclusive discretion to allow continued coverage to some, or all, of the employees previously covered and to cancel that coverage at any time.

52. For example, an AFGE agreement such as the DFAS Agreement covers both GS and WG employees, and some of these employees (the GS employees) may be in Spiral

{00212577.DOC}

1.1. These may be selectively excluded from a CBA, and the WG employees remain covered under that agreement (or at least the parts deemed unenforceable). At the same time, the Agreement may contain sections on pay, promotion and performance appraisals which may or may not remain in effect for months or years, depending on who is converted to the new Human Resources System and when.

53. NSPSs proposed replacement of appropriate arrangements bargaining and consultation, is no substitute, and does not preserve collective bargaining as required by the enabling statute, since it does not require that the parties reach agreement on any covered matter. Allowing one party to cancel existing obligations at will, and to decide whether and when any replacement bargaining will occur, makes a mockery of true collective bargaining.

54. The NSPS regulations severely weaken AFGE member employees' *Weingarten* rights, i.e. rights to representation of an employee during an agency interrogation or investigation, where the employees fears that he or she may be the subject of discipline. This right will no longer apply to investigations conducted by an Office of Inspector General or by other organizations, such as the Army Criminal Investigation Division or the Air Force Office of Special Investigations. The loss of this right, which has been upheld by the Supreme Court, will directly and immediately damage AFGE-represented DoD employees who are subjected to such investigations upon the implementation of the NSPS.

55. AFGE local union representatives will also lose their right to be present at formal discussions between a Department management official(s) and bargaining unit employees as presently guaranteed by Section 71, except in very narrow circumstances. Instead, NSPS now suggests that management has the right to call

15

meetings with represented employees without notifying the union for any number of purposes which are now prohibited by law. For example, the NSPS would allow management to conduct meetings with represented employees without notification to the union, to discuss operational matters, to reiterate, explain or apply existing personnel policies, practices, or working conditions, as long as the meeting does not result in an announcement of or a promise to change an existing personnel policy(s), practice(s), or working condition(s). Under NSPS, a manager could call a meeting to discuss ways to better accomplish a task and exclude the union because it is strictly about operational matters. If one of the employees suggests changing the overtime roster as a way to get the job done, the supervisor is apparently free to discuss such changes without contacting any union representative.

56.   Under the NSPS it is hard to envision a situation where a union has any right to attend formal discussions along with its represented employees. The Union could be excluded, bypassed and ignored, and be left with no remedy for what are now unfair labor practices. Provisions like these effectively overturn thirty years of FLRA precedent and leave union representatives out in the cold.

57. DoD has also unilaterally changed the standards of conduct for union representatives, overturning decades of case law holding that only flagrant misconduct by a union representative would subject him or her to disciplinary action. This has the potential to go well beyond stopping abusive language or conduct on the part of a union official. The standards of conduct for employees include an expectation of deference to superiors. A union representative who bangs on the table while loudly insisting, NO! is displaying behavior that might not be tolerated by a superior. Again, DoD threatens the whole concept of protected activity, without even a pretense that these

16

wholesale changes in the law are related to national security or terrorism.

58. DoD has also excused itself from providing information to the union as presently required by law.  Under § 9901.914(b)(5), DoD managers will not have to disclose information upon request if *management* believes that adequate alternative means exist for obtaining the information, or that proper discussion, understanding, or negotiation of a particular subject within the scope of collective bargaining is possible without the information.  Unlike today, when the union can file an unfair labor practice charge and obtain an order from the FLRA, providing that  the agency immediately produce the information, it is unclear whether any remedy will be available under the new NSPS.

59. The national bargaining provisions of the NSPS are just as one-sided.  Although national level bargaining is available solely at the election of the Secretary, it will be binding on all levels of the union, will supersede all local contracts, and will not be subject to membership ratification.  The NSPS completely ignores the fact that many AFGE Council and Local Union constitutions require ratification in order for any agreement to be binding on its members.

60. The NSPS does seem to preserve the negotiated grievance and arbitration procedures that presently exist, but provides that any collective bargaining agreement may exclude any matter from its negotiated grievance procedure. Given the expansion of management rights to exclude most substantive matters from collective bargaining, this provision seemingly provides for a management declaration of exclusion, to which the union will object, followed by a unilateral determination by the NSLRB as controlled by the Secretary of Defense.   This may leave nothing to grieve over.

