## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD H. RUMSFELD, SECRETARY, UNITED STATES DEPARTMENT OF DEFENSE, *et al.*,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>1:05CV02183 (EGS) |

## DECLARATION OF JEAN ZEILER

I, Jean Zeiler, hereby declare as follows:

1.      I am over the age of eighteen and competent to testify to the facts contained in this Declaration from my personal knowledge.

2.      I currently serve as Senior Counsel of the National Association of Government Employees, SEIU (NAGE). I am the senior attorney in the national headquarters in charge of the NAGE federal sector. I am responsible for representing NAGE in legal matters of nationwide effect, as well as local units in arbitration and in cases before federal agencies. I have served in this position since 1997.

3.      NAGE is a non-profit corporation, incorporated in the State of Delaware, and having its headquarters at 159 Burgin Parkway, Quincy, Massachusetts 02169. NAGE is the exclusive bargaining representative of 65,000 Federal employees, including about 35,000 Department of Defense (DoD) employees. NAGE represents the interests of these employees

**0333**

by, inter alia, negotiating collective bargaining agreements; arbitrating grievances under such agreements; filing unfair labor practice charges; lobbying Congress for favorable working conditions, pay, and benefits; and litigating employees' collective and individual rights in federal courts.

4.    NAGE holds national consultation rights with the DoD in accordance with 5 U.S.C. section 7113. On or about December 11, 2003, I filed a Charge Against an Agency on behalf of NAGE with the Federal Labor Relations Authority, stating the DoD failed to respond to NAGE's request for national consultation rights regarding changes to conditions of employment under the Defense Transformation for the 21st Century Act of 2003.

5.    On January 9, 2004, I spoke with an agent of the Federal Labor Relations Authority who assured me that the DoD, through Timothy Curry, Chief of Labor and Employee Relations, had provided assurances that it would comply with the law with regard to recognizing all unions with national consultation rights.

5.    According to the FLRA agent, the DoD agreed to send letters to all unions holding national consultation rights, and an additional, separate letter to NAGE regarding the Charge Against an Agency, within one week of January 9, 2004.

6.    On January 13, 2004, I spoke with Timothy Curry to confirm my address for the letters DoD was supposed to send. Mr. Curry did not mention that the DoD was planning to hold a meeting with the unions.

7.    On January 16, 2004, I spoke with an individual at the DoD by the name of Robey Hatfield and stated that I had not yet received any letter. I provided my facsimile number as well as my email address. Mr. Hatfield did not mention that the DoD was planning to hold a meeting with the unions. I did not see or receive any letter from the DoD prior to January 22, 2004.

**0334**

8. On January 22, 2004, NAGE received a letter in our Quincy, Massachusetts office from the DoD announcing a meeting to be held that same day in Washington, D.C. with the DoD and Unions. (A true copy of the letter is attached as Exhibit A). NAGE received the letter after the meeting had occurred. Since we had no prior notice, we were unable to attend the meeting.

9. The January 22, 2004 letter from the DoD stated that the purpose of the meeting with the unions was "to discuss the procedures that will be used to collaborate on the labor-relations system." The letter stated the meeting was "in compliance with the statutory requirement to begin the collaboration process within sixty days of the law's enactment." The law was enacted on November 24, 2003.

10. The DoD violated the National Defense Authorization Act for Fiscal Year 2004, Pub. L. 108-136, 117 Stat. 139 (2003), since the Secretary and Director failed to collaborate with NAGE as required within sixty (60) days after enactment of 5 U.S.C. section 9902(m)(3)(D).

11. In addition to other employee groups, NAGE represents certain employees of Non-Appropriated Fund Instrumentalities (NAFIs) within the Department of Defense (DoD). NAFI employees are entitled to negotiate pay, benefits, and other working conditions, to the extent that negotiation of such matters is not precluded by Chapter 71 of Title 5 of the United States Code. For over 24 years, NAGE has represented NAFI employees in negotiating pay, benefits, and other working conditions not specifically provided for by statute. It is my understanding that DoD is of the view that the provisions of the National Security Personnel System (NSPS) will have the effect of relieving DoD of the obligation to bargain over these matters.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 21, 2005.

