# Congress of the United States
## Washington, DC 20515

February 25, 2004

The Honorable Donald H. Rumsfeld
Secretary of Defense
U.S. Department of Defense
The Pentagon
Washington, DC 20301

Dear Mr. Secretary:

We are writing to express our serious concerns about a proposal for a new Department of Defense (DoD) labor relations system that was distributed to congressional staff on February 6, 2004.

The National Defense Authorization Act (NDAA), which was passed by Congress last November, provided that DoD could not waive Chapter 71 of Title 5 of the U.S. Code.[1] Chapter 71 sets forth the right of employees to join unions, the right of unions to bargain collectively, the duty of unions and management to bargain in good faith, the determination of appropriate bargaining units, and protections against unfair labor practices. However, the NDAA also allowed DoD to set up a new labor system for the next six years "to address the unique role that the Department's civilian workforce plays in supporting the Department's national security mission."[2] Through these two provisions of the NDAA, Congress intended that DoD protect the basic employee rights contained in Chapter 71, yet allowed DoD to modify the procedures for resolving labor-management disputes for the next six years. However, any such modifications would have to be consistent with Chapter 71 in furtherance of the Department's "national security mission."

Notwithstanding Congress' desire to balance employee rights and DoD's need for flexibility, we believe the recent DoD proposal abrogates the essential principles of Chapter 71 and goes well beyond what Congress intended in the NDAA. The DoD proposal effectively eliminates collective bargaining by providing only perfunctory "consultation" followed by unilateral implementation. This is not good-faith collective bargaining. It is noteworthy that the DoD proposal states that the new labor relations system "will not employ any provisions of 5 USC Chapter 71."

The details of the DoD proposal contain wholesale changes to the current federal employee labor relations system, including changes to internal union procedures, which have no relation to the Department's national security mission. These changes appear to be aimed solely at making it more difficult for employees to join unions. Such changes undermine the Civil Service Reform Act of 1978, which plainly stated that the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in

---

[1] National Defense Authorization Act for Fiscal Year 2004 (P.L. 108-136), § 9902(d)(2).

[2] Id. at § 9902(m) (emphasis added).

Exhibit E

The Honorable Donald H. Rumsfeld
February 25, 2004
Page 2

decisions which affect them safeguards the public interest and contributes to the effective conduct of public business.

Among the most significant changes sought by DoD are:

- DoD can unilaterally decide what personnel changes are "significant" enough to be subject to collective bargaining;

- DoD is required to engage only in "consultation" with unions over proposed personnel changes. If DoD and its unions cannot reach agreement, the Department can unilaterally implement the personnel changes and cut off all post-implementation negotiations;

- DoD can unilaterally issue regulations to supersede existing collective bargaining agreements negotiated by the Department and its unions;

- Large numbers of DoD employees — including some clerical employees, some professional employees, attorneys, and term-appointment employees — will be prohibited from joining unions;

- DoD can establish unrealistic requirements for the creation of a new bargaining unit;

- DoD is absolved of all liability should it mishandle union dues withheld from employee paychecks; and

- DoD can interfere in internal union procedures by requiring unions to provide a new fee-for-service arrangement for employees who do not wish to join unions but would like union representation on specific matters.

We believe the DoD proposal is also contrary to Congress' intent in other respects. The NDAA stated that the establishment of the new DoD personnel system must be "prescribed jointly with the Director" of the Office of Personnel Management (OPM). Based on our conversations with OPM officials, we understand that OPM has played only a minor role in the formulation of this proposal.

In addition, the NDAA states that any labor relations system developed by DoD must provide for "independent third party review of decisions."[3] Under the DoD proposal, this review would be provided by a newly created Defense Labor Relations Board (DLRB) that would be located within the Department and whose members would be selected solely by the Secretary. We do not see how such a system could possibly be "independent."

---

[3] Id. at § 9902(m)(6).

The Honorable Donald H. Rumsfeld
February 25, 2004
Page 3

We understand that the proposal provided to congressional staff is only an initial proposal and may be modified after consultations with employee groups. However, we strongly urge the Department to withdraw this proposal immediately and submit a new proposal that is consistent with the intent of Congress.

Sincerely,

Henry A. Waxman
Ranking Minority Member
Committee on Government Reform
U.S. House of Representatives

Joseph I. Lieberman
Ranking Minority Member
Committee on Governmental Affairs
U.S. Senate

Ike Skelton
Ranking Minority Member
Committee on Armed Services
U.S. House of Representatives

Carl Levin
Ranking Minority Member
Committee on Armed Services
U.S. Senate

Richard J. Durbin
Ranking Minority Member
Subcommittee on Oversight
of Government Management,
the Federal Workforce, and
the District of Columbia
Committee on Governmental
Affairs
U.S. Senate

Daniel K. Akaka
Ranking Minority Member
Subcommittee on Financial
Management, the Budget,
and International Security
Committee on Governmental
Affairs
U.S. Senate

Danny K. Davis
Ranking Minority Member
Subcommittee on Civil Service
and Agency Organization
Committee on Government
Reform
U.S. House of Representatives

0403



## United States Office of Personnel Management
### Office of the Director
1900 E Street, NW, Room 5A09
Washington, DC  20415
Telephone:  (202) 606-1000
Main Office of the Director Fax:  (202) 606-4489
Office of the Deputy Director & Chief of Staff Fax:  (202) 606-2183
General Fax: (202) 606-2573

**To:  The Honorable Donald Rumsfeld, Sec/Def  Date: 3/9/04**

**Fax #: 703-697-9080_____          Pages: _4__, Including Cover Sheet**

**From:  _Kay Coles James, Director, OPM_____**

- ☐ Director, Kay Coles James
- ☐ Deputy Director, Dan G. Blair
- ☐ Chief of Staff, Paul T. Conway
- ☐ Deputy Chief of Staff, Amber Roseboom
- ☐ Special Assistant, Ruthie McGinn
- ☐ Scheduler, Isabel Milan
- ☐ Secretary to the Director, Jackie Cunningham
- ☐ Secretary to the Deputy Director, Blondell Darby
- ☐ Secretary to the Chief of Staff, Betty Castro

**Subject:  NSPS Comments**
_____

**Comments:**_____
_____
_____
_____
_____ _"Working for America"_

Exhibit F

# SECFILES FULL RECORD DETAIL

Print Date:  3/10/2004

DOCUMENT TYPE:  INCOMING

OSD CONTROL  OSD 03533-04        DOC 3/9/2004        DOR 3/10/2004       SIGNATURE CASE:

