03/08/04  TUE 19:13 FAX 202 606 2873                                    ☒022

necessary to maintain the employee's adjusted rate of basic pay (including the new locality payment) at a rate equal to the employee's former adjusted rate.

- **Coverage Determination – Technical Issue**
  Introductory paragraph (page VI-1) – In the first sentence (or another chapter with cross-reference here), consider expanding the discussion of the employees eligible to be covered to include, when and how an employee eligible for coverage becomes covered; who makes the determination that an employee is covered; whether coverage may be rescinded and, if so, who may rescind it, how is it rescinded, and on what basis (e.g., sole discretion of a designated official).

- **Coverage of Title 10 Employees – Legal/Technical Issue**
  Introductory paragraph (page VI-1) – The second sentence implies that title 10 employees may be covered by the NSPS pay system in the future. Technically, the regulations that are jointly approved by DoD and OPM legally cover only employees who would be covered under waivable title 5 provisions. If a title 10 system provides administrative discretion, DoD could choose to adopt a *parallel* system for covered title 10 employees. (See DHS proposed regulations at 5 CFR 9701.102(e).)

- **Link to GS Rate Ranges, Locality Pay – Policy Issue with Governmentwide Implications**
  Introductory paragraph (page VI-1) – The band rate ranges and locality payments under the proposed system will be directly linked to General Schedule minimum and maximum rates and locality payments. This does not make optimum use of the flexibility provided by the Act and limits management's ability to adjust the pay band level based on factors such as labor market rates, recruitment and retention information, mission requirements, operational needs, and overall budgetary constraints.

- **Mass Conversion upon Initial Application – Technical Issue**
  VI.A.1. (page VI-1) – We suggest revising the heading of paragraph A.1 to delete the parenthetical and adding the following sentence in parentheses at the end of the paragraph: "(This paragraph does not apply to mass conversions upon initial application of the NSPS pay system to a group of employees, which are addressed in Chapter III.)"

- **Setting Starting Pay – Policy Issue with Governmentwide Implications**
  VI.A.1. (page VI-1) – We believe NSPS policies on setting starting pay should be established in coordination with OPM so that Governmentwide interests can be considered. (See DHS proposed regulation at 5 CFR 9701.351.) Also, how does DoD justify having a 5 percent limit on internal lateral placements and no limit on lateral movements from outside the system?

- **Setting Pay Upon Job Change – Technical Issue**
  VI.A.2. (page VI-1) – We suggest revising the second part of the heading of paragraph A.2 to read "Same Earning Potential." Also, we suggest clarifying that this paragraph applies to movements and placements *within* the NSPS pay system. The parenthetical "(irrespective of SSR supplements)" is confusing. Does DoD mean the rate of *basic* pay excluding any locality payment or SSR supplement? Please explain how an employee might "suffer an

17

0426

involuntary reduction in pay" in this situation. We assume DoD means to refer to a reduction in basic pay (excluding any supervisory adjustment). Is this covering movements prompted by bad performance or misconduct?

- **Setting Pay Upon Job Change – Policy Issue**
  VI.A.3.c. (page VI-2) – An employee who does not receive pay increases that match GS across-the-board increases may eventually fall out of his or her pay band level and then be moved to a lower band. This sounds like a significant adverse action, yet no appeal rights are given. DoD does provide internal appeal rights for other reductions in band under VI.A.3.b. Why is there a difference in appeal rights? Shouldn't an employee whose band is reduced have some kind of internal appeal or grievance rights? Further, how does this lack of appeal right comport with the Pay Category Reconsideration procedure for reviewing pay-band level at IV.J (page IV-4)?

- **Cross-Reference – Technical Issue**
  VI.A.3.d. (page VI-2) – Include a cross-reference/citation to pay retention provisions and internal appeal procedures.

- **SSR Link to GS Special Rates – Policy Issue**
  VI.B.1. (page VI-3) – The SSR supplements are tied to General Schedule special salary rates, rather than a DoD analysis of factors such as local market conditions and mission needs, and assume the continued existence of the General Schedule. (What if an OPM SSR table covers only DoD employees who are under NSPS? On what basis would OPM continue to maintain such SSR tables under its authority under 5 U.S.C. 5305?) This limits DoD's flexibility to provide a supplement when OPM does not establish a special salary rate.

- **SSR Supplement – Technical Issue**
  VI.B.1. (page VI-3) – Clarify what a SSR supplement is. We believe the intent is to establish a percentage supplement on top of the same base rate that is used in computing a locality pay supplement. (See VI.B.1, page VI-3, and Appendix 2, A.2.)

- **Readability – Technical Issue**
  VI.B.2 (page VI-3) – Since this chapter does not address mass conversions, it is not clear why a paragraph on SSR-related mass conversions is included. We suggest replacing the paragraph with a note referring the reader to Chapter III and Appendix 5.

- **Supervisory Adjustments – Technical Issue**
  VI.C. (page VI-3 and VI-4) – We have a number of concerns regarding supervisory adjustments.

  o  Clarify that a supervisory adjustment deals with setting a revised rate of basic pay and that any locality pay or SSR supplement is paid on top of the basic pay reflecting the supervisory adjustment. (Note the confusion in maintaining two basic rates in addition to having adjusted rates of basic pay.)

  o  A supervisory adjustment is basic pay for certain specified purposes and "for such other purposes as may be expressly provided for by *law*" [we assume DoD means its

18

23

**0427**

policies, not law]. For what purposes would a supervisory adjustment *not* be basic pay? Clarification is needed that it is not basic pay for pay retention and adverse action purposes in paragraph C. Also, clarification is needed regarding the circumstances in which the regular basic rate (which excludes the supervisory adjustment) will be used in lieu of the supervisory basic pay (which includes the supervisory adjustment).

o  The specific criteria for granting a supervisory adjustment are not defined but left to "the pay-setting authority." There is a significant risk that inconsistent policies will lead to a convoluted and irrational system.

o  Depending on how supervisory adjustments are used, it may not be a wise policy to make the adjustments part of basic pay. If a supervisory adjustment is generally intended to be temporary add-ons for special situations, then its treatment as retirement-creditable basic pay may be problematic, especially given the potentially large size of the adjustment (up to 25 percent). The retirement implications may affect decisions about adjustments instead of decisions being made solely based on mission-related interests.

o  Appendix 2, Example 6, shows the supervisory adjustment is being used to protect the pay of supervisors who are placed in a band that is lower than the band corresponding to their former GS grade. We question whether it is appropriate to use a supervisory adjustment as a pay retention tool.

- **Readability – Technical Issue**
  VI.D. (page VI-4) – See comments on Appendix 5. Appendix 5 should be referenced in section VI.D.

