IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, <u>et al.</u>, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Case No. 1:05CV02183 EGS |
| DONALD RUMSFELD, SECRETARY OF DEFENSE, <u>et al.</u>, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

Of Counsel:

STEWART ALY
MICHAEL REHEUSER          SUSAN K. RUDY, D.C. Bar # 369112
HELEN SULLIVAN            JOSEPH W. LOBUE, D.C. Bar # 293514
Attorneys                JEFFREY M. SMITH, D.C. Bar # 467936
U.S. Department of Defense   JONATHAN ZIMMERMAN, MA Bar # 654255
                         Attorneys, U.S. Department of Justice
STEVEN ABOW              20 Massachusetts Avenue, N.W., Room 7300
DAVID SCHOLL             Washington, D.C.  20530
ROBIN RICHARDSON         Telephone:  (202) 514-4640
Attorneys                Attorneys for Defendants
Office of Personnel Management

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The National Defense Authorization Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The Implementing Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        1.    Process Leading To Publication of the Final Rule . . . . . . . . . . . . . . . . . . 7

        2.    Regulations Governing Labor Management Relations System (Subpart I) 8

        3.    Regulations Governing Adverse Actions and Appeals (Subparts G and H) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CHALLENGE TO THE APPEALS PROCESS AND CERTAIN LABOR RELATIONS RULES THAT HAVE NOT RESULTED IN ANY ACTUAL OR IMMINENT INJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    Plaintiffs Lack Standing To Challenge The Appeals Process And Portions Of The LR System Because They Have Failed To Allege Any Injury In Fact That Is Fairly Traceable To The Regulations Which They Challenge . . . . . . . . . . . . . . . . . . . . . 15

    B.    Plaintiffs' Challenge To These Same Provisions Is Not Ripe . . . . . . . . . . . . . . . 18

II.    THE LABOR RELATIONS SYSTEM ESTABLISHED BY THE REGULATIONS COMPLIES FULLY WITH THE REQUIREMENTS OF SECTION 9902 . . . . . . . . . . 20

    A.    The Agencies Are Empowered To Establish An LR System For DoD That Modifies The Requirements Of Chapter 71 As Authorized By Section 9902(m) 21

    B.    The Specific Regulations Challenged By Plaintiffs Fall Well Within The Scope Of The Agencies' Authority Under Section 9902(m) . . . . . . . . . . . 31

        1.    The Agencies are authorized to place prospective limits on the scope of bargaining by regulation or issuance (§ 9901.917(d)(1)) . . . . . . . . . . . 31

2. The management rights regulation permissibly addresses the unique role of DoD's civilian workforce (§ 9901.910) . . . . . . . . . . 35

3. The regulations lawfully restrict collective bargaining with respect to employee pay (§§ 9901.305 and 9901.903) . . . . . . . . . . . . . . . . . . . . . . 41

4. The Agencies are empowered to prohibit enforcement of provisions in CBAs that conflict with the regulations and implementing issuances (§§ 9901.103, 9901.905 and 9901.916(a)(7)) . . . . . . . . . . . . . . . . . . . . . 43

5. The regulations creating the NSLRB comply fully with requirements of section 9902(m)(6) (§§ 9901.907 and 9901.908) . . . . . . . . . . . . . . . . . 46

6. The Agencies are authorized to modify the grievance and arbitration procedures established by Chapter 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

7. The Agencies may lawfully require employee representatives to to adhere to the agency's standards of conduct (§ 9901.914(a)(4)) . . . . . 49

8. Plaintiffs' remaining challenges to the LR system are without merit (§§ 9901.903 and 9901.914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

III. THE APPEALS PROCESS IS FULLY CONSISTENT WITH THE STATUTE . . . . . . 55

A. The Appeals Process Provides Fair Treatment To Employees . . . . . . . . . . . . . . 55

1. The regulations afford ample opportunity for employees to create a factual record and obtain independent administrative review . . . . . . . . . . . . . . 56

2. The mitigation standard and mandatory removal offense provisions permissibly implement the agencies' statutory authorization to develop "standards for applicable relief" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

3. Plaintiffs' Remaining "Fairness" Challenges Lack Merit . . . . . . . . . . . 62

B. The Regulations Properly Implement the Statutory Provision Regarding Interim Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

IV. THE AGENCIES COMPLIED WITH THE PROCEDURAL REQUIREMENTS FOR COLLABORATION WITH LABOR ORGANIZATIONS IN THE DEVELOPMENT AND IMPLEMENTATION OF THE LABOR RELATIONS SYSTEM . . . . . . . . . . . 65

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

## TABLE OF AUTHORITIES

### FEDERAL CASES

*AFGE v. FLRA*,
    46 F.3d 73 (D.C. Cir. 1995) ........................................................ 24

*AFGE v. FLRA*,
    144 F.3d 85 (D.C. Cir. 1998) ...................................................... 55

*AFGE v. FLRA*,
    803 F.2d 737 (D.C. Cir. 1986) .................................................... 32

*AFGE v. FLRA*,
    865 F.2d 1283 (D.C. Cir. 1989) .................................................. 53

*AT&T Corp. v. Iowa Utilities Board*,
    525 U.S. 366 (1999) ................................................................. 19

*Adtranz ABB Daimler Benz Transp., N.A. v. N.L.R.B.*,
    253 F.3d 19 (D.C. Cir. 2001) ...................................................... 50

*Association of Civilian Technicians v. FLRA*,
    22 F.3d 1150 (D.C. Cir. 1994) .................................................... 35

*Auer v. Robbins*,
    519 U.S. 452 (1997) ................................................................. 37

*Barnhart v. Sigmon Coal Co., Inc.*,
    534 U.S. 438 (2002) ................................................................. 22

*Barnhart v. Walton*,
    535 U.S. 212 (2002) ............................................................. 21, 31

*Beard v. GSA*,
    801 F.2d 1318 (Fed. Cir. 1986) .................................................. 61

*Bigelow v. Department of Defense*,
    217 F.3d 875 (D.C. Cir. 2000) .................................................... 37

*Brook v. Corrado*,
    999 F.2d 523 (Fed. Cir. 1993) .................................................... 63

*Brown v. Glines*,
    444 U.S. 348 (1980) ................................................................. 51

*Bryant v. NSF*,
    105 F.3d 1414 (Fed. Cir. 1997) ................................................................. 62

*Chevron, USA v. National Resources Defense Council*,
    467 U.S. 837 (1984) ................................................................. 21, 43, 58

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985) ................................................................. 60

*Department of the Air Force v. FLRA*,
    294 F.3d 192 (D.C. Cir. 2002) ................................................................. 50

*Dept. of the Air Force v. FLRA*,
    956 F.2d 1223 (D.C. Cir. 1992) ................................................................. 55

*Dept. of the Army v. FLRA*,
    914 F.2d 1291 (9th Cir. 1990) ................................................................. 41

*Dept. of Veterans Affairs v. FLRA*,
    16 F.3d 1526 (D.C. Cir. 1994) ................................................................. 53

*Eastern Associated Coal Corp. v. United Mine Workers of America*,
    531 U.S. 57 (2000) ................................................................. 45

*Exxon Mobil Corporation v. Allapattah Services*,
    125 S.Ct. 2611 (2005) ................................................................. 30

*F.L.R.A. v. Aberdeen Proving Ground, Department of the Army*,
    485 U.S. 409 (1988) ................................................................. 32, 35

*Food and Drug Administration v. Brown & Williamson Tobacco Corporation*,
    529 U.S. 120 (2000) ................................................................. 23

*Fort Stewart Schools v. FLRA*,
    495 U.S. 641 (1993) ................................................................. 41, 42

*Gilbert v. Homar*,
    520 U.S. 924 (1997) ................................................................. 60

*Greer v. Spock*, 424 U.S. 828 (1976) ................................................................. 51

*Household Credit Serv. v. Pfennig*,
    541 U.S. 232 (2004) ................................................................. 21, 24, 36

*Illinois Nat'l Guard v. FLRA*,
    854 F.2d 1396 (D.C. Cir. 1988) ................................................................. 23

*K Mart Corp. v. Cartier*,
    486 U.S. 281 (1988) ................................................................. 22, 23

*LaChance v. MSPB*,
    147 F.3d 1367 (Fed. Cir. 1998) ................................................... 63

*Lachance v. Devall*,
    178 F.3d 1246 (Fed. Cir. 1999) .............................. 58, 59, 61, 62

*Lewis v. Casey*,
    518 U.S. 343 (1996) ..................................................................... 16

*Lisiecki v. MSPB*,
    769 F.2d 1558 (Fed. Cir. 1985) ................................................... 59

*NTEU v. Chertoff*,
    385 F.Supp.2d 1 (D.D.C. 2005),
    *appeal pending*, Nos. 05-436, 05-437 (D.C. Cir.) ....................... 34

*NTEU v. FLRA*,
    774 F.2d 1181 (D.C. Cir. 1985) ................................................. 54

*NTEU v. U.S.*,
    101 F.3d 1423 (D.C. Cir. 1996) ................................................. 16

*National Ass'n of Mfrs. v. DOI*,
    134 F.3d 1095 (D.C. Cir. 1998) ................................................. 21

*National Federation of Federal Employees v. Department of the Interior*,
    526 U.S. 86 (1999) ..................................................................... 35

*National Park Hospitality Ass'n v. DOI*,
    538 U.S. 803 (2003) ................................................................... 18

*New Jersey Air Nat'l Guard v. FLRA*,
    677 F.2d 276 (D.C. Cir. 1982) ................................................... 23

*Ohio v. DOI*,
    880 F.2d 432 (D.C. Cir. 1989) ................................................... 21

*Parker v. United States Postal Serv.*,
    819 F.2d 1113 (Fed. Cir. 1987) ................................................. 61

*Reno v. Catholic Social Services, Inc.*,
    509 U.S. 43 (1993) ............................................................... 18, 19

*Reno v. Flores,*
    507 U.S. 292 (1993) ................................................................. 35

*Sprint Corp. v. FCC,*
    331 F.3d 952 (D.C. Cir. 2003) ............................................ 19, 20

*Steel Company v. Citizens for a Better Environment,*
    523 U.S. 83 (1998) ............................................................. 15, 16

*U.S. Dept. of Treasury, U.S. Customs Service v. FLRA,*
    43 F.3d 682 (1994) ................................................................. 52

*United Paperworkers Int'l Union, AFL-CIO v. Misco,*
    484 U.S. 29 (1987) ................................................................. 45

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................................... 35

*W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of America,*
    461 U.S. 757 (1983) ............................................................... 46

*Weiss v. U.S. Postal Service,*
    700 F.2d 754 (1st Cir. 1983) .................................................. 61

*Whitmore v. Arkansas,* 495 U.S. 149 (1990) ............................... 18

## ADMINISTRATIVE CASES

*DOJ, INS and AFGE,*
    23 FLRA 90 (1986) ................................................................. 37

*DOJ, INS and AFGE,*
    55 FLRA 892 (1999) ............................................................... 37

## STATUTES

5 U.S.C. § 556 ......................................................................... 57

5 U.S.C. § 557 ......................................................................... 57

5 U.S.C. § 2301 ............................................................... 4, 60, 61

5 U.S.C. § 2302 ............................................................................................ 4

5 U.S.C. § 3105 ...................................................................................... 47, 57

5 U.S.C. § 7101-7135 ............................................................... in passim

5 U.S.C. § 7701 ....................................................................................... 64

5 U.S.C. § 7703 ......................................................................................... 7

5 U.S.C. § 9701 ...................................................................................... 34

5 U.S.C. § 9902 ......................................................................... in passim

41 U.S.C. § 607 ..................................................................................... 47

## LEGISLATIVE MATERIAL

149 Cong. Rec. H4460 (May 21, 2003) (§ 9902(b)(4)) ............................. 28

149 Cong. Rec. H 4461 (May 21,2003) ...................................................... 29

149 Cong. Rec. H10985 (Nov. 7, 2003) ...................................................... 1

149 Cong. Rec. 10988 (Nov. 7, 2003); 149 Cong. Rec. H 10997 (Nov. 7, 2003); 149 Cong.
    Rec. H 10998 .................................................................................. 30

149 Cong. Rec. 14419 (Nov. 11, 2003); 149 Cong. Rec. S 14427 (Nov. 11, 2003); 149
    Cong. Rec. S 14439 (Nov. 11, 2003); 149 Cong. Rec. S 14490 (Nov. 12,
    2003) ............................................................................................. 30

E.O. 10988, § 6(b), 27 Fed. Reg. 551 (Jan. 17, 1962) ................................ 31

E.O. 11491, § 11(a), 34 Fed. Reg. 17605 (Oct. 29, 1969) ........................... 32

E.O. 11838, § 13, 40 Fed. Reg. 7391 (Feb. 6, 1975) ................................ 32

H. Rpt. No. 108-106 at 13 (May 16, 2003) ............................................ 1, 29

H. Conf. Rep. No. 95-1717, at 158, *reprinted in* 1978 U.S.C.C.A.N. 2860, 2893 .................... 32

## RULES

Fed. R. Civ. P. 12(b)(1) ............................................................................ 1

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| AJ | Administrative Judge |
| CBA | Collective Bargaining Agreement |
| CSRA | Civil Service Reform Act |
| DoD | Department of Defense |
| FLRA | Federal Labor Relations Act |
| HR | Human resources management |
| LR | Labor relations |
| MRO | Mandatory removal offense |
| MSPB | Merit Systems Protection Board |
| NDAA | National Defense Authorization Act For Fiscal Year 2004 |
| NSLRB | National Security Labor Relations Board |
| NSPS | National Security Personnel System |
| OPM | Office of Personnel Management |
| RFR | Request for Reconsideration |
| ULP | Unfair Labor Practice |

## PRELIMINARY STATEMENT

Faced with "radical changes in the international security environment" in recent years, Congress concluded that it is "vital to transform the way the Department of Defense operates." H. Rpt. No. 108-106 at 13 (May 16, 2003).  As the Chairman of the House Armed Services Committee explained: "Right now, we are facing . . .  a new war . . . in which we see terrorists with high technology.  We have to be flexible.  We have to move quickly, and that involves people who not just wear the uniform of the United States, it also involves people who wear the civil service uniform."  149 Cong. Rec. H10985 (Nov. 7, 2003).  To achieve these ends, Congress conferred broad discretion on the Secretary of the Department of Defense (DoD) and the Director of the Office of Personnel Management (OPM) (hereinafter the "Agencies") to waive many existing civil service laws and to establish a new "National Security Personnel System" ("NSPS"), a new appeals process for employment disputes and a new labor relations ("LR") system to address the unique role that the DoD's civilian workforce plays in supporting its national security mission.

After notice and public comment, and an extensive 18-month collaboration process with unions representing DoD employees, the Agencies published a final rule on November 1, 2005.  The rule establishes the NSPS, a new LR system, and a new administrative process for resolution of employee appeals from adverse personnel actions.  Plaintiffs now challenge the validity of the LR system and the appeals process, alleging that the Agencies failed to comply with several substantive statutory and procedural requirements.  These claims are uniformly without merit.

First, plaintiffs lack standing to challenge the appeals process, and some of the rules implementing the LR system, because they have failed to allege any injury-in-fact that is fairly traceable to those provisions.  Because these same rules have not been applied to plaintiffs, will not have any impact upon plaintiffs until such time as they are, and involve discretionary decisions that have not yet been formalized, plaintiffs' claims are also not ripe.

On the merits, plaintiffs' central contention is that the LR system created pursuant to § 9902 must substantially mirror the pre-existing requirements of Chapter 71 of Title 5. As we explain in Point II, that contention is fundamentally irreconcilable with the plain meaning of § 9902(m). That section authorizes the Agencies to establish an LR system that departs in significant respects from Chapter 71 to address the "unique role" of DoD's civilian workforce, to allow for a collaborative issue-based approach to labor management relations, to authorize bargaining above the level of exclusive recognition, and to permit the Agencies to determine what decisions are reviewable by a third party, what third party will conduct the review, and what standards will be applied. The statute also explicitly authorizes the Agencies to implement the system without securing the agreement of labor organizations, and mandates that the new system will be binding on employee representatives and supersede all collective bargaining agreements ("CBAs") except as otherwise determined by the Secretary. Finally, the statute provides that, unless extended, the Agencies' authority to implement a new LR system will expire six years after the date of enactment *at which time* the provisions of chapter 71 *will apply.* Given these provisions, plaintiffs' contention that the new LR system must comply with the requirements of Chapter 71 *before* the expiration of that six-year period is unfounded and should be dismissed for failure to state a claim upon which relief can be granted.

Plaintiffs' claim that the appeals process for resolving adverse personnel actions is "unlawful" is also without merit. The statute authorizes the Agencies to establish an appeals process that provides employees fair treatment in any appeals that they bring in decisions relating to their employment and to establish new legal standards and procedures for personnel actions, including standards for applicable relief. Contrary to plaintiffs' claims, there is nothing unfair about mandating the removal of DoD employees who commit offenses that have a direct and substantial adverse impact on DoD's national security mission. Nor is there any unfairness in allowing an employing

agency to determine what penalty is appropriate for employee misconduct particularly where, as here, such an action may be sustained only if: (1) an administrative judge ("AJ") determines that the action is supported by a preponderance of the evidence and the agency's penalty determination is not totally unwarranted in light of all pertinent circumstances; (2) the MSPB determines that the agency's action is not arbitrary or capricious; and (3) a court of appeals sustains both determinations. Taken together, the Agencies' conclusion that the process established by the rule satisfies the "fair treatment" requirement in the statute is reasonable and entitled to deference.

Finally, plaintiffs' procedural challenge to the rule is groundless. The Agencies scrupulously complied with the statutory requirements for ensuring participation of employee representatives, including the requirement that they be afforded an opportunity to have meaningful discussions with management regarding the development of the new system. The Agencies sought input from employee representatives on what the new system should look like before the Agencies had even formulated any proposal, afforded them an ample opportunity to make recommendations with respect to the Agencies' proposal once it was completed, and engaged in an extensive meet and confer process in an attempt to resolve disputed issues. The Agencies also carefully considered the recommendations made by employee representatives, including the views that they expressed during the meet and confer process, and made significant changes in the new system in response. When the Secretary concluded that further mediation and consultation was unlikely to produce agreement, the Agencies published a final rule resolving all remaining issues. The statute requires nothing more, and plaintiffs' procedural challenge should be dismissed.

## STATUTORY AND REGULATORY BACKGROUND

### A.    The National Defense Authorization Act

As part of the National Defense Authorization Act for Fiscal Year 2004 ("NDAA"), Pub. L.

No. 108-136, 117 Stat. 1392 (Nov. 24, 2003), Congress granted broad authority to the Agencies to waive or modify much of Title 5 and to establish a new "National Security Personnel System."