61. The NSPS also unilaterally seeks to limit the jurisdiction of any arbitrator by

prohibiting him or her from considering, reversing or modifying any future mandatory

removal, even though it has not yet announced or defined the criteria for any such

actions, and no agreement that we are aware of has yet negotiated such an exclusion.

*See* § 9901.712; 9901.922(f).  DoD also declares that such disciplinary actions are

unreviewable, and cannot be reversed or mitigated by any appellate agency or body,

such as the Merit Systems Protection Board. *See* § 9901.922(f)(1).  Such exclusions

raise serious due process concerns.

62. DoD also tries to unilaterally alter thousands of negotiated grievance and arbitration

provisions in another way.  In Section 9901.922(h)(2), DoD appoints a three-person

arbitration panel instead of a single arbitrator to take over final decision authority.  It

says nothing about who selects this panel, who pays them, or how and when they can

be substituted for the single arbitrator provided for in most collective bargaining

agreements negotiated by AFGE.

63. As part of my duties, I am familiar with the AFGE-Defense Finance and Accounting

Service Operating Locations Multi-Unit Master Agreement (DFAS Agreement),

which was negotiated under 5 U.S.C. § 7114.  The Agreement establishes currently

applicable terms and conditions of employment for many AFGE-represented DoD

employees employed by the Defense Finance and Accounting Service at various

locations at 26 DFAS facilities nationwide.[1]  The Agreement became effective June

16, 1999 and currently remains in effect.

64. A true and correct copy of the Agreement **OR EXCERPTS OF THE**

**AGREEMENT** is attached hereto as Exhibit A to this Declaration.

---

[1]   These local unions formed a consolidated collective bargaining unit represented by AFGE Council 171, which is
one of the Councils described in Paragraph 10 above.  Other AFGE-represented DFAS employees are covered under
a similar AFGE-DFAS Multi-Unit Agreement, the Center Agreement, which includes employees stationed at Kansas
City, MO, Cleveland, OH, Columbus, OH, Denver, CO and Indianapolis, IN.  AFGE and AFGE Council 171 also
represent DFAS employees in Rome, NY, Omaha, NE, Limestone, ME, and Rock Island, IL,  who are covered under

{00212577.DOC}                                                                                                    **0018**

65. Many of the specific provisions in the DFAS agreement attached hereto are identical or similar to provisions found in many other AFGE agreements governing conditions of employment of AFGE bargaining unit employees.

66. As part of my duties, I apply and interpret the terms of this Agreement during interactions with agency representatives, AFGE staff members, elected national and local AFGE officials, AFGE stewards, and other bargaining unit employees. I have assisted in bargaining mid-term changes to this agreement since approximately 2002.

67. I am aware that, pursuant to proposed §§ 9901.905(a), and 914(d)(5), DoD has unilaterally decreed that it will not honor any provision in a collective bargaining agreement that is inconsistent with the new regulations and/or their implementing issuances on the effective date of coverage, November 28, 2005.

68. My review of the Agreement, my understanding of the regulations, and my familiarity with DoD management's views and statements during the meet and confer period and to Congress have led me to conclude that the DoD is likely to declare many provisions of the Agreement, or portions thereof, to be unenforceable and invalid because, in the DoD's opinion, they conflict with portions of the new regulations or the as-yet unpublished implementing issuances.

69. This list is preliminary and tentative, since NSPS permits *the agency*, but not the union, to cancel contractual obligations, and we have no way of knowing which ones they will choose to cancel, or what DoD will declare to be a non-negotiable operational decision. Furthermore, the NSPS regulations allow the union to request to bargain a second time on matters which were formerly negotiable, and permits the *Secretary of Defense* (a non-party) but not the union or the agency, to elect to re-

---

different agreements and/or Memoranda of Understanding.

{00212577.DOC}

bargain over certain personnel rules, policies, and procedures which were previously negotiable.