Jean Zeiler

3

**0335**



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

PERSONNEL AND
READINESS

1 6 JAN 2004

Mr. David Holway, National President
International Brotherhood of
Police Officers
159 Burgin Parkway
Quincy, MA 02169

Dear Mr. Holway:

As you may know, the National Security Personnel System (NSPS) is included in Section 1101 of the National Defense Authorization Act for fiscal year 2004. Section 1101 provides for exclusive procedures to ensure collaboration with employee representatives concerning the establishment of a new labor management relations system.

This is an historic opportunity for the Department of Defense and its labor unions to collaborate together on transforming how we conduct labor-management relations, and we are excited at this opportunity.

In compliance with the statutory requirement to begin the collaboration process within sixty days of the law's enactment, the first meeting to discuss the transformation of our labor relations system will be on Thursday, January 22, 2004. The agenda for the meeting is to discuss the procedures that will be used to collaborate on the labor-relations system.

We have invited representatives from the unions with national consultation rights to the January 22nd meeting (these represent approximately 96% of the bargaining unit employees in the Department). For purposes of having representatives from the remaining unions that do not hold national consultation rights, we are requesting that two representatives from the Laborers International Union of North America (LIUNA) attend the meeting. LIUNA represents the largest number of bargaining unit employees from among the remaining unions without national consultation rights.

Although we have identified LIUNA for the initial meeting on January 22 (because they are the largest), we request that you coordinate with the other DoD unions



NAGE Exhibit A

**0336**

that do not hold national consultation rights (a list is enclosed), and develop a selection process to identify two representatives for future meetings. We request that the two representatives selected be identified to us by Friday, February 6, 2004. This information may be e-mailed to labor.relations@cpms.osd.mil.

We look forward to working with your representatives on the exciting changes that lie ahead for the Department of Defense and its employees. If you have any questions, please feel free to contact Mr. Timothy Curry at (703) 696-1450.

Sincerely,

Bradley Bunn
Director
NSPS Program Implementation Office

Enclosure:
As stated

2                    NAGE Exhibit A

**0337**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

American Federation of Government Employees, AFL-CIO, et al., )
                                                             )
                                    Plaintiffs,              )
                                                             )        Case No:
                              v.                             )        1:05CV02183 EGS
                                                             )
Donald H. Rumsfeld, Secretary,                               )
United States Department of                                  )
Defense, et al.,                                             )
                                                             )
                                    Defendants.              )

## DECLARATION OF MARK D. ROTH

1.   I am Mark D. Roth. I have been employed as an in-house attorney with the American Federation of Government Employees, AFL-CIO (AFGE) since June 1976. I have been General Counsel of AFGE since July 1983.

2.   As AFGE's General Counsel, I am the chief legal officer of AFGE and supervise a staff of 11 staff attorneys as well as dozens of attorneys on retainer to assist in specific cases.

3.   One of my duties as AFGE's General Counsel was to head AFGE's collaboration efforts with the Department of Defense (DoD) and Office of Personnel Management (OPM) to jointly develop and implement a labor relations systems in accordance with the National Defense Authorization Act for 2004, PL. 108-136, 117 Stat 139 (2003), National Security Personnel System (NSPS), 5 U.S.C. § 9902(m).

4.   The first meeting relevant to the NSPS between DoD, AFGE, and other Unions took place on Thursday, January 22, 2004, pursuant to an invitation issued by DoD dated January 16, 2004. (Exhibit A)

5.   Sec. 9902(m) of the NSPS provides that the process for "collaborating" with employee representatives "...shall begin no later than 60 calendar days after the date of enactment of this subsection." Sec. 9902(m)(3) mandates that the Secretary (of DoD) and the Director (of OPM) are the officials responsible for the collaboration process on the behalf of the United States as an employer.

**0338**

6.    On January 22, 2004, on the 60th day after enactment of NSPS, I met with approximately six DoD officials and the same number of Union officials to discuss how DoD would proceed with collaboration over a labor relation system. I asked if anyone was in attendance from OPM and was told that OPM had not been consulted on the labor relations system by DoD. I advised DoD that I believed § 9902(m) required OPM's involvement and direction to the same extent as DoD's. A DoD official, Ginger Graeber, who was heading the meeting, thanked me, but said DoD would discuss NSPS with OPM on DoD's own timetable; not mine.