FROM OPM JAMES                          TO SECDEF

SUBJECT    PROPOSED PAY AND STAFFING COMPONENTS OF THE NATIONAL SECURITY PERSONNEL SYSTEM
           (NSPS)

KEYWORDS

COMMENTS

PN                              SEC  U        OCN

REFERENCE DOCUMENTS

STATUS CODE        DECISION        DECISION DATE              PRIORITY ACTION REPORT:

AGENCY UPR    ACTION ASSIGNED   RDC  SUSPENSE  3/16/2004    DOC SUSPENSE: 3/23/2004

SUSPENSE COMPLETE           ACD              COORDINATION GC

PAGES 4           ENCLOSURES 1                              PACKAGE VIEW:

SUSPENSE STATUS                                             INCOMING

                                        CREATED BY:   barnwell

DISTRIBUTION: OFFICE  COPIES
              ES      RWI
              ADC     RWI
              LA      E
              ESR     RWI
              UPR     E
              USC     E
              ADM     RWI
              SN      E
              DSD     RWI
              GC      RWI

1

@002



**OFFICE OF THE DIRECTOR**

UNITED STATES
OFFICE OF PERSONNEL MANAGEMENT
WASHINGTON, DC 20415-1000

March 9, 2004

The Honorable Donald H. Rumsfeld
Secretary of Defense
The Pentagon
Washington, DC  20301-1155

Dear Mr. Secretary:

On February 25, 2004, we received the proposed pay and staffing components of the National Security Personnel System (NSPS) for Office of Personnel Management (OPM) review. We were asked to complete that review and provide comments by March 9, 2004. I know how critical this effort is to you and the Department, and I want to ensure that we in OPM do our part as members of the NSPS team. My staff has no higher priority, and in an effort to provide you with as much support as we could within that limited time frame, I have attached an initial set of detailed policy and technical comments based upon our preliminary analysis of the proposal. As we continue to work together in this historic endeavor, we will be providing additional analysis, guidance, comments, and recommendations.

I trust that you can appreciate that since this is our first opportunity to, in any way, review the Department's concepts or proposal, our staff experts have identified a broad range of legal, policy, and technical issues that need to be addressed. In addition, we have a number of concerns about the impact of the proposal on other Federal agencies, particularly the Department of Homeland Security (DHS). Many of these issues have profound tactical and strategic implications for the Department of Defense (DoD), OPM, and the Administration, and I would like to call the most critical of them to your immediate attention.

First, the NSPS proposal significantly diminishes veterans' preference, contrary to the express policy of the President, and what I believe to be your intent. For example, the proposal eliminates protection for veterans affected by reduction-in-force (RIF), unless they have the most severe of service-connected disabilities. Compared to current law, it also diminishes hiring preference for even the most severely disabled veterans. Finally, the proposal eliminates every veteran's right to a pre-termination notice and hearing after one year of Federal service; instead, it treats veterans and non-veterans alike, requiring both to have at least three years of service before such rights accrue. In this latter regard, you should know that the Administration struck a similar proposal in the draft regulations initially developed for DHS because it could have been construed as diminishing the protections accorded those who have served our Nation.

Second, the NSPS proposal undermines the Administration's efforts to modernize the Federal civil service, and in particular, the Department of Homeland Security's personnel system. Thus, although the pay and performance management provisions of the proposal do offer some improvements over the law and regulations that govern most Federal

2

OSD 03533-04    CON 131-E September 2

0406

employees, they do not take full advantage of the flexibilities afforded DoD. This is in sharp contrast to the proposed DHS personnel system, and as a result, the NSPS proposal may give congressional and union critics ammunition to pressure DHS to "pull back" on the more far-reaching and innovative elements of its proposed personnel system.

For example, unlike the pay system proposed by Homeland Security, the NSPS proposal remains firmly tied to the General Schedule, a scheme we all know to be outdated and obsolete, and it fails to move the Department to greater occupational and local labor market precision in matching Federal pay to the private sector. In addition, the NSPS proposal continues to require rigid employee performance standards and lengthy improvement periods as the means for dealing with poor performers, and may even grant additional procedural protections in this regard; in comparison, the DHS system dramatically streamlines and simplifies that process, reducing the managerial burden rather than raising it.

Third, while provided to us under separate cover and not part of our attached comments, the Department's labor-management relations proposal also warrants your reconsideration. That proposal was distributed to the Department's unions on February 27, amid much controversy and criticism; it too was developed without any prior OPM involvement or union input, and the unions' negative reaction was both predictable and public. We strongly support the objective of assuring DoD's discretion to act without being burdened by collective bargaining obligations; such discretion is both needed and justified for national security reasons and is similar to that provided by the proposed DHS regulations. However, we believe the proposal may be contrary to law, insofar as it attempts to replace collective bargaining with "consultation" and eliminate collective bargaining agreements altogether. In addition, other elements of the proposal – for example, those dealing with union elections and dues withholding – lack a clear and defensible national security nexus and jeopardize those parts that do.

Finally, perhaps the most important issue raised by the NSPS proposal is a legal one, but that issue also has profound strategic and tactical implications for the future of the system itself. As you know, the law requires that NSPS be established by "regulations jointly prescribed" by the Secretary of Defense and the Director of OPM. I have maintained from the beginning that this means the joint publication of broad, proposed NSPS regulations in the *Federal Register*; the opportunity for the public to review and comment on their content; the involvement of labor unions through the formal collaboration process set forth in the law; and their final issuance as a chapter in the Code of Federal Regulations (CFR). All of these steps can be accomplished within the time frames you have established, and in the end, such an approach gives you far more flexibility and freedom of movement than the one that is currently being pursued by DoD.

Mr. Secretary, this is not a case of form over substance. Failure to execute correctly could undermine everything we are trying to achieve with NSPS. I understand that your staff believes this to be a matter of policy and not simply a legal question. I agree. The attorneys at OMB and OPM have concluded that the language in the law is clear and unambiguous on this point, and so is congressional intent. I believe the merits of the approach I have described are equally compelling. In point of fact, the issuance of broad "enabling" regulations will give you far more internal flexibility as you implement NSPS.