19

**0428**

## VII. Pay for Performance (PFP) Evaluation System

### General Comments

- The proposed pay-for-performance system retains some problematic features of the current title 5 system. An example is the requirement that all employees have preestablished performance standards at the beginning of each rating cycle. The NSPS plan also does not give DoD much flexibility to change or add new performance factors. Furthermore, the benchmark performance standards lack validation and do not focus sufficiently on achieving results. The proposed performance factors are not designed to allow for ratings below 50 points, even though DoD has a 100-point scale. This would make it difficult to take performance-based actions. (See related comments on Chapter VIII.)

- Our comments treat this chapter as if it were part of an internal directive, rather than part of the enabling regulations. Thus, where we suggest changes or additions, this should not necessarily be understood as a recommendation to include such details in the joint DoD/OPM enabling regulations.

### Specific Comments

- **Coverage – Technical Issue**
  VII. (page VII-1) – A section on coverage is missing. It is not clear which DoD employees are covered by this chapter. The chapter is also missing a statement of which title 5 provisions are waived.

- **System Evaluation – Technical Issue**
  VII. (page VII-1) – The chapter does not provide for evaluating the effectiveness of the pay for performance evaluation system.

- **SES Performance Appraisal Certification – Policy Issue with Governmentwide Implications**
  VII. (page VII-1) – If this performance system is intended to cover SES members for appraisal purposes, but SES members remain covered by the current SES pay system, the SES performance appraisal system must meet any certification requirements issued by OPM before DoD would have access to the higher pay range for its SES members.

- **Performance Plan Requirement – Policy Issue with Governmentwide Implications**
  VII.B.1. (page VII-1) – The NSPS plan requires all employees to have a performance plan, which is more restrictive than necessary (and more restrictive than proposed for DHS). Performance objectives are jointly established between employee and supervisor, but at the beginning of the performance cycle, and would have to be changed as the performance year progresses and objectives change. It may be better to allow performance expectations that can take many forms—goals/objectives, standard operating procedures/generally applicable instructions, work assignments with expected characteristics of the completed assignment, and/or competencies or contributions expected.

20

- **Lack of Results Focus – Policy Issue with Governmentwide Implications**
  VII.B. and Appendix 7 (pages VII-1-4, and A.7) – While the objectives are described as being results-focused, the factors and benchmark standards do not provide an opportunity for determining whether the results were achieved, how well they were achieved, how many were achieved, etc. The benchmark standards provide only for measuring performance on the seven factors (which, for the most part, relate to competencies, not results) and do not provide for measuring the quality, quantity, timeliness, etc., of the results achieved. This approach undermines the Administration's focus on results.

- **Performance Factor Validation – Legal/Tactical Issue**
  VII.B.2 (page VII-2) – The performance factors are competency-based. Since they will be applied to a broad spectrum of occupations (much broader than has been done in previous demonstration projects), they must be validated before they are applied, or serious legal issues could arise.

  o  **Performance Factor Flexibility – Technical Issue**
     NSPS provides no explicit flexibility to add competencies or performance factors, only to drop factors. This would make NSPS less flexible than the title 5 system.

  o  **Performance Factor Weights – Technical Issue**
     Weights are established at the beginning of the rating period. But what if a change in weights is appropriate as the year goes by? We also question the validity of rating performance in 1 percentage point increments when the scores will be used to rank-order employees. This implies a level of precision that creates expectations of performance levels that may not be credible.

- **Focus on Rigorous Performance Management – Technical Issue**
  VII.B.2.f. (page VII-3) – The Leadership factor does not include a requirement to practice realistic and rigorous performance management—an important requirement to ensure effective application of an appraisal system that must support a pay-for-performance system.

  o  **Optional Sub-Factor – Technical Issue**
     The lead-in to this paragraph states that subparagraph (2) is optional for non-supervisory employees. We believe the intent was to make subparagraph (1) optional for other employees (not subparagraph (2)).

- **Application of Benchmark Descriptors to Poor Performers –Policy Issue with Governmentwide Implications**
  VII.B.3. (page VII- 4) – The benchmark performance standards in appendix 7 provide several descriptors to permit the supervisor to assign points to each performance factor for a given employee. The benchmark performance standards describe the high end of each score range, but the percentages assigned in the appendix do not track the scores in the table describing the score ranges. Also, if performance is not "at the benchmark level for substantially all listed aspects, the supervisor should consider assigning the next performance standard level." What purpose is served by the points between the lower level, which is described at its high end, and the level being considered, also described at its high end? The lowest benchmark is 50 percent, but in order to score as low as 50, the employee would essentially have to have

21

no redeeming value with respect to any of the 7 performance factors, which seems unlikely. The unintended consequence of this point scheme is that very few (if any) employees ever would receive fewer than 51 points overall, thus making it virtually impossible to take any performance-based actions. (See related comment on Chapter VIII.A. (page VIII-1).)

- **Inconsistent Terminology – Technical Issue**
  VII.B. and VII.C. (pages VII-2 through 5) – Use of terminology is inconsistent throughout Chapter 7. For example, the summary evaluation of an employee's level of performance is referred to variously as an employee's "performance score," "overall score," and "final rating score." This may cause confusion and make the system less transparent.

- **Readability – Technical Issue**
  VII.C.6.b. (page VII-6) – The instructions for determining performance scores are difficult to follow and can be interpreted in several different ways, resulting in a variety of application and calculation differences.

- **Artificial Scoring Process – Technical Issue**
  VII.C.6.b. (page VII-6) – The scoring process implies an artificial precision in terms of assigning points. Without specific measures of performance, including some focused on measuring results, point assignments that provide for such narrow differentiations in performance seem arbitrary.

- **Wide Percentage Payout Ratio – Technical Issue**
  VII.C.6.c. (page VII-7) – Application of the share payout matrix could result in as much as a 16-fold difference between the highest and lowest payout in percent-of-salary terms.

- **Ensuring Correction of Ratings Inflation/Deflation – Technical Issue**
  VII.C.6.d. (page VII-8) – How will the Pay Pool Manager "ensure" that inflation or deflation of ratings is "corrected"? Making decisions based on an Order of Merit list calibrated at 1 percentage point intervals strains credibility.

- **Identifying Poor Performance – Policy Issue with Governmentwide Implications**
  VII.C.5. (page VII-6) – It appears that achieving unacceptable performance requires an overall point score of 50 or below. What about unacceptable performance on a single objective or factor? Since weighted scores are summative, does DoD really want to retain employees in a given position who perform well enough on some factors to avoid an overall score of 50, but who fail in others? Given the complexity of the scoring process, it appears unlikely that supervisors will be willing/able to identify poor performance except at the end of a rating period. This may not comply with merit system principles. (See related comment on Chapter VIII.A. (page VIII-1).)