5 U.S.C. § 9902(a).  Section 9902(a) provides that: "*Notwithstanding any other provision of this part*, the Secretary may, in regulations prescribed jointly with the Director, establish, and from time to time adjust, a human resources management ["HR"] system for some or all of the organizational or functional units of the Department of Defense."  5 U.S.C. § 9902(a) (emphasis added).  The phrase "this part" refers to Part III of Title 5 ("Employees") (5 U.S.C. §§ 2101-9904).

Section 9902(b) requires that the HR system established pursuant to § 9902(a) meet certain "System Requirements."  Among other things, this section requires that the HR system:

> (1) be flexible; (2) be contemporary; * * * (4) ensure that employees may organize, bargain collectively as provided for in this chapter, and participate through labor organizations of their own choosing in decisions which affect them, subject to the provisions of this chapter and any exclusion from coverage or limitation on negotiability established by law; * * * and (6) include a performance management system that incorporates * * * [a] pay-for-performance evaluation system to better link individual pay to performance, and provide an equitable method for appraising and compensating employees.

5 U.S.C. § 9902(b)(1), (2), (4), and (6).

Section 9902(b) also contains a list of provisions that the HR system may "not waive, modify, or otherwise affect" notwithstanding the broad authority conferred by Section 9902(a). These include provisions that establish "merit systems principles" (5 U.S.C. § 2301) and "prohibited personnel practices" (5 U.S.C. § 2302), *see* 5 U.S.C. §§ 9902(b)(3)(A)-(C), as well as five specified subparts and 11 chapters within Title 5 that are nonwaivable "to the extent not otherwise specified in this title."  *Id.*, §§ 9902(b)(3)(D) and (d).  The provisions listed in § 9902(d)(2) include Chapter 71 which generally governs labor relations and collective bargaining in the federal sector.

In addition to authorizing establishment of the HR system, the statute also provides that, notwithstanding the limitation in 5 U.S.C. §9902(d)(2), the Agencies are authorized to establish and

implement an LR system for DoD that substantially departs from the requirements of Chapter 71. More specifically, § 9902(m)(1) provides that: "*Notwithstanding section 9902(d)(2)* [which would otherwise make Chapter 71 of Title 5 "nonwaivable"], the Secretary, together with the Director, may establish and from time to time adjust a [LR] system for [DoD] to address the unique role that the Department's civilian workforce plays in supporting the Department's national security mission." 5 U.S.C. § 9902(m)(1) (emphasis added).  In addition to this broad grant of authority, the statute requires that the new LR system "allow for a collaborative issue-based approach" (§ 9902(m)(2)), provides for collaboration and bargaining with employee representatives at a level "above the level of exclusive recognition" of labor organizations (§§ 9902(g) and 9902(m)(4) and (m)(5)), requires that the LR system "provide for independent third party review of decisions," and authorizes the Agencies to "defin[e] what decisions are reviewable by the third party, what third party would conduct the review, and the standard or standards for that review" (§ 9902(m)(6)).  Finally, it states that the Agencies' authority to establish, implement, and adjust the new LR system expires six years after the date of enactment "at which time the provisions of chapter 71 will apply" (§ 9902(m)(9)).

To ensure participation by employee representatives in the development and implementation of the new LR system, the statute requires that the Agencies afford employee representatives and management an "opportunity to have meaningful discussions" concerning the development of the new system, employee representatives be given 30 days to review any proposal for the LR system and make recommendations with respect to it, the Agencies give those recommendations "full and fair consideration," and the Agencies meet and confer for an additional 30-day period in order to attempt to reach agreement with respect to those parts of the proposal as to which the recommendations have not been accepted.  5 U.S.C. § 9902(m)(3)(A) & (B).  If the Secretary "in his discretion" determines that "further consultation and mediation is unlikely to produce an agreement,"

the statute authorizes him to implement "any or all" of the disputed provisions, including any modifications made in response to the unions' recommendations "the Secretary deems advisable." *Id.*, § 9902(m)(3)(C)(ii). The statute provides further that the new LR system "shall be binding on all bargaining units within the [DoD], all employee representatives of such units, and the DoD and its subcomponents, and shall supersede all other collective bargaining agreements for bargaining units within the DoD . . . except as otherwise determined by the Secretary" (§ 9902(m)(8)).

The statute also authorizes the Secretary to "establish an appeals process that provides employees . . . fair treatment in any appeals that they bring in decisions relating to their employment." 5 U.S.C. § 9902(h)(1)(A). "Regulations implementing the appeals process may establish legal standards and procedures for personnel actions, including standards for applicable relief, to be taken on the basis of employee misconduct or performance that fails to meet expectations." *Id.*, § 9902(h)(2)). "Legal standards and precedents applied before the effective date of [§ 9902] by the [MSPB] and the courts under chapters 43, 75, and 77 of [Title 5]" are applicable to NSPS employees "unless such standards and precedents are inconsistent with the legal standards established under [§ 9902(h)]." *Id.*, § 9902(h)(3). However, "[n]othing in [subsection (h)] shall be construed to authorize the waiver of any provision of law . . . that is not otherwise waivable under subsection (a) [of § 9902]." *Id.*, § 9902(h)(7).

The statute grants an NSPS employee who is subject to certain major personnel actions (*e.g.*, removal, suspension for more than 14 days, or reduction in pay), who is not serving under a probationary period, and who would otherwise be eligible to appeal a performance based or adverse action under pre-existing provisions in Chapter 43 or 75 of Title 5 "the right to petition the full [MSPB] for review of the record of [DoD's] decision pursuant to regulations established under [§ 9902(h)(2)]." *Id.*, § 9902(h)(4). The MSPB may, in turn, order "corrective action" only if it

- 6 -

determines that DoD's decision was "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule or regulation having been followed; or (C) unsupported by substantial evidence." *Id.*, § 9902(h)(5). An employee who is adversely affected by a final order or decision of the MSPB may obtain judicial review of the decision in the Federal Circuit as provided in 5 U.S.C. § 7703. *Id.*, § 9902(h)(5).

### B.   The Implementing Regulations

#### 1.   Process Leading To Publication of the Final Rule

Beginning in January, 2004, the Agencies met with union leaders "for the purpose of exchanging ideas and interests on a new [LR] system." 70 Fed. Reg. 66116, 66120 (Nov. 1, 2005). During the balance of 2004, the Agencies held 10 additional meetings with officials from 43 unions representing DoD employees "to discuss the design elements, options, and proposals under consideration for NSPS and solicit union feedback." *Id.* The Agencies also conducted focus groups with DoD employees throughout the world to ask "what they thought worked well in the current HR systems and what they thought should be changed," and town hall meetings to "provide the status of the design and development of NSPS, and solicit thoughts and ideas." *Id.* at 66121.

In conjunction with the process of seeking input from DoD employees, union representatives, and other interested stakeholders, the Agencies established Working Groups composed of over 120 employees representing the Military Departments, other DoD components, and OPM, and developed a set of options for the NSPS that culminated in the publication of a proposed rule in the Federal Register. 70 Fed. Reg. 7552 (Feb. 14, 2005). After 30 days for submission of public comments, in April 2005, the Agencies initiated "the second step in the formal development process – an additional 30-day period during which DoD and OPM representatives were to meet and confer with employee representatives to resolve differences over the proposed regulations wherever possible."

70 Fed. Reg. 66122.  The Agencies also sought the assistance of federal mediators, conducted face-to-face meet and confer sessions on 19 days between April 18, 2005 and June 2, 2005, and met with the principals of the unions in June 2005 to resolve the remaining issues.  *Id.*

The Agencies' review of the public comments and proposals made during the meet and confer process led to significant revisions of the proposed rule; however, substantial differences with labor organizations remained over, among other things, the scope of collective bargaining and the enforceability of provisions in CBAs that are inconsistent with issuances that implement the NSPS regulations.  *Id.* at 66122-23.  In accordance with § 9902(m)(3)(C)(ii), the Secretary determined that "further consultation and mediation [was] unlikely to produce agreement" and, on November 1, 2005, the Agencies published a final rule establishing the new system.  70 Fed. Reg. 66116.

## 2.  Regulations Governing Labor Management Relations System (Subpart I)

Subpart I of the rule (70 Fed. Reg. 66210-66220 (§§ 9901.901-9901.928)) "implement[s] the provisions in 5 U.S.C. 9902(m) relating to the Department's labor-management relations system."  *Id.* at 66210 (§ 9901.901).   As the regulations reflect, the purposes of the LR system are to "address[] the unique role that the Department's civilian workforce plays in supporting the Department's national security mission and promote[] a collaborative issue-based approach to labor management relations," and to "recognize the rights of DoD employees to organize and bargain collectively, as provided for in 5 U.S.C. 9902 and this part . . . ."  *Id.*

***Duty to bargain and consult.***  Consistent with these purposes, the rule provides that "[e]ach employee has the right to form, join, or assist any labor organization . . . freely and without fear of penalty or reprisal . . . [and] [t]o engage in collective bargaining with respect to conditions of employment through representatives chosen by employees . . . ."  *Id.* at 66212 (§ 9901.906).  The regulations impose an obligation on DoD to "meet and negotiate in good faith . . . for the purpose

of arriving at a [CBA]," *id.* at 66217 (§ 9901.917(a)).  In addition, it is an unfair labor practice (ULP) for DoD to "refuse . . . to negotiate in good faith or consult with a labor organization as required by [subpart I of the rule]."  *Id.* at 66216 (§9901.916(a)(5)).

The regulation defines the term "collective bargaining" as "the performance of the mutual obligation of a management representative of the Department and an exclusive representative of employees . . . to meet at reasonable times and to consult and bargain in a good faith effort to reach agreement, pursuant to 5 U.S.C. 9902 and this subpart, with respect to the *conditions of employment* affecting such employees . . . ."  *Id.* at 66211 (§ 9901.903) (emphasis added).  "Conditions of employment" is broadly defined to include "personnel policies, practices and matters affecting working conditions – whether established by rule, regulation or otherwise . . .," *id.*,  however, it explicitly does not include "policies, practices, and matters" relating to, among other things, "[t]he pay of any employee or for any position, including any determinations regarding pay or adjustments thereto under subpart C of [the regulations]."  *Id.*  The duty to bargain does not extend to "matters that are inconsistent with law or the regulations in [Part 9901], Governmentwide rules . . ., issuances and implementing issuances, or Executive orders."  *Id.* at 66217 (§ 9901.917(d)(1)).  Similarly, management "has no obligation to bargain or consult over a change to a condition of employment unless the change is otherwise negotiable . . . and is foreseeable, substantial, and significant in terms of both impact and duration on the bargaining unit . . . ."  *Id.* (§ 9901.917(d)(2)).

*Management rights.*  The rule limits DoD's general obligation to bargain with respect to "conditions of employment" by designating certain categories of agency actions as "management rights," *i.e.*, actions that DoD management retains the right to take without engaging in collective bargaining.  *Id.* at 66213 (§ 9901.910(a) and (b)).  Specifically, management retains the right to determine the agency's "mission, budget, organization, number of employees, and internal security

- 9 -

practices," *id.* (§ 9901.910(a)(1)); to hire, assign and direct employees, contract out functions, determine the personnel by which operations may be conducted, and "take whatever other actions may be necessary to carry out the Department's mission," *id.* (§ 9901.910(a)(2)); and to lay off, retain, discipline, pay, and promote employees, *id.* (§ 9901.910(a)(3)).

The regulations require management to bargain with respect to the "procedures which management officials and supervisors will observe in exercising any authority under paragraph (a)(3) of [§ 9901.910]" (*e.g.*, decisions to lay off, suspend, remove, reduce in pay, or otherwise discipline employees). *Id.* at 66214 (§ 9901.910(f)(1)(i)). In contrast, the rule provides that, absent prior authorization of the Secretary, management is prohibited from bargaining over the "procedures that it will observe in exercising" the management rights identified in sections 9901.910(a)(1) and (a)(2) (which generally encompass actions directly affecting the Department's ability to carry out its mission). *Id.* at 66213 (§ 9901.910(b) and (c)). Notwithstanding this prohibition, the Secretary may authorize bargaining over such procedures if he determines, in his discretion, that bargaining is "necessary to advance the Department's mission or promote organizational effectiveness." *Id.* (§ 9901.910(c)). In the absence of such a determination, management is required to "consult" with an exclusive representative over such procedures. *Id.* (§ 9901.910(d)).

Management is required to bargain with respect to "[a]ppropriate arrangements for employees adversely affected by the exercise of any authority under paragraph (a)(3) of [§ 9901.910]" (which again pertains to non-operational actions such as layoffs or disciplinary actions). *Id.* at 66214 (§ 9901.910(f)(1)(i)). Management is likewise required to bargain with respect to "[a]ppropriate arrangements for employees adversely affected by the exercise of any authority under paragraphs (a)(1) and (a)(2) of [§ 9901.910]," including "proposals on matters such as personal hardships and safety measures." *Id.* (§ 9901.910(f)(1)(ii)). However, the duty to bargain with respect to

"appropriate arrangements" does not include "proposals on matters such as the routine assignment to specific duties, shifts, or work on a regular or overtime basis except when the Secretary . . . authorizes such bargaining." *Id.* (§ 9901.910(f)(2)).  In addition "mid-term agreements" with respect to the management rights identified in paragraphs (a)(1) and (a)(2) are not "precedential or binding on subsequent acts . . . ." *Id.* (§ 9901.910(h)).

If an obligation exists to bargain regarding the exercise of a management right, management *must* "provide notice to the exclusive representative concurrently with the exercise of that authority," but "*may* provide notice . . . of its intention to exercise [a management right] as far in advance as practicable." *Id.* (§ 9901.910(e)) (emphasis added).  However, "[n]othing will delay or prevent the Secretary from exercising his or her authority under [subpart I of the rule]." *Id.* (§9901.910(i)).

***Resolution of labor disputes.***  The regulations prescribe procedures for resolving impasses and enforcing collective bargaining obligations.  Among other things, it creates the National Security Labor Relations Board (NSLRB), 70 Fed. Reg. 66212 (§§ 9901.907, 9901.908), which adjudicates certain matters previously decided by the Federal Labor Relations Authority (FLRA) in the first instance.[1] *Compare id.* § 9901.908(b) with 5 U.S.C. §§ 7105, 7118.  NSLRB decisions concerning certain ULPs, exceptions to arbitration awards, and negotiability disputes may be appealed to the FLRA, which must sustain the NSLRB's decision unless it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, based on a procedural error, or unsupported by substantial evidence. 70 Fed. Reg. 66212 (§ 9901.908(b)), 66213 (§ 9901.910(a)(4) and (c)).  Other matters including the determination of appropriate bargaining units, supervision of elections, and disputes regarding national consultation rights will be heard in the first instance by the FLRA. *Id.*

---

[1]  The Board has authority to conduct investigations and resolve allegations of unfair labor practices, to resolve issues relating to the scope of bargaining and the duty to bargain in good faith, to resolve exceptions to arbitration awards, and to resolve negotiation impasses. *Id.* (§ 9701.908(b)).

(§ 9901.909(a)(1)-(3)).  The regulation does not waive 5 U.S.C. § 7123 which provides for judicial review of FLRA decisions in the courts of appeals.  *Id*. (§ 9901.909(d)).

The regulations also incorporate provisions governing the resolution of "grievances," *id.* at 66218 (§ 9901.922), and exceptions to arbitration awards, *id.* at 66219 (§ 9901.923(a)).[2]  Under the rule, "any [CBA] will provide procedures for the settlement of grievances, including questions of arbitrability."  *Id.* at 66218 (§ 9901.922(a)(1)).  Except as specified in the rule, the procedures established by the CBA are "the exclusive procedures for grievances which fall within its coverage."  *Id.*  A grievance that is "not satisfactorily settled under the negotiated grievance procedure is subject to binding arbitration . . . ."  *Id.* (§ 9901.922(b)(1)(iii)).  Either party to an arbitration proceeding may file an exception to an arbitrator's award with the NSLRB except for awards that are issued in connection with adverse personnel actions appealable to the MSPB.  *Id.* at 66219 (§ 9901.923(a)).

The regulations governing grievances establish special procedures for matters that are appealable to the MSPB that are of particular pertinence here.  First, the grievance procedures do not apply with respect to an employee who is subject to "[a] removal taken under [a mandatory removal offense ("MRO")] as defined in § 9901.712."  *Id.* at 66218 (§ 9901.922(c)(4)).[3]  Second, an arbitrator hearing a dispute concerning an adverse personnel action appealable to the MSPB is bound by the requirements of the regulations governing such actions.  *Id.* (§ 9901.922(f)(2)).  Third, the rule

---

[2]  The term "grievance" is broadly defined to include, among other things, "any complaint" by an employee or a labor organization concerning "any matter relating to the conditions of employment of [an] employee," "[t]he effect or interpretation, or a claim of breach of a collective bargaining agreement," or "any claimed violation, misinterpretation, or misapplication of any law, rule, regulation, or issuance issued for the purpose of affecting conditions of employment."  *Id.* at 66211 (§ 9901.903) (definition of "grievance").

[3]  Section 9901.712 prescribes separate procedures for adverse actions taken against DoD employees for "mandatory removal offenses," *i.e.*, "offenses that have a direct and substantial adverse impact on the Department's national security mission."  *Id.* at 66206 (§ 9901.712).

requires exceptions to arbitration awards concerning such actions to be adjudicated under the regulatory appeals procedures established for such actions in sections 9901.807(g) and (h) of the rule. *Id.* at 66219 (§ 9901.923(a)). Those appeals procedures are discussed in more detail below.

***Impact of the regulations on existing CBAs.*** In accordance with 5 U.S.C. § 9902(m)(8), any provision of a CBA that is inconsistent with the regulations and/or "implementing issuances" that carry out the regulations is unenforceable. 70 Fed. Reg. 66211 (§ 9901.905(a)). The term "implementing issuance" is defined as a document issued by the Secretary or certain other designated DoD officials to "carry out a policy or procedure implementing [the NSPS regulations]." 70 Fed. Reg. 66190 (§ 9901.103) (definition of "implementing issuance").[4] In contrast, the regulations provide that it is an unfair labor practice ("ULP") to "enforce any issuance (other than an implementing issuance), or Governmentwide regulation, which is in conflict with an applicable [CBA] if the agreement was in effect before the issuance or regulation was prescribed." *Id.* at 66216 (§ 9901.916(a)(7)). This same distinction is reflected in § 9901.914(d)(5) of the rule:

> Provisions in existing [CBAs] are unenforceable if they are contrary to Federal law, Presidential issuance (*e.g.*, Executive order), the regulations in this part, or implementing issuances. Provisions in existing [CBAs] that are inconsistent with Governmentwide regulations or issuances (other than implementing issuances), are unenforceable upon expiration, extension, renewal, or renegotiation of the [CBA], whichever occurs first.

*Id.* at 66216 (§ 9901.914(d)(5)). Union representatives may appeal a DoD determination that any provision in a CBA is unenforceable to the NSLRB and ultimately to the FLRA. *Id.* at 66211-66213, 66218 (§ 9901.905(a), § 9901.908(b)(2) and (b)(4), § 9901.909(a)(4), and § 9901.920).