70. These provisions include the following:

Article 2 (Governing Laws and Regulations)

Article 3, Section 3 and a portion of Section 4 (Employee Rights)

Article 4, Sections 2 and 3 (Union Rights and Duties)

Portions of Article 5 (Management Rights)

Article 6 (Labor-Management Committee) (Section A requires training in interest-based, non-adversarial negotiating techniques for members of the labor-management committee. If the new regulations redefine training as non-negotiable, this provision may be eliminated.)

Article 7, Section 3 (Training of Union Officers and Stewards)

Article 9, Sections 4, 5, and 7 (Official Time and Travel of Union Officers and Stewards)

Article 11 (Hours of Work)

Article 12 (Alternative Work Schedules)

Article 13 (Overtime)

Article 14 (Annual Leave)

Article 15 (Sick Leave) Sections 1 and 6

Article 16 (Other Absences)

Article 17 (Health and Safety)

Article 18 (Disability Compensation) Section B(2) requires training to new employees and others on handling work-related injuries. To the extent NSPS would eliminate any negotiations over training or work assignments, this provision would be eliminated.

Article 19 (Employee Assistance Programs) Section 6 requires training for union

20

0020

representatives in the operation of the employee assistance program. To the extent NSPS would eliminate any negotiations over training or work assignments, this provision would be eliminated.

Article 22 (Video Display Terminals) Section 2C calls for rest periods for employees who operate video display terminals. To the extent NSPS would eliminate any negotiations over work assignments, this provision would be eliminated.

Article 26 (Merit Promotion)

Article 27 (Career Enhancement Program)

Article 28 (Internal Reorganization)

Article 29 (Reduction in Force)

Article 30 (Transfer of Function)

Article 31 (Position Classification)

Article 32 (Equal Employment Opportunity), Section 3A concerns creation of EEO Committees. Section 4B concerns training of EEO counselors. To the extent NSPS would eliminate any negotiations over training and work assignments, this provision would be eliminated.

Article 34 (Employee Development)

Article 35 (Performance Management Program)

Article 36 (Denial of Within Grade Increase)

Article 37 (Incentive Awards)

Article 42 (Contracting Out)

71. Although all of the provisions described in the preceding paragraph are important, the invalidation of articles on Hours of Work and Leave (Articles 11, 14, 15, 16), Alternative Work Schedules (Article 12); Overtime (Article13), and Health and

{00212577.DOC}

**0021**

Safety (Article 17) will have a particularly dramatic adverse impact on bargaining unit employees.

72. **Hours of Work and Leave**:  Under current law, management has the right to assign work and to determine the personnel by which agency operations shall be conducted. However management and unions can negotiate the procedures management uses in exercising their authority and appropriate arrangements for employees adversely affected by such authority.

73. The final NSPS regulations specifically prohibit management from negotiating over the procedures used to exercise its rights to assign work and determine the personnel by which agency operations are conducted.  In addition, the final regulation limits severely, the types of provisions that could be negotiated as appropriate arrangements. This will have the effect of erasing the current rules that the parties have negotiated to preserve the rights of employees to choose where they work and live, and preclude further negotiations.

74. Under current law, DoD reshapes its workforce and makes assignments to different hours, shifts and locations using a number of criteria, including seniority, reorganizations, transfers of function, details, and in the use of designated positions requiring travel or deployment.  In most instances, the union and management deal with these instances on a case-by-case basis.  This allows bargaining for the specific circumstance and avoids imposing a one-size-fits-all agreement.

75. Collective bargaining agreement protections include such things as the use of volunteers, followed by seniority, (as described in other sections of this paper) coupled with requirements that the work be performed by qualified employees.  (Of course, management has the right to set qualifications as it sees fit.)  In some cases,

{00212577.DOC}

there are also provisions calling for advance notice whenever possible.

76. Under NSPS, agency officials could work employees arbitrarily around the clock, or could demand a prolonged detail or deployment anywhere in the world without regard to any hardship this could cause employees or their families. They could deploy an employee whose family obligations make absence an extreme hardship even if a similarly qualified employee volunteered for the assignment.

77. In some cases, employees will be forced to make choices between family and job. DoD will be able to exercise its right to assign employees and leave any collective bargaining out of the process, including the limited procedural and appropriate arrangement requirements now in current law.