7.    At the January 22, 2004 meeting with DoD, I and other Union participants expressed our commitment to a full and honest collaboration process that would lead to systematic improvements which would not be inconsistent with Ch. 71 of Title V (5 U.S.C. § 7101, et seq.), in a labor relations system tailored to DoD, such as specific time limits on bargaining. DoD agreed to provide the Unions with a document outlining its ideas and concepts for a new labor relations system.

8.    On February 26-27, 2004, DoD and OPM officials met with the representatives of approximately 25 Unions and a representative of the Federal Mediation and Conciliation Service (FMCS). I was the spokesperson for the Unions' collaboration team. DoD presented documents, one of which was entitled "Pre-Collaboration Labor Relation System Options – February 6, 2004." (Exhibit B)

9.    Accurate minutes reviewed by me were separately drafted by the Unions and DoD. They reflect that OPM had not previously been involved in the development of DoD's concept papers or the development or implementation plans for NSPS. In point of fact, OPM officials stated that they were simply "observing" and not participating in the February 26 - 27, 2004 meeting. (Exhibit C-DoD notes; Exhibit D-Union notes)

10.   The February 26–27, 2004 meetings between the Unions and DoD/OPM were highly contentious. On behalf of the Unions, I challenged the legality of OPM's lack of involvement. I also objected to DoD's stated plans to waive Ch. 71 of Title V and DoD's plan to implement a Labor Management Relations (LMR) system directly in conflict with provisions of Ch. 71. The Unions' objections were mirrored, in part by numerous members of Congress. (Exhibit E) The Unions objected to the very concept of "a pre-collaboration process" that would end with DoD taking the Unions' ideas and drafting regulations that would be published in the Federal Register with the "statutory" collaboration process beginning thereafter.

11.   DoD officials closed the February 26-27, 2004 meeting with an announcement that DoD would draft the official written proposal (in regulation form) by April 20, 2004 and would initiate the statutory collaboration process thereafter.

12.   In April 2004, no regulations were issued. Instead, authority for NSPS was moved from Ms. Graeber's direction to then Secretary of the Navy, Gordon England.

2

**0339**

13. Sporadically, throughout the summer of 2004, meetings were held with DoD, OPM, and several dozen Union officials. I did not attend every meeting, but at the meetings I attended, no proposals were exchanged, no joint collaboration over issues took place, and DoD referred to the process as "pre-statutory collaboration". In fact, both DoD and OPM officials affirmatively stated on many occasions during the summer of 2004, that the meetings with the Unions were not required by law, but were simply being "offered" voluntarily by DoD and OPM, not the collaboration required by § 9902(m). Indeed, the Unions later learned that any attempt at "collaboration" (as required by the NSPS was futile on the Unions' part, as OPM has advised DoD on March 9, 2004, to essentially ignore Union input. (Exhibit F)

14. DoD and OPM stated their intention to go into "a dark period" when all discussions with the Unions would be suspended and they would write and publish proposed regulations in the Federal Register detailing the new LMR system which would then be the subject of "collaboration" with the Unions. The Unions, including myself for AFGE, objected to this process and stated that collaboration under § 9902(m) was required prior to DoD's initial decision to publish proposed regulations in the Federal Register. DoD and OPM noted the Unions' objections.

15. On or about February 10, 2005, AFGE and other coalition members were invited to a very short briefing by DoD and OPM, regarding the fully developed proposed regulations that were to be published on February 14, 2005. No input was taken, but the limited number of participants were allowed to ask Secretary England some questions. I asked Secretary England if he would characterize the employee organizations as having had any meaningful participation in the "development" of this new system and he replied, "No." He admitted that there had been working groups that did not include any representation from any employee organization (referred to by the Unions as "secret groups) and that they had developed the regulations. No employee representative had ever been given any opportunity to participate or comment on any stage of the development of the regulations with the working groups who actually developed the new system prior to the developed system being published in the Federal Register on February 14, 2005.

16. Meetings among OPM, DoD, and the Unions were resumed in March 2005, after publication of the NSPS proposed regulations by DoD.