3

0407

Once those enabling regulations are published in the CFR, you will be in a position to issue as many standardized, detailed internal NSPS implementing directives as and when you see fit, including the document you have provided us for comment – generally *without* further public comment, formal collaboration with unions, or OPM approval.

In contrast, if issued in its present form, the NSPS proposal will be as rigid and inflexible as the system we are trying to transform. Its excessive and unnecessary detail, once locked in regulation, will be extremely difficult to change. By law, each time DoD needs to modify its content in *any* substantive way, it will be required to invoke the statutory union notification and collaboration process, obtain formal OPM approval, and notify Congress. Surely this is not the result you intended; it certainly is not what we envisioned when we fought for NSPS.

So that our choices are clear in this regard, I have asked my staff to prepare, as an example, a draft set of broad enabling NSPS regulations for our consideration by the end of this week. These draft regulations will be designed to establish the parameters for far more detailed internal DoD directives governing compensation, classification, and performance management – in short, just the sort of highly detailed internal operating directives that you have provided us for comment. Once enabling regulations are issued, you would be free to make those internal directives as uniform or as flexible as you see fit; for example, to the extent that those internal directives need to be tailored to address the unique needs of a particular military department or functional community within DoD, you could do so without triggering the cumbersome procedures established by the statute.

Thus, while the law supports the approach I have advocated, I also believe that it makes the best sense from a tactical and strategic standpoint. It also offers one other important advantage. By starting with broad, enabling regulations, we are in a better position to involve and engage critical stakeholders, especially the Department's civilian employees, in a far more substantive and meaningful way. At the risk of stating the obvious, their input and "buy in" is essential to the successful implementation of NSPS, and presenting the workforce with what amounts to a fait accompli, crafted with only token employee involvement, will just serve to provoke even more resistance from those who are most crucial to its success. I certainly intend to conduct such communications and outreach to better inform OPM's input to DOD. However, I firmly believe it would be far better for DOD and OPM to conduct this process together so that the overall Administration is reaching out.

I have noted the high level of concern already expressed by congressional oversight committees and by affected stakeholders and constituent groups monitoring our progress. It is therefore vital to the Administration and our respective agencies that we develop and execute a joint strategy that maximizes the chances for successful NSPS implementation. While a great deal of emphasis has been placed on implementation deadlines, not enough attention seems to be focused on the fundamental efficacy of the proposal and its acceptance by the Congress and DoD's civilian workforce – particularly if it is your intent to have it apply to 300,000 employees all at once.

4

@005

Thank you for the opportunity to comment on the NSPS pay, staffing, and labor relations proposals. I look forward to working with you and Secretary England in creating an NSPS that we can all be proud of, and whatever the outcome of the issues I have raised above, you can rest assured that I will do everything within my authority to support you and the Department. In the end, we are one team with the same goal of providing the Department with a personnel system that supports your mission to safeguard the security of our Nation.

                                        Sincerely

                                        Kay Coles James
                                        Director

cc: DOD Deputy Secretary Paul Wolfowitz
    Navy Secretary Gordon England
    OMB Deputy Director Clay Johnson

Enclosure

5

0409

**ENCLOSURE**

**OPM Comments on DoD National Security Personnel System Draft HR Proposal**

## Chapter I.  Introduction

- **Level of Detail in Enabling Regulations – Legal/Policy Issue**
  1. (page I-1) – The level of detail provided in this document is unnecessary for joint DoD/OPM enabling regulations establishing the NSPS HR system.  In fact, a high level of detail could be contrary to Governmentwide interests because such details would become the subject of up-front collaboration with Federal employee unions under the statutory collaboration process.  It could also impede efforts to tailor the new system to the needs of the major DoD components.  Finally, a high level of detail in the joint DoD/OPM enabling regulations also could undermine efforts now in progress to establish joint DHS/OPM enabling regulations for the DHS HR system.

  We strongly recommend that DoD provide for less detail in the joint DoD/OPM enabling regulations, which must be promulgated through the notice and comment procedures established by the Administrative Procedure Act (5 U.S.C. 553).  Additional details should follow in the form of internal directives (which could be under development simultaneously and need not be subject to the statutory collaboration process).  A decision to proceed without issuing enabling regulations through APA procedures would be viewed with alarm by both Federal employee unions and some Members of Congress and could lead to litigation over the failure to provide for public notice and comment regarding the NSPS plan.

  Note:  In the comments that follow on Chapters II through IX, we have treated this document as if it were an internal directive, rather than enabling regulations.  Thus, where we suggest changes or additions, this should not necessarily be understood as a recommendation to include such details in the joint DoD/OPM enabling regulations.

- **Subsequent Modification – Legal/Policy Issue**
  I.C. (page I-1) – If DoD intends to follow the statutorily prescribed collaboration process for all subsequent modifications of this document, we foresee many time-consuming discussions with Federal employee unions ahead (with the potential for more reports to Congress and further involvement of the Federal Mediation and Conciliation Service).  For this reason alone, the joint DoD/OPM enabling regulations should not include the level of detail provided in this document.

- **OPM Coordination Role – Policy Issue with Governmentwide Implications**
  With respect to a few key provisions of the proposed NSPS HR system, we believe there is a Governmentwide interest in ensuring that OPM has an ongoing role in coordinating with DoD regarding its implementation and administration of the new system.  This will be particularly important if the joint DoD/OPM enabling regulations provide greater flexibility than found in this draft proposal.  Examples include establishing career groups (or other occupational groupings), banding structures, and rate range adjustments.

6

@007

- **Coverage of NSPS HR System – Legal/Technical Issue**
  The NSPS plan does not clearly specify which groups of DoD employees would be covered
  by the various parts of the plan, nor does it specify which provisions of title 5 would be
  waived or modified, as authorized by 5 U.S.C. 9902. We recommend that each part of the
  NSPS plan include specific provisions addressing both of these issues. In addition, we
  recommend that DoD address how other laws that rely on coverage under waived provisions
  (e.g., the General Schedule classification and pay system) apply to employees covered by the
  NSPS HR system. (See proposed DHS/OPM regulations at 5 CFR 9701.106.)

2

0411

## Chapter II.  Pay Banding

### General Comments

- The pay banding provisions of the NSPS proposal do not take full advantage of the flexibilities afforded DoD.  In particular, this proposal remains firmly tied to the General Schedule classification and pay system, even though nothing in the law authorizing the NSPS requires this result.  As a consequence, it fails to move the Department toward greater occupational and local labor market precision in matching Federal pay to the private sector.