- **Requirement for Performance Improvement Plans – Policy Issue with Governmentwide Implications**
  VII.C.5. (page 6) – The NSPS plan requires Performance Improvement Plans as the method used to notify employees and address poor performance. This is more restrictive than has been proposed for DHS. (See related comments on Chapter VIII.)

22

27

0431

- **Wide Dollar Payout Ratio – Technical Issue**
  VII.D. (page VII-9) – If pay pools are generally "combinations of organizational elements"—e.g., divisions, branches, etc.—and the salary distribution of the pool is not considered, there could be very wide variations in the pool payout. In CG1 Level 1, the largest payout in dollar terms could be more than 40 times the lowest payout. Employees in a given band might expect less variation in the dollar payout, even though the payouts are expressed in percentage terms.

- **Poor Performance Consequences – Policy Issue**
  VII.D.1. (page VII-9) – Since it is possible for employees with acceptable performance scores (51 or more) to get less in base pay payout than the amount the pay band moves, those employees will fall behind relative to pay band movement, with the possible eventual result of falling out of the pay band. If that happens, the employee would be placed in a lower pay band at salary, but with no appeal rights. This does not seem like a straightforward way to deal with poor performers.

- **Pay Pool Funding – Technical Issue**
  VII.D.1. (page VII-9) – Has DOD analyzed whether the cited 2 to 2.4% figures actually reflect GS system costs for within-grade increases, quality step increases, and within-band promotions for DOD employees? Based on CPDF data, we estimate that the average value of within-grade increases for DOD employees is less than 1.3% of basic payroll. The average annual value of all GS promotions is about 1.3% of basic payroll. Since DOD (1) continues to have promotions between bands (with no percentage limit—so they may be more generous than average GS promotions), (2) provides accelerated compensation for interns and extraordinary pay increases (that in effect spend dollars that used to be spent on GS promotions), and (3) allows for pay increase upon lateral movements, it is not clear whether even a 2% pay pool would be cost neutral. If DOD intends to spend more than the GS system, then that should be clear to all. We note that spending just half a percent more than the GS system on basic pay increases each year will result over time in a basic payroll that is over 8% greater than the GS payroll.

- **Pay Pool Reallocation, Technical Issue**
  VII.D.1. (page VII-9) – While some demonstration projects have used a reallocation step to distribute basic pay dollars in a pay pool that are not expended due to capped employees, there is a problem with this approach. It gives an unfair advantage to uncapped employees in pay pools that happen to have more capped employees. An alternative approach that addresses this problem would be to set a basic pay pool percentage that applies in all pay pools across the Department and takes into account the overall number of capped employees. The pay pool percentage would be set higher to account for capped employees. There would be no reallocation. Has DOD considered this issue?

- **Discretion Regarding Basic Pay/Lump Sum Ratio – Technical Issue**
  VII.D.2. (page VII-11) – We are concerned about the broad discretion given to supervisors and pay pool managers to determine the distribution of performance payouts as basic pay increase or lump-sum performance. Basic pay increases are much more valuable than lump-sum payments. What criteria will guide these very significant decisions? Isn't there a great risk of inconsistent approaches, which will generate charges of unfairness or favoritism? For

23

28

the system to be credible, shouldn't employees have some understanding before hand regarding how these distribution decisions will be made?

- **Pay Pool Set-Aside Amounts – Technical Issue**
  VII.D.2b. (page VII-11) – How will pay pool managers know how much to set aside for Extraordinary Pay Increases, Accelerated Compensation for Interns, increases following PIPs, and Specially Situated Employees? The first two kinds of pay increases seem to be clearly performance-related, but this is less clear in the case of the last two.

  o **Pay Progression Rate – Technical Issue**
    It isn't clear whether the annual pay increase rate is limited to 25% for all reasons.

24

29

## Chapter VIII. Performance That Fails To Meet Expectations

### General Comments

- The proposed system to address poor performance retains all the key elements of the current 5 USC Chapter 43 with only two minor changes. Neither of those changes address the key aspects of chapter 43 which historically have significantly hindered agencies from making effective use of it to address unacceptable performance: (1) the reliance on specific, preestablished performance standards; and (2) the requirement for a formal performance improvement period (PIP). Failure to address these two substantive hurdles will hinder DoD ability to address unacceptable performers.

- The level of detail provided in this chapter is unnecessary for joint DoD/OPM enabling regulations establishing the NSPS HR system. In the comments that follow, we have treated this chapter as if it were part of an internal directive, rather than part of the enabling regulations. Thus, where we suggest changes or additions, this should not necessarily be understood as a recommendation to include such details in the joint DoD/OPM enabling regulations.

### Specific Comments

- **Retention of Current Hurdles - Policy Issue with Governmentwide Implications**
  VIII. (page VIII-1-3) - Overall, DoD has elected to retain all the key elements of chapter 43 with only two or possibly three substantive changes. Those changes do not address the key aspects of chapter 43 which historically have hindered agencies from making effective use of it to address unacceptable performance: (1) the reliance on specific, preestablished performance standards; and (2) the requirement for a formal performance improvement period (PIP).

- **Coverage – Technical Issue**
  VIII.A. (page VIII-1) – It is not clear who is covered by this chapter. For example, are excepted service employees covered?

- **Action Based on Failure in Only One Area - Policy Issue with Governmentwide Implications**
  VIII.A. (page VIII-1) – The DoD proposal authorizes action under this chapter only when an employee's overall performance is deficient (i.e., overall performance score falls below 51). What if an employee's overall performance is acceptable as a result of outstanding results in certain areas, but performance in a single key area is abysmal. It appears that in such cases, no action could be taken. This approach undermines the Administration's emphasis on moving to a performance-oriented culture throughout the Government.

- **PIP Retention - Policy Issue with Governmentwide Implications**
  VIII.A. (page VIII-1) – the DoD proposal retains the formal requirement for a PIP – a major stumbling block in the current system.

25

- **PIP Requirement - Technical Issue**
  VIII.A. (page VIII-1) – It is not clear whether a PIP is always required whenever an employee's performance is determined to be deficient. For example, could a manager reassign a deficient employee without utilizing a PIP?