### 3.    Regulations Governing Adverse Actions and Appeals (Subparts G and H)

The rule also modifies certain standards and procedures governing adverse personnel actions

---

[4] An "issuance" is defined as a document issued by these same officials to "carry out a policy or procedure of the Department" other than implementation of the NSPS regulations. *Id.* at 66211 (§ 9901.903) (definition of "issuance").

and appeals. 70 Fed. Reg. 66205-207 (Subpart G – Adverse Actions) and 66208-210 (Subpart H – Appeals). An employee must be given 15 days advance written notice of a proposed adverse action, an opportunity to reply, and a decision notice specifying the reasons for any adverse action taken. 70 Fed. Reg. at 66206-207 (§§ 9901.713-9901.726). The employee has the right to appeal the decision to the MSPB. *Id.* at 66208 (§ 9901.807(a)(1)). Upon the filing of such an appeal, the MSPB is required to refer the matter to an administrative judge ("AJ") for adjudication. *Id.* (§ 9901.807)(a)(2)(ii)). The AJ must render an initial decision within 90 days after the appeal is filed, *id.* at 66209 (§ 9901.807(f)(1)), and must sustain the action if it is supported by a preponderance of the evidence unless the employee demonstrates a harmful procedural error, or that the action was based on a prohibited personnel practice or not in accordance with law. *Id.* (§ 9901.807(e)(1)).[5] If the action is sustained, the AJ may not modify the penalty imposed by the agency unless it is found to be "totally unwarranted in light of all pertinent circumstances." *Id.* (§ 9901.807(f)(2)).

The AJ's initial decision will become DoD's final decision 30 days after it is issued unless either party files a request for reconsideration (RFR). *Id.* (§ 9901.807(g)(1)). If an RFR is filed, the AJ's decision will become DoD's final decision 30 days after the request is filed unless DoD notifies the parties that it will act on the RFR. *Id.* (§ 9901.807(g)(2)). If DoD decides to act on the RFR, the other party will be provided an opportunity to respond. *Id.* After receipt of a timely response, DoD can remand the matter, or modify or reverse the AJ's initial decision if it determines that there has been a "material error of fact" or that there is "new and material evidence that, despite due diligence, was not available when the record was closed." *Id.* (§ 9901.807(g)(2)(A)). DoD can also modify

---

[5] The regulations also provide that neither the AJ nor the full MSPB may reverse an action "based on the way in which the charge is labeled or the conduct characterized, provided that the employee has sufficient notice to respond to the charge," 70 Fed. Reg. 66209 (§ 9901.807(f)(3)), or "based on the way a performance expectation is expressed, provided that the expectation would be clear to a reasonable person." *Id.* (§ 9901.807(f)(4)).

or reverse the AJ's initial decision if DOD determines that the decision has a direct or substantial adverse impact on the Department's national security mission or is based on an erroneous legal interpretation.  *Id.* (§ 9901.807(g)(2)(B)).  Alternatively, DoD can issue a final DoD decision affirming the AJ's initial decision.  *Id.* (§ 9901.807(g)(2)(C)).  Employees have the right to file a petition for review of DoD's final decision by the full MSPB which can order corrective action if it determines that the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, obtained without procedures required by law or regulation having been followed, or unsupported by substantial evidence.  *Id.* (§ 9901.807(h)(2)).  Final decisions of the MSPB are subject to judicial review in the Federal Circuit.  *Id.* (§ 9901.807(i)).

The rule also creates a category of "mandatory removal offenses" (MROs) which are offenses that the Secretary has determined "have a direct and substantial adverse impact on the Department's national security mission," and hence require mandatory removal of the employee from his or her position.  *Id.* at 66206 (§ 9901.712(a)).  The procedures for appeals of adverse actions based on MROs are the same as those applicable to other offenses except that an AJ that sustains an MRO may not mitigate the penalty imposed.  *Id.* at 66210 (§ 9901.908(a) and (b)).  MROs are reviewed by the full MSPB under the same standards as any other adverse action.  *Id.* (§ 9901.807(h)(2).

## ARGUMENT

I.  **THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CHALLENGE TO THE APPEALS PROCESS AND CERTAIN LABOR RELATIONS RULES THAT HAVE NOT RESULTED IN ANY ACTUAL OR IMMINENT INJURY**

A.  **Plaintiffs Lack Standing To Challenge The Appeals Process And Portions Of The LR System Because They Have Failed To Allege Any Injury In Fact That Is Fairly Traceable To The Regulations Which They Challenge**

Three requirements must be met to satisfy the "irreducible constitutional minimum of standing."  *Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998). "First and

foremost, there must be alleged (and ultimately proved) an 'injury in fact' - - a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Id.* at 103, (*quoting in part*, *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)); *NTEU v. U.S.*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (injury alleged cannot be "conjectural or hypothetical," "remote," "speculative," or "abstract"). "Second, there must be causation - - a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. . . . And third, there must be redressability - - a likelihood that the requested relief will redress the alleged injury." *Steel Company*, 523 U.S. at 103. "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Id.* Plaintiffs have failed to allege any injury-in-fact that is fairly traceable to several of the regulations that they challenge.

Plaintiffs have standing to challenge LR regulations that limit the scope of bargaining with respect to management rights and employee pay (*see* Point II.B.2 and II.B.3., *infra*), the composition of the NSLRB (*see* Point II.B.5., *infra*), regulations that limit grievances (*see* Point II.B.6. insofar as it relates to §§ 9901.924(c)(4) and 9901.923(a)), as well as the procedures used in developing the LR system (*see* Point IV., *infra*). However, "standing is not dispensed in gross," and "a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Lewis v. Casey*, 518 U.S. 343, 358 n. 6 (1996). Thus, whatever "injury" might be caused by the foregoing provisions cannot provide standing for plaintiffs to challenge other regulations that have not resulted in any actual or imminent injury.

Plaintiffs have not and cannot allege any actual or imminent injury that is fairly traceable to §§ 9901.905(a) and 9901.917(d)(1) insofar as those provisions address "implementing issuances" that place restrictions on bargaining (*see* Point II.B.1. and 4) unless and until such an implementing issuance is promulgated by DoD.  Plaintiffs have also failed to allege any injury that is fairly traceable to § 9901.922(f)(2) which merely provides that arbitrators hearing grievances with respect to adverse actions are bound by the regulations governing such actions (*see* Point II.B.6, *infra*).

Nor have plaintiffs alleged any injury-in-fact that is fairly traceable to § 9901.914(a)(4) which merely provides that employee representatives are "subject to the same expectations regarding conduct as any other employee," 70 Fed. Reg. 66215.   Plaintiffs have not alleged that they intend to act otherwise, but have been prevented from doing so by this regulation.  Nor do they allege that the Agencies have threatened to enforce this regulation against any past conduct.  In the absence of any such allegations, they lack standing to challenge this provision.

Plaintiffs' Amended Complaint ("Compl.") is also devoid of any allegation of injury that is fairly traceable to the regulatory definitions of the terms "grievance" and "supervisor" in § 9901.903, or  the rules specifying the circumstances in which an employee representative may attend a "formal discussion" concerning a grievance or personnel policy (§ 9901.914(a)(2)) or obtain access to information needed for collective bargaining (§ 9901.914(c)(2)).  *See generally* Point II.B.8., *infra*. Plaintiffs do not allege that they sought to attend a "formal discussion" and were denied the opportunity to do so; nor do they contend that they sought and were denied access to information.

With respect to plaintiffs' challenge to the NSPS appeals process (*see* Point III, *infra*), the Amended Complaint contains no allegations remotely suggesting that any employee has suffered or imminently will suffer any "particularized injury" that is fairly traceable to these regulatory provisions.  At most, plaintiffs' allegations amount to a generalized concern that, if some as yet

unknown employee should appeal an adverse action, he *might* be subject to an (as yet undefined) mandatory removal offense ("MRO"), or he *might* fail to have a (non-MRO) penalty mitigated by an administrative judge or arbitrator, or DoD *might* reverse an AJ ruling during the administrative decision process, or DoD *might* place the employee in an alternative position after the MSPB has issued (as yet hypothetical) interim relief. It is established, however, that the mere possibility of future injury is insufficient to satisfy Article III standing requirements. . *Whitmore*, 495 U.S. at 155.

### B.    Plaintiffs' Challenge To These Same Provisions Is Not Ripe

"The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *National Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 808 (2003) (quoting in part *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57 n.18 (1993) ("*CSS*")). It is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *National Park*, 538 U.S. at 807-808 (*quoting in part Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-149 (1967)).

To determine whether administrative action is ripe, the courts "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.*, 538 U.S. at 808. "[A] regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Id.* at 808 (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). As the Supreme Court explained in *CSS*, promulgation of a regulation may itself affect parties concretely enough to satisfy

the ripeness requirement where, for example, a regulation presents the plaintiffs "with an immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation." 509 U.S. at 57. Conversely, a challenge to a "regulation, the impact of which could not 'be said to be felt immediately by those subject to it in conducting their day-to-day affairs' . . . would not be ripe before the regulation's application to the plaintiffs in some more acute fashion, since 'no irremediabl[y] adverse consequences flow[ed] from requiring a later challenge.'" *Id.* at 58 (*quoting in part Toilet Goods Assn. v. Gardner*, 387 U.S. 158, 164)).

Judicial review of the regulations discussed in Point I.A. above that have neither been applied to plaintiffs nor had any concrete effect of any kind on plaintiffs are also not ripe for review. Plaintiffs have not alleged that they will suffer any hardship if judicial review of these provisions is deferred until they are applied to plaintiffs through some concrete action. Moreover, none of these provisions is "fit" for judicial review at this time. Plaintiffs' claim that §§ 9901.905(a) and 9901.917(d)(1) authorize DoD to promulgate "implementing issuances" that unlawfully limit the scope of bargaining is plainly not ripe where, as here, the regulation "no immediate effect on the plaintiffs' primary conduct." *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 386 (1999). Judicial review of the validity of such implementing issuances would be particularly inappropriate now given the fact that it would prematurely disrupt the continuing collaboration process mandated by 5 U.S.C. § 9902(f) and (m)(3), and § 9901.106. *See* Stip. and Order (Nov. 16, 2005) (¶ 2.A.).

The Court's assessment of the validity of the regulation providing that employee representatives are "subject to the same expectations regarding conduct as any other employee" (§ 9901.914(a)(4)) would stand on a "much surer footing in the context of a specific application of [the] regulation than could be the case in the framework of [a] generalized challenge." *Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003). Similarly, plaintiffs' claim that the regulatory definitions

of "grievance" and "supervisor" (§ 9901.903), as well as those governing attendance at "formal discussions" (§ 9901.914(a)(2)) and access to information (§ 9901.914(c)(2)) will result in a change in standards rests on speculation about how these provisions will be applied by DoD in the future.

Finally, the Court would be in a better position to adjudicate plaintiffs' challenge to the appeals process if the Court knew how the regulations had been applied in a concrete setting involving an actual employee. Because the agency retains considerable discretion in applying these rules – as DoD clearly does here with regard to, for example, the listing of MROs, the review of AJ decisions, and the implementation of interim relief granted by the MSPB – judicial review should be deferred pending a specific application of the rule. *Sprint Corp. v. FCC*, 331 F.3d at 956.

## II.    THE LABOR RELATIONS SYSTEM ESTABLISHED BY THE REGULATIONS COMPLIES FULLY WITH THE REQUIREMENTS OF SECTION 9902

Plaintiffs' central contention is that Congress authorized the Agencies to establish an LR system for DoD that may depart in only two respects from the LR scheme in Chapter 71 - - that Congress granted the Secretary authority to bargain above the level of exclusive recognition and required that the LR system provide for independent third party review of decisions. Plaintiffs insist that the statute does not authorize any other departure from the requirements of Chapter 71. Compl., ¶ 24 (citing 5 U.S.C. § 9902(m)(5) and (6)); *see generally* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Mem.") at 10-18. Based on this premise, plaintiffs argue that numerous rules are invalid. Compl., ¶¶ 33-43; Pl. Mem. at 18-33.

As we explain in Point II.A. below, plaintiffs' premise (*i.e.*, that the statute authorizes only two discrete departures from Chapter 71) is fundamentally in error. As the text of the statute makes clear, the Agencies are empowered to waive and/or modify the requirements of Chapter 71 insofar as authorized by *all* of § 9902(m), not just the two subsections that plaintiffs would have the Court focus upon. Moreover, as we demonstrate in Point II.B., the specific regulations challenged by

- 20 -

plaintiffs here fall well within the scope of the Agencies' authority under subsection (m). For these reasons, plaintiffs' substantive challenge to the LR system established by the rule is unfounded and should be dismissed for failure to state a claim upon which relief may be granted.

### A. The Agencies Are Empowered To Establish An LR System For DoD That Modifies The Requirements Of Chapter 71 As Authorized By Section 9902(m)

The Secretary of DoD and the Director of OPM concluded that the NDAA authorizes the Agencies, in exercising the authority in 5 U.S.C. § 9902, to waive or modify "Chapter 71, dealing with labor relations (as authorized by 5 U.S.C. 9902(m))." 70 Fed. Reg. 66191 (§ 9901.104(f)). Plaintiffs' challenge to the Agencies' interpretation of the statute is governed by the familiar two-part inquiry set forth in *Chevron, USA v. National Resources Defense Council*, 467 U.S. 837 (1984). "[I]f the statute speaks clearly 'to the precise question at issue," the Court "must give effect to the unambiguously expressed intent of Congress." *Barnhart v. Walton*, 535 U.S. 212, 217 (2002) (*quoting Chevron*, 467 U.S. at 842-843). If "the statute is silent or ambiguous with respect to the specific issue," the Court "must sustain the Agency's interpretation if it is 'based on a permissible construction' of the Act." *Barnhart*, 535 U.S. at 218 (*quoting in part Chevron*, 467 U.S. at 843).[6] Moreover, if "Congress has 'explicitly left a gap for the . . . agency to fill,' the agency's regulation is 'given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute.'" *Household Credit Serv. v. Pfennig*, 541 U.S. 232, 239 (2004).

"The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute.'" *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438,

---

[6] "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. Instead, "the court must defer to the agency's interpretation of the statute so long as it is reasonable and consistent with the statutory purpose." *National Ass'n of Mfrs. v. DOI*, 134 F.3d 1095, 1106 (D.C. Cir. 1998) (*quoting in part Ohio v. DOI*, 880 F.2d 432, 441 (D.C. Cir. 1989)).

450 (2002). "In ascertaining the plain meaning of the statute, the court must look to the . . . language and design of the statute as a whole." *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988). Here, the language and overall structure of § 9902 compels the conclusion that Congress intended to authorize the Agencies to waive or modify Chapter 71 insofar as authorized by § 9902(m).

The NDAA authorizes upon the Agencies to waive or modify much of Title 5 to establish a new NSPS for DoD's civilian workforce. Section 9902(a) provides that: "Notwithstanding any other provision of [Part III of Title 5], the Secretary may, in regulations prescribed jointly with the Director, establish, and from time to time adjust, a human resources management [HR] system for some or all of the organizational or functional units of the Department of Defense."

Section 9902(b) establishes several "system requirements" for that HR system including, among other things, requirements that it be "flexible" and "contemporary," and "ensure that employees may organize, bargain collectively *as provided in this chapter*, and participate through labor organizations of their own choosing in decisions which affect them, *subject to the provisions of this chapter* and any exclusion from coverage or limitation on negotiability established pursuant to law." *Id.*, § 9902(b)(1), (2) and (4) (emphasis added). As the italicized language reflects, Congress clearly intended that the scope of the collective bargaining rights of DoD employees are to be delimited by provisions within Chapter 99 of Title 5 (*i.e.*, 5 U.S.C. §§ 9901-9904).[7]

Section 9902(b)(3) provides that the HR system established under subsection (a) shall "not waive, modify or otherwise affect * * * (D) any other provision of this part (as described in subsection (d))." 5 U.S.C. § 9202(b)(3). Subsection 9902(d)(2), in turn, contains a list of "nonwaivable provisions" which includes "to the extent not otherwise specified in this title" Chapter

---

[7] Plaintiffs' brief repeatedly omits the language emphasized above. *E.g.*, Pl. Mem. at 1, 11, 16, 19-20, and 28.

71, *see generally* 5 U.S.C. §§ 7101-7135.  Based largely on these two subsections, plaintiffs

challenge virtually all rules that are different from Chapter 71.  Pl. Mem. at 35-36 ("The only valid

provisions of the labor relations portion of Defendants' regulation are those that repeat provisions

in chapter 71 or implement the section of the statute that authorizes national level bargaining").

If the statutory scheme ended with subsection (d)(2), these arguments might have some force.

However, as the Supreme Court has emphasized, "a reviewing court should not confine itself to

examining a particular statutory provision in isolation," *Food and Drug Administration v. Brown &*

*Williamson Tobacco Corporation*, 529 U.S. 120, 132 (2000), and "must look to the particular

statutory language at issue, as well as the language and design of the statute as a whole." *K Mart*

*Corp. v. Cartier*, 486 U.S. at 291. These settled principles are particularly apt here as § 9902(m)

expressly authorizes the Agencies to establish an LR system for DoD that departs from Chapter 71

in numerous respects other than the two areas identified in plaintiffs' memorandum.

Section 9902(m)(1) provides that: "Notwithstanding section 9902(d)(2) [which makes

Chapter 71 "nonwaivable"], the Secretary, together with the Director, may establish and from time

to time adjust a labor relations system for the Department of Defense to address the unique role that

the Department's civilian workforce plays in supporting the Department's national security mission."

5 U.S.C. § 9902(m)(1).  Given the wording of this provision, it is quite clear that Congress intended

to authorize the Agencies to alter the LR scheme created by Chapter 71.

As the D.C. Circuit has explained, the phrase "notwithstanding any other provision of law"

must be read to "override any conflicting provision of law in existence at the time that the [] Act was

enacted." *Illinois Nat'l Guard v. FLRA*, 854 F.2d 1396, 1403 (D.C. Cir. 1988) (quoting *New Jersey*

*Air Nat'l Guard v. FLRA*, 677 F.2d 276, 283 (D.C. Cir. 1982)).  Similarly, here, the phrase

"[n]otwithstanding section 9902(d)(2)," as used in § 9902(m)(1), can only be read to "override" the

limitation in § 9902(d)(2), and "can only reasonably be taken to mean that Congress intended the [Agency] to be unconstrained by the negotiation provisions in [Chapter 71]" in establishing a new LR system. *AFGE v. FLRA*, 46 F.3d 73, 78 (D.C. Cir. 1995). If Congress had intended the "prohibition against waiver of Chapter 71 [to] appl[y] to the subsection (m) labor relations system" as plaintiffs claim (Pl. Mem. at 17), it is inconceivable that Congress would have authorized the Agencies to establish an LR system "notwithstanding" that "prohibition."