78. The consequences of eliminating bargaining for dealing with overtime policies, shift rotation, safety and health programs, flextime and compressed work schedules, deployment away from regular work locations, and other important workplace issues will likely include worker burnout, increased danger to workers in unsafe situations, and strong feelings of unfairness within work units if assignments and work schedules are not offered or ordered in a fair and consistent manner. Ultimately, the inability of the employees' representatives to resolve these matters through collective bargaining will create recruitment and retention problems for the Department, as employees find more stable positions in other federal agencies, or with state and local governments.

79. AFGE Bargaining unit employees work in air bases, army bases, offices, shipyards, ports, and other installations at more than 300 locations nationwide and around the world. Accordingly, DoD decisions to reassign employees from one location to another can have a dramatic effect on employees who can be forced to move great distances with very little notice.

{00212577.DOC}

80. Negotiated procedures and appropriate arrangements such as regular work hours, shifts and deployment provisions protect employees in several ways. They provide qualified volunteers the opportunity to perform work that is important, challenging, or even career enhancing. They also serve to minimize the adverse consequences that employees with child care or other family responsibilities would face, both practical and emotional, if they were reassigned against their wishes with little or no notice.

81. **Shift Rotation for Employees**:  In industrial DoD settings, shift work is common. Usually there are three shifts: day, evening, and graveyard.   Although an evening or graveyard shift may appear unattractive to some, others may prefer such shifts due to increased rates of pay, or because they help the worker handle child or elder care responsibilities with a spouse who works a day shift. Shift work assignment is a frequent subject for bargaining, with the union's primary focus on providing predictability and stability in workers' family and personal lives and on equitable sharing of any shift differentials (increased pay) or burdens of work performed outside the normal day shift.  Contract language often calls for volunteers first, then the use of seniority when making decisions about shift work, or provides for the equitable rotation of shifts.

82. Under current law, management is permitted to negotiate over the numbers, types and grades of employees or positions assigned to a tour of duty and is required to bargain over the procedures it uses to exercise its right to assign work, including assignments to shift rotations.

83. However, under the proposed NSPS regulation, both shift work policies in current contracts as well as the unions' right to negotiate similar provisions in the future are undermined. Specifically, DoD could issue a department or even component level

{00212577.DOC}

**0024**

policy or issuance that would negate current contract language dealing with shift work and preclude further negotiations, unless management determined that current contracts were not in conflict with the NSPS.

84. In addition, the new NSPS management rights section includes both assignment of work, and determining the employees or positions assigned to a work project or tour of duty, making this no longer a permissive subject of bargaining, but a prohibited subject. The proposed regulation goes on to specifically prohibit management from negotiating over the procedures used to exercise such rights, including assignments to shift rotations.

85. **Overtime Assignments (Article 13)**: In general, AFGE locals negotiate overtime policies using two basic premises. First, the union's interest is in having management assign overtime work to employees who are qualified to perform the work and who normally perform the work. Second, the union seeks a fair and consistent means of assigning or ordering overtime, so it is not used as an arbitrary reward or punishment. Prior to being able to negotiate the fair rotation of overtime, it is significant to note that employees filed hundreds of grievances over denial of overtime. Since procedures have been negotiated, clear, transparent, and known; these grievances have literally disappeared.

86. In negotiations, AFGE locals have requested that overtime should be first offered, then ordered. By treating overtime first as an opportunity, workers, based on their personal circumstances, get an opportunity to perform extra work for overtime pay (paid at time and a half) or compensatory time (paid hour per hour).

87. The negotiated overtime provisions are critical to employee quality of life issues. They permit employees to predict the likelihood of having to work overtime and to

make plans for off-duty family and social activity. Predictability of work hours is something that people depend upon in meeting the other obligations in their lives. It is especially important for single parent families and families in which both parents are working. Similarly, an employee who cannot attend a child's wedding, graduation, sporting event, or recital, for example, because of an unexpected overtime assignment, can never be compensated for this loss.

88. Contracts commonly require overtime to be offered to employees within specific work units, job descriptions or occupational fields to ensure employees performing the work are qualified. Additional language allows for the assignment or ordering of overtime if a sufficient number of employees do not volunteer to perform the necessary work. Normally, employee seniority is applied in determining which volunteers will receive the overtime (most senior) and reverse seniority (least senior) in ordering overtime in the absence of volunteers.