17. As AFGE's General Counsel, I was also lead on the AFGE's "meet and confer team" involving the Department of Homeland Security (DHS) new performance management, pay, appeals, and labor relations regulations developed with OPM under the authority of the Homeland Security Act (HSA). The HSA does not have any provision comparable to the specific meet and confer process set out in § 9902 (m) for developing and implementing a labor relation system. The HSA also provides for a total waiver of Ch. 71. At DHS, discussions over a new labor relations system were part of one single 30-day meet and confer process that included pay, performance management, and employee appeals. Because there was no provision analogous to § 9902(m) in the HSA, unlike our objections in the instant case, the

3

**0340**

Unions did not object to the meet and confer process for DHS's regulations taking place after the proposed regulations were issued and being combined with the other three human resource areas.

18. The DoD/OPM meet and confer process began in May of 2005 and ended on or about June 2, 2005. At the first meeting, the Unions asked the DoD Deputy under Secretary for Personnel, Charles Abell (who was chairing the meeting), whether DoD and OPM would provide the Unions, as required by law, a separate 30-day period to collaborate specifically on labor relations, either without reference to the proposed regulations or even working from the regulations. Mr. Abell stated that there would be only one 30-day process for everything – appeals, pay, performance management, and labor relations. The Unions advised Mr. Abell that the Unions did not waive their legal objections to DoD's interpretation of § 9902(m)'s requirements. Mr. Abell said he understood that the Unions were not waiving any of their rights by continuing discussions.

19. When the parties began to discuss labor relations, the Unions presented packages of proposals that were different from existing Ch. 71 labor relations processes but not inconsistent with the express requirements of Ch. 71. Two areas for discussion which were inconsistent from Ch. 71 involved "national level bargaining" (§ 9902(g)) and "independent third party review" (§ 9902(m)(b)) because Congress specifically provided that DoD could only depart from Ch. 71 as "specified" (§ 9902(d)) and only specifically provided the two areas listed above.

20. On May 9, 2005, the Unions asked Deputy Under Secretary Abell for feedback on their labor relations proposals in order to begin to make progress in the meet and confer/collaboration process. Mr. Abell stated that it served little purpose to discuss the Unions' proposals on scope of bargaining and objections, and inconsistencies with Ch. 71 because the proposed regulations represented the Administration's position on labor relations and, "It is a hard one for us, or at least me, to understand if there is room . . . to find some middle ground" due to "the fairly rigid position and Administration has taken on this so far…" After Mr. Abell's comments, discussions on labor relations progressed no further during the 30-day period.

21. After a brief meeting with Acting Deputy Secretary England and Acting OPM Director Blair on June 16, 2005, Mr. England ultimately advised the Unions that DoD had no intention of further changing any portion of its proposed labor management as a result of the Union objections, proposals or concerns.

4

22.    Since the June 16, 2005 meeting, no further official meetings or substantive communications have taken place between the Unions and DoD/OPM on the DoD LMR program.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 17, 2005.

_____

Mark D. Roth
AFGE General Counsel

**0342**

**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

PERSONNEL AND
READINESS

16 JAN 2004

Mr. John Gage
National President
American Federation of Government Employees
80 F Street, NW
Washington, DC 20001

Dear Mr. Gage:

I am inviting you to a meeting concerning the establishment of a new labor relations system for the Department of Defense. As you may know, the National Security Personnel System (NSPS) is included in Section 1101 of the National Defense Authorization Act for Fiscal Year 2004. Section 1101 provides for exclusive procedures to ensure collaboration with employee representatives concerning the establishment of a new labor relations system.

This is an historic opportunity for the Department of Defense and its labor unions to work together on transforming how we conduct labor-management relations, and we are excited at this opportunity.

This first meeting to discuss the labor relations system will be on Thursday, January 22, 2004, from 1:00 p.m. to 4:00 p.m. This meeting will take place at the Civilian Personnel Management Service (CPMS) offices in Arlington, Virginia. Directions to CPMS are enclosed for your information. The purpose for the meeting is to discuss the overall process that we will use to collaborate on the design of the new labor-relations system.

Due to space limitations, we request that you limit your representatives to two individuals. We request that you identify your representatives to us by Tuesday, January 20, 2004. This information may be e-mailed to labor.relations@cpms.osd.mil.

Exhibit A

0343

We look forward to working with you on the exciting changes that lie ahead for the Department of Defense and its employees. If you have any questions, please feel free to contact Mr. Timothy Curry at (703) 696-1450.