- The proposed "career groups" and pay band architecture also are far too detailed and inflexible.  If adopted in this form, future changes in this pay banding structure would require DoD to invoke the statutory union notification and collaboration process, obtain additional OPM approval, and notify Congress.  We strongly recommend that the joint DoD/OPM regulations on pay banding provide far less detail.

- We have a number of specific technical comments regarding employee coverage, pay band level descriptors, and the treatment of supervisors and employees in law enforcement and protective occupations.  With respect to these technical comments, we have treated this chapter as if it were part of an internal directive, rather than part of the enabling regulations.  Thus, where we suggest changes or additions, this should not necessarily be understood as a recommendation to include such details in the joint DoD/OPM enabling regulations.

### Specific Comments

- **Linkage to GS System – Policy Issue with Governmentwide Implications**
  II.A. (page II-1) – Career Groups (CGS) and pay band levels are tied to the continuation of the existing 15-grade General Schedule classification and pay system.  It is based on the assumption that OPM will continue to maintain and update the GS system, which may or may not be true.  As a result, the proposed structure fails to fully utilize the flexibilities available to "deconstruct" the GS and bring Federal occupations into better alignment with the 21st century world of work.  Grouping professional, scientific, engineering and administrative occupations into the same CG and bands misses an opportunity to cluster occupations to make market sensitive pay decisions.

- **Occupational Coverage of Pay Bands – Technical Issue with Governmentwide Implications**
  II.B. (page II-1) – Pay bands are usually created to group like positions with similar pay potential into a banding scheme.  The CG 1 Engineering, Scientific, Professional, and Administrative career group combines unlike positions with different full-performance levels into the same bands.  (See also Appendix 1)

  o  For example, while Social Work, Clinical Psychologist, and Librarian work is important and analytically demanding, those occupations are not compensated in other market sectors with the same pay as engineering (or attorney) work of comparable difficulty and complexity.  DoD should consider creating multiple Career Groups to replace CG 1, in particular—e.g., a professional health care cluster, an

3

8

0412

engineering and related physical science cluster, an accounting and financial cluster, and an administrative services cluster—to more fully rationalize the system for qualification assessment and pay-setting purposes. OPM has conducted several Governmentwide studies, and we have empirically clustered occupations by task and competency similarities, which could be useful as a starting point for DoD in establishing meaningful clusters.

o  In addition, DoD should consider moving law enforcement and protective services into its own cluster. This will provide for more market sensitive pay decisions and provide for creating more integrated career development and placement programs. By placing these positions in multiple CGs and linking their pay with relatively unrelated occupations (e.g., criminal investigators with chemists), DoD will be less able than DHS to rationalize its treatment of and competitiveness for employees in these occupations.

o  The proposal is inconsistent across its chapters with respect to whether CG-2 and CG-3 will include a pay-band level 4. The initial description at II.C. (page II-2) says those groups have only three pay-band levels. However, the later pay-band level descriptors for CG-2 (pages II-13-14) and CG-3 (pages II-19-20) clearly describe work at "pay-band level 4" (vs. "above pay-band level 3"). Also Chapter IV's discussion of Fair Labor Standards Act coverage (page IV-3) includes a chart that appears to include positions at pay-band level 4 for both CG-2 and CG-3.

•  **Veterans' Preference within Pay Bands – Policy/Tactical Issue**
   II.C.1. (page II-3) – CG-1 includes both professional and administrative positions at the GS 5-12 equivalent levels. This is an issue involving competitive examination and veterans' preference rights. Securing those rights to remain in compliance with 5 U.S.C. 3313, as required under 5 U.S.C. 9902(k)(2) depends on applying distinctions in occupational level (entry vs. full performance) and type of occupation (scientific and professional vs. administrative). Currently, 5 U.S.C. 3313 explains how qualified preference eligibles are available for appointment according to their numerical scores.

   o  For all positions except scientific and professional at the GS-9 or higher, disabled veterans with at least a 10% disability rating are listed first (i.e., they float to the top of a certificate).

   o  For scientific and professional positions at the GS-9 or higher, disabled veterans with at least a 10% disability rating are listed according to their numerical scores (i.e., they do not float to the top of a certificate).

   Therefore, DoD should remove the professional and scientific positions from pay band CG-1.

•  **Coverage of NSPS Pay Banding System – Technical Issue**
   II.C.1. (page II-3) – Plan does not clearly specify the coverage of the proposed NSPS pay banding system. Are SES/SL/ST positions covered? (If not, what work is covered by pay-band level 4 of CG-1?) Who will control the number of these positions? What about FWS positions? How will they be addressed?

4

- **Pay Band Level Descriptors – Technical Issue**
  II.C.2. (page II-3) – There are two primary concerns with the pay band level descriptors, which may impact consistency and accuracy in application.

  o **Coverage and Qualifications**
     Pay band level descriptors for CG-1 are focused on administrative occupations. They do not adequately reflect the nature of work for scientific/engineering and professional occupations. Also, NSPS establishes pay band level descriptors only at the top of the pay band. Failure to provide pay band descriptors at the bottom and mid-levels of the pay band makes it difficult or impossible to determine threshold qualifications requirements for placement at the bottom of the band. In addition, the descriptors include brief knowledge statements in each pay band level, but the descriptors do not address qualifications or competencies beyond that, even though section II.B. indicates qualifications are to be considered in the pay band level determinations. (See also V.D.2.) Finally, there are considerable differences between a GS-5 and GS-12 particularly in supervisory controls, but there are no descriptors to help managers/HR make these distinctions for classification, hiring, etc. purposes.

  o **Tests of Consistency in Application**
     Were the pay band levels test-applied for consistency in pay levels? That is, has DoD run test applications to establish, empirically, that these descriptors are sufficient to yield consistent assignment of positions to a pay band level?

- **Supervisors in Pay Bands – Technical Issue with Governmentwide Implications**
  II.C.2. (page II-4) – It is inappropriate to put entry level and full performance level positions in the same pay band, along with first-line supervisors because they are subject to markedly different performance expectations, pay progression, and market forces.

- **Health Care Occupations – Technical Issue**
  II.C.2. (page II-10) – Does DoD intend to eliminate its ability to pay health care positions in parallel with VA's title 38 system?