- **Extensive Procedural Requirements - Technical Issue**
  VIII.A. (page VIII-1) – While written in broad terms, the proposal also appears to impose numerous and detailed requirements on supervisors, including the following: (1) to specifically and immediately communicate to the employee why and how their performance is deficient and to jointly develop a plan for improving that performance, (2) to again communicate performance deficiencies and expectations at the beginning of the PIP, and (3) to provide the employee with appropriate assistance during the PIP. While in many instances, each of these actions may make sense, they should not be required in every case. For example, there may be no issue as to expectations and deficiencies; both may be completely clear and understood by any reasonable person. Imposing detailed requirements invites a third party (such as MSPB, an arbitrator, or the courts) to adopt a strict review of the process and, having found that one or more requirements was not met, to rule that the action must be reversed, notwithstanding a clear demonstration that the employee knew what was expected and failed to meet those expectations.

- **Action When Employee Successfully Completes PIP – Technical Issue**
  VIII.B.1. (page VIII-1) – It is not clear if a notice of decision is required when an employee successfully completes a PIP. In Section A.2., a manager is required to provide notice of decision in such situations, but in Section B.1, it is stated that "no further action is necessary" in such situations.

- **Options When Employee Fails PIP - Technical Issue**
  VIII.B.2. (page VIII-2) – It appears that management may not reassign an employee whose performance fails to improve after a PIP. Instead, management must reduce an employee's pay and/or band, or remove the employee. This is an unnecessary restriction on management's discretion.

- **Performance Action Not Involving a PIP – Technical Issue**
  VIII.C. (page VIII-3) – Absent the opportunity to review "the alternative adverse action procedures of the DoD NSPS," it is not possible to assess this provision, which states that action based on a performance deficiency may also be taken under such procedures and implies that such procedures would not involve a PIP.

26

0435

## Chapter IX.  Revised Reduction-in-Force Procedures

### General Comments

- DoD would give retention preference in its performance category subgroups only to otherwise eligible veterans with a 30% or greater service-connected disability.  For other veterans, DoD would not provide any retention preference.

- We believe that DoD's proposal to eliminate retention preference for the majority of its veterans is inconsistent with the longstanding commitment of Congress to provide additional Reduction in Force (RIF) protections for most veterans.  The sum total of this will be a perceived reduction of veterans' preference for RIF competition which will appear contrary to the expressed commitment of the President.

- The level of detail provided in this chapter is unnecessary for joint DoD/OPM enabling regulations establishing the NSPS HR system.  In the comments that follow, we have treated this chapter as if it were part of an internal directive, rather than part of the enabling regulations.  Thus, where we suggest changes or additions, this should not necessarily be understood as a recommendation to include such details in the joint DoD/OPM enabling regulations.

### Specific Comment

- **Veterans' Preference and Retention Standing/Assignment Rights – Policy/Tactical Issue with Governmentwide Implications**
  IX. (pages IX-1-5) – At a minimum, we believe NSPS should provide comparable preference (i.e., 3 veterans preference subgroups) within each performance category.  The NSPS proposal accords preference only for 30 percent or more disabled veterans within a performance category.  The other veterans' preference subgroups come into play only as tiebreakers with non-veterans who have the same length of service.

- DoD's proposed NSPS RIF procedures in Chapter IX would (1) establish a performance-based retention system, while (2) eliminating preference for most employees presently eligible for that benefit.  Specifically, new 5 U.S.C. 9902(k)(1)(C) provides that, in its implementing NSPS retention regulations, DoD will consider "veterans' preference" as one of five potential factors.  We believe that the DoD NSPS proposal does not meet this requirement.

  o  DoD would give retention preference in its eight proposed performance category subgroups only to otherwise eligible veterans with a 30% or greater service-connected disability.  This proposal is minimally consistent with the RIF preference presently given to those disabled veterans under 5 U.S.C. 3502(b).

  o  For other veterans, DoD would not provide any retention preference, even within the limited confines of the eight proposed performance category subgroups.  At present, under 5 U.S.C. 3502(c) those veterans are eligible for retention preference over nonveterans.

27

03/09/04   TUE 19:18 FAX 202 606 2573                                     ☒033

- We believe that DoD's NSPS proposal to eliminate retention preference for the majority of its veterans is inconsistent with the longstanding commitment of Congress to provide additional RIF protections for most veterans. (For reference, Congress has mandated retention preference for most veterans since the Veterans Act of 1876; the present provisions in 5 U.S.C. 3502(c) originated in Section 12 of the Veterans' Preference Act of 1944.)

  o We believe that the language of 5 U.S.C. 9902(k)(1)(C) requires retention preference in the context of the performance category subgroup for veterans presently eligible for retention under 5 U.S.C. 3502(c).

- On other items, we believe that the plain language of 5 U.S.C. 9902(k) clearly mandates that DoD publish its proposed retention system through implementing regulations that are available for review by all interested parties. We also suggest that these regulations clearly address the impact of the retention provisions of the Dual Compensation Act (i.e., 5 U.S.C. 3501(a) and 5 U.S.C. 3502(B)) upon DoD's proposed NSPS retention system.

28

33

0437

03/09/04  TUE 19:19 FAX 202 606 2873                                              @034

**Appendices**

Note: The following comments are technical in nature and may be useful as DoD begins the NSPS implementation process. We have treated the appendices as if they were part of an internal directive, rather than part of the enabling regulations. Thus, where we suggest changes or additions, this should not be understood as a recommendation to include such details in the joint DoD/OPM enabling regulations.

**Appendix 2. Mass Conversion Pay Administration Procedures**

- **Special Salary Base Rate**
  A.13. (page App. 2-2) – Why is there a definition for "special salary base rate?" Isn't the SSR supplement paid on top of the same base rate as a locality payment? There should be only one rate of basic pay. (See A.2 and A.3 on page 1 and A.15 on page 2, which seem to be consistent with our understanding.)

- **SSR Supplement**
  A.14. (page App. 2-2) – The definition of "SSR supplement" isn't entirely clear. Shouldn't we state that the SSR supplement is paid on top of the same base or basic rate as locality pay? The last sentence should read: "An SSR supplement is paid in lieu of the regular locality pay, since it establishes a higher adjusted rate."

- **Supervisory Adjustment**
  A.16. and A.17. (page App. 2-2) – We suggest clarifying that a supervisory adjustment deals with setting a revised rate of basic pay and that any locality pay or SSR supplement is paid on top of the basic pay reflecting the supervisory adjustment. (See Example 6 in Appendix 2.) The definition of "basic pay" in A.3 states that basic pay is exclusive of additional pay of any kind. Shouldn't that definition be modified to add "except that basic pay includes any supervisory adjustment"? Note that the definition of "adjusted basic pay" states that it is basic pay plus locality pay or an SSR supplement and that, under VI.C., a supervisory adjustment is part of basic pay for locality pay/SSR purposes. Appendix 3 adds a third term, "supervisory basic pay." (These comments presume DoD will continue to propose that supervisory adjustments be treated as part of basic pay.)