The broad delegation in subsection (m)(1) forecloses plaintiffs' contention that Congress intended to authorize only two narrow changes to the labor relations scheme created by Chapter 71. Subsection (m)(1), by its terms, provides that, "[n]otwithstanding section 9902(d)(2)," the Agencies may establish and adjust an LR system for DoD to address the "unique role that the [DoD's] civilian workforce plays in supporting the Department's national security mission," 5 U.S.C. § 9902(m)(1). The statute does not specify what types of changes in the Chapter 71 LR scheme are to be made to address the "unique role" of DoD's civilian workforce, and thus commits that determination to the discretion and expertise of the Agencies. In these circumstances, the Agencies' regulation is 'given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute.'" *Household Credit Serv. v. Pfennig*, 541 U.S. at 239.

The remaining provisions in subsection (m) likewise establish that Congress authorized the Agencies to create an LR system that differs in many respects from Chapter 71, not just the two that plaintiffs have identified. Subsection (m)(2) provides that the LR system "would allow for a collaborative issue-based approach to labor management relations," *id.*, § 9902(m)(2); that subsection has no counterpart in Chapter 71. Subsection (m)(3) establishes procedures to ensure the participation of employee representatives in the development of the LR system and authorizes the Secretary to implement that system without the consent of employee representatives and without

collective bargaining that might otherwise be required by Chapter 71. *Id.*, § 9902(m)(3)(C)(ii). If there were to be only two narrow changes from Chapter 71, as plaintiffs allege, elaborate procedures to develop the system would seem unnecessary.

Subsection (m)(4) and (m)(5) respectively authorize the Secretary to engage in "collaboration activities . . . at an organizational level above the level of exclusive recognition," and to incorporate in the LR system "authority to bargain at a level above the level of exclusi[ve] recognition." *Id.*, § 9902(m)(4) and (5). Both provisions are inconsistent with the customary role of a labor organization which, under Chapter 71, is recognized as the "*exclusive* representative of the employees in the [bargaining] unit it represents." 5 U.S.C. § 7114(a)(1) (emphasis added).

Subsection (m)(6) authorizes the Agencies to designate "what third party" should resolve labor management disputes, to define "what decisions are reviewable by the third party," and to specify "the standard or standards for that review." *Id.*, § 9902(m)(6). Thus, Congress authorized the Agencies to modify those provisions in Chapter 71 which designate the FLRA as the "third party" authorized to resolve such disputes, specify what decisions are reviewable by the third party and prescribe what standards should be applied in that review. S*ee*, *e.g.*, 5 U.S.C. §§ 7105, 7114, 7116-7119, 7122. This same provision authorizes the Agencies to modify those provisions in Chapter 71 which designate arbitrators as the "third party" authorized to resolve "grievances" arising under CBAs, specify "what decisions are reviewable" by those arbitrators and establish what standards should be applied in arbitration proceedings. 5 U.S.C. § 7121. If Congress intended Chapter 71 to remain controlling in these respects, the Agencies could not designate any "third party" other than the FLRA and/or an arbitrator to resolve such disputes, could not change "what decisions are reviewable" by those third parties, and could make no change in the Chapter 71 standards. In essence, § 9902(m)(6) would be a  meaningless grant of authority under which the Agencies' only

lawful option would be to "repeat provisions of Chapter 71." *See* Pl. Mem. at 35.

Section 9902(m)(8) provides additional authority to the Agencies to waive and/or modify provisions in Chapter 71 that would otherwise govern the enforceability of CBAs. In contrast to Chapter 71 which states that it is a ULP for an agency to enforce a rule or regulation which is inconsistent with a pre-existing CBA, 5 U.S.C. § 7116(a)(7), § 9902(m)(8) provides that the LR system "shall be binding on all bargaining units within [DoD] . . . and shall supersede all other [CBAs] for bargaining units within the [DoD] . . . except as otherwise determined by the Secretary."

Finally § 9902(m)(9) provides that, unless extended or otherwise provided in law, the Agencies' authority to establish, implement and adjust the LR system developed under subsection (m) "shall expire six years after the date of enactment of this subsection, *at which time* the provisions of chapter 71 will apply." *Id.*, § 9902(m)(9) (emphasis added). This provision, by its terms, specifies that Chapter 71 "will apply" six years after the enactment of subsection (m) unless the Agencies' authority is "extended or otherwise provided for in law" and, by necessary implication, will *not* apply prior to the expiration of that six-year period to the extent that it has been waived and/or modified by the Agencies pursuant to the authority granted in subsection (m). The text of § 9902(m) thus compels the conclusion that Congress conferred broad authority on the Agencies to establish and implement an LR system that departs from Chapter 71.

**(1)** Plaintiffs suggest that the "basis" for the Agencies' conclusion that the "prohibition against waiver of chapter 71 contained in § 9902(b)(3)(D) and (d) is inapplicable to the labor system authorized by § 9902(m)" is found in the regulatory definition of the term NSPS which states that "the [HR] management system established under 5 U.S.C. § 9902(a) . . . does not include the labor relations system established under 5 U.S.C. § 9902(m)." Pl. Mem. at 16. Plaintiffs are mistaken. The "basis" for the Agencies' conclusion that subsection (m) authorizes them to create an LR system

that does not conform to the requirements of subsection (d) is that subsection (m) expressly states that the Agencies may establish an LR system for DoD "[n]otwithstanding section 9902(d)(2)." 5 U.S.C. § 9902(m)(1).[8]

(2)  Plaintiffs' argument that the Agencies' construction of the subsection (m) is inconsistent with 5 U.S.C. § 9902(b)(4) (*see* Pl. Mem. at 16-17) is contrary to the text of the statute.  Section 9902(b)(4) provides that: "Any system established under subsection (a) shall * * * ensure that employees may organize, bargain collectively *as provided for in this chapter*, and participate through labor organizations of their own choosing in decisions which affect them, *subject to the provisions of this chapter* and any exclusion from coverage or limitation on negotiability established pursuant to law."  Because the right of DoD employees to "bargain collectively" exists only "as provided for in this chapter" (*i.e.*, Chapter 99), that right cannot be construed to circumscribe the authority under subsection (m).[9]

(3)  Nor is there any basis for the contention that § 9902(d)(2) and subsection (m) must be "read together" and, accordingly, the "prohibition against waiver of chapter 71 applies to the subsection (m) labor relations system."  Pl. Mem. at 17.  As explained above, the explicit language

---

[8]  The regulatory definition of NSPS which is contained in § 9901.103 (70 Fed. Reg. 66190) does not alter the scope of the Agencies' authority under the statute.  As stated in the preamble, the definition of NSPS is intended to "closely track the language in the statute," 70 Fed. Reg. 66132, which states that "[t]he human resources management system established under authority of this section shall be referred to as the 'National Security Personnel System.'" 5 U.S.C. § 9902(a).  The regulatory definition of the NSPS in § 9901.103 (*see* 70 Fed. Reg. 66190) states that it "does not include the labor relations system established under 5 U.S.C. § 9902(m)" merely to clarify that, in establishing the LR system, the Agencies acted pursuant to the temporary authority conferred by Congress in § 9902(m) rather than pursuant to the permanent authority conferred upon the Agencies by § 9902(a).

[9]  Similarly, because the right of DoD employees to "participate through labor organizations of their own choosing in decisions which affect them" is expressly made "subject to" § 9902(m), it cannot, by definition, strip the Agencies of their authority under § 9902(m).

of subsection (m) which begins "[n]otwithstanding section 9902(d)(2)" can only be read to override the limitation in § 9902(d)(2) which would otherwise make Chapter 71 nonwaivable and to permit the Agencies to establish a new LR system unconstrained by that limitation. Plaintiffs are also mistaken in suggesting that the Agencies' interpretation would render the inclusion of Chapter 71 in the list of nonwaivable provisions in subsection (d)(2) "meaningless." Pl. Mem. at 17. The Agencies are empowered to establish an LR system that departs from Chapter 71 insofar as authorized by § 9902(m). Moreover, subsection (m)(9) contains a sunset provision under which the authority to establish, implement, and adjust an LR system will "expire six years after the date of enactment, at which time the provisions of chapter 71 will apply." 5 U.S.C. § 9902(m)(9). Once the temporary authority under subsection (m) expires, the limitations contained in sections 9902(b)(3) and (d) would prevent the Agencies from invoking the permanent authority granted by § 9902(a) to waive and/or modify Chapter 71. Thus, regardless of the breadth of the Agencies' authority under subsection (m) during the interim, the inclusion of Chapter 71 amongst the "other nonwaivable provisions" would still impose a direct and meaningful limitation on the Agencies' residual authority under § 9902(a).

(4) Contrary to plaintiffs' broad claims (Pl. Mem. at 11-16), the legislative history is at best ambiguous and provides no basis for ignoring the literal language of the statute. The statute was derived in substantial part from section 1111 of H.R. 1588 which was passed by the House of Representatives on May 21, 2003. Three aspects of the House-passed bill are particularly pertinent here. First, the bill incorporated a provision with language identical to § 9902(b)(4) which requires that the HR system "ensure that employees may organize, bargain collectively as provided for in this chapter . . . ." 149 Cong. Rec. H4460 (May 21, 2003) (§ 9902(b)(4)). Second, in contrast to the legislation ultimately enacted, Chapter 71 was not included in the list of "other nonwaivable

provisions" contained in the House-passed bill.  *Id.* (§ 9902(c)(2)).  Third, the House-passed bill did

not contain § 9902(m).  149 Cong. Rec. H 4461 (May 21,2003).  After the House acted, the Senate

amended H.R. 1588 by substituting its own version of the NDAA which did not include any

provision analogous to Chapter 99.  149 Cong. Rec. S 7297 (June 4, 2003).

The Conference Committee restored the provisions contained in the House bill with several

amendments.  H. Rpt. No. 108-354 (Nov. 7, 2003), at 232-243, 758-759.  Of particular importance

here, the Committee forged a compromise which added Chapter 71 as a "nonwaivable provision"

in § 9902(d)(2) but also added a new § 9902(m) which, as discussed above, authorizes the Agencies

to establish a new time-limited LR system notwithstanding that limitation.  *Id.*

Senator Collins explained that there was an "extremely challenging conference with the

House of Representatives" regarding the bill, 149 Cong. Rec. S 14428 (Nov. 11, 2003) and "[i]n the

end, the product was not the one I would have preferred."  *Id.* at 14429; *see also* 149 Cong. Rec. S

14427 (Nov. 11, 2003) (Statement of Senator Akaka) (noting that he could not support the civilian

personnel provision "because of the outcome of collective bargaining"); 149 Cong. Rec. S 14439

(Nov. 11, 2003) (Statement of Senator Levin) ("The outcome on collective bargaining issues was

more of a mixed bag.").  Senator Collins opined that "the conference agreement, while by no means

perfect, is a reasonable compromise to the challenge of modernizing an outdated system while

protecting employee rights."  149 Cong. Rec. S 14428 (Nov. 11, 2003).

It was generally understood that § 9902(m) would authorize the Agencies to override Chapter

71 in certain respects.  However, the statements of individual members of Congress reflect varying

interpretations concerning the scope of the Agencies' authority under these provisions.  Taken

together, these varying interpretations of individual members of Congress shed little or no light on

the proper construction of the statute.[10]  The fact that specific Senators focused their remarks on one

or more subsections within subsection (m) (*see* Pl. Mem. at 13-16) can hardly provide a basis for

ignoring the remaining provisions.  As the Supreme Court has repeatedly held:

> [T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material.  Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.  Not all extrinsic materials are reliable sources of insight into legislative understandings, however, and legislative history in particular . . . is itself often murky, ambiguous, and contradictory.  Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in "looking over a crowd and picking out your friends."

*Exxon Mobil Corporation v. Allapattah Services*, 125 S.Ct. 2611, 2626 (2005).

    **(5)**  In sum, the plain language of subsection (m) authorizes the Agencies to establish an LR

---

    [10]  *E.g.*, 149 Cong. Rec. 10988 (Nov. 7, 2003) (Statement of Rep. Waxman) ("At the same time the bill claims to protect collective bargaining, it allows DoD to waive these requirements for the next six years"); 149 Cong. Rec. H 10997 (Nov. 7, 2003) (Statement of Rep. Hoyer) (While it is "technically true" that chapter 71 will not be waived, "the bill allows them to be suspended for the next ten years.  So although they technically cannot be waived, they will not be in effect at the decision of the Secretary."); 149 Cong. Rec. H 10998 (Statement of Rep. Jackson-Lee) ("This bill claims to make Chapter 71 nonwaivable but essentially allows the DoD to waive Chapter 71 requirements for the 6-year period following enactment. . . . During the 6-year period, the Secretary of Defense will have the authority to decide what issues will be bargained, whether labor-management impasses will be resolved by an outside third party, and what protections union members will have against discrimination."); 149 Cong. Rec. 14419 (Nov. 11, 2003) (Statement of Sen. Warner) (the conference report "will provide expansive new civilian personnel authorities for the Department of Defense"); 149 Cong. Rec. S 14427 (Nov. 11, 2003) (Statement of Sen. Akaka) ("In general, the new labor relations system must be consistent with Chapter 71, since Chapter 71 remains in effect.  In a few areas, however, the conference report would specifically override Chapter 71."); 149 Cong. Rec. S 14439 (Nov. 11, 2003) (Statement of Sen. Levin) ("Unfortunately, the conference report does provide for exceptions to the applicability of Chapter 71.  In this regard, the conference report specifically provides that the labor relations system established by the Secretary 'shall provide for independent third party review of decisions, including defining what decisions are reviewable by the third party . . .' [and] states that national level collective bargaining shall 'be subject to review by an independent only to the extent provided' under this process"); 149 Cong. Rec. S 14490 (Nov. 12, 2003) (Statement of Senator Lieberman) ("[T]he conferees also agreed to a new provision authorizing the Secretary of Defense, together with the Director of [OPM], to establish a 'labor relations system' for the Department of Defense to address the 'unique role' of the Department's civilian workforce.  As the conference report makes clear, this new provision overrides chapter 71 only where the new provision and chapter 71 are directly inconsistent with each other.").

system that departs from the requirements of Chapter 71 in numerous respects other than the two identified by plaintiffs. But even if these provisions were deemed ambiguous, the Agencies' interpretation is clearly "based on a permissible construction of the Act," and must therefore be sustained by the Court, *Barnhart*, 535 U.S. at 218 (*quoting in part Chevron*, 467 U.S. at 843), even if the Court might have adopted a different view.

> **B.    The Specific Regulations Challenged By Plaintiffs Fall Well Within The Scope Of The Agencies' Authority Under Section 9902(m)**

Plaintiffs challenge portions of 10 regulations on the theory that they unlawfully modify the scope of collective bargaining under Chapter 71.[11] As explained below, each of these provisions is fully consistent with the governing statute and falls well within the scope of the Agencies' authority under § 9902(m). Accordingly, plaintiffs' challenge to these regulations should be dismissed.

> **1.    The Agencies are authorized to place prospective limits on the scope of bargaining by regulation or issuance (§ 9901.917(d)(1))**

Plaintiffs' contention that the Agencies cannot lawfully impose a restriction on bargaining by promulgating a regulation or issuance (Pl. Mem. at 18-20) is simply wrong. Federal agencies have retained the unilateral right to impose limitations on the scope of collective bargaining throughout the 42-year history of collective bargaining in the federal sector. The Executive Orders that governed labor relations in the federal sector between 1962 and 1978 reserved to agencies the unilateral right to impose limitations on the scope of bargaining by issuing regulations and other binding policies. E.O. 10988, § 6(b), 27 Fed. Reg. 551 (Jan. 17, 1962) (agencies to meet and confer with respect to matters affecting working conditions "so far as may be appropriate subject to law and

---

[11]    The rules challenged on this basis include §§ 9901.103 and 9901.903 ("Definitions"), § 9901.305 ("Bar on collective bargaining"); § 9901.905(a) ("Impact on existing agreements"); § 9901.907 ("National Security Labor Relations Board"); § 9901.908 ("Powers and duties of the Board"); § 9901.910 ("Management Rights"); § 9901.914 ("Representation rights and duties"); 9901.916(a)(7) ("Unfair labor Practices"); and § 9901.917(d)(1) ("Duty to Bargain and Consult").

policy requirements"); E.O. 11491, § 11(a), 34 Fed. Reg. 17605 (Oct. 29, 1969) (obligation to meet and confer "so far as may be appropriate under applicable laws, including policies set forth in the Federal Personnel Manual, [and] published agency policies and regulations"); E.O. 11838, § 13, 40 Fed. Reg. 7391 (Feb. 6, 1975) (obligation to meet and confer "so far as may be appropriate under applicable laws and regulations, including policies set forth in the Federal Personnel Manual; published agency policies and regulations for which a compelling need exists . . .").

Similarly, in Chapter 71, the statute that has governed collective bargaining for 27 years, Congress expressly limited an agency's duty to bargain with respect to matters that are the subject of any agency rule or regulation. Section 7117(a)(2) provides that: "The duty to bargain in good faith shall, to the extent not inconsistent with Federal law or any Government-wide rule or regulation, extend to matters which are the subject of any agency rule or regulation . . . only if the [Federal Labor Relations Authority] has determined . . . that no compelling need exists for the rule or regulation." 5 U.S.C. § 7117(a)(2). Thus, "where a matter is covered by regulation, no duty to bargain arises until the Authority has first determined that no compelling need justifies adherence to the regulation." *F.L.R.A. v. Aberdeen Proving Ground, Department of the Army*, 485 U.S. 409, 412 (1988).[12]

Under the regulations, the Secretary retains the authority to limit the DoD's duty to bargain with respect to matters that are the subject of DoD regulations or other binding policies. In that regard, § 9901.917(d)(1) provides that: "Management may not bargain over any matters that are inconsistent with law or the regulations in this part, Government-wide rules and regulations,

---

[12] The phrase "agency rule or regulation" broadly encompasses not only formal regulations promulgated after notice and public comment, but also "official declarations of policy of an agency which are binding on officials and agencies to which they apply," H. Conf. Rep. No. 95-1717, at 158, *reprinted in* 1978 U.S.C.C.A.N. 2860, 2893, as well as a binding policy or procedure promulgated "pursuant to a specific federal regulation." *AFGE v. FLRA*, 803 F.2d 737, 741 (D.C. Cir. 1986).

issuances and implementing issuances, or Executive orders." 70 Fed. Reg. 66217. In contrast to

Chapter 71, the regulations do not authorize the FLRA to prevent enforcement of such a regulation

if it determines "no compelling need . . . exists for the rule or regulation." 5 U.S.C. § 7117(a)(2).