89. This basic contract language over the procedures to be used in assigning overtime provides predictability for both employees and management in dealing with workload surges that force the use of overtime in organizations. Organizations that frequently rely on overtime will usually adopt an overtime scheduling roster.

90. Under current law, the agency has the right to assign work which would include overtime assignments. However, the statute requires bargaining over procedures and appropriate arrangements for employees affected by the exercise of a management right if requested by the union. In this way, federal employee representatives have always been permitted to bargain over important issues dealing with overtime.

91. However, under the final NSPS regulations, both overtime policies in current contracts as well as the unions' right to negotiate similar provisions in the future are

{00212577.DOC}

**0026**

undermined. Specifically, management could issue a department or even a component level policy or issuance that would negate current contract language dealing with overtime procedures and preclude further negotiations, unless management determined that current contracts were not in conflict with the NSPS.

92. In addition, the new NSPS management rights section prohibits DoD managers from bargaining over the procedures they will use when exercising their management rights, which would include assigning overtime.

93. **Safety and Health Programs (Article 17):** Many provisions of Article 17 (Health and Safety) concern the agency's obligations under the Occupational Safety and Health Act and implementing Executive Orders. DOD may seek to exempt itself from these laws under NSPS, as the government did in response to the hurricanes of this fall. This would make these contractual provisions void and unenforceable, no matter how dangerous the working conditions. In addition, Section 4 of this article requires training for members of the health and safety committee. To the extent NSPS would eliminate any negotiations over training or work assignments, these protections could be eliminated.

94. Worker safety and health has always been of paramount importance to unions. Many AFGE locals representing DoD's blue collar industrial workforce have negotiated, over many years, comprehensive safety programs and often are involved in negotiated workplace safety committees with the employer. For example, today's state-of-the-art welding operations in DoD's industrial operations exist as the result of years of negotiation over workplace safety practices, personal protective equipment, training, technologies and practices, ventilation and moving to safer, newer welding practices. These practices have not only protected employees, but have saved countless DoD

dollars in the elimination of on-the-job-injuries, lost time due to accidents, improved

work processes and prevented financial losses as the result of destroyed or damaged

material and equipment.

95. Currently, safety and health matters are covered by a section of the law which allows,

at the election of the agency, bargaining over issues dealing with technology,

methods, and means of performing work.  In addition, negotiations are required over

appropriate arrangements for employees adversely affected by the exercise of

management's rights.

96. The final NSPS regulations threaten both safety and health policies in current

contracts as well as the unions' right to negotiate similar provisions in the future.

Specifically, management could issue a department or even component level policy or

issuance that would negate current contract language dealing with safety and health

policies and preclude further negotiations, unless management determined that current

contracts were not in conflict with the NSPS.

97. In addition, the new NSPS management rights section includes technology, methods,

and means of performing work, making this no longer a permissive subject of

bargaining, but a prohibited matter.  The proposal limits severely, the types of

provisions that could be negotiated as appropriate arrangements.

98. **Flextime and Compressed Work Schedules: (Article 12) :** Under chapter 61 of

Title 5, U.S. Code, which is not waived by the NSPS statute, federal employees may

work under flextime and compressed schedules.  Examples of **flextime** are 7 am to 4

pm or 9:30 am to 6:30 pm, rather than the traditional 8 am to 5 pm shift.  Examples of

**compressed** work schedules are Monday through Thursday for 10 hours per day with

Friday off, or Tuesday through Friday for 10 hours per day with Monday off, rather

{00212577.DOC}

than 8 hours per day Monday through Friday. Today's DoD installations often operate daily on a 10 to 12 hour business day meeting customer demands longer and faster than ever before in the department's history.

99. Legislation authorizing flextime and compressed work schedules was enacted to assist employees in handling job, family and community responsibilities. In addition, Congress recognized that such schedules would go a long way toward improving commuting times in crowded metropolitan areas.

100. Ensuring sufficient choices for employees and protecting the capability to perform the vital work of the department have always been the two guiding principles used in bargaining these arrangements. Currently, work schedule options include core hours, permitted changes by employees, and protections for management in ensuring completion of the agency mission.