Sincerely,

Bradley Bunn
Director
NSPS Program Implementation Office

Enclosure:
As stated

# DIRECTIONS TO CIVILIAN PERSONNEL MANAGEMENT
## SERVICE (CPMS)

CPMS is located at 1400 Key Boulevard, between Oak and Nash Streets, in Rosslyn, Virginia; two blocks from the Rosslyn METRO Station. Specifically, exit the subway station by taking the steep escalator up to the street level. At the top of the escalator you want to exit to your right out through the turnstiles. You will immediately see another escalator (much shorter). Take this escalator up. At the top, turn left and then take some stairs up to the Skywalk. Follow the walkway, which goes over Ft. Myer Dr. and Nash St. You will pass a church on your right just before you cross Nash. At the church, go up the stairs (not down). Straight ahead you will see two glass doors. This is the CPMS building, 1400 Key Blvd. Go through these doors and follow the hallway along to the marble lobby. The elevators will be on your left. You are on Level B. Take the elevator up to Level A. When you exit the elevator, follow the signs directing you to the Texas and California Conference Rooms. At the doorway, ring the buzzer if someone is not there to provide access. Once inside this secure doorway, the California Room is the first room on your right. Enter through this doorway.

Detailed directions to FAS from, METRO, airports, major arteries and popular locations are provided at the following website: http://www.cpms.osd.mil/fas/benefits/directions/be_dir.htm, as well as a list of nearby hotels and restaurants.

If you cannot access the website above or require any assistance locating CPMS, please contact Ms Shannon W. Schmidt at commercial (703) 696-6301, extension 462.

# National Security Personnel System
## Pre-Collaboration Labor Relations System Options

### Introduction
This document outlines concepts that the Department of Defense (DoD) has developed as part of the beginning of the collaborative process of designing and building a new labor management relations system for DoD civilian employees.

### Purpose
The concepts in this table represent descriptions of potential elements of a new labor relations system that the Department of Defense could adopt. The system concepts described are not necessarily all-inclusive, but represent the major elements of what could be adopted. These proposed ideas do not represent any decision of the Department of Defense on the content or details of a new labor relations system. The Department will consider these options, as well as ideas and concepts provided by the various exclusive representatives prior to drafting the system proposal, which will be provided at a later date to begin the official collaboration process.

### Next Steps
As agreed to in our meeting on January 22, 2004, DoD union representatives will provide an outline of their ideas and concepts for a new labor relations system by February 23, 2004, followed by meetings on February 26 and 27, 2004, to discuss these proposals. The Department looks forward to receiving input from the union representatives, and anticipates a meaningful interchange on our respective concepts.

NSPS Labor Relations Outline
February 6, 2004

Exhibit B

# OUTLINE OF PROPOSED NSPS LABOR RELATIONS SYSTEM CONCEPTS

| SYSTEM ELEMENTS | DESCRIPTION OF PROPOSED CONCEPTS |
|---|---|
| **1. Labor Relations Administration**<br><br>(Who will resolve labor-management disputes?)<br><br>*Guiding principle: Establish an independent third party that provides for an efficient and streamlined resolution of disputes and appropriately balances the Department's national security mission and employee and union rights.* | • Establish a Defense Labor Relations Board (DLRB) to make final published decisions as the independent third party.<br>• DLRB operates with independence and autonomy within the Department.<br>• There will be 5 to 7 members on the DLRB with some members nominated by the unions.<br>• DLRB will also adjudicate employee appeals in the NSPS appeals process. |
| **2. Employee Rights**<br><br>(What rights will bargaining unit employees have?)<br><br>*Guiding principle: Provide fairness and equity concerning labor organizations' obligations to represent bargaining unit employees who choose not to become dues paying members.* | The NSPS Labor Relations System ensures that employees may organize, bargain collectively as provided for in NSPS, and participate through labor organizations of their own choosing in decisions that affect them, subject to the provisions of NSPS.<br><br>**PARTICIPATION IN LABOR ORGANIZATIONS**<br><br>• Establish a fee-for-service arrangement (bargaining unit members not required to join union).<br>• Non-dues paying bargaining unit members must pay a fee-for-service for any union representation provided on individual representation.<br>• Fees would be determined by unions. |

NSPS Labor Relations Outline

**3. Bargaining Units**

(What are appropriate bargaining units and how are disputes over the make up of bargaining units resolved?)