- **Protective Services Positions – Technical Issue with Governmentwide Implications**
  II.C.2. (page II-14) – The inclusion of protective services (police officers and firefighters) positions in the same career group with Business and Administrative Support is problematic because such a categorization fails to recognize the criticality and hazards encountered by these protective service positions. Firefighting duties described within the different pay band levels reflect a lack of understanding of the structure of the firefighting occupation. DoD should consider using the flexibility to waive chapter 51 to establish a more up-to-date approach to valuing protective services work in a manner that accommodates its distinct nature and substantive differences from administrative and professional work.

5

0414

## Chapter III. Mass Conversions to and from NSPS

### General Comments

- Our comments on this chapter are primarily technical in nature. Further clarification is needed with respect to conversions involving geographic movements, within-grade increase buy-ins, special salary rate supplements, temporary promotions, and the treatment of nonsupervisory leaders and career-ladder employees. Many of these requests for clarification are attributable to the level of detail provided here, which is unnecessary (and ultimately counterproductive) in enabling regulations. Our comments treat this chapter as if it were part of an internal directive, rather than part of the enabling regulations. Thus, where we suggest changes or additions, this should not necessarily be understood as a recommendation to include such details in the joint DoD/OPM enabling regulations.

### Specific Comments

- **Concurrent Geographic Move – Technical Issue**
  III.A.3.a. (page III-1) – We suggest clarifying that this section deals with geographic movements that involve a change in the employee's official duty station. "Geographic move" is not defined. Also, we assume the intent is that the pay conversion will be made after setting the employee's pay in the new geographic area under the old system's rules. Clarification is needed. (Same comment applies to III.B.3.a, page III-4.)

- **Cost of Conversion to Pay Band – Technical Issue**
  III.A.3.c. (page III-2) – We assume that the net costs of the WGI buy-in will be funded from the initial pay pool. Please note that there is offsetting savings from not providing GS within-grade increases that would have occurred after the date of conversion. It is true that, if the first pay pool is set to provide adjustments that are less than the GS adjustments that otherwise would have occurred, estimated future net costs associated with the WGI buy-in can be eliminated. Has DoD estimated the costs of the WGI buy-in and the amount of the offset to be applied to the first pay pool? If so, how were the estimates made? Did DoD consider spreading the pay pool offsets over 2-3 years, instead of doing the full offset in the first year?

- **Conversions Involving Special Salary Rates – Technical Issue**
  III.A.3.d. (page III-2) – The language regarding conversions involving special salary rates is not clear. We believe the intent is to establish a percentage supplement on top of the same base rate that is used in computing a locality pay supplement. (See VI.B.1, page VI-3, and Appendix 2, A.2.) However, this section states that the maximum rate of the pay band level is "extended." Some demonstration projects have used "staffing supplements" and others have used band extensions (which gets very complicated). Under the supplement approach, all employees in the band who are covered by the given special rate category receive a percentage supplement that is greater than the regular locality supplement. Also, this section must be clarified to note that it applies only to employees who are in an approved special rate category, not to all employees in the same band.

6.

11

- **FLSA Exemptions – Legal Issue**
  III.A.4. (page III-2) – See our comments on the FLSA exemption issue in Chapter IV. (See also III.B.4, page III-4.)

- **Employees on Temporary Promotion – Technical Issue**
  III.A.7. (page III-3) – This section states that the pay corresponding to the pre-conversion temporary promotion rate will be "restored" for the duration of the temporary promotion period. DoD may need to clarify that the "restored" rate is set using the conversion rules; thus, if a special rate is involved, the base rate may change and be supplemented by a separate payment. (Same comment applies to III.B.7, page III-5.)

- **Staffing Supplements – Technical Issue**
  III.B. (pages III-3-4) – DoD fails to address the conversion of employees that may have staffing supplements under another pay banding system. The value of the staffing supplement may be different if the new NSPS bands grades differently. DoD needs to provide for a conversion that reallocates the employee's pay to maintain the total adjusted rate. (See also Appendix 2, D.6.)

- **Leader Employees – Technical Issue**
  III.C. (page III-5) – This section states that leaders are converted to an NSPS band by application of the nonsupervisory pay band level descriptors. Thus, it appears to be possible that a leader at a given GS grade might not qualify for the NSPS band that corresponds with the grade. Please confirm this and that 2-year pay retention would apply. (We understand that a supervisor also could be placed in a band associated with a lower grade, but that a supervisory adjustment might be used to avoid the need for pay retention, as in Appendix 2, Example 6.)

- **Conversion from NSPS to GS – Technical Issue**
  III.D. (pages III-5-6) – This section addresses conversion from NSPS to the General Schedule. It provides for conversion of NSPS rates to GS rates after processing any simultaneous pay action, other than geographic relocation. However, in various DoD demonstration projects, the rules for conversions back to the General Schedule provided that the conversion to GS rates would be done before any pay action (including a geographic movement) that coincides with conversion. The idea was to convert the employee to GS rates while the employee was still under the demonstration project authority. Any simultaneous pay actions were considered to be associated with the General Schedule; thus, the employee needed to be under the General Schedule first so that the regular GS rules could be applied. We believe this latter approach makes more sense. Why is DoD proposing to change what has, through practical experience, become a standard approach? Also, the reference to "representative rates" is confusing. Why not just say step 4? Obviously, the guidance here is not complete and will need to be supplemented in DoD's detailed system procedures.

- **Exception Rule – Technical Issue**
  III.E. (page III-6) – This section provides that, if conversion would result in a loss of pay, the employee is entitled to "retain the existing rate of basic pay (including locality pay where applicable), notwithstanding any other provision." This language could be interpreted to

7

12

03/09/04   TUE 19:10 FAX 202 806 2873                                            ☑013

allow an employee to retain a locality rate if the employee is moved to a lower-paying locality pay area on the date of conversion. DoD should clarify that this is not the case.

- **Career-Ladder Employees – Technical Issue**
  There is no provision for recognizing career-ladder employees accrued time toward a career-ladder promotion, nor does the NSPS plan authorize DoD to establish an alternative pay progression scheme for developmental employees. Under the NSPS plan, developmental employees will progress in base pay through performance increases (through the pay pool) or through extraordinary pay increases. Many employees may be significantly worse off than they were under the General Schedule. If DoD begins to set starting salaries at higher levels, on-board developmental employees may be leapfrogged. Has DoD fully considered this set of issues? (We note that DHS plans to establish a special development pay adjustment plan that would allow it to replicate GS career-ladder progression, or to raise starting salaries and have a flatter progression. DHS could adjust the pay of on-board developmental employees to avoid leapfrogging.)