- **Step Prorated Value**
  B, Figure 3 (page App. 2-3) – Some GM employees could have rates of basic pay between steps 9 and 10. They should receive a prorated portion of a partial step. Just to cover this possibility, we suggest that the definition of "prorated value" be revised to read ". . . times the value of the employee's next scheduled GS within-grade increase at the employee's current grade."

- **Example Clarification**
  D.3. (page App.2-4) – We suggest revising the last sentence as follows: "Since the employee is entitled to an SSR supplement that is higher than the locality payment for the Huntsville locality pay area, the employee receives the SSR supplement in lieu of the locality payment." (The employee is still entitled to locality pay, but the SSR supplement is greater.)

29

0438

- **Example Clarification**
  D.3. and D.5. (page App. 2-4) and examples (pages 6-14 of App. 2) – We note that the examples use 2003 rates.

- **Total Adjusted Rate**
  D.6. (page App. 2-4) – The percentage value of the staffing supplement under a demonstration project may be different than an NSPS SSR supplement if the new NSPS bands group grades differently. Thus, the plan should provide for a reallocation that maintains the total adjusted rate.

- **Example Clarification**
  Example 3 (page App. 2-7) – We see the following problems with this example:

  o  Step 3 shows $63,992 as the existing adjusted rate of basic pay. But at the beginning of the example, Cheryl is described as a GS-12, step 4, employee with a table 414 (RUS) rate of $62,110, not $63,992 (which happens to be the locality adjusted rate for GS-12, step 5). The beginning of the example also states that "Cheryl does not receive locality pay," which is not true. As a GS employee, Cheryl is receiving a locality rate that exceeds her underlying special rate.

  o  Step 3 shows the value of the prorated WGI being added to the adjusted rate of basic pay, which is a locality rate. A WGI is a basic pay adjustment; therefore, it is incorrect to add the prorated WGI to the locality rate. There are two possible orders of sequences in applying a WGI buy-in: (1) apply the WGI buy-in adjustment *before* converting the employee's GS rates to NSPS rates, or (2) apply the buy-in adjustment *after* converting the employee's GS rates to NSPS rates. In this example, the order does not make a difference; however, *it does make a difference in situations where an employee is entitled to a special rate that exceeds the locality rate and the special rate is a fixed dollar add-on (instead of a percentage supplement)*. Approach 1 is the more logical approach. In this example, when the prorated WGI ($660) is added to the GS base rate and to the special rate, and the locality rate is recomputed based on the new GS base rate, the locality rate remains the highest entitlement (GS-12/5 $58,376 + $660 = $59,036 base rate; $60,093 + $660 = $60,753 special rate; add 9.62% to $59,036 derive the locality rate of $64,715). Upon conversion, the NSPS basic rate is $59,036, and the locality rate is $64,715. The example gave the incorrect results of $58,978 and $64,652 (since it did not reflect locality pay on top of the prorated WGI).

- **Example Clarification**
  Example 4 (page App. 2-8) – This example deals with a GS special salary rate that is computed as a percentage add-on. It seems to follow the logical approach of applying the WGI buy-in *before* conversion. The example shows a prorated WGI adjustment of $747 to the employee's special rate, which is OK, since a special rate is basic pay under the current GS system. However, the example should add a step 5 that shows how the reallocation process works: $70,592 divided by 1.13 = $62,471, which is the new NSPS base rate. (The NSPS conversion reallocation formula requires that the employee's highest rate be divided by a factor equal to the percentage difference between the maximum special rate for the

30

banded grades and the maximum GS base rate. Since GS-12 is the maximum grade of the band, the factor is 13% (value of the table 999B special rate percentage add-on at GS-12). The NSPS SSR adjusted rate is $70,592 ($62,471 + 13%). The employee has an underlying NSPS locality rate of $68,754 ($62,471 + 10.06%). (Note: Many employees have special rates computed as a fixed dollar add-on. A detailed procedures manual probably needs to include an example of a situation where the fixed dollar SSR is converted to an NSPS staffing supplement, since that is where you see an employee's base rate change.)

- **Example Clarification**
  Example 6 (page App. 2-11) – The last sentence of the example states that the maximum percentage for a CG 1, level 1, Supervisor B, is 18.92%. We cannot follow this conclusion.

- **Example Clarification**
  Examples 7 and 8 (page App. 2-11&12) – The final sentence in each example seems be based on an unstated presumption that no additional NSPS pay adjustments will occur before the temporary promotion expires. In Example 8, how can a temporary promotion continue to exist if the temporary promotion position is in the same band? Is this policy just for conversion situations (almost like pay retention), or will NSPS allow within-band temporary promotions in the future? Does DoD instead plan to use a temporary supervisory adjustment for such situations? Why not use a temporary supervisory adjustment in Example 8?

- **Example Clarification**
  Example 11 (page App. 2-13) – We suggest dropping the references to any "representative rates" and simply referring to step 4 rates. (The ARL conversion-out rules are more complicated than presented here, but it is true that they involve a comparison to step 4 rates.)

## Appendix 3. Pay Administration

- **Basic Pay Definition**
  A.2. (page App. 3-1) – The use of the phrase "the total amount of pay" in definition of "Basic Pay" is confusing.

- **Earning Potential Definitions**
  A.4. (page App. 3-1) – Consider changing the phrase "Job Change – No Higher Earning Potential" to "Job Change – Same Earning Potential" to help differentiate it from "Job Change – Higher Earning Potential" and "Job Change – Lower Earning Potential." Also, please consider revising the definitions or adding a separate definition of "earning potential" in order to clarify what is meant by this term.

- **Pay Progression Clarification**
  A.6. (page App. 3-1) – Clarification is needed on whether inadequate pay progression occurs only at the instant an employee's pay falls below the minimum basic pay for the band level or whether the definition also encompasses pay progression that does not keep up with the movement of the band minimum and maximum rates.

- **Involuntary Movement Definition**
  A.7. (page App. 3-1) – How does the definition of "Involuntary Movement" relate to the

31

references to involuntary job changes (as described in chapter VI (page VI-2)) which result from adverse action, inadequate pay progression, and management action.? Please clarify in the definition whether an involuntary movement only involves movements not for performance or conduct reasons and not at the employee's request or for the employee's benefit.

- **SSR Base Rate**
  A.10 (page App. 3–1) – How does "SSR Base Rate" differ from "Basic Pay"? Also, "SSR" is not defined.