The regulations instead strictly limit which DoD officials are authorized to impose limitations

on the duty to bargain. Specifically, the rule defines the term "Implementing issuance(s)" to "mean[]

a document or document issued by the Secretary, Deputy Secretary, Principal Staff Assistants (as

authorized by the Secretary), or Secretaries of the Military Departments to carry out a policy or

procedure implementing this part [*i.e.*, the regulations challenged in this case]." 70 Fed. Reg. 66190

(§ 9901.103). The term "Principal Staff Assistants" includes only "senior officials of the Office of

the Secretary who report directly to the Secretary or Deputy Secretary of Defense." *Id.* Similarly,

the term "Issuance" is defined to mean a document issued by one of these same designated officials

"to carry out a policy or procedure of the Department other than those issuances implementing this

part." 70 Fed. Reg. 66211 (§ 9901.903). As the Agencies explained, these limitations were adopted

as a direct result of the meet-and-confer process to prevent arbitrary or unnecessary limitations on

the scope of bargaining. *See* 70 Fed. Reg. 66178.

Plaintiffs challenge this regulation contending that, by virtue of the limitation in § 9902(d)(2),

the Agencies have no authority to waive Chapter 71 and "DoD is bound by the limits set by

§§ 7117(a)(2) and (3)." Pl. Mem. at 19. They also assert that the rule fails to ensure that employees

may "bargain collectively" as required by 5 U.S.C. § 9902(b)(4). As we explained in Point II.A.

above, however, § 9902(m) expressly authorizes the Agencies to establish an LR system conforming

to the requirements of that subsection "notwithstanding section 9902(d)(2)." In addition, §

9902(b)(4) provides that the HR system must ensure that employees may bargain collectively "as

- 33 -

provided in this chapter" thereby making the scope of the obligation subject to § 9902(m).[13]

The rule at issue falls well within the scope of the Agencies' authority under § 9902(m). First, there can be little question that Congress has authorized the Agencies to eliminate the FLRA's role in reviewing DoD regulations and issuances. In that regard, § 9902(m)(6) expressly authorizes the Agencies to "provide for independent third party review of decisions, including defining what decisions are reviewable by the third party, what third party would conduct the review, and the standard or standards for that review." 5 U.S.C. § 9902(m)(6). As the text of this provision makes clear, the Agencies are empowered to "define[] what decisions are reviewable" by the FLRA and what decisions are not, and to define "the standard or standards for that review." Hence, the Agencies have no obligation to retain the "compelling need" standard prescribed by § 7117(a)(2).

Second, § 9902(m)(1) authorizes the Agencies to establish and adjust an LR system for DoD "to address the unique role that the Department's civilian workforce plays in supporting the Department's national security mission." 5 U.S.C. § 9902(m)(1). As the preamble reflects, the rule challenged here is designed to achieve this objective by establishing procedures that "provid[e] the Department the necessary flexibility to meet changing national security requirements and to efficiently manage its workforce." 70 Fed. Reg. 66178. Retention of DoD's authority to limit the duty to bargain by regulation or issuance rationally furthers the statutory mandate for a "flexible" and

---

[13] Plaintiffs' quotation of § 9902(b)(4) in their brief (at 20) omits the phrase "as provided in this chapter," and thereafter compounds the misleading character of their quotation by suggesting that § 9902(b)(4) is "identical" to a separate statutory provision governing employees of the Department of Homeland Security (DHS) that was considered by the district court in *NTEU v. Chertoff*, 385 F.Supp.2d 1, 25 (D.D.C. 2005), *appeal pending*, Nos. 05-436, 05-437 (D.C. Cir.). In fact, there are significant differences in the language of the two statutes. Unlike § 9902, the DHS statute does not contain any provision analogous to section 9902(m). *Compare* 5 U.S.C. § 9902 with 5 U.S.C. § 9701. In addition, the DHS statute requires that the DHS and OPM ensure that employees may "bargain collectively" *without* the qualifying language "as provided in this chapter." *See* 5 U.S.C. § 9701(b)(4).

"contemporary" personnel system (5 U.S.C. §9902(b)(1) and (2)) which Congress believed to be "vital" given the "radical changes in the international security environment." H. Rpt. 108-106 at 13 (May 16, 2003). Moreover, this authority may only be exercised by designated high-level DoD officials thereby minimizing the likelihood of arbitrary or unnecessary restrictions on bargaining.

Plaintiffs' speculation that DoD might use its authority in a manner which results in the "total elimination of the statutory right to collective bargaining" (Pl. Mem. at 19) plainly fails to afford any basis for the facial invalidation of the rule. "To prevail in such a facial challenge, [plaintiffs] 'must establish that no set of circumstances exist under which the [regulation] would be valid.'" *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Plaintiffs plainly have not and cannot satisfy this requirement here.

### 2.    The management rights regulation permissibly addresses the unique role of DoD's civilian workforce (§ 9901.910)

The management rights regulation (§ 9901.910) is patterned after a similar provision in 5 U.S.C. § 7106. In Chapter 71, Congress sought to promote competing objectives of securing the rights of federal employees while establishing procedures that are "designed to meet the special requirements and needs of the Government." 5 U.S.C. § 7101(b). To achieve these objectives, Congress required that the statute be "interpreted in a manner consistent with the requirement of an effective and efficient Government." *Id.*; *see also F.L.R.A. v. Aberdeen Proving Ground*, 485 U.S. at 412-413. As part of the effort "to balance collective bargaining rights of employees against the need to secure the effective administration of government, the Act [] shields certain management rights from the negotiation process." *Association of Civilian Technicians v. FLRA*, 22 F.3d 1150, 1151 (D.C. Cir. 1994); *National Federation of Federal Employees v. Department of the Interior*, 526 U.S. 86, 97 (1999) ("*NFFE*") (§ 7106(a) "withdraws from collective bargaining certain subjects that it reserves exclusively for decision by management"). The management rights described in §

7106(a) include broad categories of agency actions such as determining the agency's mission and budget (§ 7106(a)(1)); hiring, assigning, laying off and disciplining employees (§§ 7106(a)(2)(A) and (B); and taking "whatever other actions may be necessary to carry out the agency mission during emergencies." *Id.*, § 7106(a)(2)(D). Section 7106(b) qualifies the restriction on bargaining by permitting negotiations with respect to "procedures" which management officials will observe in exercising a management right an "appropriate arrangements" for employees adversely affected.

Section 9902(m)(1) of the NDAA explicitly authorizes the Agencies to adjust the labor relations scheme created by § 7106 "to address the unique role that DoD's civilian workforce plays in supporting the Department's national security mission." 5 U.S.C. § 9902(m)(1). The statute does not specify what changes are necessary to achieve this objective; instead, Congress delegated that decision to the discretion and expertise of the Agencies. In these circumstances, the governing standard of review is well-established: "[W]henever Congress has 'explicitly left a gap for the . . . agency to fill,' the agency's regulation is 'given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Household Credit Serv. v. Pfennig*, 541 U.S. at 239. The regulation challenged here easily satisfies this standard.

**(a) Actions necessary to carry out DoD's mission (§ 9901.910(a)(2)):** Section 7106(a) specifies that management has the right "to take whatever actions may be necessary to carry out the agency mission during emergencies." 5 U.S.C. § 7106(a)(2)(D). Section 9701.510(a)(2) modifies this provision by eliminating the words "during emergencies" and thus grants management the right to "take whatever other actions may be necessary to carry out the Department's mission." 70 Fed. Reg. 66213. As the Agencies explained: "The ability to act quickly is central to the Department's national security mission – not just during emergencies but, more importantly, in order to prepare for and prevent emergencies. The ability to act quickly is necessary even in meeting day-to-day

operational demands. The Department must be able to assign employees and to introduce the latest security technologies without delay." *Id.* at 66128.

The regulation and the Agencies' rationale for promulgating it are manifestly consistent with Congress's stated objective of designing an LR system that addresses the "unique role of [DoD's] civilian workforce in supporting the Department's national security mission." 5 U.S.C. § 9902(m)(1). Consistent with prior decisions of the FLRA, the Agencies interpret the phrase "necessary to carry out the agency's mission" as permitting DoD to take action when required for the agency "to perform its duties most effectively." *DOJ, INS and AFGE*, 23 FLRA 90,93 (1986); *DOJ, INS and AFGE*, 55 FLRA 892, 904 (1999) ("necessary functioning" means those actions that if not taken would impede the agency's "ability to effectively and efficiently carry out its mission").[14] Plaintiffs' contention that DoD cannot take actions required for the defense of the United States until such time as an "emergency" has already arisen (Pl. Mem. at 20-21) is both imprudent and flatly contrary to the objectives of § 9902(m).

**(b) Procedures observed in exercising management rights (§ 9901.910(b)):** Section 9901.910(f)(1)(i) continues to require that DoD engage in collective bargaining with respect to the "procedures which management officials and supervisors will observe in exercising any authority under [§ 9901.910(a)(3)]," 70 Fed. Reg. 66214 (§ 9901.910(f)(1)(i)), including any action by management to lay off or discipline employees, or to make selections for appointments or promotions. *Id.* (§ 9901.910(a)(3)). However, as a departure from Chapter 71, § 9901.910(b) prohibits management from bargaining over procedures that the agency will observe

---

[14]  It is well-established that the Agencies' interpretation of the regulation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 462 (1997); *Bigelow v. Department of Defense*, 217 F.3d 875, 878 (D.C. Cir. 2000) (court is required to afford deference even where the Agencies' interpretation "appeared only in a legal brief").

in exercising the management rights set out in sections 9901.910(a)(1) and (a)(2).  *Id.* at 66213.[15]

Instead, management is required to "consult" with employee representative regarding such procedures.  *Id.* (§ 9901.910(d)).  As the Agencies explained in the preamble, these management rights relate to actions that "deal directly with the Department's national security operations," 70 Fed. Reg. 66128, and agreements prescribing the procedures to be followed in taking those actions frustrate the Department's ability to achieve its mission of defending the United States:

> Once negotiated . . . procedures can and do place significant constraints on critical actions such as the assignment of work, the deployment of personnel, and the staffing of tours of duty.  These procedures are negotiable under 5 U.S.C. chapter 71.  Labor organizations would have the Department continue that obligation, but under time limits and with an expanded interpretation of the chapter 71 provisions regarding emergencies that would allow management to bargain post-implementation in certain limited circumstances.

> However, in today's operational environment, the exception has become the rule.  Department managers, supervisors and employees are critical to the Department's mission to defend our national security.  The Department must be able to rely on the judgment and ability of managers and supervisors to make day-to-day decisions – even if this means deviating from established or negotiated procedures.  Moreover, the Department's managers and supervisors must be able to make split-second decisions to deal with operational realities free of procedural constraints.

70 Fed. Reg. 66128.

**(c)  Appropriate arrangements for employees affected by the exercise of management rights (§§ 9901.910(f) and (h)):**  Section 9901.910(f)(1)(i) requires bargaining with respect to the "appropriate arrangements for employees adversely affected by the exercise of any authority under [§ 9901.910(a)(3)]," 70 Fed. Reg. 66214 (§ 9901.910(f)(1)(i)), which as stated above, includes such matters as appointments, promotions, layoffs, disciplinary actions, and reductions in pay.

---

[15]   Section 9901.910(a)(1) and (2) include DoD's right to determine its mission, budget, organization, number of employees, and internal security practices, as well as its right, *inter alia*, to hire, assign and direct its employees; make determinations regarding contracting out; determine the personnel by which Departmental operations may be conducted; determine number, types and pay of employees assigned to each subdivision; and take whatever other actions may be necessary to carry out DoD's mission.  70 Fed. Reg. 66213 (§ 9901.910(a)(1) and (2)).

Management is also required to bargain with respect to "[a]ppropriate arrangements" for employees adversely affected by the exercise of management rights that deal directly with the Department's national security operations [*see* §§ 9901.910(a)(1) and (2)]," including "proposals on matters such as personal hardships and safety measures." *Id.* (§ 9901.910(f)(1)(ii)). However, the duty to bargain in these circumstances does not include "proposals on matters such as routine assignments to specific duties, shifts, or work on a regular or overtime basis except when the Secretary . . . authorizes such bargaining." *Id.* (§ 9901.910(f)(2)).

As the Agencies explained in the preamble, because the "reality of DoD's operational environment today is that change is constant," a requirement for "immediate post-implementation negotiations and third-party impasse resolution" every time management made any change (even "routine assignments to specific duties, shifts, or work") would embroil the agency in constant "post-implementation bargaining, with the prospect of prolonged third party impasse resolution." 70 Fed. Reg. 66129. "These negotiations would be required even in cases where the change was short-lived and/or where its impact was insignificant, insubstantial, or transient. The demand on DoD's frontline managers, supervisors and employees to engage in constant post-implementation negotiations would divert them from accomplishing the mission" of the agency. *Id.*

Moreover, mid-term agreements regarding appropriate arrangements relating to the exercise of one of the operational management rights listed in § 9901.910(a)(1) and (2) are binding only for the action that triggered the negotiations and "will not be precedential or binding on subsequent acts . . . ." *Id.* (§ 9901.910(h)). As the Agencies explained:

> [U]nder 5 U.S.C. chapter 71, interpretations of negotiated appropriate arrangements tend to assume that those agreements have anticipated future changes, but today's operational environment belies that assumption. Changes necessitated by operational demands are recurring and variable. Our frontline managers must not be bound by agreements presupposing circumstances that are assumed to be constant, when they must face current and future exigencies.

70 Fed. Reg. 66129.  This does not mean that the regulation "eliminates any right to have an appropriate arrangement negotiated during the term of a contract apply to anyone," Pl. Mem. at 21, but simply limits the scope of such agreements to employees affected by the particular action that triggered the negotiations which is entirely appropriate given the unique circumstances in which DoD's civilian workforce operates.

**(d)  Notice of exercise of management rights (§ 9901.910(e) and (i)):**  The regulation alters the Chapter 71 requirement for pre-implementation bargaining by requiring that "management will provide notice to the exclusive representative *concurrently with* the exercise of [management rights]," but permitting management to provide notice "as far in advance as practicable."  70 Fed. Reg. 66214 (§ 9901.910(e)).  Similarly, it provides that "[n]othing will delay or prevent the Secretary from exercising his or her authority under this subpart."  *Id.* (§ 9901.910(i)).  As noted:

> DoD's ability to carry out its mission swiftly and authoritatively is of paramount importance to national security.  The DoD civilian workforce plays a critical role in the successful accomplishment of that mission.  In authorizing the creation of the NSPS, Congress recognized that maintaining the status quo with respect to labor-management relations would not provide DoD with a workforce that is sufficiently agile and flexible to execute the current and future national security mission.

70 Fed. Reg. 7568.  In the final rule, the Agencies explained further that:

> [T]he current statute does not give the Department the flexibility necessary to carry out its vital national security mission.  Today the Department is increasingly faced with an enemy that can attack with little or no advance warning.  The Department must be agile enough to respond to the emerging and rapidly evolving threats inherent in 21st century warfare.

70 Fed. Reg. 66181.

**(e)**  As the foregoing reflects, each of the changes made in the management rights regulation were designed to adapt the prior LR scheme to address the "unique role" played DoD's civilian workforce in supporting the Department's national security mission and, as such, the Agencies acted well within the scope of their authority under § 9902(m)(1).

### 3. The regulations lawfully restrict collective bargaining with respect to employee pay (§§ 9901.305 and 9901.903)

Plaintiffs argue that two regulations which provide that employee pay is not subject to bargaining are unlawful as applied to employees of non-appropriated fund instrumentalities. Pl. Mem. at 30-33. This claim is foreclosed by the explicit terms of § 9902. Under Chapter 71, employees have a statutory right to engage in collective bargaining with respect to "conditions of employment." 5 U.S.C. § 7102(2). The statute defines the term "conditions of employment" to mean "personnel policies, practices, and matters . . . affecting working conditions" but it also specifically provides that the term does *not* include matters "specifically provided for by federal statute." 5 U.S.C. § 7103(a)(14)(C). "The wages and fringe benefits of the overwhelming majority of Executive Branch employees are fixed by law, in accordance with the General Schedules of the Civil Service Act, see 5 U.S.C. § 5332, and are therefore eliminated from the definition of 'conditions of employment' by the third exception in § 7103(a)(14) . . . ." *Fort Stewart Schools v. FLRA*, 495 U.S. 641, 649 (1993). However, this exception does not apply to the "minuscule minority of federal employees whose wages are exempted from the operation of the General Schedules." *Id.* Thus, under Chapter 71, pay and fringe benefits are negotiable "conditions of employment" for employees that are exempted from the General Schedule in the absence of some other statutory restriction. *Id.*; *Dept. of the Army v. FLRA*, 914 F.2d 1291 (9th Cir. 1990).

The Agencies are authorized to establish a new HR system "notwithstanding any other provision" in Part III of Title 5, including 5 U.S.C. § 5332, the statute prescribing the General Schedules for federal employee wages, and to create a new "pay-for-performance system to better link individual pay to performance, and provide an equitable method for appraising and compensating employees." 5 U.S.C. § 9902(a) and (b)(6)(I). Upon implementation of the new system, employee pay would no longer be "specifically provided for by federal statute" and hence

no longer within the scope of the exception under 5 U.S.C. § 7103(a)(14)(C). Nonetheless, § 9902 makes clear that the new pay system is not subject to collective bargaining.

Section 9902(m)(7) provides that "Nothing in this section, including the authority provided to waive, modify, or otherwise affect provisions of law not listed in subsections (b) and (c) as nonwaivable, shall be construed to expand the scope of bargaining under chapter 71 or this subsection with respect to any provision of this title that may be waived, modified or otherwise affected under this section." *Id.* at § 9902(m)(7). Thus, the Agencies' decision to waive and/or modify 5 U.S.C. § 5332 may not "expand the scope of bargaining under chapter 71" and hence cannot create a right to bargain with respect to pay where no such right existed under the prior scheme. As the Supreme Court held in *Fort Stewart*, a small group of federal employees whose wages were exempt from the operation of the General Schedules were entitled to negotiate pay under Chapter 71. As plaintiffs point out (Pl. Mem. at 31-32), for this group of employees, bargaining with respect to employee pay would not "expand the scope of bargaining under chapter 71" and is therefore not precluded by § 9902(m)(7).

However, the Agencies' conclusion that employee pay is not subject to collective bargaining did not rest exclusively on § 9902(m)(7). Section 9901.305 provides:

> Pursuant to 5 U.S.C. § 9902(f)(4) and (m)(7), any pay program established under authority of this subpart is not subject to collective bargaining. This bar on collective bargaining applies to all aspects of the pay program, including but not limited to coverage decisions, the design of pay structures, the setting and adjustment of pay levels, pay administration rules and policies, and administration procedures and arrangements.

70 Fed. Reg. 66195 (§ 9901.305). Section 9902(f) establishes procedures to ensure the participation of employee representatives in the planning, development, and implementation of the NSPS, 5 U.S.C. § 9902(f), which is required to include a "pay-for-performance evaluation system" and "an equitable method for appraising and compensating employees." 5 U.S.C. § 9902(b)(6)(I). Section

9902(f) does not require collective bargaining with respect to the planning, development and implementation of NSPS. In fact, it authorizes the Agencies to implement the NSPS, including those portions to which employees object, "if the Secretary, in his discretion, determines that further consultation and mediation is unlikely to produce agreement . . . ." *Id.*, § 9902(f)(1)(C)(ii).