101. Flextime and compressed work schedules are negotiated under provisions of Title 5, chapters 61 and 71, which provide that for employees in a unit represented by a union, establishment and termination of such work schedules, shall be subject to the provisions of the terms of a collective bargaining agreement between the agency and the exclusive representative. They are also subject to special removal, bargaining and impasse obligations, which are not waived by NSPS.

102. In contrast, the proposed NSPS regulations threaten flextime and compressed work schedules in current contracts as well as the unions' right to negotiate similar provisions in the future. Specifically management could issue a department or even a component level policy or issuance that would negate current contract language dealing with flextime and compressed work schedules, and preclude further negotiations, unless management determined that current contracts were not in

29

**0029**

conflict with the NSPS

103.    In addition, the new NSPS management rights section specifically prohibits

management from negotiating over the procedures used to exercise its rights and

limits severely the types of provisions that could be negotiated as appropriate

arrangements.  Both of these factors could further limit or eliminate bargaining over

alternative schedules.

104.    Other Sections are also problematic.  **Article 2 (Governing Laws and**

**Regulations**):  The DFAS contract, like many AFGE-DOD collective bargaining

agreements, restates certain provisions of existing law, primarily the provisions of

Title 5, Chapter 71.  In Article 2, Section 1 of the Agreement, the employer promised

to comply with its obligations and duties as set forth in Chapter 71.  We expect that

DoD will instruct the agency not to keep that promise, based on the elimination of

many of those rights in the NSPS regulations.

105.    In Article 2, Section 2, the provisions requiring negotiations prior to

implementing new agency regulations would be eliminated.  The Article 3 and Article

4 Weingarten protection to employees and right for the union to be represented at

formal discussions would be void.  The union's right to information in Article 4

would be curtailed by NSPS.

106.    Article 3, Section 3 and a portion of Section 4 (Employee Rights), and Article 4,

Sections 2 and 3 (Union Rights and Duties), have previously created a balance

between the employers' right to assign work and in bargaining provisions for

employee training.  Participation in employer controlled workplace committees is

clearly subject to being declared inappropriate, nonnegotiable, and not in compliance

with the provisions of NSPS.

{00212577.DOC}

**0030**

107.    Some examples in the cited collective bargaining agreement include Article 6, Section 1.B that allows training for participants serving on Labor Management Committees, Article 7, Section 3 which allows for excused absences for union representatives attending training of mutual concern and benefit, Article 9, Section 4 which allows for equal representation at meetings, and Section 5 that provides for union participation on committees.

108.    We expect wholesale exclusion of Article 26, over merit promotion procedures, application processes, reassignments, career ladder programs and temporary promotions and details, Article 27 governing the Career Enhancement Program in DFAS, Article 28 which outline procedures for conducting agency reorganizations and Articles 29 and 30 covering Reductions in Force and Transfer of Functions. All these provisions are likely to be eliminated from hundreds of DOD collective bargaining agreements.

109.    Contract provisions such as these, are core to every collective bargaining agreement/ Now, if they are not declared totally out of the now limited range of appropriate subjects for bargaining, bargaining over such critical matters may only be possible at the discretion of the Secretary of Defense.

110.    Article 6 (Labor-Management Committee) Section A requires training in interest-based, non-adversarial negotiating techniques for members of the labor-management committee. To the extent DoD considers NSPS to make all training an assignment of work issue, this provision may be eliminated.

111.    Article 22 (Video Display Terminals) Section 2C calls for rest periods for employees who operate video display terminals. To the extent NSPS would eliminate any negotiations over work assignments, this provision would be eliminated.

{00212577.DOC}

112.    Article 32 (Equal Employment Opportunity) Section 3A concerns creation of EEO Committees. Section 4B concerns training of EEO counselors. To the extent NSPS would eliminate any negotiations over work assignments, this provision would be eliminated.

113.    I am aware that the new regulations allow AFGE to negotiate with the Agency to bring remaining negotiable terms directly affected by the terms rendered unenforceable "into conformance" with the regulations and requires impasses over such negotiations to be submitted to the National Security Labor Relations Board ("NSLRB").