*Guiding principle: Establish criteria for determining appropriate bargaining units that provides for collective bargaining balanced against considerations of agency mission and organizational structure allowing for more effective and efficient dealings between labor and management.*

- Bargaining Unit coverage determinations are based on a standard that the bargaining unit provides for collective bargaining AND efficient and effective administration of the mission of DoD and its Components.

- Bargaining units may be described in terms of command structure, geographic location, and/or Component.

- When there is a disagreement on the status of the bargaining unit (as it meets the defined standard), the parties may submit to the DLRB to make unit determinations, make determinations on bargaining unit status, and oversee the local election processes using the most efficient method available for the ballot process.

- When elections are required for new or existing bargaining units, more than 50% of potential or existing bargaining unit members must participate in a vote with over 50% of actual bargaining unit votes cast in favor of union representation or the bargaining unit.

- An outside third party could participate in decisions on a case-by-case basis on sensitive or significant cases and if invited to participate by the DLRB.

NSPS Labor Relations Outline

| | |
|---|---|
| Bargaining Units – Continued | Bargaining units may not include the following categories of employees:<br>• management officials;<br>• supervisory employees (including supervisors of military members);<br>• work leaders;<br>• confidential employees;<br>• human resources employees (to include clerical);<br>• employees performing intelligence or counter-intelligence, investigative, and security work that impacts or affects in a significant way DoD physical, personnel, and information security;<br>• Attorneys;<br>• Employees on time limited appointments of 2 years or less;<br>• Students;<br>• Professional employees and employees requiring certification (i.e. DAWIA, accountants, teachers) (unless a majority of the employees vote for inclusion in the unit).<br>• Employees engaged in administering the provisions of NSPS labor relations regulations. |
| **4. Union Dues**<br><br>(What will the process be for collection of union dues?)<br><br>*Guiding principle: Provide a mechanism that allows for efficient collection of union dues balancing considerations of impact on unit employees and agency resources utilized to collect such dues.* | • Retain current union dues allotment collection procedures (dues allotments through payroll deductions) with the following changes:<br>  ○ Bargaining unit employees may cancel dues at any time after one year has passed since initial dues allotment commenced.<br>  ○ Management will not be held fiscally responsible for administrative errors related to dues withholding.<br>  ○ Disputes between the union and union members concerning dues are not included in any agency complaints procedures. |

| | |
|---|---|
| **5. Duty to Bargain**<br><br>(When is management obligated to bargain?)<br><br>*Guiding principle: Provide for collective bargaining that allows the parties to collaborate by focusing bargaining on issues of significant impact and ensuring that critical agency resources are used in a constructive manner.* | **General requirement:** Bargaining shall be accomplished in good faith. Both parties must give due consideration to each other's concerns, interest, and perspectives.<br><br>Under the NSPS labor relations system, collective bargaining means the use of a collaborative, issue-based approach where the parties have a mutual obligation to consult on matters concerning conditions of employment.<br><br>**Duty to Bargain – Management Initiated Changes** (*When must management bargain on changes to conditions of employment initiated by management?*)<br><br>• Bargaining is required when management makes changes to conditions of employment that have a significant impact on the bargaining unit.<br>• "Significant" will be clarified in NSPS labor relations regulations.<br>• As a point of information, but not to imply bargaining rights, the exclusive representative will be informed of changes to conditions of employment that do not have a significant impact on the bargaining unit.<br><br>**Duty to Bargain – Union Initiated Changes** (*When must management bargain on changes to conditions of employment proposed by the union and not initiated by management?*)<br><br>Union initiated bargaining occurs on matters significantly affecting conditions of employment for the bargaining unit and not covered by existing policies or national level bargaining unless conditions are substantially altered by new events or circumstances. |

NSPS Labor Relations Outline

## 6. Scope of Bargaining

(Once a duty to bargain is established, what are the parameters of what must be bargained?)

*Guiding principle: Simplifies the parameters of what must be bargained when collective bargaining does occur by eliminating complex and confusing legal standards that have resulted in extensive disputes and litigation.*

**AGENCY REGULATIONS** – Existing and new DoD-wide and Component-wide regulations, policies and other similar issuances will supersede any conflicting provisions of collective bargaining agreements and past practice issues.