8

0417

03/09/04  TUE 19:10 FAX 202 606 2573                                    ☒014

## Chapter IV. Classification

### General Comments

- Our primary concerns, in our review of the Classification chapter, center around the focus of the pay band descriptors, the definition of supervisory positions, and conflicts with the Fair Labor Standards Act. We recommend that DoD provide pay band descriptors at the low and mid-levels, in addition to the top levels of the bands to assist with classification and hiring decisions. We are concerned with the proposed definition of supervisory positions, which conflicts with existing Administration guidance for evaluating supervisory positions. Finally, and most notably, is the legal issue presented by the proposal to waive the coverage of DoD employees under the Fair Labor Standards Act of 1938. This proposal exceeds the authority granted to DoD in the National Defense Authorization Act.

- We have treated this chapter as if it were part of an internal directive, rather than part of the enabling regulations. Thus, where we suggest changes or additions, this should not necessarily be understood as a recommendation to include such details in the joint DoD/OPM enabling regulations.

### Specific Comments

- **Classification vs. Allocation – Technical Issue**
  IV. (page IV-1) – In general, the term "allocation" carries a connotation of "distribution" or "share" rather that "assignment" or "classification." We recommend choosing another term.

- **Authority of Managers/Supervisors – Technical Issue**
  IV.C 2. (page IV-1) – Would be clearer to users if changed to "Managers/supervisors do not have the authority to classify the position they encumber."

- **Pay-Band Level Descriptors – Technical Issue**
  IV.D. (page IV-1 and -2) – Pay band level descriptors should include low and mid levels as well as the top of the level to assist with classification and hiring decisions across the pay band level. (See also II. C. 2.)

- **Supervisory Definition – Policy Issue with Governmentwide Implications**
  IV.E. (page IV-2) – Conflicts with the Administration's guidance regarding the inadvisability of evaluating supervisory jobs in terms of numbers of subordinates supervised. It does not require responsibility for technical oversight; and does not define "significant portion of the time." If DoD plans to allocate NSPS positions to the appropriate pay-band levels using NSPS criteria instead of OPM grading criteria, it will be necessary that they define significant classification terms and phrases in their guidance.

- **Fair Labor Standards Act (FLSA) Exemption – Legal Issue**
  IV.I. (page IV-3 and IV-4) – The authority to waive subchapter V of chapter 55 of title 5, U.S. Code, does not extend to waiving the coverage of DoD employees under the Fair Labor Standards Act of 1938 and its implementing regulations and applicable case law. The NSPS plan conflicts with the Fair Labor Standards Act of 1938 and applicable case law in that it

9

0418

appears to presume exemption for employees in certain nonsupervisory career groups/levels (CG 1-Levels 2/3/4). This approach was voided by the DC Circuit Court (AFGE v. OPM, No. 86-5456, 5457, 5461, June 26, 1987), which found that presumptive exemption conflicted with the FLSA where the burden of proof is on the agency to show that the employee is exempt from overtime eligibility.

- o **Requirement for Case-by-Case Application**
  FLSA exemption determinations must be made on a case-by-case basis. Given the presence of two-grade interval administrative occupations in CG 1, even higher level positions could be found nonexempt if they are performing "line" rather than "staff" work and, therefore, would not meet the administrative exemption. See *Stephen S. Adams, et al. v. United States*, 27 Fed. Cl. 5(1992). Court reaction to the physical nature of law enforcement work further underscores the need for caution in ensuring that decisions are made on a case-by-case basis. See *Wallace Ronay v. United States*, 790 F. Supp. 23, 28 (DDC 1992). The reverse is also true of positions that have been identified as nonexempt. Higher level technical positions in CG 2 Level 3 (Engineering, Scientific, and Medical Support, GS-8-11) and CG 3 Level 3 (Business Support, GS-8-10) may have contractor oversight and approval authority or exercise similar authority that would meet the administrative exemption criteria. It would be improper to treat them as nonexempt if the actual work that they are performing is exempt. The NSPS authority does not give DoD any authority to treat them otherwise.

- o **Interaction with Pay-Bands**
  The interaction of FLSA and the pay banding proposal presents additional challenges. FLSA exemption rests on the primary duty test (typically 50 percent of the work time, but with the alternative defined in definition of primary duty in 5 CFR 551.104 ). The NSPS system does not appear to address percentages of time, so it is unclear how this test can be applied. Some bands likely will contain a mix of exempt and nonexempt work based on the application of such FLSA concepts as discretion and independent judgment. Because the bands define the highest level of work performed, application of the FLSA to positions at the lower ends of the band will be challenging.

- o **Supervisory Positions**
  The FLSA proposal does not address supervisory positions. Chapter IV, page 2, appears to define the supervisory threshold as supervising at least two employees and performing the enumerated duties "a significant portion of the time." Without a definition for "significant," we are not clear as to how DoD will handle the primary duty test in applying the executive exemption criteria (5 CFR 551.205).

- • **Pay Category Reconsideration – Technical Issue with Governmentwide Implications**
  IV.J. (Page IV-4) – DoD employees can appeal not only their occupational series and pay system, but also their Career Group, title, pay band level, and supervisory status. This undermines the effort to establish a simplified and streamlined job evaluation reconsideration process for DHS.

10

## Chapter V. Appointment and Placement Authorities

### General Comments

- A variety of provisions in Chapter V clearly undermine veterans' preference, in apparent contravention of 5 U.S.C. 9902(k)(2), as well as the expressed commitment of the President. Other provisions are vague and require more detail to ensure that both Merit Principles and veterans' preference requirements are not compromised. The sum total of the Chapter V proposal is both a real and perceived diminution of several veterans' preference requirements as defined in 5 U.S.C. 2302(e)(1).

- Further, it is difficult to discern in Chapter V a coherent strategic approach to hiring and placement. Much of what is being proposed here has no apparent nexus to DoD's mission and appears to undermine the primacy of merit in staffing decisions. For example, replacing Public Notice with Advance Notice appears inconsistent with the merit-based requirement for fair and open competition. The use of seven predetermined performance factors and assessment benchmarks that have not been validated through any job analysis process and the provision regarding competitive promotion by means of a name request contribute to the overall appearance of an effort to loosen the links between merit and staffing decisions wherever possible. In addition, authorities like "on-the-spot" hiring for all occupations covered by special salary rates and the extended sabbatical authority lack a clear and compelling mission-related rationale. Consequently, we caution against relying on one criterion which may not reflect the necessity for continued suspension of merit and veterans preference.