- **Supervisory Adjustment Definition**
  A.12. (page App. 3–2) – The definition of "Supervisory Adjustment" is confusing. We suggest a clarification stating that a supervisory adjustment may not exceed (1) 25 percent of the employee's regular rate of basic pay or (2) an amount that would cause the supervisory basic pay (including the supervisory adjustment) to exceed the rate for level IV of the Executive Schedule.

- **Supervisory Status Definition**
  A.14. (page App. 3–2) – What is the purpose of the definition of "Supervisory Status"?

- **Transfers and Reassignments**
  B.1. (page App. 3–2) – Please clarify whether transfers and reassignments include transfers and reassignments from other Federal agencies. What about other accessions, e.g., reinstatements and reemployment of annuitants?

- **"Additional Examples" Corrections**

  o Example: Voluntary Job Change With a Three Percent Increase and Locality Change. (page App. 3–5)

    Step 4: The figures used for "new adjusted basic pay" should be $62,830 + $6,321 = $69,151 – With this change, the example no longer supports the point made in the next paragraph.

  o Example: Involuntary Job Change – Lower Earning Potential (page App. 3–10)

    Step 1: The figure for Basis Pay should $25,000.

  o Example: Voluntary Movement from a Nonsupervisory Position to a Supervisory Position (page App. 3–10)

    Step 3: Last paragraph should read "Janet's total basic pay". Locality pay is added on top.

32

@038

03/09/04  TUE 19:20 FAX 202 606 2873

## Appendix 5. Pay Retention

- **Supervisory Basic Pay**
  A.1. (App. 5-1) – Insert "adjustment" after "supervisory basic pay"?

- **Pay Retention Definition**
  A.6. (App. 5-1) – Consider revising the definition of "pay retention" based on any revisions made on how to determine an employee's retained rate. (See comment, below.) Clarification is needed on whether there is any cap on retained rates (e.g., 150 percent of band maximum rate).

- **SSR Supplement Definition**
  A.8. (App. 5-1) – Clarification is needed on the definition of SSR supplement in the context of applying the pay retention provisions. Is it an adjustment to a band maximum rate or an adjustment to an individual's basic pay? Consider adding a reference to Appendix 4 for additional information.

- **Clarification**
  A.9. (App. 5-1) – Insert "or SSR supplement" after "locality pay"?

- **Pay Retention**
  C., Example #2 (beginning on page App. 5-3) – This example deals with a situation where an employee's former rate can be accommodated (slotted) within a band. This slotting is actually an entitlement under pay retention. While no retained rate is established, it preserves the employee's former rate. We recommend changing the sentence beginning "In this case, Susan is not entitled to pay retention . . ." to "Since her pay falls within the rate range, Susan is entitled under pay retention rules to a rate in the range equal to her former rate." Also, revise Step 2 to read "Since Susan's former rate is less than the maximum rate of the pay band level that applies to the new position, her pay is set within the range at a rate equal to her former rate and pay retention ceases to apply."

- **Pay Retention**
  Overall – Please clarify (1) the situations that trigger pay retention, (2) what rates will be used to determine whether an employee is entitled to pay retention and what rate an employee is entitled to retain, (3) when pay retention terminates, and (4) how pay is set when pay retention terminates. Clarification of these issues in regulations or providing DoD authority to clarify in an operating manual is key to ensuring consistency in when and how pay retention provisions are applied and preventing inequitable treatment of employees and costly pay administration problems.

- **Pay Retention**
  C.1. and C.2. (App. page 5-2) – *Situations that trigger pay retention:*
    o Please clarify that such involuntary placements are for reasons other than performance or misconduct.

33

38

0442

○ C.2. describes when pay retention is discretionary ("may be entitled"). Where will this discretion rest? With supervisors? Or will DoD headquarters issue detailed policies to apply DoD-wide?

○ Please clarify whether pay retention will apply to the loss or reduction of an SSR supplement when the employee moves to a position in a different geographic location where no or a lower SSR supplement applies. If DoD intends to administer SSR supplements in the same manner as locality payments, we recommend that DoD process geographic moves (and make any resulting pay adjustments) before processing the action that triggers pay retention.

○ Please clarify whether a reduction or termination of a special rate, which causes a reduction or termination of an SSR supplement, will trigger eligibility for mandatory or discretionary pay retention. (Note that no "placement" is involved. The employee holds the same position as before.)

○ Please clarify whether pay retention (mandatory or discretionary) will apply in other situations that are similar to situations in which pay retention is currently provided, such as movement to a band with a lower maximum rate upon placement in a formal employee development program or actions for which DoD currently grants optional pay retention. (See 5 CFR 536.104.) If DoD adopts a broad discretionary authority, as found in 5 CFR 536.104(b), then it will need to specify exclusions such as those found in 5 CFR 536.105 (e.g., no pay retention for loss of pay resulting from expiration of a temporary promotion or from failure to complete successfully a supervisory probationary period).

• **Rates Used in Pay Retention Determinations**
Appendix 5 (throughout) – *Rates used to determine whether an employee is entitled to pay retention and what rate an employee is entitled to retain:* In determining whether an employee is entitled to pay retention, please clarify whether DoD will compare (1) an employee's basic rate (*excluding* any locality payment or SSR supplement) to the maximum basic rate of the band applicable to the new position (*excluding* any locality payment or SSR supplement) or (2) an employee's adjusted basic rate (*including* any locality payment or SSR supplement) to the maximum adjusted basic rate of the band applicable to the new position (*including* any locality payment or SSR supplement).

○ Appendix 5 is inconsistent in describing this process. For example, the first and second examples in paragraph C. (App. pages 5-2 and 3) appear to use unadjusted basic rates and unadjusted rate ranges (when SSR supplements are not involved), while the third example (App. page 5-3) uses adjusted basic rates and adjusted rate ranges (when SSR supplements are involved). Other provisions in Appendix 5 (and Chapter IV. Pay Administration) are not clear as to whether adjusted or unadjusted rates are used in applying pay retention provisions.

○ C.3. (page App. 5-2) indicates that locality pay is not paid on top of (1) a retained rate that was based on an SSR adjusted rate or (2) a retained rate received by an employee in a position covered in a SSR category. What happens if an employee's retained rate

34

0443

03/09/04  TUE 19:21 FAX 202 606 2573                                  ⁣040

was based on an SSR adjusted rate but the employee is now serving in a non-SSR position? What happens if an employee's retained rate was originally based on the NSPS base rate and the employee later moves to a position covered in a SSR category? We believe this approach of trying to pay locality pay on some types of retained rates and not on other types is fraught with problems.

o  OPM has developed legislation to amend title 5 provisions dealing with special rates, locality rates, and pay retention to address various pay administration anomalies. That legislation is currently under active consideration in Congress. It provides that locality pay is never paid on top of a retained rate and that a retained rate is based on an employee's former highest applicable adjusted rate of basic pay and compared to the highest adjusted rate range applicable to the employee's current position. If an employee's former highest adjusted rate fits within the highest applicable rate range, the employee is alotted into the rate range, and other underlying rates of pay are derived based on the adjusted rate (similar to mass conversion procedures described in Chapter III). We recommend that DoD follow a similar approach.