Moreover, Congress plainly intended the procedures prescribed by § 9902(f) to apply in lieu of any collective bargaining requirements under chapter 71. In that regard, § 9902(f)(4) provides that: "The procedures under this subsection are the *exclusive* procedures for the participation of employee representatives in the planning, development, implementation, or adjustment of the [NSPS]." 5 U.S.C. § 9902(f)(4) (emphasis added). The plain meaning of this subsection compels the conclusion that Congress intended to displace any collective bargaining requirement that might otherwise apply. But even if there were some ambiguity, the Agencies' interpretation of §§ 9902(m) and 9902(f)(4) which is embodied in §§ 9901.305 and 9901.903 of the rule is, at the very least, a "permissible one," and is therefore entitled to deference under *Chevron*.

**4.     The Agencies are empowered to prohibit enforcement of provisions in CBAs that conflict with the regulations and implementing issuances (§§ 9901.103, 9901.905 and 9901.916(a)(7))**

Plaintiffs challenge three related regulations that limit the enforceability of certain provisions in CBAs. Pl. Mem. at 19, 29. Specifically, § 9901.905(a) provides that: "Any provision of a [CBA] that is inconsistent with this part and/or implementing issuances is unenforceable on the effective date of the applicable subpart(s) or such issuances." 70 Fed. Reg. 66211 (§ 9901.905(a)).[16] The term "Implementing issuances" is defined in § 9901.103 to mean a document issued by the Secretary or several other designated DoD officials to "carry out a policy or procedure implementing this part." *Id.* at 66190 (§ 9901.103). A companion provision in § 9901.916(a)(7) provides that it is a ULP

---

[16]  *See also* 70 Fed. Reg. 66216 (§ 9901.914(d)(5)).

- 43 -

"[t]o enforce any issuance (*other than an implementing issuance*), or Governmentwide regulation, which is in conflict with an applicable [CBA] if the agreement was in effect before the issuance or regulation was prescribed." *Id.* at 66217 (§ 9901.916(a)(7)) (emphasis added).

As explained in Point II.A, § 9902(m) authorizes the Agencies to establish and adjust a new LR system for DoD that differs substantially from Chapter 71. Of particular importance, the statute provides that: "The [LR] system developed or adjusted under this subsection *shall be binding* on all bargaining units within the Department of Defense [and] all employee representatives of such units . . . and *shall supersede* all other [CBAs] for bargaining units in the Department of Defense, including [CBAs] negotiated with employee representatives at the level of recognition, except as otherwise determined by the Secretary." 5 U.S.C. § 9902(m)(8) (emphasis added). Congress anticipated the possibility of a conflict and provided that the new "[LR] system" shall be "binding" on employee representatives and "shall supersede" CBAs. The Agencies reasonably construed the term "labor relations system" to include the regulations establishing that system (Part 9901) and the "implementing issuances" that "carry out a policy or procedure implementing [Part 9901]." 70 Fed. Reg. 66211 (§ 9901.905(a)).

Plaintiffs' claims are also irreconcilable with the statutory provisions prescribing the procedures to be followed by the Agencies in establishing and implementing the NSPS, including the pay-for-performance system. Section 9902(f) contains elaborate procedures to "ensure that the authority of [§ 9902] is exercised in *collaboration* with, and in a manner that ensures the participation of employee representatives in the planning, development, and implementation of the [NSPS] . . . ." 5 U.S.C. § 9902(f)(1) (emphasis added).[17] At the same time, the statute specifically

---

[17]    The Agencies are required to provide a written description of the proposed system to employee representatives, and to give each representative 30 calendar days to review and make recommendations with respect to the proposal. *Id.*, § 9902(f)(1)(A)(i) and (ii). The Agencies are

contemplates that the parties may be unable to reach agreement. *Id.*, § 9902(f)(1)(B). In the event

no agreement is reached, the Agencies are authorized to reject the recommendations of employee

representatives and to implement a new system without their agreement. *Id.*, § 9902(f)(1)(C)(ii)

("[I]f the Secretary, in his discretion, determines that further consultation and mediation is unlikely

to produce agreement, the Secretary may implement any or all of such parts (including any

modifications made in response to the recommendations as the Secretary determines advisable)").

> As the Agencies explained in the preamble:
>
> Congress authorized the Department to establish and implement the HR system by providing an alternative to collective bargaining for involving employee representatives in the planning, development, and implementation of that system and making this the exclusive process for their involvement (5 U.S.C. § 9902(f)). It would be impossible to implement the HR system authorized by Congress without overriding conflicting provisions of existing [CBAs].

70 Fed. Reg. 66176. Moreover, the statute makes clear that these procedures "are the exclusive

procedures for the participation of employee representatives in the planning, development,

implementation, or adjustment of the [NSPS]," 5 U.S.C. § 9902(f)(4), thereby foreclosing any claim

that Congress intended to require adherence to the collective bargaining requirements of Chapter 71.

Plaintiffs' CBAs, like those in the private sector, remain subject to Federal law and where,

as here, those agreements conflict with an applicable federal statute, they cannot be enforced. *See*

5 U.S.C. § 7114(c) (CBAs "shall be binding on the agency . . . subject to the provisions of this

chapter and any other applicable law, rule or regulation"). Given the Agencies' statutory authority

to implement the new system without plaintiffs' agreement, any conflicting provision in a CBA is

contrary to public policy and therefore unenforceable. *E.g.*, *Eastern Associated Coal Corp. v. United*

*Mine Workers of America*, 531 U.S. 57, 62-64 (2000); *United Paperworkers Int'l Union, AFL-CIO*

---

also required to give any recommendations made by employee  representatives "full and fair
consideration in deciding whether or how to proceed with the proposal." *Id.*, § 9902(f)(1)(A)(iii).

*v. Misco*, 484 U.S. 29, 42-43 (1987); *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 766 (1983).

> **5.     The regulations creating the NSLRB comply fully with requirements of section 9902(m)(6) (§§ 9901.907 and 9901.908)**

Sections 9901.907 and 9901.908 authorize the Secretary to establish the NSLRB which will have authority to resolve various types of labor disputes, including allegations of ULPs, issues as to the scope of the duty to bargain, exceptions to arbitration awards, and negotiation impasses. Plaintiffs allege these two regulations fail to provide for "independent third party review of decisions" as required by § 9902(m)(6). Pl. Mem. at 22-23. Plaintiffs contend that "[b]ecause the Secretary determines the board's membership, it is not independent," Pl. Mem. at 22, and that "[a]n agency board, appointed by the head of the agency, and empowered by agency regulation to adjudicate labor disputes, is incompatible with the concept of 'independent third party review' reflected in other collective bargaining laws that Congress has enacted." Pl. Mem. at 23. These claims are without merit.

Section 9902(m)(6) provides that "[t]he labor relations system developed or adjusted under this section shall provide for independent third party review of decisions, including defining what decisions are reviewable by the third party, *what third party would conduct the review*, and the standard or standards for that review." 5 U.S.C. § 9902(m)(6) (emphasis added). Thus, the statute vests authority in the Agencies to choose "what third party would conduct the review," which indicates that Congress (unlike plaintiffs) did not view the Agencies' authority to appoint the third party to be in any way incompatible with the concept of "independent third party review." Similarly, the statute authorizes the Agencies to define "the standard or standards for th[e] review" by the third party. Thus, plaintiffs are also plainly in error insofar as they suggest that a board that is "empowered by agency regulation to adjudicate labor disputes" is incompatible with the concept of

"independent third party review" as used in § 9902(m)(6).

The regulations contain several provisions that ensure the independence of the NSLRB and its fairness and impartiality. As the Agencies explained:

> The regulations establish NSLRB membership criteria that require candidates to exhibit integrity and impartiality in addition to extensive knowledge of labor laws, DoD's mission, or both. Although the Secretary has authority to remove NSLRB members before the expiration of their terms, that authority is limited to removal for inefficiency, neglect of duty or malfeasance in office, which is a standard similar to that for removing members of the FLRA. In addition, since the standard is established in these jointly prescribed regulations, it may not be changed unilaterally by the Secretary.

70 Fed. Reg. 66130; *see also id.* at 66212 (§ 9901.907(b)(2)). Labor organizations may submit lists of recommended nominees for two of the three members of the Board. *Id.* (§ 9901.907(d)).

In sum, "[the] regulations establish that the Board will operate independent of the chain of supervision as does any agency administrative judge or administrative review board whose decisions can be appealed to a higher authority." 70 Fed. Reg. 66130. This type of adjudicatory body is hardly unusual in the Executive Branch. For example, the various federal Boards of Contract Appeals are appointed by their respective agency heads under 41 U.S.C. § 607; yet, they operate as independent and impartial adjudicatory bodies that resolve disputes arising under agency contracts much as the NSLRB will here. *See*, *e.g.*, 48 C.F.R. § 6101.0; 7 C.F.R. § 24.1; 24 C.F.R. § 20.3. Similarly, AJs throughout the Executive Branch, who adjudicate countless matters where Congress provides for an agency hearing by law, are appointed by the agency (with the prior approval of OPM). *See* 5 U.S.C. § 3105; 5 C.F.R. § 930.203a.

Finally, the NSLRB is "intended to act as one element of independent third party review of collective bargaining disputes as provided for in 5 U.S.C. 9902(m)(6)." 70 Fed. Reg. 66129. "NSLRB decisions are subject to review by the FLRA, which acts as another element of independent third party review." 70 Fed. Reg. 66129; *see also id.* at 66213 (§ 9901.909) (providing for FLRA

review). This "second element" standing alone is sufficient to satisfy the statutory requirement for "independent third party review." Moreover, "[t]he FLRA decisions, including those reviewing decisions of the NSLRB, remain subject to judicial review as they are under chapter 71." 70 Fed. Reg. 66130. The scheme for adjudication of labor management disputes, particularly when viewed as a whole, plainly satisfies the requirement for "independent third party review."

> **6.     The Agencies are authorized to modify the grievance and arbitration procedures established by Chapter 71**

The regulation modifies Chapter 71 grievance and arbitration procedures in various respects. Each of the changes made fall well within the scope of the Agencies' authority under 5 U.S.C. § 9902(m)(6).[18] First, plaintiffs challenge § 9901.922(f)(2) because it requires an arbitrator to give deference to the Department's choice of penalty and only authorizes the arbitrator to mitigate a penalty if it is "totally unwarranted in light of all pertinent circumstances." *See* Pl. Mem. 49. Although plaintiffs contend that the Agencies are not authorized to establish the standard of review to be applied by an arbitrator, § 9902(m)(6) explicitly authorizes the Agencies to define the "standard or standards for [the third party's] review," including those to be used by arbitrators. 5 U.S.C. § 9902(m)(6).[19] Plaintiffs also challenge § 9901.923(a) which provides that an exception to an

---

[18] In their Amended Complaint, plaintiffs allege that defendants lack authority under § 9902(h) to waive any aspect of Chapter 71 relating to negotiated grievance procedures. Compl. ¶¶ 44-47. Regardless of the scope of the Agencies' authority under subsection (h), § 9902(m) plainly authorizes them to establish a new LR scheme and, in particular, to provide for independent third party review that differs in multiple respects from the review scheme established by Chapter 71. *See* 5 U.S.C. § 9902(m)(6). Morever, even plaintiffs recognize that the negotiated grievance procedures are a central part of the LR system. Pl. Mem. at 50-51 (describing the grievance and arbitration procedure as "one of the most fundamental tenets of union representation").

[19] Section 9902(m) permits the Agencies to waive Chapter 71 to "address the unique role that the Department's civilian workforce plays in supporting the Department's national security mission." 5 U.S.C. § 9902(m). These concerns also played a role in the deviations from § 7121 to which plaintiffs object. See 70 Fed. Reg. 66184 ("To address the requirement that the appeals process be fair and to ensure that the Department's national security mission is considered, we have retained

arbitration award that involves a matter that falls within the MSPB's jurisdiction will be adjudicated under the regulatory appeals procedures applied to such claims. Pl. Mem. 49-50. More specifically, an arbitrator's decision may be reviewed by DoD upon a RFR and thereafter appealed to the full MSPB. 70 Fed. Reg. 66209-210 (§ 9901.807(g) and (h)). Plaintiffs contend that "the regulation requiring that arbitrator's decisions be appealed to the DoD and then to the full MSPB violate § 7121(e) and (f) of chapter 71." Pl. Mem. at 50. As we explained above, however, the Agencies are plainly authorized to modify Chapter 71 insofar as authorized by § 9902(m). Section 9902(m)(6) authorizes the Agencies to determine "what third party" would review decisions made in the context of the labor relations system (including the grievance process) and to define the standard or standards to be applied in that review. Consequently, the Agencies are empowered to require MSPB review of arbitrator decisions following reconsideration by DoD if appropriate. *See* 5 U.S.C. § 9901.923(a).

Finally, plaintiffs challenge § 9901.922(c)(4) which exempts appeals from actions based on mandatory removal offenses (MROs) from the negotiated grievance process, requiring instead that they be challenged under the regulatory appeals process established for MROs in § 9901.808. *See* Pl. Mem. 55. Because § 9902(m)(6) authorizes the Agencies to "define[] what decisions are reviewable" by an independent third party, the Agencies are plainly empowered to determine whether MRO appeals may be reviewed as part the grievance and arbitration process. 5 U.S.C. § 9902(m)(6).

### 7. The Agencies may lawfully require employee representatives to to adhere to the agency's standards of conduct (§ 9901.914(a)(4))

Section 9901.914(a)(4) provides that: "Employee representatives employed by the Department are subject to the same expectations regarding conduct as any other employee, whether

---

regulatory language ensuring uniform review and interpretation of arbitral awards and AJ decisions.").

they are serving in their representative capacity or not." 70 Fed. Reg. 66215.  Plaintiffs argue this imposes standards of conduct that are more restrictive than those applied by the FLRA under Chapter 71, and is thus unlawful.  As plaintiffs see it, they have a statutory right to use "vulgar or sexually explicit language" as well as "physical intimidation" to achieve their objectives.  Pl. Mem. at 26-29.  However, the regulation is fully consistent with D.C. Circuit precedent regarding similar rules in both the public and private sectors and, in any event, well within the Agencies' authority under § 9902(m).

However, the D.C. Circuit has concluded otherwise.  In *Adtranz ABB Daimler Benz Transp., N.A. v. N.L.R.B.*, 253 F.3d 19, 22 (D.C. Cir. 2001), the NLRB had found that an employer's adoption of "Rules of Conduct" prohibiting "abusive or threatening language" constituted a ULP because it interfered with the employees' right to unionize and engage in related labor activities.  The D.C. Circuit vacated the NLRB's ULP determinations finding that they were "utterly without merit."  *Id.*

> Under the Board's reasoning, every employer in the United States that has a rule or handbook barring abusive and threatening language from one employee to another is now in violation of the NLRA . . .  This position is not "reasonably defensible."  It is not even close.  In the simplest terms, it is preposterous that employees are incapable of organizing a union or exercising their other statutory rights under the NLRA without resort to abusive or threatening language.

*Id.* at 25-26.  The court concludes that "[i]t defies explanation that a law enacted to facilitate collective bargaining and protect employees' right to organize prohibits employers from seeking to maintain civility in the workplace."  *Id.* at 28.

Similarly, the D.C. Circuit has endorsed the conclusions and rationale of *Adtranz* in the public sector.  In *Department of the Air Force v. F.L.R.A.*, 294 F.3d 192 (D.C. Cir. 2002), the court extended the reasoning of *Adtranz* finding that "[i]t is at least equally preposterous for the FLRA to conclude that Congress could reasonably have contemplated that federal employees are incapable of exercising their rights under § 7102 without ranting, raving, assaulting, battering and harassing

their co-workers." *Id.* at 198. "Physical intimidation and touching amounting to assault and battery, during the course of otherwise protected activity, is not condoned nor immunized by the federal labor laws . . . ." *Id.* at 201. "To hold otherwise is not only error, but is 'remarkably indifferent' . . . to the basic need of employers to maintain decorum, not to mention the very safety of other employees." *Id.* Thus, Chapter 71 does not interfere with the authority of agencies to maintain "civility" and "decorum" in the workplace which is all that this regulation is designed to do. *Id.*

But even if that were not the case, Congress authorized the Agencies to modify Chapter 71 to address the unique role that DoD's civilian workforce plays in its national security mission. As the Supreme Court has recognized: "To ensure that [military personnel] are capable of performing their mission promptly and reliably, the military services must insist upon a respect for duty and a discipline without counterpart in civilian life." *Brown v. Glines*, 444 U.S. 348, 354 (1980). For that reason, a military commander may impose restrictions on a civilian's speech on a military base that would not be permissible in other contexts "to avert what he perceives to be a clear and present danger to the loyalty, discipline, or morale of troops on the base under his command." *Greer v. Spock*, 424 U.S. 828, 840 (1976); *accord*, *Brown v. Glines*, 444 U.S. at 354 ("Speech likely to interfere with these vital prerequisites for military effectiveness therefore can be excluded from a military base."). The rule here is a reasonable and measured standard of conduct for employee representatives that appropriately addresses the "unique role" that DoD's civilian workforce plays in supporting the nation's military forces. 5 U.S.C. § 9902(m)(1). As the Agencies explained:

> [A]ll employees, regardless of whether they are union representatives, are expected to express their concerns in an appropriate manner, particularly in scenarios where there could be a safety or security violation. The intent is not to prevent honest and open discussion, but rather to ensure that such discussions are undertaken in a professional and courteous manner. Under the proposed standard, there is no requirement that a union representative not assert the union's position. The only conduct the revised standard is intended to stop is the rare, but utterly unacceptable use of vulgar or sexually explicit language, as well as physical intimidation by union officials. We believe the revised standard is appropriate, particularly

in a military organization that has a longstanding tradition of professionalism and courtesy. 70 Fed. Reg. 66182. For all of these reasons, plaintiffs' challenge to the rule is wholly without merit.

> **8.    Plaintiffs' remaining challenges to the LR system are without merit (§§ 9901.903 and 9901.914)**

Plaintiffs challenge four other provisions, including the regulatory definitions of "grievance" and "supervisor" (§ 9901.903), and two rules that specify the circumstances in which an employee representative may attend formal discussions with DoD representatives regarding grievances or personnel policies (§ 9901.914(a)(2)) or obtain access to information needed for collective bargaining (§ 9901.914(c)(2)). Each of these claims is wholly without merit.