114.    Because of the large number of collective bargaining agreements and collectively bargained terms and conditions of employment which are likely to be declared unenforceable by the Agency, and the dramatic effect that the Agency's actions will have on the remaining portions of the Agreement, AFGE is certain to request to enter into the negotiations described in the preceding paragraph. These negotiations, including resort to the impasse resolution procedures of the NSLRB, will undoubtedly require the investment of significant time, effort, and resources by AFGE.

115.    Based on the positions the Agency has taken during the statutory meet and confer process, the Agency's commentary accompanying the regulations, and my familiarity with the Agency's approach to bargaining issues (informed through continuous bargaining activities with it over several years), I am confident that the Agency will declare unenforceable most, if not all of the matters described in this declaration. The Union's right to negotiate over any terms that are affected by those provisions is subject to the severe restrictions on negotiability imposed by the new system. It will therefore be very difficult to reach agreements on those modifications that are

satisfactory to the Union, as the scope of bargaining under the NSPS scheme is so narrow.

116.    The negotiability rules in the new regulations will require the Union to adopt a completely different approach to bargaining with the Agency. Under the federal labor statute, AFGE, other federal sector unions, and the agency-employers customarily offer packages of proposals which, if accepted, can result in a complete agreement. Under the new system, the Union's ability to make separate proposals or packages of proposals will be greatly diminished because fewer topics will be negotiable. Because there will be far fewer subjects over which the Union may bargain, the Union will have less flexibility to compromise with the Agency in reaching an agreement on those subjects. The regulations have taken so many subjects off of the bargaining table that for those few subjects over which bargaining is required, the Union will be hard-pressed to give any ground, whether in a package deal or otherwise.

117.    The regulations also grant to the Agency, the authority to implement unilateral changes in conditions of employment, even on those matters which are presently subject to collective bargaining and/or already covered by a collective bargaining agreement. This power will thwart the parties' ability to reach agreement on conditions of employment at the bargaining table. The Union will be disinclined to make any concessions at the bargaining table in exchange for concessions from the Agency, because, after the parties reach an agreement containing the concessions, the Agency would be empowered to reverse its concessions through a variety of means, including issuing a contrary directive, policy, or regulation. Under this scheme, only the Union, and not the Agency, is bound by the agreements it enters. As a result, there is little incentive for the Union to enter any agreements at all.

{00212577.DOC}

**0033**

118.    Further, the Union's ability to formulate effective bargaining strategies will be seriously impaired by DoD's reservation of authority to invalidate provisions of agreements that it subsequently finds unsatisfactory. An important part of any bargaining strategy is determining which goals are most important and trading off less important priorities to achieve those goals. Under the new NSPS regulations, the Agency grants itself the power to negate any concessions it makes at the bargaining table, even after the agreement is signed. The Union, accordingly, will always be at risk of having its bargaining strategy completely circumvented after the fact.

119.    Moreover, even if the Union is able to reach an accord with the Agency under the new rules, the resulting Agreement will not be binding on the Agency under the current collective bargaining system, because it will, by operation of the regulations, not address the bulk of the conditions that are most important to employees. Instead, these procedures and appropriate arrangements over which the Union used to negotiate with the Agency, will now be within the exclusive discretion of the Agency and beyond the scope of bargaining. As a result, if the regulations are permitted to go into effect as written, and the Union eventually wins the relief it seeks in this lawsuit, the Union and the Agency will then have to return to the bargaining table and will have to re-negotiate any agreements that were negotiated under the terms of the new regulations.

{00212577.DOC}

**0034**

120.    The new regulations will also remove the union's existing right to bargain pay in

some cases for DoD's Non-Appropriated Fund (NAF) employees (Ft Stewart

Schools) as the regulations unilaterally declare all bargaining over pay and pay

procedures non-negotiable.

I declare under penalty of perjury under the laws of the United States of America, 28

U.S.C. 1746; as shown at 5 C.F.R. Part 1201, App.IV, that the foregoing is true and correct.

BY: _____    Executed on <u>November 17, 2005</u>

Mark E. Gibson, Labor Relations Specialist    (DATE)

AFGE

Attachment: Exhibit A: DFAS MUMA OP LOC CBA, dated June 16, 1999

{00212577.DOC}