**MANAGEMENT RIGHTS –**

- Management retains the right to take whatever actions may be necessary to carry out the agency mission during emergencies or for national security reasons (not subject to any bargaining obligations prior to implementation).

- Management retains existing rights, and also has the right to:

  a) Determine cash awards & incentives
  b) Determine performance ratings and payouts
  c) Set pay
  d) Determine pay and allowances, and differentials
  e) Offer VERA/VSIP
  f) Make FLSA determinations

The exercise of these rights is subject only the NSPS bargaining process.

NSPS Labor Relations Outline

### 7. Bargaining Processes – At the Level of Recognition

(When there is a duty to bargain, what processes are used to meet this obligation?)

*Guiding principle: Provide for an efficient and effective local bargaining process that balances the need for a meaningful exchange of interests and concerns and the need to accomplish mission requirements in a timely manner.*

Bargaining is accomplished through a form of local "consultation" with the exclusive representative when there is a "duty to bargain" on a matter and the union has timely requested to bargain.

Consultation is a form of collective bargaining that is an issue-based process of collaborating over changes to conditions of employment that have a significant impact on the bargaining unit. Consultation affords the employee representatives and management the opportunity to have a meaningful exchange of views in an attempt to reach agreement on the resulting policy document that is issued.

- Immediate implementation for emergencies and national security with post-implementation consultation.
- Consultation process in all cases lasts no more than 60 calendar days (notification period and consult period combined). If no agreement is reached after good faith efforts (within the time limits provided), management may implement the proposed changes.
- A copy of any resulting policy will be provided to the union(s) with the reasons for taking the final action.
- Post-implementation consultation may continue by mutual agreement.
- Union will have opportunity to seek a review of procedural compliance with the DLRB. There are no status quo ante remedies.

NSPS Labor Relations Outline

| 8. Bargaining Processes – Above the Level of Recognition (National Level Bargaining) | National level bargaining replaces both the traditional national consultation process and local bargaining on the issue. National level bargaining can occur at the DoD level on DoD policy changes or at the Component level on Component level policy changes not covered at the DoD level. |
|---|---|
| (When there is a duty to bargain, what processes are used to meet this obligation?) | |
| *Guiding principle: Provide for an efficient and effective national level bargaining process that streamlines bargaining on Department-wide and Component-wide issues and allows for a meaningful exchange of interests and concerns balanced with the need to accomplish mission requirements in a timely manner.* | Such bargaining is accomplished through a form of consultation with the exclusive representative when there is a duty to bargain on a matter and the union has timely requested to bargain. National level bargaining will use the same process as the local bargaining. |

0353

NSPS Labor Relations Outline

**9. Union Rights and Obligations**

(What rights does the union have when representing bargaining unit employees and what are its obligations when doing so?)

*Guiding principle: Provide simplified criteria of union rights and obligations that ensure the union may represent the interests of the bargaining unit balanced with effective and efficient accomplishment of mission requirements.*

**UNION PARTICIPATION IN MEETINGS WITH EMPLOYEES**

*Formal Discussions (Addresses exclusive representative's independent right to be present at certain discussions held with bargaining unit employees)*

- Retain the "formal discussion" concept with modifications:
  ○ Management will invite the union to meetings where it is known in advance that there will be a discussion of changes in general conditions of employment having a significant impact on the bargaining unit.
  ○ Any matters concerning any employee complaint(s) will not be considered a formal discussion. There is no automatic right for union attendance at such meetings. However, employees may invite union attendance.
  ○ Witness preparation or interviews will not be considered a formal discussion in any formal complaint process.
  ○ No portion of the EEO process will be considered a formal discussion in any administrative or statutory process.

0354

NSPS Labor Relations Outline

## Union Rights and Obligations – Cont'd

**Investigations (a.k.a. Weingarten rights)** *(Addresses exclusive representative's right to be present at certain investigatory meetings with unit bargaining unit employees)*

- Employees have a right to union representation during management investigations (and the employee reasonably believes will result in discipline and requests representation); however, management may limit delays to investigations awaiting union representation. This determination is based on geographic location of closest steward, security, health, safety, and integrity of the interview process.

- Unions do not have a right to be present during investigations by CID, AFOSI, DCIA, NCIS, DCIS, IG, and similar investigative organizations.

- Conflicts of interest will be considered a reason for disapproval of a particular union representative's involvement.