- The level of detail provided in this chapter is unnecessary for joint DoD/OPM enabling regulations establishing the NSPS HR system. In the comments that follow, we have treated this chapter as if it were part of an internal directive, rather than part of the enabling regulations. Thus, where we suggest changes or additions, this should not necessarily be understood as a recommendation to include such details in the joint DoD/OPM enabling regulations.

### Specific Comments

- **Definition of Advance Notice – Policy/Tactical Issue**
  V.B.2. (page V-1) – In lieu of a Public Notice (PN), DoD will use an "Advance Notice" (AN), which is more narrow in scope than a PN and therefore might exclude certain groups of individuals from applying for DoD jobs. Under an AN, job information is made available to "appropriate" audiences, but the proposal does not describe what "appropriate" is or how it will be determined. It is not clear how this approach balances the requirement of the Merit System Principle to recruit from "appropriate sources" with selection and advancement determined only "after fair and open competition which assures that all receive equal opportunity." We are also concerned that preference eligibles may be adversely affected.

- **Combining Competitive and Excepted Services – Technical Issue**
  V.C. (page V-2) – This section says that DoD could still use the existing authorities available under 5 CFR 213, 301, 315 and 316. One example mentioned is the student temporary

11

☑017

appointment under the Student Educational Employment Program. However, in discussion with DOD, they implied that they would not have excepted service jobs in the new system. Instead, their personnel system would utilize the flexibilities of the excepted service when making noncompetitive appointments and therefore, make it unnecessary to have an excepted service.

If DOD decided to use the existing authorities such as the Presidential Management Fellows (PMF) Program or the Student Career Experience Program (SCEP), the Basic Staffing Requirements under paragraph (D) would need to be amended. Currently the definitions of Tenure groups 0, I, and III do not encompass a PMF or an SCEP employee.

- **Qualification Requirements for Pay Bands – Technical Issue**
  V.D.2 (page V-2) – It is unclear how qualifications will be used in hiring someone into a pay band level. DoD intends to use OPM's current qualification standards unless replaced by DoD qualification standards. CG-1, Pay band level 1, goes from GS-5 to GS-12. Does this mean an applicant only has to qualify at the GS-5 level, and then that person can be placed anywhere in the pay band level – up to the equivalent of a GS-12 level position? Will DoD use OPM's qualification standards for advancement within pay bands?

  o  Also, by tying the qualifications to get into a pay band to OPM's current qualification standards, DoD is committed to require 1 year at the next lower grade before an employee can move to the next pay band level. Finally, DoD may want to consider other job-related factors (e.g., competencies) in setting qualifications.

- **Advancement to Supervisory Positions – Technical/Tactical Issue**
  V.E. (page V-3) – Since CG1 encompasses GS 5-12 equivalent positions, it is possible to advance from entry level to full performance level to supervisor without competition or assessment. This could raise serious issues for groups concerned about the merit staffing process and equal employment opportunities.

- **Valid Assessment Procedures – Technical/Tactical Issue**
  V.E.2.a (p. V-3) – If the seven predetermined performance factors and the assessment benchmarks used to rate employees throughout DoD have not been validated through any job analysis and validation process, the system could be vulnerable to litigation. The Uniform Guidelines on Employee Selection Procedures apply to performance evaluation methods and include in the definition of "employment decisions" hiring, promotion, demotion, membership (for example, in a labor organization), referral, retention, and licensing and certification, to the extent that licensing and certification may be covered by Federal equal employment opportunity law, and other selection decisions, such as selection for training or transfer, which may also be considered employment decisions if they lead to any of the decisions listed above. Because DoD intends to use the Order of Merit Lists for many of these employment decisions across all of DoD, including those of the Assessment Boards, the risk is high that adverse impact could occur somewhere. DoD will want to be sure these "factors" and the assessment benchmarks will meet the standards for validation under the Uniform Guidelines. (See also VII.D – page VII-8)

12

- **Competitive Promotion via Name Request – Technical Issue**
  V.E.2.b.i. (page V-3) – This section is unclear. It starts out by saying that management may make a by-name request for an individual since management can consider candidates from any appropriate source. What is the source of candidates? A name request is not a source.

- **Advancement Based on Prior Competitive / Excepted positions – Technical Issue**
  V.E.3.a and b. (page V-4) – These paragraphs allow job changes to positions at pay levels no higher than the employee had, or had the potential to have, on a permanent basis in the competitive service or Schedule A or B of the excepted service.

  - Why single out Schedule As and Bs? What about other excepted appointments such as those covered under other merit-based personnel systems for which OPM has established an interchange agreement and other statutory excepted appointments?

  - If excepted appointments are included in this determination, how would DoD make comparisons between levels (i.e., qualifications, duties and responsibilities, etc.) of excepted and competitive positions?

- **Temporary Job Change, NTE 1 Year – Technical Issue**
  V.E.3.d. (page V-4) – "Temporary job changes for one year" should read, "Temporary job changes for up to 1 year" to allow for temporary changes that may not last 1 year.

  - V.E.5. (page V-7) – Language should be added to describe what happens at the end of a temporary job change

- **Coverage for Positions Above GS-15 – Technical Issue**
  V.F.1. (page V-7) – The relationship among SES/SL/ST positions and the positions to be included in pay-band level 4 of CG-1 is unclear. This provision in the proposal implies that they are different categories.

- **External Hiring [*Luevano* Positions] – Legal/Tactical Issue with Governmentwide Implications**
  V.F.1.a. (page V-7) – DoD proposes, at management's option, to refer all candidates who meet basic qualifications to the selecting official. As DoD will still be subject to the *Luevano Consent Decree* under NSPS, this provision should not include positions covered by the decree.

- **External Hiring [Veterans' Preference for Disabled Veterans] – Policy/Tactical Issue with Governmentwide Implications**
  V.F.1.a. (pages V-7 and -8) – Preference has been diminished significantly for disabled veterans with less than a 30 percent disability rating. Currently, under 5 U.S.C. 3313, disabled veterans with a service-connected disability rating of at least 10 percent receive certain preferences (i.e., they are listed at the top of the numeric list if minimally qualified). Under the DoD proposal, those special preferences are reserved for 30 percent or more disabled veterans, which will not keep DoD in compliance with veterans' preference requirements under 5 U.S.C. 9902(k)(2).