- **Terminating Conditions**
  **B.1. and B.2. (App. page 5-2) –**

  o  Paragraphs B.1. and B.2. state that pay retention expires 2 years after the effective date of the action that causes pay retention (including the date of conversion into NSPS) or at such time the employee's retained rate falls within the rate range of the current position, whichever occurs first. Please clarify that pay is set at the maximum rate of the applicable band range when a retained rate is terminated. Also, please clarify whether pay retention also will terminate when the employee has a break in service, the employee denies a reasonable offer of a position with a maximum rate that is greater than the employee's retained rate, or the employee is moved to a band with a lower maximum rate for performance or misconduct or at the employee's request. (See 5 CFR 536.209.)

  o  Please clarify that a reduction in basic pay because of the expiration of a 2-year pay retention period is not an adverse action.

- **Pay Setting Upon Termination of Pay Retention**
  **C., third example (App. pages 5-3 and 5-4) –**

  o  The third example in section C appears to use a combination of actual and hypothetical maximum band rates and locality adjustments and is difficult to follow. Some of the numbers don't seem to add up. For example, the first part of the example shows an adjusted rate of $43,000, which consists of a base rate of $28,000 and a SSR supplement of $13,000 (which equals $41,000). Also, in the second part of the example, after ending pay retention, the employee ends up with an adjusted rate of $41,800, which exceeds the stated maximum adjusted rate of $41,547.

  o  Clarification is needed regarding whether the employee's rate of basic pay will be reduced to the maximum rate of basic pay for the band of the employee's position

35

0444

when the 2-year pay retention period expires and the employee will receive the higher of any applicable locality payment or SSR supplement on top of this basic rate.

○ Clarification needed regarding whether the pay of employees with retained rates that are surpassed by maximum band rates will similarly be set at maximum band rate.

## Appendix 7. Benchmark Performance Standards

* **Inadequate Instructions**
The explanation of how to apply the percentages for the benchmark standards is missing or inadequate. For example, what is required to meet the benchmark standard level of 90%— meet all the bullets all the time, all the bullets some/most of the time, some of the bullets all or most of the time? Is it possible to meet some of them and only get 85%? Must points be assigned in 10-point increments (80%, 90%, 100%) except for the 65% standard? The instructions don't address this.

* **Backward Standards**
The benchmark standard level descriptor for 50% is not adequate. The standard is negative, which is an inappropriate way to measure performance even if not subject to MSPB case law and interpretation. If these things happened just once, does the employee meet that level? (The 50% level describes the equivalent of unacceptable performance.)

* **Range of Unacceptable Performance**
There appears to be no way to get below 50% because the 50% descriptor already describes the equivalent of unacceptable performance in terms of what the employee failed to do. If supervisors are supposed to use the range from 0-50% for unacceptable performance, how badly does someone have to fail a factor to get scores below 50?

* **Poor Measures in Generic Standards**
The benchmark standards are very generic. They will require careful explication of what is "adequate quality" for an engineer compared to a budget analyst or a human resources assistant and consistent application to meet the requirement to be fair, credible, and transparent.

* **Lack of Definition of Expectation**
The benchmark standards often refer to meeting or exceeding expectations, but there are no expectations established anywhere in the performance plan, nor does the plan state when/where the expectations will be established/communicated. Standards usually are the established expectations, so it is not appropriate to refer to meeting expectations in the standard itself.

## Appendix 9. Guide to Calculating Pay Pool Funds and Payout

* **Clarification of Example**
B.STEP 3 (page App 9-2) – The range of employee salaries in the example is greater than the CG1 pay band that starts at GS-5/1 and goes to GS-12/10. Maybe the lowest has fallen out of the band and the highest is a retained rate.

○ The payout factor should be 6.6%, not 0.066%.

36

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD H. RUMSFELD, SECRETARY, UNITED STATES DEPARTMENT OF DEFENSE, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 05-2183 (EGS)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF PLAINTIFF NATIONAL FEDERATION OF FEDERAL EMPLOYEES BY RICHARD N. BROWN, NATIONAL PRESIDENT

1.  My name is Richard N. Brown.  I am over eighteen years of age.  I am the National President of the National Federation of Federal Employees (NFFE).  I have been NFFE National President since November 1, 1998.  NFFE is a plaintiff in the above-captioned case.  This declaration states matters known to NFFE and by me personally.

2.  Plaintiff National Federation of Federal Employees, FD-1, IAMAW, AFL-CIO (NFFE), is an unincorporated association having its headquarters at 1016 16th Street, N.W., Washington, D.C. 20036.  NFFE is an exclusive bargaining representative of federal employees, including DoD employees, totaling approximately 65,000 federal employees and 37,000 DoD employees respectively.  In that capacity, NFFE represents the interests of its members and bargaining units by, *inter alia*, negotiating collective bargaining agreements, arbitrating grievances under such agreements, filing unfair labor practice charges, lobbying Congress for favorable working conditions, pay and benefits, and litigating employees' collective and individual rights in federal courts.  In addition to an on-going collective bargaining relationship

**0446**

with DoD and many of its components, NFFE has also been accorded national consultation rights by DoD in accordance with 5 U.S.C. § 7113.

3. In January of 2004, representatives of the DoD notified NFFE of a meeting regarding the National Security Personnel System (NSPS). Representatives of NFFE responded and attended this meeting on January 22, 2004. Only members of DoD were represented at this meeting, including by not limited to Undersecretary of Defense, Ginger Graeber and DoD Director, Labor Relations & Appeals Systems, Tim Curry. No representatives or employees of the Office of Personnel Management (OPM) were in attendance. When questioned about the absence of OPM and whether DoD believed that this meeting met the statutory requirement in 5 U.S.C. § 9902(m)(3), which mandated that DoD *and* OPM begin collaboration with the employee representatives no later than 60 calendar days after the enactment of the National Defense Authorization Act for Fiscal Year 2004, DoD offered no explanation for OPM's absence from this meeting.