**(1)** Plaintiffs challenge the definition of "grievance" (§ 9901.903) arguing that Chapter 71 defines the term to include any claimed violation of a law, rule or regulation affecting conditions of employment, while the rule limits the scope of the term to a law, rule or regulation "issued for the purpose of" affecting conditions of employment. Pl. Mem. at 24. However, the regulation merely "adopt[s] the D.C. Circuit's interpretation in *U.S. Dept. of Treasury, U.S. Customs Service v. FLRA*, 43 F.3d 682 (1994), of what constitutes a 'grievance.'" 70 Fed. Reg. 7569. In that case, the D.C. Circuit concluded that the definition of "grievance" in 5 U.S.C. § 7103(a)(9) likewise applies only to a law, rule, or regulation "issued for the purpose of" affecting conditions of employment.

**(2)** Plaintiffs allege that the Agencies unlawfully modified the definition of "supervisor" contained in Chapter 71 (*see* 5 U.S.C. § 7103(a)(10)) insofar as the regulatory definition of that term encompasses an employee who "exercises supervisory authority over military members of the armed services . . . ." 70 Fed. Reg. 66211 (§ 9901.903). *See* Pl. Mem. at 23. As the Agencies explained this regulation is "intended to apply to those situations where a civilian is exercising supervisory control over military members." 70 Fed. Reg. 66178. "If an individual is exercising supervisory duties and authorities over military personnel . . ., we believe that individual is a member of the

management team, and his or her inclusion within a bargaining unit would create an inherent conflict

of interest." *Id.* The regulation is therefore unquestionably designed to address the unique role that

the Department's civilian workforce plays in the national security mission, and falls squarely within

the scope of § 9902(m)(1).

**(3)** Plaintiffs also challenge § 9901.914(a)(2) (70 Fed. Reg. 66215) which grants unions a

right to attend "formal discussions" between employees and DoD "management official(s)" in

certain circumstances. According to plaintiffs, the rule eliminates the unions' right under Chapter

71 to attend "formal discussions" with "other agency representatives, such as supervisors," and

discussions concerning "grievances" that have not yet been "filed," "operational matters" where the

agency reiterates existing personnel policies, and "discrimination complaints." Pl. Mem. at 24-25.

As stated in the preamble, however, these contentions "confuse this right as it currently exists

under chapter 71." 70 Fed. Reg. 66182. To determine whether a discussion is "formal," "[t]he

FLRA has commonly looked to a number of specific factors . . . such as the level in the management

hierarchy of the person who called the discussion . . . ." *Dept. of Veterans Affairs v. F.L.R.A.*, 16

F.3d 1526, 1531 (D.C. Cir. 1994). Consistent with this principle, the rule defines "management

official" as an individual with responsibilities that "require or authorize the individual to formulate,

determine, or influence the policies of the Department." 70 Fed. Reg. 66211 (§ 9901.903).

Under Chapter 71, an exclusive representative has a right to attend a "formal discussion"

concerning a "grievance," 5 U.S.C. § 7114(a)(2)(A); however, a "grievance," by definition, "must

involve a *complaint* by an employee," *AFGE v. F.L.R.A.*, 865 F.2d 1283, 1288 (D.C. Cir. 1989)

(citing 5 U.S.C. § 7103(a)(9)) (emphasis by court), and therefore cannot exist before "the employee

. . . *filed* a grievance against his employer . . . ." *Id.* (emphasis added); *Dept. of Veterans Affairs v.*

*F.L.R.A.*, 16 F.3d 1526, (D.C. Cir. 1994) ("If, after the employee is notified that he is being

disciplined, he files a grievance, . . . the Statute gives the union the right to be present at all formal discussions concerning the grievance.").

Section 7114(a)(5)(A) provides that the rights of an exclusive representative are not to be construed to preclude an employee from "being represented by an attorney or other representative other than an exclusive representative" except in the case of a grievance.  Based on this provision, the D.C. Circuit concluded that "Congress must have intended to exclude the union from any right of inclusion in the statutory alternatives to the negotiated grievance procedure . . . ." *NTEU v. FLRA*, 774 F.2d 1181, 1187 (D.C. Cir. 1985).  "[A] *direct* conflict between the rights of an exclusive representative under § 7114(a)(2)(A) and the *rights* of an employee victim of discrimination should also presumably be resolved in favor of the latter." *Id.* at 1189 n. 12.

**(4)** Section 9901.914(b)(5) of the regulations, which is patterned after 5 U.S.C. § 7114(b)(4), imposes an obligation on the Department to furnish information that is "normally maintained" and "reasonably available" to an exclusive representative where the representative demonstrates a "particularized need" for the information in order to perform its representational functions, and "[d]isclosure is not prohibited by law."  70 Fed. Reg. 66215 (§ 9901.914(b)(5)). Section 9901.914(c) provides that disclosure of information under paragraph (b)(5) of the regulation does not include, *inter alia*, (1) a disclosure prohibited by law, including regulations, "implementing issuances" and other policies, (2) a disclosure of information if "adequate alternative means exist for obtaining the requested information, or if proper discussion, understanding or negotiation of a particular subject within the scope of collective bargaining is possible without recourse to the information," and (4) "[a]ny disclosure where an authorized official has determined that disclosure would compromise the Department's mission, security, or employee safety." *Id.* (§ 9901.914(c)(1), (2) and (4)).  Plaintiffs allege that each of these provisions departs from the requirements of chapter

71 and is therefore unlawful.  Pl. Mem. at 25-26.

As the preamble reflects, however, "[t]hese provisions generally codify current caselaw in which the right of the union to information is weighed against the rights of employees and management."  70 Fed. Reg. 66182.  *E.g.*, *Dept. of the Air Force v. F.L.R.A.*, 956 F.2d 1223, 1224 (D.C. Cir. 1992) ("statute requires consideration of countervailing interests against disclosure"); *A.F.G.E v. F.L.R.A.*, 144 F.3d 85, 87 (D.C. Cir. 1998) ("employer must balance the union's particularized need against its own countervailing anti-disclosure interest").

## III.    THE APPEALS PROCESS IS FULLY CONSISTENT WITH THE STATUTE

The NDAA authorizes the Secretary to establish an appeals process for employees who have been subjected to adverse actions.  The regulations implementing this appeals process–

> may establish legal *standards and procedures* for personnel actions, *including standards for applicable relief*, to be taken on the basis of employee misconduct or performance that fails to meet expectations.  Such standards shall be consistent with the public employment principles of merit and fitness set forth in section 2301.

5 U.S.C. § 9902(h)(2) (emphases added).  In establishing this appeals process, the Secretary may depart from, *inter alia*, Chapters 43, 75, and 77 of Title 5.  5 U.S.C. §§ 9902(a) (NSPS may be created "[n]otwithstanding any other provision of this part"); 9902(h)(3) (appeals provisions prescribed by Secretary may displace provisions in Chapters 43, 75, and 77).

### A.    The Appeals Process Provides Fair Treatment To Employees

The appeals process set forth in § 9901.807 "provides employees . . . fair treatment."  5 U.S.C. § 9902(h)(1)(A).  An employee triggers this process by appealing an adverse action to the MSPB which then refers the case to an AJ.  5 C.F.R. § 9901.807(a).  The AJ's decision is appealable by either party.  On appeal, DoD has 30 days in which to decide whether to review the AJ's decision, and may modify or reverse the decision if it "has a direct and substantial adverse impact on DoD's national security mission, or is based on an erroneous interpretation."  *Id.* (§ 9901.807(g)(2)(ii)(B)).

If DoD does not act on the AJ's decision, the AJ's decision becomes the final decision of DoD. § 9901.807(g)(2)(i).

In the second step of the process, the DoD's decision is appealable to the full MSPB. *Id.* (§ 9901.807(h)). The MSPB reviews DoD's final agency action pursuant to standards promulgated by Congress: the MSPB may order corrective action only if it determines that the decision was (1) "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" (2) "[o]btained without procedures required by law, rule, or regulation having been followed;" or (3) "[u]nsupported by substantial evidence." 5 U.S.C. § 9902(h)(5); 5 C.F.R. § 9901.807(h)(2)(iii). The MSPB's decision is then reviewable by the Federal Circuit under the same procedures and standards that previously applied. 5 U.S.C. § 9902(h)(6); 5 C.F.R. § 9901.807(i).

### 1. The regulations afford ample opportunity for employees to create a factual record and obtain independent administrative review

Plaintiffs contention that DoD's limited review of AJ decisions renders the process unfair (*see* Compl. ¶ 48) is without merit. DoD's role occurs within its own agency process, which is then subject to independent administrative and judicial review thereby ensuring "fair treatment." The rule grants DoD the ability to alter or remand an AJ decision in three circumstances: where (1) the AJ decision "has a direct and substantial adverse impact on the Department's national security mission," (2) the decision is based on an erroneous interpretation of law, Governmentwide rule or regulation, or the NSPS regulations, or (3) there has been "a material error of fact, or that there is new and material evidence available that, despite due diligence, was not available when the record closed." 5 C.F.R. § 9901.807(g)(2)(A). OPM and DoD "anticipate that relatively few cases will be reviewed by the Department under this authority." 70 Fed. Reg. 66174.

There is nothing unfair about reversing or remanding a decision that adversely impacts national security, is legally erroneous, or factually incorrect, and plaintiffs do not appear to contend

otherwise. Rather, plaintiffs contend that it is unfair to allow DoD to make these determinations. Compl. ¶ 48. But DoD's determination, which is necessary "to ensure that [AJ] decisions interpret NSPS and these regulations in a way that recognizes the critical mission of the Department," 70 Fed. Reg. at 66174-75, is part of the Agency's decision-making process which, once complete, is reviewed by the MSPB and Federal Circuit under the standards prescribed by Congress.[20]

It is typical for disputes to be heard, in the first instance, by the head of an agency or his designee. Indeed, the normal agency adjudication process, under the Administrative Procedures Act, begins with an initial decision by an administrative judge *appointed by the agency*. *See* 5 U.S.C. § 556; 5 U.S.C. § 3105. The administrative judge's decision is then appealable to the agency and, on appeal, "the agency has all the powers which it would have in making the initial decision." 5 U.S.C. § 557(b).[21] The only differences between the APA and the NSPS appeals process are (1) the Agencies vested the initial fact-finding in MSPB AJs rather than DoD AJs,[22] and (2) DoD's agency review is cabined by specific standards. Neither of these differences renders the process unfair.[23]

DoD's agency decision is then subject to independent review. 70 Fed. Reg. at 66127. The MSPB can, for example, reverse any DoD decision that is "not in accordance with law." 5 C.F.R.

---

[20] Moreover, it is hard to see how a major purpose of the NDAA–ensuring that personnel decisions reflect an understanding of the nation's national security needs–could be accomplished without DoD having a role in its own agency decision-making process. *See* 70 Fed. Reg at 66127 ("The Secretary is accountable to the President and the American people for safeguarding national security. . . . These regulations ensure that the Secretary's authority aligns with that responsibility.").

[21] Thus, Plaintiffs' unsupported assertion that an agency cannot review the initial AJ decision during the agency's decision making process (Pl. Br. at 51) is simply incorrect.

[22] "The decision to utilize the MSPB AJ corps, rather than establishing a new corps of AJs, is purposeful. [The Agencies] are mindful of the need to conserve resources and recognize the value these AJs' independence brings to the process." 70 Fed. Reg. at 66127.

[23] Of course, this appeals process does differ from the preexisting MSPB process, as Congress clearly intended when it authorized the Agencies to establish a new process. *See* 5 U.S.C. § 9902(h).

§ 9901.807(h)(2)(iii)(A).  The MSPB's decision is further reviewable by the Federal Circuit under legal standards that are unaffected by these regulations.  Thus, while DoD is entitled to a role in the process leading up to its final agency determination, *see* 5 C.F.R. 9901.807(g) (setting forth process for reaching the "Department's final decision"), the employee can challenge that determination in both an independent administrative forum (the MSPB) and an Article III judicial forum.

Finally, the regulations provide that the employee will have ample opportunity to make an adequate factual record prior to review by the MSPB and the Federal Circuit.  *See* 5 C.F.R. §§ 9901.807(d) ("The parties may seek discovery regarding any matter that is relevant to any of their claims or defenses."); 9901.807(a) (employee has right to attorney representation); 9901.807(e) (right to either hearing or filing of evidence and/or arguments); 9901.807(g)(ii)(A) ("Any remand will be served on all parties with an opportunity for those parties to comment to the AJ.").

The process thus assures DoD of meaningful participation and the opportunity to protect national security interests within its own agency process, and provides employees with an opportunity to present a complete factual record for review in independent administrative and judicial fora.  Thus, the regulations comport with the statutory requirement of "fair treatment."  And, of course, to the extent that there is any doubt, the Agencies' interpretation of the term "fair treatment" is entitled to deference under *Chevron*.

> **2.  The mitigation standard and mandatory removal offense provisions permissibly implement the agencies' statutory authorization to develop "standards for applicable relief"**

Following the statutory mandate, the appeals process developed by the Agencies contains "standards for applicable relief," modifying the standards set forth in Chapters 43 and 75 of the CSRA.  Chapter 43 of the CSRA covers unacceptable performance, while Chapter 75 covers employee misconduct.  *See Lachance v. Devall*, 178 F.3d 1246, 1253 n.6 (Fed. Cir. 1999).  Under

the CSRA, the MSPB has no mitigation authority with regard to adverse actions for unacceptable performance, *id.*; *Lisiecki v. MSPB*, 769 F.2d 1558, 1568 (Fed. Cir. 1985), while, with regard to misconduct, the MSPB may only mitigate "those penalties it finds abusive." *LaChance*, 178 F.3d at 1258 (MSPB may not "infringe upon an agency's exclusive domain as workforce manager.").

The regulations simplify this review by adopting a single mitigation standard for both unacceptable performance and misconduct. Under the regulations, an AJ "may not modify the penalty imposed unless such penalty is totally unwarranted in light of all pertinent circumstances." § 9901.807(f)(2)(ii).[24] In making this evaluation, the AJ must "give primary consideration to the impact of the sustained misconduct or poor performance on the Department's national security mission . . . ." *Id.* If the penalty is found to be totally unwarranted in light of all pertinent circumstances, the AJ may lower the penalty to the "maximum justifiable penalty." § 9901.807(f)(2)(iv). The regulations further provide for the Secretary to designate, and publish in advance, "offenses that have a direct and substantial adverse impact on the Department's national security mission." *Id.*, § 9901.712(a) These particularly damaging offenses are designated as "mandatory removal offenses" (MROs), and the AJ is not permitted to mitigate the penalty if he or she determines that the offense was committed. *Id.*, § 9901.808(b). Because of the high standard for designating an action as an MRO, these offenses will be very serious offenses such as aiding terrorism, engaging in sabotage that could lead to loss of life or adverse impact on military readiness,

---

[24] The standard of review used by AJs within the agency review process is different from the standard of review used by the full MSPB, the latter being set by statute. Plaintiffs' unsupported suggestion that the standard of review should be identical at all levels of review (*see* Pl. Mem. at 48) is inconsistent with the statute. The NDAA sets forth the standard of review that the MSPB must use in reviewing adverse actions. *See* § 9902(h)(5). The NDAA then provides that, with regard to the earlier levels of review, the Secretary may prescribe "standards for applicable relief." § 9902(h)(2). Clearly, by setting forth the MSPB's review standard, while giving the Secretary latitude to set review standards at earlier levels, Congress was allowing for the agency decision-making process to utilize different review standards than the one specified for the MSPB.

or soliciting a bribe for an act that compromises national security. *See* 70 Fed. Reg. at 66127.

This mitigation standard meets Congress' mandate that the appeals process provide employees "fair treatment." 5 U.S.C. § 9902(h)(1)(A).[25]  The Agencies ensured that the process would be fair to employees by, for example, retaining the CSRA's evidentiary standard for adverse actions. Before the AJ reaches the mitigation phase of a proceeding, the regulations require him or her to determine that the adverse personnel action at issue is supported by a preponderance of the evidence. 5 C.F.R. § 9901.807(e)(1).[26]  The Agencies deliberately maintained this relatively stringent standard, debating but ultimately rejecting the laxer "substantial evidence" standard. *See* 70 Fed. Reg. at 66119, 66172. Given this assurance that an adverse action is sustained only where supported by a preponderance of the evidence, the deference given to DoD's determination as to the appropriate penalty does not render the appeals process unfair.[27]  Moreover, the fairness of mandatory removal (subject to possible mitigation by the Secretary or the full MSPB) for certain particularly serious offenses is confirmed by the fact that Congress has implemented a similar MRO system for the Internal Revenue Service. *See* Internal Revenue Service Reform and Restructuring Act of 1998, Pub. L. No. 105-206 , tit. I, § 1203, 112 Stat. 685, 720-21 (*see* 26 U.S.C. § 7804 note).

---

[25] To the extent that plaintiffs' claim is deemed to be constitutional in nature, constitutional due process requires, with regard to removal, notice, an opportunity to respond, and a written decision and a post-termination hearing and nothing more. *Gilbert v. Homar*, 520 U.S. 924, 929 (1997); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

[26] Thus, employees are protected from, *inter alia*, "arbitrary action, personal favoritism, or coercion for partisan political purposes," 5 U.S.C. § 2301(b)(8)(A), as well as from unlawful reprisal, *see* 5 U.S.C. § 2301(b)(9). The AJ is also specifically permitted to reverse an adverse action that was based on a prohibited personnel practice, such as race or gender discrimination, or is otherwise not in accordance with law. 5 C.F.R. § 9901.807(e); *cf.* 5 U.S.C. § 2301(b)(2) (merit system principle prohibiting discrimination).

[27] Plaintiffs' assertion that an AJ must uphold a termination for arriving five minutes late (Pl. Mem. 48-49) is both unsupported and incorrect. An AJ could conclude that termination for arriving five minutes late is totally unwarranted in light of all pertinent circumstances. Contrary to Plaintiffs' fear, an AJ is not required to "uphold unreasonable penalties." Pl. Mem. at 49.

- 60 -

The mitigation standard, in addition to being fair, is also consistent with the merit system principles set forth in 5 U.S.C. § 2301 which DoD is required to uphold. In addition to requiring fair treatment of employees (discussed above), *see* 5 U.S.C. §§ 2301(b)(1), (2), (3), (8), (9), the merit system principles require three things: (1) "[a]ll employees should maintain high standards of integrity, conduct, and concern for the public interest;" (2) "[t]he Federal work force should be used efficiently and effectively;" and (3) "[e]mployees should be retained on the basis of the adequacy of their performance, inadequate performance should be corrected, and employees should be separated who cannot . . . improve their performance to meet required standards." *Id.*, §§ 2301(a)(4)-(6).