## UNION ACCESS TO INFORMATION MAINTAINED BY THE AGENCY

The Freedom of Information Act (FOIA) procedures will be used as the method for union requests for information.

## UNION DUTY TO REPRESENT BARGAINING UNIT EMPLOYEES

- The union has the right to not represent a bargaining unit member if a fee is required and not received. If a fee is received, the union must fairly and competently represent the member.

- Failure by the union to adequately adhere to this provision will not result in the reversal of any management action.

10



**10. Official Time**

(What duty status is the union representative in while representing an employee or the bargaining unit during duty hours?)

*Guiding principle: Simplify the criteria for when official time may be granted minimizing disputes between labor and management on official time use.*

- Official time is available only for designated uses as specified below with advance approval by the appropriate supervisor.
- Designated uses for official time:
  - Consultation (negotiations)
  - Preparation time for consultation (negotiations)
  - Presentation of labor disputes
  - Management initiated meetings
  - For other situations as requested by the union and approved by management at its sole and exclusive discretion.

**11. All Inclusive Complaints Review**

(What dispute process will management, unions and employees use?)

*Guiding principle: Streamline and expedite processing of complaints providing for quicker resolution of labor disputes.*

**Employee Individual Complaints**

Under NSPS, employee complaints (currently filed under negotiated grievance procedures, administrative grievance procedures, and the statutory MSPB appeals process) are consolidated into a new NSPS appeals system.

**Local Union and Management Complaints** (in lieu of union and management grievances filed under negotiated grievance procedures or unfair labor practice charges).

- An alleged violation of NSPS labor relations regulations is appealable to DLRB, with a copy furnished to charged party.
- These complaints must be filed within 15 calendar days of the event or the date the charging party became aware of the event.

11



NSPS Labor Relations Outline

## All Inclusive Complaints Review – Cont'd

In addition –

- An alleged violation of the local application of agency policy is reviewable by an appropriate management official as determined by the Component or designee or by an appropriate union official if a management initiated complaint.
- The complaint process lasts no more than 30 calendar days (time to file and time to make decisions). This will not preclude extension of individual time limits as necessary.
- Decisions in the complaint process are final and binding unless mediation is invoked by either party.
- The DLRB may do a limited, substantive review of the original complaint decision.

### Bargaining Unit Employee Complaints Against the Union

- A complaint by a bargaining unit member against the exclusive representative will be filed with the DLRB with a copy furnished to charged party.
- These complaints must be filed within 15 calendar days of the event or the date the charging party became aware of the event.
- Decisions on these complaints will not direct the taking of any action by management.

### National Level Management and Union Complaints

- Alleged procedural violations at the national level of the NSPS labor relations regulations are appealable to the DLRB, with a copy furnished to charged party.

These complaints must be filed within 15 calendar days of the event or the date the charging party became aware of the event.

12

0357

NSPS Labor Relations Outline

## MISCELLANEOUS ISSUES

*Guiding principle:  Establish a collaborative, issue-based approach to bargaining while minimizing disruption to existing policies and collective bargaining agreements when transitioning to the NSPS labor relations system.*

*Guiding principle:  Provide the parties a single, streamlined labor relations system that is effective and efficient.*

*Guiding principle:  Ensure that the Department's national security mission is accomplished without disruption due to labor disputes.*

## Term Collective Bargaining Agreements

- Provisions in current term collective bargaining agreements at the time NSPS is implemented will remain in effect until they expire or their current rollover expires except:
  - When there is a conflict with existing or subsequently issued NSPS, DoD, or Component regulations; or
  - When there is a conflict with other laws or government-wide regulations.

- No term collective bargaining agreement can be renewed, rolled-over or negotiated at the time NSPS is implemented.

- Provisions in expired term collective bargaining agreements may continue until they are replaced by policy or regulations issued at any level subject to the consultation process.

## Status of 5 USC Chapter 71

The new NSPS labor relations system will not employ any provisions of 5 USC Chapter 71.

## Prohibition on Striking

It will be a violation of NSPS regulations for employees or labor unions to call or participate in a strike, work stoppage, or slowdown, or picketing of an agency in a labor-management dispute if such picketing interferes with an agency's operations.  It will be a violation of NSPS regulations for a labor union to condone any activity described above by failing to take action to prevent or stop such activity.

0358