13

- **Category Rating – Policy/Tactical Issue with Governmentwide Implications**
  V.F.1.b. (page V-8) – DoD proposes to alter the current category rating procedures in a way that seriously undermines veterans' preference in violation of the express determination of the President. NSPS will still establish quality categories; however, disabled veterans with a service-connected *disability* rating of at least 10 percent, including 30 percent disabled veterans who are minimally qualified, will not be placed in the highest quality category if minimally qualified as required by 5 U.S.C. 3319(b). Instead, all preference eligibles will be listed ahead of non-preference eligibles within each quality category, which diminishes the veterans' preference disabled veterans would otherwise receive.

  o DoD will refer the next lower quality group where there is an insufficient number of candidates in the highest quality category. Instead of merging the categories so that the preference eligibles will be listed ahead of non-preference eligibles on the newly merged list, DoD will refer the two categories differently—i.e., highest group (vets then non vets), followed by the next highest group (vets then non vets). Again, this weakens veterans' preference and therefore may adversely affect preference eligibles.

- **Probation / Appeal rights for Preference Eligibles – Policy/Tactical Issue with Governmentwide Implications**
  V.F.2.a.vi. (page V-10) – It appears that preference eligibles would have no appeal rights during the DoD initial probationary period, which may be up to 3 years. This paragraph makes reference to 5 U.S.C. 7511(a)(1)(B), but that provision deals with preference eligibles in the excepted service only. Consequently, it appears that the result would diminish the rights preference eligible appointees in the competitive service currently have after completion of the current 1-year probationary period.

- **Modified Term Appointments [Veterans' Preference] – Technical Issue**
  V.F.2.b.i. (page V-10) – DoD's proposal would apply veterans' preference with this noncompetitive hiring authority by considering preference eligibles ahead of non-preference eligibles. In practice, how can this be done? What does "considered" mean? Would the preference eligibles have to be selected before the non-preference eligibles?

- **Noncompetitive Temporary Appointments [Veterans' Preference] – Technical Issue**
  V.F.2.c. (page V-11) – DoD's proposal would apply veterans' preference with this noncompetitive hiring authority, but DoD has not established a process for doing so.

- **Scholastic Achievement Appointment – Technical Issue**
  V.F.2.d.iii. (page V-12) – We suggest amending this paragraph to clarify that the field of study must be related to the job being filled. Currently the language reads the field of study is that which is qualifying for the occupation. This could lead someone to think that the job has specific education requirements. The same problematic language described above on page V-10, regarding "consideration" of preference eligibles ahead of non-preference eligibles, appears again at the end of this section. Once again, this appears to be a weakening of veterans' preference.

- **On-the-Spot Hiring for Special Salary Rate Occupations – Policy/Technical Issue**
  V.F.2.e.iv. (page V-12) – DoD proposes to authorize on-the-spot hiring solely on the basis

14

that an occupation is covered by a special salary rate. Although special salary rates are authorized to address staffing problems, their accommodation of labor market pay rates involves different issues than examination and appointment procedures. Special salary rates often apply only to selected grades in an occupation, but this hiring authority would appear to apply to any position in the occupation. Further, the rates may remain in effect long after a critical hiring need has waned and operate more to support retention. For these reasons, we question the logic of allowing special salary rate coverage to be used as the sole determinant for granting on-the-spot hiring authority.

- **Veteran Passover Requests – Policy/Technical Issue**
  V.G. (page V-13) – The DoD proposal refers to "veterans' passover procedures authorized by the Department of Defense" but those procedures are not spelled out to ensure that DoD continues to comply with 5 U.S.C. 3318 as required under 5 U.S.C. 9902(k)(2).

- **Extended Sabbatical Authority – Technical Issue**
  V.I. (page V-13) – The authority to grant "paid expanded sabbaticals to career employees" is essentially undefined. Are there any limitations in duration or eligibility for this program? Will a continued service agreement be required?

15

20

0424

## Chapter VI. Pay Administration

### General Comments

- Our comments on this chapter relate primarily to the proposed linkage to General Schedule rate ranges, locality payments, and special salary rates. We believe the NSPS should have greater built-in flexibility to adjust salaries based on local labor market rates and other factors. (See related comments on Chapter II.) In addition, we do not believe unsatisfactory employees should automatically receive locality pay increases.

- At the same time, the proposed system may provide too much flexibility to supervisors in determining starting salaries, promotion increases, and other pay adjustments associated with position changes. If supervisors are given too much flexibility in this regard, the transparency and credibility of such pay adjustments may be called into question. In addition, we know that Members of Congress are concerned about using pay flexibilities to entice employees from other agencies. Giving OPM a coordination role may help to alleviate such concerns. Finally, it is not clear why the proposed system does not provide appeal rights for employees who are reduced in band when their pay falls below the band minimum because performance pay adjustments do not keep pace with band rate range adjustments.

- Our comments treat this chapter as if it were part of an internal directive, rather than part of the enabling regulations. Thus, where we suggest changes or additions, this should not necessarily be understood as a recommendation to include such details in the joint DoD/OPM enabling regulations.

### Specific Comments

- **Readability – Technical Issue**
  To improve readability, consider incorporating the substantive information (i.e., all but the examples) from Appendix 3 so the reader does not have to constantly check other places for additional information. Appendices 3, 4, and 5 could be limited to examples. In particular, having definitions of terms at the beginning of the chapter would be helpful.

- **Appropriate Exercise of Pay Flexibility – Technical Issue**
  The proposed rules provide very broad flexibility in setting pay rates. Does DoD expect that supervisors will be delegated broad discretion, or will DoD or component headquarters establish additional rules, limits, etc.? How will DoD ensure that flexibility is exercised appropriately?

- **Guaranteeing Locality Pay Adjustments for Poor Performers - Policy Issue with Governmentwide Implications**
  Introductory paragraph (page VI-1) - The proposed plan guarantees that all employees receive locality pay adjustments. This is contrary to the Administration's support for performance-oriented systems under which employees with an unsatisfactory rating do not receive automatic pay increases. One way DOD could prevent a pay increase based on a locality pay adjustment would be to reduce the employee's rate of basic pay to the extent

16

21

0425