4. Subsequent to January 22, 2004, and prior to publication of the proposed rules in the Federal Register on February 14, 2005, DoD and OPM held several meetings regarding NSPS with employee representatives, including but not limited to NFFE and the other plaintiffs in this action. These meetings took place in various locations in and around the Washington, D.C., area including but not limited to the Sheraton Hotel in Crystal City, Virginia, the Ritz-Carlton at Pentagon City, Virginia, the Key Bridge Marriot in Arlington, Virginia, and the Ronald Regan Building on 14th Street, N.W., Washington, D.C. These meetings took place on or about the following dates: February 9 through 10, 2004; February 26 through 27, 2004; June 7, 2004; June 29, 2004; August 16, 2004; August 25 through 26, 2004; October 5, 2004; and December 14, 2004. At each of these meetings, the following individuals represented DoD: Mary Lacey

**0447**

(Director, Program Executive Office-NSPS), Tim Curry (DoD Director, Labor Relations & Appeals Systems), Bradley Bunn (Deputy Program Executive Office-NSPS). On nearly all occasions, Charles Abel, Undersecretary of Defense, attended said meetings. Additional DoD personnel were present during these meetings but not permitted to speak in any capacity. At most of these meetings, the following individuals represented OPM: Ron Sanders (Associate Director of OPM) and George Nesterchuk (Senior Advisor to OPM). Additional OPM personnel were present during these meetings but not permitted to speak in any capacity. At each of these meetings, NFFE was represented by either Susan Tsui Grundmann, NFFE General Counsel, or myself or both.

5. During the spring of 2004, NFFE representatives attended a meeting with OPM principals regarding personnel reform at the Department of Homeland Security. During this meeting, Ron Sanders indicated that DoD, in its initial meetings in January and February of 2004, did not include OPM in its discussions for a new personnel system at DoD and OPM had to 'rein in' DoD. Mr. Sanders advised NFFE that following these initial meetings, which occurred both before and after the 60 calendar day statutory collaboration requirement that authorized defendants to create a new personnel system, OPM had become involved, as required by statute in Public Law 108-136.

6. During the 2004 meetings, defendants' representatives discussed "concepts" with NFFE and the other employee representatives but offered no proposals on what a new human resources and labor relations system would look like. Defendant DoD's representative, Mary Lacey, admitted at these meetings that defendants were conveying "concepts", which were occasionally inconsistent and were periodically contradicting. Any concepts presented at the meetings in 2004 were expressly labeled in the following fashion: "These concepts do not

0448

constitute proposals, and are predecisional." All DoD and OPM representatives consistently maintained that these discussions were outside the statutory process mandated in § 9902 (m)(3). Simultaneously, defendants' representatives consistently maintained that individuals present during the 2004 meetings, referenced in paragraph 4 of this declaration, did not have the authority to bind their respective agencies on terms or agreements, if any, reached during the 2004 meetings. Thus, any discussions on these predecisional concepts, even if agreement were to be reached by NFFE and the other employee representatives, would not bind the defendants, according to the statements made by defendants' representatives and the document disseminated by the defendants.

Attached to this declaration are true and correct copies of some of the referenced documents created by DoD and OPM which were given to NFFE and the other employee representatives during the course of our meetings in 2004. Exhibits A and B, NFFE Decl.

7. During the summer of 2004, NFFE, along with other employee representatives, learned of discussions with secret groups hosted by DoD and OPM. NFFE, along with other employee representatives, repeatedly requested to collaborate and participate in these discussions and meetings but were repeatedly refused by defendants. Despite our requests, DoD and OPM refused to divulge any of defendants' instructions to the groups, any preliminary draft proposals or other work products seen or produced by these secret groups. Instead, defendants steadfastly maintained at each of the 2004 meetings, that defendants would establish DoD's labor relations system via formal, notice and comment rulemaking through the Federal Register. As such, DoD and OPM rejected any NFFE or employee representative collaboration or participation in defendants' secret work groups as well as our request to review defendants' instructions to such groups, any preliminary proposals of these groups, and the final proposed regulations prior to

4

**0449**

publication in the Federal Register.    Defendants' representatives further maintained that following the completion of the 2004 meetings, the agencies would "go dark" and draft the proposed regulations without further comment, input, discussion, or collaboration with NFFE and the other employee representatives. Following the defendants' last substantive meeting with NFFE and the employee representatives on or about December 14, 2004, DoD and OPM "went dark" and refused NFFE and other employee representatives the opportunity to collaborate and participate in the proposed labor relations system.

8. On February 10, 2005, DoD and OPM contacted NFFE and requested that we attend a briefing on DoD's proposed personnel system, which would be published in the Federal Register on February 14, 2005. Secretary of the Navy, Gordon England, represented DoD and Associate Director Ron Sanders represented OPM. At this briefing, Secretary England stated that defendants afforded NFFE and the other employee representatives discussion but not input into the development of the labor relations system.

9. On February 14, 2005, DoD and OPM published its proposed regulations on NSPS including but not limited to the new labor relations system. With nominal exceptions, none of NFFE's concerns or interests were reflected in the proposed regulations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___11-15-2005___

National Federation of Federal Employees
By Richard N. Brown, National President

5

**0450**



# Potential Options for the National Security Personnel System

## Labor Management Relations & Employee Appeals

### Presented to:
### Department of Defense Unions

### August 16, 2004

On June 29, 2004, DoD and OPM leaders met with DoD union leaders to continue discussions on the design and implementation of the National Security Personnel System (NSPS). During that session, DoD and OPM agreed to provide the unions with potential options for NSPS by late August and to organize another meeting to discuss those options. The attached options were developed by the Program Executive Office, NSPS (PEO-NSPS) Working Groups as potential features of the National Security Personnel System Labor Management Relations System and Employee Appeals System. These are working ideas and concepts that have not been approved or endorsed by DoD leadership. The purpose of presenting these options is to generate discussion, and obtain the union's feedback and input into the NSPS design.

These options do not constitute a proposal, and are "predecisional."

Exhibit A **0451**
NEFF Declaration

Potential Options for NSPS LR & Appeals System
August 16, 2004

# Draft Options for the National Security Personnel System Labor Management Relations & Employee Appeals

Ability to act without delay

> Scope of Bargaining
> Length of Bargaining
> Furnishing of Information

Ability to implement DoD and Component-wide policies quickly and consistently

> Local Bargaining on Agency Issuances
> National Level Bargaining
> Multi-unit Bargaining
> National Consultation

Ability to quickly resolve labor disputes

> Dispute Resolution and Third Party Review

Open Management-Employee Communications

> Employee-Management Communications

Ability to handle quickly and decisively, performance deficiencies and egregious misconduct; and
Ability to have a system of appeals that is simple and streamlined

> Consideration of DoD Mission in Appeals Adjudication
> Independent Review
> Expedited Case Processing & Appeal Resolution
> Standard of Evidence and Legal Authorities

Exhibit 0452
NFFE Declaration