As courts have recognized, the employing agency is in the best position to determine what penalty will best promote efficiency, adequate performance, and integrity. *See, e.g.*, *Parker v. United States Postal Serv.*, 819 F.2d 1113, 1116 (Fed. Cir. 1987) ("It is well established that the determination of the proper disciplinary action to be taken to promote the efficiency of the service is a matter peculiarly and necessarily within the discretion of the agency."); *Beard v. GSA*, 801 F.2d 1318, 1321 (Fed. Cir. 1986) (recognizing "the important policy consideration that the employing (and not the reviewing) agency is in the best position to judge the impact of the employee misconduct upon the operations of the agency, the prospects for the employee's rehabilitation and improvement, and the need to maintain and encourage high standards of conduct by all employees."); *Weiss v. U.S. Postal Service*, 700 F.2d 754, 758-759 (1st Cir. 1983) ("efficient management is served by allowing the agency, within broad limits, to assess the severity of the penalty necessary, for instance, to deter extensive tardiness or absenteeism."). Even outside of the crucial national security arena, "[i]t is a well-established rule of civil service law that the penalty for employee misconduct is left to the sound discretion of the agency." *Lachance v. Devall*, 178 F.3d 1246, 1251 (Fed. Cir.

1999) (quotation omitted); *id.* at 1258 ("agency's exclusive domain" to discipline its employees.").[28]

Ultimately, the penalty mitigation standard rests on an eminently sound rationale. "By its very nature, the Department's national security mission requires an exceptionally high level of workplace order and discipline." 70 Fed. Reg. 66116, 66126 (2005). And, "because the Department [of Defense] bears full accountability for national security, it is in the best position to determine the penalty for . . . misconduct, subject to a more limited review than exists now under chapter 75 of title 5." *Id.* Recognizing the unique mission of DoD, Congress left it to the Agencies to craft standards of review for the appeals process and prescribed the standard to be applied by the MSPB. The mitigation standard to be applied by AJs is a reasonable application of this delegated authority.

### 3.  Plaintiffs' Remaining "Fairness" Challenges Lack Merit

Plaintiffs challenge two rules that require decisions to be made for substantively fair reasons rather than on technicalities. The first of these provisions states that the MSPB AJ and the MSPB may not reverse an adverse action based on the way a charge is labeled or conduct is characterized "*provided the employee has sufficient notice to respond to the charge*." 5 C.F.R. § 9901.807(f)(3) (emphasis added). The second provision states that the MSPB AJ and MSPB may not reverse an adverse action based on the way a performance expectation is expressed "*provided that the expectation would be clear to a reasonable person*." 5 C.F.R. § 9901.807(f)(4) (emphasis added).

These provisions provide that the review process must focus on *substance*–i.e., whether the employee has sufficient notice of the charge and whether the performance expectation was

---

[28] Moreover, federal courts have applied deferential standards similar to the NSPS mitigation standard, without finding their review to be superfluous or unfair. *E.g., Bryant v. NSF*, 105 F.3d 1414, 1416 (Fed. Cir. 1997) ("we cannot disturb the penalty chosen by the agency unless it is so 'outrageously disproportionate' to the charged offense . . . as to constitute an abuse of discretion" (quotation omitted)); *Lachance*, 178 F.3d at 1251 ("we will not disturb a choice of penalty within the agency's discretion unless the severity of the agency's action appears totally unwarranted in light of all the factors" (quotation omitted)).

objectively clear–rather than any technicality regarding wording. *See* 70 Fed. Reg. at 66174 ("These provisions are written to eliminate overly technical and legalistic aspects of the current appeals process, while preserving employees' due process rights."). These provisions are reasonable applications of the Agencies' power to establish "standards for applicable relief" and are fair to employees. *See, e.g.*, *Brook v. Corrado*, 999 F.2d 523, 527 (Fed. Cir. 1993) (due process requires only that the employee be informed of the grounds for the adverse action and have an opportunity to respond). Moreover, this focus on substance makes little, if any, change to preexisting law as interpreted by the Federal Circuit. *See LaChance v. MSPB*, 147 F.3d 1367, 1371-72 (Fed. Cir. 1998) (agency must notify employee of charged conduct "in sufficient detail to permit the employee to make an informed reply" but such detail need not be in the characterization of the offense itself); *Brook v. Corrado*, 999 F.2d 523, 526 (Fed. Cir. 1993) ("A notice of a proposed removal is sufficient under [chapter 75 of title 5] when it apprises the employee of the nature of the charges in sufficient detail to allow the employee to make an informed reply") (internal quotations omitted).

Finally, these requirements that the MSPB focus on substance rather than technicalities implement, rather than violate, the statutory provision that provides that the MSPB "may order such corrective action as [it] considers appropriate only if [it] determines that the decision was . . . arbitrary, capricious, an abuse of discretion, or other wise not in accordance with law; . . . obtained without procedures required by law, rule, or regulation having been followed; or . . . unsupported by substantial evidence." 5 U.S.C. § 9902(h)(5). A decision that focuses on substance will not be arbitrary or capricious, and Plaintiffs have offered no basis for their assertion that it would be.

**B.    The Regulations Properly Implement the Statutory Provision Regarding Interim Relief**

Plaintiffs misrepresent both the statutory and regulatory provisions relating to interim relief. *See* Compl. ¶ 49. The only provision of the NDAA that relates to interim relief states: "No personnel

action shall be stayed and no interim relief shall be granted during the pendency of the [MSPB's] review unless specifically ordered by the [MSPB]." 5 U.S.C. § 9902(h)(4). This provision represents a *limitation* on, not an *expansion* of, the power to grant interim relief. It neither creates nor defines any power to grant interim relief, but provides only that any such power shall only be exercised by the MSPB through specific orders, and not in any other manner.

The regulatory provision on interim relief neither restricts the MSPB's power to grant interim relief nor permits DoD to "refuse to obey" (Compl. ¶ 49) an MSPB order. Rather, it provides:

> If the interim relief ordered by the full MSPB provides that the employee will return or be present at the place of employment pending the outcome of any petition for review, and the Secretary determines . . . that the employee's return to the workplace is impracticable or the presence of the employee is unduly disruptive to the work environment, the employee may be placed in an alternative position, or may be placed on excused absence pending final disposition of the employee's appeal.

5 C.F.R. § 9901.807(f)(5)(i). This provision only slightly modifies Chapter 77's general right of the employing agency to refuse to allow an employee who has received interim relief to return to the workplace if the agency "determines that the return or presence of such employee . . . is unduly disruptive to the work environment," 5 U.S.C. § 7701(b)(2)(A)(ii), by also providing the agency can decline to return employees to the workplace if it would be impracticable to do so. This right to avoid impracticability or prevent undue disruption does not prevent the MSPB from ordering interim reinstatement during the pendency of an appeal. It merely provides that the Secretary, as part of his duties to manage the Department and his workforce, may reassign the employee or place the employee on *excused* absence, where returning the employee to his or her prior position would be impractical or unduly disruptive to the work environment. The employee is still reinstated and receives his or her full pay and benefits and is not charged any leave. *See* 70 Fed. Reg. at 66174.

This rule permits the employee to be reinstated by the MSPB while protecting DoD from undue disruption and impractical requirements. It is thus fair to both parties and recognizes that

DoD's mission could be undermined if an employee's presence would be disruptive or impracticable.

## IV.  THE AGENCIES COMPLIED WITH THE PROCEDURAL REQUIREMENTS FOR COLLABORATION WITH LABOR ORGANIZATIONS IN THE DEVELOPMENT AND IMPLEMENTATION OF THE LABOR RELATIONS SYSTEM

As discussed above, § 9902(m) authorizes the Agencies to develop a new LR system for DoD.  Section 9902(m)(3) requires that authority to be "exercised in collaboration with, and in a manner that ensures the participation of, employee representatives in the development and implementation of the labor management relations system . . . ." 5 U.S.C. § 9902(m)(3).  Section 9902(m)(3)(D) requires that the collaborative process begin within sixty days of the enactment of 5 U.S.C. § 9902(m).  As part of the collaborative process, the statute requires the Agencies to: "afford employee representatives and management the opportunity to have meaningful discussions concerning the development of the new system." *Id.*, § 9902(m)(3)(A)(i).  It also gives guideposts to assure that this opportunity is provided.  Employee representatives are given 30 days to review and respond to the proposed system.  *Id.*, § 9902(m)(3)(A)(ii).  The Agencies are required to "give any recommendations received. . .full and fair consideration." *Id.*, § 9902(m)(3)(A)(iii).  The statute authorizes the Agencies to accept such recommendations "as are determined advisable," and requires that the Agencies meet and confer with employee representatives for not less than 30 days to discuss recommendations that are not adopted.  *Id.*, § 9902(m)(3)(C).  At the Secretary's option, the Federal Mediation and Conciliation Service may be used to facilitate the meet and confer sessions.  *Id.*, § 9902(m)(3)(B)(ii).  At the end of the meet and confer period, the Secretary may implement those parts of the proposed system to which no recommendations were made, or to which recommendations were accepted.  *Id.*, § 9902(m)(3)(C)(i).  With respect to disputed provisions, if the Secretary "in his discretion" determines that "further consultation and mediation is unlikely to produce agreement, the Secretary may implement any or all of such parts" 30 days after notifying

Congress of the dispute. *Id.*, § 9902(m)(3)(C)(ii). The Agencies complied with each requirement.

As required, a meeting was held with employee representatives on January 22, 2004, within 60 days after the enactment of § 9902(m). *See* 70 Fed. Reg. 66120. *See also* 5 U.S.C. § 9902 note ("The date of enactment of this subsection. . .means Nov. 24, 2003. . .").[29] *Id.* Following the January meeting, the Agencies held 11 additional meetings with employee representatives that focused on "the design elements, options and proposals under consideration for NSPS" and union feedback was solicited.[30] *Id.* Though a specific proposed system had not yet been developed, at these meetings plaintiffs, as they admit, were provided with, and engaged in a discussion of, potential options for the development of the new system. *See* Pl. Mem. 38-39.

On February 14, 2005, the Agencies provided employee representatives with a proposal, as contemplated in § 9902(m)(3)(A), which was published in the Federal Register.[31] *See* 70 Fed. Reg.

---

[29] Plaintiffs claim that the January 22, 2004 meeting failed to satisfy § 9902(m)(3)(D) because neither OPM nor all employee representatives were at the meeting, and all other meetings took place more than 60 days after the enactment of § 9902. *See* Pl. Mem. 38. Even if OPM and some employee representatives did not attend the January 22, 2004 meeting, § 9902(m)(3)(D) only requires that the collaborative process *begin* within 60 days of the enactment of § 9902. *Id.* It does not specify what must be done to begin the process; nor does it specify which parties must be engaged within the 60 day period. By engaging employee representatives in a collaborative meeting within 60 days of the enactment of § 9902, the January 22, 2004 meeting meets that requirement.

[30] Plaintiffs claim that "any attempt at collaboration" at these meetings "was futile on the Unions' part, as OPM has [*sic*] advised DoD on March 9, 2004, to essentially ignore Union input." Decl. of Mark D. Roth ¶ 13 at 340. To support this allegation, plaintiffs cite a March 9, 2004 letter from OPM to DoD concerning the very early development process for the NSPS and labor management relations system. Nothing in that letter, however, suggests that DoD should ignore Union comments. Rather, OPM sought greater OPM and employee representative involvement in the process going forward, and counsels that DoD needs to engage the Department's civilian employees in a substantive and meaningful way because their "'buy in' is essential to the successful implementation of NSPS. . ." Ex. F to Roth Decl. at 408.

[31] Plaintiffs allege that at a meeting held on February 10, 2005, during which they were given advance notice of the pending publication of the proposed rule, Deputy Sec. England stated that employee representatives had not "had any meaningful participation in the 'development' of this new system." Roth Decl. ¶ 15 at 340. Even if this statement was made, the facts belie it. The unions had been engaged in 12 meetings at which the development of the LR system was discussed prior to

7552. Plaintiffs claim that because they were not provided access to the internal agency working groups that prepared the proposal, they were denied the opportunity for meaningful discussions required by § 9902(m)(3)(A)(i).[32]  *See* Compl. ¶¶ 19-23, and Pl. Mem. 37-41.  They appear to suggest that § 9902(m)(3)(A)(i) required defendants to provide them the opportunity to jointly draft the proposal with DoD and OPM prior to the notice, comment, and meet and confer phases of development. The statute, however, requires none of these things.[33]  Section 9902(m)(3)(A)(i) states only that employee representatives receive an opportunity to have meaningful discussions "concerning the development of the new system."  Nothing in this language suggests that employee representatives must be given the opportunity to draft that proposal alongside the agencies.

As required by the statute, following publication of the proposed rule, the Agencies provided a 30-day period for employees, and employee representatives, as well as the public, to review the proposal and submit comments.  70 Fed. Reg. 66121.  The Agencies received over 58,538 comments, many of them from union members and labor organizations.  *Id.* at 66121-22.  They carefully considered each of these comments, as reflected in the preamble to the rule, and used them as a starting point for the meet and confer process.  *Id.*

---

February 10, 2005.  Furthermore, the collaborative process was far from complete on February 10, 2005.  The parties still had yet to engage in notice, comment, and the meet and confer process, all of which provided additional opportunity for the meaningful discussion of the development of the LR system, and which led to significant changes in the final rule.  *See, e.g.*, 70 Fed. Reg. 66122-23.

[32] While employee representatives did not meet directly with the working groups, the working groups were fully aware of the comments and suggestions made by the employee representatives, and considered them in drafting options for the proposed regulations.  *See* 70 Fed. Reg. 66121 ("The Working Groups reviewed available information, including: Pertinent laws, rules, regulations; input from NSPS focus groups and town hall [*sic*]; union meetings. . .").

[33] Plaintiffs' reading of the statute would render meaningless the notice, comment, and meet and confer requirements because if the agencies were required to jointly draft the new regulations with employee representatives, there would be no purpose to the notice, comment, and meet and confer sessions following the drafting.

As required by the statute, the Agencies met and conferred with the employee representatives for not less than 30 days. The Agencies held 19 face-to-face meetings with employee representatives that took place between April 18, 2005 and June 2, 2005,[34] at which recommendations for the system were exchanged, and the unions proposed revisions to each subpart of the rule. *Id.* at 66122-23. At the close of the meet and confer period, the NSPS Senior Executive and the Acting Director of OPM met with the unions so they could "present their issues and concerns directly to the principles." *Id.*

Plaintiffs claim the meet and confer process did not satisfy § 9902(m)(3)(B) because defendants did not intend to reach agreement with them as to any disputed provisions.[35] They argue that, by requiring a "meet and confer" process, Congress intended a process similar to collective bargaining, in which agreement would be reached on disputed provisions.[36] Because no agreement

---

[34] Plaintiffs claim they were improperly provided with only one 30-day period during which to meet and confer on both the HR and the LR systems. *See* Roth Decl. ¶ 18 at 341. While the meet and confer process for the HR and the LR systems proceeded simultaneously, it encompassed at least 60 days, starting with a meeting to discuss procedures on April 8, 2005, and ending with a meeting between union officials and the Secretary and Acting Director in mid-June. Additionally, nothing in § 9902 precludes the use of a single meet and confer process for both the HR and LR systems. Simultaneity is logical as the same parties were involved in both. *See* § 9902(f) and (m).

[35] Their sole support for this claim is a statement they attribute, without context, to Deputy Under Secretary Charles Abell. They claim that on May 9, 2005, at one of the meet and confer sessions, Mr. Abell told employee representatives that "it served little purpose to discuss the Unions' proposals on the scope of bargaining and objections, and inconsistencies with Ch. 71 because the proposed regulations represented the Administration's position on labor relations. . ." Roth Decl. ¶ 20 at 341. Even if Mr. Abell did make this comment, it is not surprising that the proposed rule, the Agencies' proposal, would reflect their positions on the scope of bargaining and objections and the extent to which Ch. 71 could be modified or waived. Furthermore, all of these issues were discussed at a number of meetings and in a meaningful way. Even after the May 9, 2005, meeting, the Agencies engaged in an additional 8 meet and confer sessions with the unions. The meet and confer sessions, and the unions' written comments and pre-proposal meetings, led defendants to make numerous changes to the final rule. *See* 70 Fed. Reg. 66123; *see also supra* n.39.

[36] Plaintiffs attempt to support this view of what is required by "meet and confer" by noting that federal LR statutes like the FSLMRA and the NLRA use the words "meet" and "confer" in defining what is required for collective bargaining. *See e.g.* Pl. Mem. 41. Section 9902(m), however, makes plain that Congress was not requiring a collective bargaining process, but rather, a collaboration process for developing the LR system.

- 68 -

was reached on parts of the LR system, they claim the process did not comply with § 9902(m)(3)(B).

Plaintiffs are simply wrong that agreement is a fundamental aspect of the "meet and confer" process required in § 9902(m)(3)(B). Congress spoke clearly to this issue in § 9902(m)(3)(C)(ii) which states that following the meet and confer period the Secretary may implement any disputed provision 30 days after notifying Congress of the dispute. *Id.* The statute, therefore, explicitly contemplates that the meet and confer process may not resolve all outstanding disputes.

As a result of the employee representatives' comments elicited through these many forms of collaboration, the Agencies made substantial and "significant revisions of the proposed regulations." *See* 70 Fed. Reg. 66122-23.[37] Employee representatives' suggestions that were not accepted are discussed extensively in the preamble to the regulations and the reasons for their rejection explained, reflecting the seriousness with which defendants took every comment received. Thus, the Agencies conducted an extensive collaborative process that complied fully with the statute. *Id.* at 66130-89.

---

[37] The regulations also provide numerous examples of specific changes made to the proposed labor management relations system in response to employee representatives' written comments and participation in the meet and confer process. *See*, *e.g.*, 70 Fed. Reg. 66178 (changing definitions of "confidential employee"; "implementing issuances"; "supervisor" as it relates to nurses and firefighters; and limiting who within DoD is permitted to issue implementing issuances); 66179 (adding 9901.905(c) to make clear that any provision of a CBA that is inconsistent with non implementing issuances will remain in effect until the expiration, extension, or renewal of the agreement; and adding a regulation that permits unions to nominate individuals to seats on the NSLRB); granting jurisdiction over national consultation disputes to the FLRA; 66181 (modifying the regulations to permit the Secretary to engage in bargaining over procedures to be followed in exercising operational management rights, and appropriate arrangements on the routine matters related to the operation management rights); 66183 (modifying 9901.916 to provide six months to file an unfair labor practice; adopting a recommendation to delete the prohibition on ratification in 9901.919(b)(5)); 66184 (new regulations allow employees the right to grieve performance ratings through the negotiated grievance procedures using either a panel or traditional arbitration).

# CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment should be denied, defendants' motion to dismiss should be granted, and this action should be dismissed with prejudice.

Dated: December 8, 2005                Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

_____/s/_____
SUSAN K. RUDY, D.C. Bar # 369112
JOSEPH W. LOBUE, D.C. Bar # 293514
JEFFREY M. SMITH, D.C. Bar # 467936
JONATHAN ZIMMERMAN, MA Bar # 654255
Attorneys, U.S. Department of Justice
20 Massachusetts Avenue, N.W., Room 7300
Washington, D.C.  20530
Telephone:  (202) 514-4640
Attorneys for Defendants