## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | : : : | |
| Plaintiffs, | : : | Civil Action No. 05-2183 (EGS) |
| v. | : : | |
| DONALD H. RUMSFELD, SECRETARY, UNITED STATES DEPARTMENT OF DEFENSE, *et al.*, | : : : : | |
| Defendants. | : : | |

### MEMORANDUM OF POINTS AND AUTHORITIES
### IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY
### SUPPORTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Of counsel:*

JEAN E. ZEILER
National Association of Government
  Employees, SEIU, AFL-CIO
159 Burgin Parkway
Quincy, MA  02169
(617) 376-0220

JULIA AKINS CLARK, Bar #337493
International Federation of Professional
  and Technical Engineers, AFL-CIO
8630 Fenton Street, Suite 400
Silver Spring, MD  20910
(301) 565-9016

PATRICK J. SZYMANSKI, Bar #269654
International Brotherhood of Teamsters
25 Louisiana Avenue, N.W.
Washington, DC  20001
(202) 624-6945

JOSEPH GOLDBERG, Bar # 291096
MARK D. ROTH, Bar # 235473
American Federation of Government
  Employees, AFL-CIO
80 F Street, N.W.
Washington, DC  20001
(202) 639-6426

SALLY M. TEDROW, Bar #938803
O'Donoghue & O'Donoghue LLP
4748 Wisconsin Avenue, N.W.
Washington, DC  20016
(202) 362-0041

SUSAN TSUI GRUNDMANN, Bar #433437
National Federation of Federal Employees,
  FD-1, IAMAW, AFL-CIO
1016 16th Street, N.W.
Washington, DC  20036
(202) 862-4400

DANIEL M. SCHEMBER, Bar #237180
Gaffney & Schember, P.C.
1666 Connecticut Avenue, N.W.
Suite 225
Washington, DC  20009
(202) 328-2244

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   ARGUMENT ................................................................................................... 2

  A.   The Agencies' Threshold Challenges are Without Merit ................................ 2

    1.   The Unions Have Standing to Pursue their Challenges ............................. 2

    2.   All of the Unions' Challenges are Ripe for Judicial Resolution................... 4

  B.   The Labor Relations System Established by the Regulation
       does not Comply with Section 9902 ........................................................... 6

    1.   The Agencies are Not Empowered to Modify Chapter 71
         Except as Specified in Sections 9902(m)(5) or 9902(m)(6) ........................ 6

    2.   The Regulations are Contrary to Law Because They Are
         Inconsistent With Chapter 71 and Not Authorized by
         Sections 9902(m)(5) or 9902(m)(6) ......................................................... 19

      a.   The Regulation, 5 C.F.R. § 9901.917(d)(1) Improperly
           Allows the Agencies to Use "Issuances" to Eliminate
           the Statutory Right to Bargain ...................................................... 19

      b.   The Regulation, 5 C.F.R. § 9901.910, Improperly
           Expands Management Rights to Eliminate Almost
           All Negotiated Procedures and Appropriate Arrangements ................... 21

      c.   The Regulations, 5 C.F.R. § 9901.305 & 903,
           Impermissibly Restrict Collective Bargaining
           over NAFI Employees' Pay ............................................................. 23

      d.   The Regulations, 5 C.F.R. § 9901.103, 905 & 916(a)(7),
           Unlawfully Permit the Immediate Invalidation of Collective
           Bargaining Agreements through Implementing Issuances ..................... 26

      e.   The Regulations, 5 C.F.R. § 9901.907 & 908, do
           Not Create a Review Board that is a Third Party and Independent ......... 29

      f.   The Regulations, 5 C.F.R. §§ 9901.807(g),
           807(h), 922(c)(4), 922(f)(2) & 923(a) Improperly Modify the Grievance and
           Arbitration Procedure.................................................................... 30

      g.   The Regulation, 5 C.F.R. §§ 9901.914(a)(4),

        Improperly Infringes on the Conduct of Union Representatives ............................... 31

    h.    The Regulations, 5 C.F.R. §§ 9901.903 & 914,
    Improperly Depart from Chapter 71 ............................................................... 33

C.    <u>The Appeals Process is Unlawful under the Act</u> ............................................................ 36

    1.    The Agencies' Regulation Governing Employee
    Appeals is Invalid Under Step One of Chevron Review
    Because the Provisions at Issue Violate the Clear Language of the Act ..................... 36

        a.    The Regulation Violates § 9902(h)(2)'s Unambiguous
        Requirement that the NSPS Appeals Process Must be
        Consistent with the Public Employment Principles
        of Merit and Fitness ...................................................................................... 36

        b.    The New Mitigation Standard,
        5 C.F.R. § 9901.807(f)(2)(iii), Promotes  Arbitrary Action
        Against Employees ...................................................................................... 37

        c.    The Sections of the Regulation which Allow the DoD
        to Unilaterally Modify or Reverse an Arbitrator's
        or AJ's decision, 5 C.F.R. §§ 9901.807(g)(2)(ii)(A)
        and (B), Further Expose Employees to Arbitrary
        Actions by the Department ........................................................................... 37

    2.    Even if the Provisions at Issue Were to Pass Muster
    Under Chevron Step One, They Fail Under Chevron Step
    Two and/or Analysis Under the Administrative Procedure Act ................................... 39

    3.    Conclusions with Respect to Fairness ........................................................................ 40

    4.    The Agencies' Defense of their Mandatory
    Removal Offense Process Lacks Any Semblance of Merit ......................................... 42

III.  <u>CONCLUSION</u> ................................................................................................................. 45

## TABLE OF AUTHORITIES

### CASES

*AFGE v. FLRA*,
    865 F.2d 1283 (D.C. Cir. 1989) ...............................................................34

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967)..............................................................................5

*Aid Ass'n for Lutherans v. United States Postal Svc.*,
    321 F.3d 1166 (D.C. Cir. 2003) .............................................................2

*Air Force Flight Test Ctr., Edwards Air Force Base*,
    53 F.L.R.A. 1455 (1998).......................................................................32

*American Bar Assn v. FTC*,
    2005 U.S. App. LEXIS 26524 (D.C. Cir. Dec. 6, 2005) ...........................16

*American Library Ass'n v. F.C.C.*,
    401 F.3d 489 (D.C. Cir. 2005) ...............................................................3

*\* Association of Civ. Techs., Mont. Air Chapter No. 29 v. FLRA,*[1]
    22 F.3d 1150 (D.C. Cir. 1994) ...............................................................9

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979)..............................................................................5

*Brown v. Glines*,
    444 U.S. 348 (1980)..............................................................................32

*\* Chevron USA v. National Resources Defense Council*,
    467 U.S. 837 (1984)...........................................................1, 14, 37, 39, 42

*City of Auburn v. Quest*,
    260 F.3d 1160 (9th Cir. 2001) ...............................................................5

*Dep't of the Air Force, Grissom Air Force Base*,
    51 F.L.R.A. 7 (1995)..............................................................................32

*Department of the Air Force v. FLRA*,
    294 F.3d 192 (D.C. Cir. 2002) ...............................................................32

---

[1] Authorities marked with an asterisk (*) indicate authorities chiefly relied upon.

*Dept. of Veterans Affairs v. FLRA,*
   16 F.3d 1526 (9th Cir. 1994) .......................................................34

*Disabled in Action of Metro. N.Y. v. Hammons,*
   202 F.3d 110 (2d Cir. 2000)........................................................11


*Fuentes v. Shevin,*
   407 U.S. 67 (1972)......................................................................41

*Griffin v. Oceanic Contractors, Inc.,*
   458 U.S. 564 (1982)................................................................6, 14

\* *Illinois Nat'l Guard v. FLRA,*
   854 F.2d 1396 (D.C. Cir. 1988) ...................................7, 8, 9, 13

*Katris v. City of Waukegan,*
   498 F. Supp. 48 (N.D. Ill. 1980) ................................................41

\* *Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)..................................................................3, 4

*NFFE v. FLRA,*
   581 F.2d 886 (D.C. Cir. 1982) ...................................................22

*NTEU v. FLRA,*
   774 F.2d 1181 (D.C. Cir. 1985) .................................................35

*Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC,*
   41 F.3d 721 (D.C. Cir. 1994) .....................................................39

*National Ass'n of Postal Supervisors v. United States Postal Svc.,*
   602 F.2d 420 (D.C. Cir. 1979) .....................................................2

*National Park Hospitality Ass'n v. Department of the Interior,*
   538 U.S. 803 (2003)..................................................................4, 5

\* *National Treasury Employees Union v. Chertoff,*
   385 F. Supp. 2d 1 (D.D.C. 2005), *appeal pending,*
   Nos. 05-436, 05-437 (D.C. Cir.) .........................2, 5, 6, 23, 30, 37

*Old Dominion Branch No. 496 v. Austin,*
   418 U.S. 264 (1974)....................................................................32

*Sierra Club v. EPA,*
   292 F.3d 895 (D.C. Cir. 2002) .....................................................3

*Social Sec. Bd. v. Nierotko,*
    327 U.S. 358 (1946)..................................................................................................2

\* *Whitman v. American Trucking Associations,*
    531 U.S. 457 (2001)............................................................................................21, 31

## STATUTES

5 U.S.C. § 2301(b)(8) ..................................................................................................37

5 U.S.C. §§ 5311-5318 ................................................................................................24

5 U.S.C. § 556 .............................................................................................................38

5 U.S.C. § 706 .............................................................................................................19

5 U.S.C. § 712 .............................................................................................................28

5 U.S.C. § 7101, *et. seq.* ........................................................................................ *passim*

5 U.S.C. § 7701, *et. seq.* ..............................................................................................38

\* 5 U.S.C. § 9902, *et seq.* ....................................................................................... *passim*

26 U.S.C. § 7804..........................................................................................................44

\* 5 C.F.R. §§ 9901 *et. seq.* ..................................................................................... *passim*

## OTHER AUTHORITES

\* 70 Fed. Reg. 66116, *et. seq.* (Nov. 1, 2005) ........................................................ *passim*

149 Cong. Rec. 10988 (November 7, 2003) .................................................................11

149 Cong. Rec. 10997 (November 7, 2003) .................................................................11

\* 149 Cong. Rec. S14428 (November 11, 2003) ...........................................................10

\* 149 Cong. Rec. S14439 (November 11, 2003).......................7, 9, 10, 14, 15, 16, 17, 33

\* 149 Cong. Rec. S 14490 (November 12, 2003); 149 Cong. Rec. S14439
    (November 11, 2003)................................................................................................20

\* H.R. Rep. 354, 108th Cong., 1st Sess. (November 7, 2003) .......................................11

# I.     <u>INTRODUCTION</u>

A leading commentator once noted that "[s]ince administrative agencies are purely creatures of legislation, without inherent or common-law powers, the general rule applied to statutes granting powers to them is that only those powers are granted which are conferred expressly or by necessary implication."   NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 65.2 (6th Ed. 2001) (footnotes omitted).   Through the National Defense Reauthorization Act for Fiscal Year 2004 ("Act"), the legislative creatures in this case—the Department of Defense ("DoD") and the Office of Personnel Management ("OPM") (collectively "Agencies")—were granted the power to establish "a human resources management system" known as the National Security Personnel System ("NSPS").   5 U.S.C. § 9902(a).   In exercising that power, the Agencies have issued a final regulation establishing the NSPS.   *See*, Department of Defense Human Resources Management and Labor Relations Systems; Final Rule, 70 Fed. Reg. 66116 (Nov. 1, 2005) (to be codified at 5 C.F.R. Part 9901) ("Final Rule").

The Plaintiffs, which are thirteen labor organizations that represent hundreds of thousands of DoD employees, have brought this lawsuit challenging significant aspects of the NSPS that exceed the grant of authority provided by Congress to the Agencies.   The Plaintiffs have also filed a motion for summary judgment seeking to permanently enjoin the challenged aspects of the NSPS.   The Agencies have moved to dismiss the case, asking for the Court to find in their favor under *Chevron USA v. National Resources Defense Council*, 467 U.S. 837 (1984). (*See*, *e.g.*, Memorandum in Support of Defs.' Mot. to Dismiss ("Defs.' Mem.") at 1, 21-22.)

The D.C. Circuit has noted both before and after *Chevron* that, "[c]ourts can defer to the exercise of administrative discretion on internal management matters, but they cannot abdicate their responsibility to insure compliance with congressional directives setting the limits on that

discretion.'" *Aid Ass'n for Lutherans v. United States Postal Svc.*, 321 F.3d 1166 1174 (D.C. Cir. 2003) (quoting *National Ass'n of Postal Supervisors v. United States Postal Svc.*, 602 F.2d 420, 432 (D.C. Cir. 1979)). "An agency may not finally decide the limitations of its statutory power. That is a judicial function." *Social Sec. Bd. v. Nierotko*, 327 U.S. 358, 369 (1946).

The Plaintiffs respectfully request that the Court exercise this judicial function in this case, because the Agencies' interpretation of their own enabling statute exceeds the authority granted to them by Congress. The Court, through the Honorable Judge Rosemary Collyer, restrained a sister agency of the DoD, the Department of Homeland Security ("DHS"), from its efforts to expand its authority to establish a human resources management system beyond the Congressional grant in the Homeland Security Act. *National Treasury Employees Union v. Chertoff*, 385 F. Supp.2d 1 (D.D.C. 2005), *appeal pending*, Nos. 05-436, 05-437 (D.C. Cir.) ("*NTEU*"). The Agencies fail to address *Chertoff* in a substantive manner, even though that case involves challenges that are similar to those presented in this case. As explained in the following subsections, the Agencies' Final Rule exceeds the authority provided by Congress in certain important respects and the Unions respectfully ask this Court to enjoin the Agencies and limit their authority to the confines of what Congress actually provided in the Act.

## II.    ARGUMENT

### A.    The Agencies' Threshold Challenges are Without Merit

#### 1.    The Unions Have Standing to Pursue their Challenges

The Agencies concede Plaintiffs' standing on the major issues of scope of bargaining, composition of the NSLRB, and regulations that limit grievances, as well as the procedures used in developing the NSPS labor relations system. (Defs.' Mem. at 16). In a *pro forma* argument, the Agencies suggest that Plaintiffs lack standing to litigate certain other portions of the Final

Rule challenged in the Plaintiff's Motion for Summary Judgment. (*Id.* at17-18). The Agencies argue that Plaintiffs suffer no "injury in fact" from, *inter alia*, the "implementing issuances" [5 C.F.R. §§ 9901.905(a) and .917(d)(1)]; the restrictions on the conduct of union representatives [5 C.F.R. § 9901.914(a)(4)]; the "formal discussion" provisions [§ 9901.914(a)(2)]; and the employee representatives' access to information from DOD management [§ 9901.914(c)(2)].

The Plaintiffs are federal employee labor organizations which are directly affected by the challenged regulations (*see* First Am. Compl. ¶¶ 4-16; Pls. Material Facts Not at Issue, ¶¶12-22) and the bargaining representatives of hundreds of thousands of DoD employees who are, themselves, directly affected by the challenged regulations. In suits against the federal government, the injury in fact element is invariably satisfied when plaintiff is "an object of the action (or forgone action) at issue." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992).

The Plaintiffs also respectfully suggest that their standing to litigate the issues questioned by the Agencies, *supra*, is "self-evident". *See American Library Ass'n v. F.C.C.*, 401 F.3d 489, 492-93 (D.C. Cir. 2005) (*citing*, *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002)).[2] The "implementing issuances" provided for in 5 C.F.R. §§ 9901.905(a) and .917(d)(1) clearly and pointedly address the Defendants' duty to bargain with the labor organization Plaintiffs. Since both of these sections of the NSPS relate to the duty to collectively bargain, the question might be rephrased as to whom the Agencies intend (or have the legal duty) to bargain with other than labor organizations including the Plaintiffs?

Similarly, the new regulatory restrictions on the conduct of union representative conduct found in 5 C.F.R. § 9901.914(a)(4), by definition *only* cover "employee representatives" which

---

[2] Should this Court find that the non-opposed allegations in the First Amended Complaint need to be further supplemented, the Plaintiffs will, of course do so immediately.

are (to a major if not total extent) the local spokespersons (if not elected officers or stewards) of the Plaintiff labor organizations. Indeed, § 9901.914 is titled "Representation Rights and Duties." The "formal discussion" provisions, also found in the section labeled "Representation Rights and Duties," is explicitly limited to: "[a] labor organization which…is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering all employees in the unit." 5 C.F.R. § 9901.914(a)(2). To suggest that the Plaintiff labor organizations are not directly affected by the modifications the NSPS makes in the day-to-day relationship between DoD and the bargaining unit employees represented by the Plaintiffs is simply incomprehensible.

Finally, the employee representative's access to information from DoD management found in 5 C.F.R. § 9901.914(c)(2) is, again, a right granted solely to exclusive representatives such as the Plaintiffs. There can be no argument that the exclusive representatives (the Plaintiffs) are not directly affected by new restrictions placed on information the exclusive representatives needs to effectively represent their bargaining units. Therefore, Plaintiffs respectfully suggest that their interests (and standing) in the issues raised in the First Amended Complaint and the Motion for Summary Judgment are "self evident" under *Lujan*.

### 2. All of the Unions' Challenges are Ripe for Judicial Resolution

In addition to challenging the Unions' standing, the Agencies further claim that the Unions' challenges are not ripe for judicial review, citing *National Park Hospitality Ass'n v. Department of the Interior*, 538 U.S. 803 (2003). (Defs.' Memo. at 18.) The Agencies contend that immediate judicial review of any of the regulations cited in the Defendants' Memorandum at pages 17-18, which are also discussed *supra* in Section II.A.1, is not appropriate because the

4

Plaintiffs have not alleged any hardship if judicial review is not deferred until the regulations are applied "through some concrete action." *Id.*

The Defendant's reliance upon *National Park Hospitality Ass'n v. Doe*, 538 U.S. 803 (2003) (*citing*, *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)) as to ripeness is misplaced. (*See* Defs.' Memo at 18.)  Ripeness analysis requires the court to consider whether the Plaintiff's face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," or, by contrast if the alleged injury is too "imaginary" or "speculative" to support jurisdiction.  *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  As one court has noted: "*Abbott Laboratories*, does not require Damocles' sword to fall before we recognize the 'realistic danger of sustaining a direct injury' that is the heart of the constitutional component of ripeness."  *City of Auburn v. Quest*, 260 F.3d 1160, 1171 (9th Cir. 2001) (quoting *Babbitt*, 442 U.S. at 298).

Moreover, Judge Collyer rejected similar arguments raised by DHS in *Chertoff*.  Judge Collyer noted, with respect to the challenge to the regulation addressing implementing issuances, "[t]he Plaintiff Unions and their members face immediate loss of all bargained terms that are inconsistent with the Regulations and a massive deterioration of their rights to require management to bargain and to abide by the terms of the contracts it signs."  *Chertoff*, 385 F. Supp.2d at 22.  Furthermore, the Agencies omit that they intend to enforce the very regulations challenged by the Unions as soon as they can, which means that the unlawful appellate procedures will be in place, the restrictions upon the conduct of union representatives will be imposed and the limitations on the unions' ability to attend formal discussions and receive requested information will be instituted.  As stated by Judge Collyer: "The [unions'] challenge does not depend on any specific instances of repudiation [of union contracts], but on the

5

immediate change to the bargaining relationship…" *Id.* at 22.  As with the implementing issuances, the Unions premise their challenges to the other regulations at issue based upon the immediate changes in the bargaining relationship and the appeals processes wrought by the regulations.  These challenges are ripe for review because they are purely legal challenges that involve the comparison of the regulatory language with the statutory language.  Thus, the Plaintiffs respectfully request that the Court reject the Agencies' ripeness defense.

**B.    The Labor Relations System Established by the Regulation does not Comply with Section 9902**

       *1.    The Agencies are Not Empowered to Modify Chapter 71 Except as Specified in Sections 9902(m)(5) or 9902(m)(6)*

In the Final Rule, the Agencies establish a labor-management system based upon the "waiver," *i.e.*, the modification and substitution, of Chapter 71 with the regulations set forth in 5 C.F.R. §§ 9901.901 *et seq.*  The Agencies based their authority to waive Chapter 71 upon the phrase "notwithstanding section 9902(d)(2)" in 5 U.S.C. § 9902(m)(1), which provides that the Agencies "may establish and from time to time adjust a labor relations system for the [DoD] to address the unique role that the Department's civilian workforce plays in supporting the Department's national security interest."  Given that 5 U.S.C. § 9902(d)(2) makes Chapter 71 "nonwaivable," the Agencies interpret § 9902(m)(1) to be "clear that Congress intended to authorize the Agencies to alter the LR scheme created by Chapter 71."  (Defs.' Memo. at 23.)[3]

---

[3] In their Final Rule, the Agencies create an artificial distinction between the "human resources management system" in 5 U.S.C. § 9902(a) and the "labor relations system" in § 9902(m).  *See* 5 U.S.C. § 9901.103 (defining NSPS to include human resources system but exclude the labor relations system).  The Agencies explain that this distinction was inserted "merely to clarify that, in establishing the [labor relations] system, the Agencies acted pursuant to the temporary authority conferred by Congress in § 9902(m) rather than pursuant to the permanent authority conferred upon the Agencies in § 9902(a)."  (Defs.' Mem. at 26-27; *Id. at* n.8.)  However, they fail to acknowledge or address the potentially absurd effects of this distinction.  For instance, if the Agencies acted pursuant to a separate, albeit temporary power, in § 9902(m), then that exercise of power in creating a labor relations system would be unencumbered by the requirement in § 9902(b)(4) that the system ensure the right to organize and bargain collectively as provided in this chapter, which applies only to systems established under § 9902(a). Conversely, the human resources management system established pursuant to § 9902(a), which is subject to the

In the Agencies' view, "the phrase 'notwithstanding any other provision of law' must be read to 'override any conflicting provision of law in existence at the time that the [ ] Act was enacted." (*Id*. (*quoting Illinois Nat'l Guard v. FLRA*, 854 F.2d 1396, 1403 (D.C. Cir. 1988).)

The Agencies misread *Illinois Nat'l Guard*.  In that case, the court stated that statutes that begin with the phrase "notwithstanding any other provision of law" override other laws only if, and to the extent, other laws conflict with the terms of the statute.  *Illinois Nat'l Guard*, 854 F.2d at 1403.  The court explained that, because "the preface to [32 U.S.C. §] 709(e) ... provides that its terms apply 'Notwithstanding any other provision of law,' ... section 709(e) must be read to override any conflicting provision of law."  *Id*. (emphasis deleted).  Where statutes conflict, according to the court, they must be harmonized to the extent this is possible in order to minimize the conflict.  *Id*. at 1405.  The provision in § 709(e) gave an agency official unilateral authority to set hours of work.  The court held that the preface granting this authority "[n]otwithstanding any other provision of law" meant that the grant of unilateral authority overrode a subsequently enacted, conflicting statute providing for determination of hours of work through negotiations.  The court said that the recognition of this narrow exception to the later law was the only way the two provisions could be harmonized.  *Id*.

The Agencies' authority in 5 U.S.C. § 9902(m) to "establish … a labor relations system … to address the unique role" of DoD's employees does not conflict with any provision of Chapter 71.[4]  The only subject areas in which § 9902(m) provisions conflict with Chapter 71 are,

---

requirement in § 9902(b)(4), would be devoid of a means by which employees could organize and bargain given those means are addressed in the supposedly separate labor relations established pursuant to § 9902(m).  Generally, courts are loathe to construe a statute, or accept an agency's construction of a statute, that has potentially absurd results, especially when there is an alternative interpretation that is consistent with the legislative history.  *See, e.g.*, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).  The alternate explanation, which is consistent with the legislative history cited by the Plaintiffs, is that § 9902(a) creates a human resources management system known as the NSPS, which includes the labor relations system as a system within the NSPS, not outside of it.

[4] The authors of the law expressly indicated that the Agencies' authority to "establish … a labor relations system … to address the unique role" of DoD's employees does not authorize the departure from the provisions of Chapter 71.

first, "authority to bargain at a level above the level of exclusive recognition," § 9902(m)(5); and, second, "independent third party review of decisions," including, among other things, "standards for that review," § 9902(m)(6).[5]

Sections 9902(b)(3)(D) and (d)—which govern "any system established under subsection (a)," including the Agencies' subsection (m) labor relations system, *see* n. 3, *supra*—prohibit any regulatory waiver or modification of, or effect on, Chapter 71 that is "not otherwise specified" in title 5.  Section 9902(m) specifies only two regulatory subject areas in which subsection (m) conflicts with Chapter 71.  Those subjects are stated in § 9902(m)(5) and (6). Thus, § 9902(m) authorizes the regulation to depart from Chapter 71 only in those two subject areas.  This follows from reading subsections (m) and (d) together and from giving proper effect (in accordance with *Illinois Nat'l Guard*) to the subsection (m) phrase saying "[n]otwithstanding section 9902(d)(2)."

The Agencies erroneously argue that 5 U.S.C. § 9902(m) overrides § 9902(d)(2), and, further that § 9902(m) and § 9902 (d)(2) should not "be read together."  (Defs.' Mem. at 23, 27.) A law cannot override another unless the two laws conflict, and even if they do conflict, the Court "must do [its] best to harmonize them."  *Illinois Nat'l Guard*, 854 F.2d at 1405.  The Agencies' argument that § 9902(m) overrides § 9902(d)(2) presents the extraordinary assumption that two expressly cross referenced provisions of the same Act actually conflict with one another.[6]  Sections 9902(m) and 9902(d)(2) do not conflict.  Section 9902(d) expressly

---

*See* 149 Cong. Rec. S14439 (November 11, 2003) (statement of Senator Levin) (stating "the unique labor relations system established by the Secretary must be consistent with the requirements of Chapter 71").

[5] Section 9902(m)(8) authorizes immediate implementation of labor system regulatory provisions that are either fully consistent with Chapter 71 or allowed by § 9902(m)(5) or (6).  Thus, as to the timing of the labor regulation's implementation, § 9902(m)(8) overrides § 7116, a Chapter 71 provision that otherwise would prohibit immediate implementation to the extent the regulation conflicts with applicable pre-existing collective bargaining agreements.  Section 9902(m)(8), however, unlike §§ 9902(m)(5) and (m)(6), does not define a subject area in which the regulation, itself, may depart from Chapter 71 provisions.

[6] It is understandable that Congress, in enacting one law, might overlook another enacted many years earlier that is codified in a different title of the code, and through such an oversight create a conflict.  This was the situation in

allows departures from laws listed in (d)(2), which include Chapter 71, to the extent the departures are "specified" in other title 5 provisions. Section 9902(m), in §§ 9902(m)(5) and (6), specifies two regulatory subjects that depart from Chapter 71.[7] The harmony of the provisions is apparent, and must be preserved. *Illinois Nat'l Guard*, 854 F.2d at 1405.

The Agencies' assertion that subsection (m) should not be read together with a law to which it expressly refers—subsection (d)(2)—is absurd. It is a basic principle of statutory construction that cross-referenced provisions of the same Act must be read together to determine their proper relationship and to ensure that each is given effect. *Association of Civ. Techs., Mont. Air Chapter No. 29 v. FLRA,* 22 F.3d 1150, 1152 (D.C. Cir. 1994).[8] Indeed, a court must attempt to harmonize even laws written at different times that make no mention of one another. *Illinois Nat'l Guard*, 854 F.2d at 1405. Further, the legislative history here reveals that the authors of the law expressly intended that §§ 9902(d)(2) and 9902 (m) be read together. *See* 149 Cong. Rec. S14439 (November 11, 2003) (statement of Senator Levin) (citing §§ 9902(d)(2) and 9902(m) and stating, "these two provisions must be read together and both must be given

---

*Illinois Nat'l Guard.* However, imputing to Members of Congress the irrationality of having written simultaneously, in the same Act, cross-referenced but conflicting provisions is quite another matter.

[7] Section 9902(m)(8) states that the Secretary may immediately implement the labor regulation, overriding § 7116.

[8] The statutes in *ACT Chapter 29*, 5 U.S.C. § 7106(a) and (b), had directional signals that, like those here, referred the reader from one statute to the other and to provisions elsewhere. *See* § 7106 ("[s]ubject to subsection (b) of this section, nothing in this chapter shall," which begins subsection (a); and "[n]othing in this section shall preclude," which begins subsection (b)). The Court held that subsections (a) and (b) of § 7106 must be read together and that the terms of one subsection must not be construed to negate those of the other. *ACT Chapter 29*, 22 F.3d at 1152. While each of the substantive terms of statutes must be given effect, *id.*, the directional signals that cross-reference the terms often are redundant, due to the inclusion of a signal in each provision. (Redundant signals are valuable because they alert the reader of one statute to the existence of other provisions that may qualify the statute, and with which the statute must be read.) In 5 U.S.C. § 7106(a), the phrase "[s]ubject to subsection (b) of this section" is redundant, because subsection (b), itself, begins with "[n]othing in this section shall preclude." There is a similar redundancy here. Section 9902(m) says that, notwithstanding the inclusion of Chapter 71 in the § 9902(d)(2) list of provisions that may not be waived, modified, or affected by any system established under § 9902(a) (including a labor relations system that is part of that system), Chapter 71 provisions are overridden if and to the extent they conflict with the terms of subsection (m). Similarly, § 9902(d) says that there may be exceptions to the inclusion of Chapter 71 in the § 9902(d)(2) list of provisions that may not be waived, modified, or affected, "to the extent [the exceptions are] specified" in other Title 5 provisions.

meaning").[9]  *See also* 149 Cong. Rec. S 14490 (November 12, 2003) (statement of Senator Lieberman) (stating Section 9902(m) overrides Chapter 71 only to the extent they are directly inconsistent with each other).  *Accord* 149 Cong. Rec. S14428 (November 11, 2003) (statement of Senator Collins) (stating "the bill before the Senate specifically states the Department does not have the authority to waive the chapter of title 5 that governs labor-management relations").[10]

The Agencies erroneously argue that "the legislative history is at best ambiguous" and "shed[s] little or no light on the proper construction of the statute" due to "varying interpretations of individual members of Congress."  (Defs.' Mem. at 28-30.)  There were no "varying interpretations" expressed by the authors of the law.  The law was written through Conference Committee negotiations between Senators Collins and Levin and opponents in the House of Representatives who acted on behalf of the administration.[11]  The November 11, 2003, statements by Senators Collins and Levin, and the November 12, 2003, statement by Senator Lieberman, quoted in Pls.' Memo. at 12-16, all presented the unvarying interpretation of the law.

---

[9] The quotes of Senators Levin, Lieberman and others are set forth in detail in the Plaintiffs' Memorandum in Support of their Motion for Summary Judgment at 12-16.

[10] Thus, contrary to the Agencies' position, the authors of the law intended that all Chapter 71 provisions not directly inconsistent with matters specified in § 9902(m) apply—as § 9902(b) expressly states—to "*Any* system established under subsection (a)."  The § 9902(d) prohibition against unspecified departures from chapter 71 applies to all subsection (a) systems, not just those established after § 9902(m) expires.  Every subsection (a) human resources system, not just one established after § 9902(m) expires, includes the agency labor relations system, as the title of § 9902 indicates and the law expressly requires.  § 9902(b)(4) ("[a]ny system established under subsection (a) shall … ensure that employees may organize [and] bargain collectively … through labor organizations").  The Agencies' position is contrary not only to the authors' expressed intent, but also to the statutory inclusion of the labor relations system in the subsection (a) human resources system and the prohibition against unspecified departures from Chapter 71 that applies to every subsection (a) system.

[11] 149 Cong. Rec. S14439 (November 11, 2003) (Statement of Senator Levin) ("[t]he bipartisan approach that Senator Collins and I took … met with opposition from the administration"; "it appeared that some of our opponents were less interested in enacting sound human capital provisions than they were in providing as much power as possible to the Secretary of Defense"; "[n]onetheless, … collective bargaining provisions that Senator Collins and I were able to negotiate ... are substantially better … than …  provisions … in … the Homeland Security Act").

None of the House opponents who negotiated with Senators Collins and Levin in drafting the law made any statements inconsistent with those of Senators Collins, Levin, and Lieberman.[12]

The November 7, 2003 statements by three Members of the House of Representatives, cited by the Agencies, (Defs.' Mem. at 30, n. 10), are not statements by Representatives who, on behalf of the administration, drafted the law in negotiations with Senators Collins and Levin.[13] These Representatives spoke on November 7, 2003, without having heard either the November 11, 2003, explanation of the law by the Senate authors (Collins and Levin) or the similar explanation by Senator Lieberman on November 12, 2003.  The Conference Report had been prepared on the day that these Representatives spoke.  H.R. Rep. 354, 108th Cong., 1st Sess. (November 7, 2003).  However, the Conference Report contains only the text of the provisions in question, and does not explain the meaning of these provisions.  *Id*. at 758-760.  The Representatives' statements do not reveal any basis for their understanding of the law other than their readings of the text, which they only recently had received.  In these circumstances, their statements are not "reliable sources of insight into legislative understandings."  (Defs.' Mem. at 30, *quoting Exxon Mobil Corporation v. Allapattah Services*, __ U.S. __, 125 S.Ct. 2611, 2626 (2005).)  Rather, the later statements of Senators Collins and Levin, the authors of the law, and Senator Lieberman's consistent statement, "shed a reliable light on" the law that was drafted in the Conference Committee negotiations.  (*Id*.)  *See also Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124-127 (2d Cir. 2000) (conference report, statement by floor manager

---

[12] This is not a case where legislative opponents drafted a compromise and then the opposing sides issued conflicting statements over its meaning.

[13] The statements of these Representatives show they were critics, not proponents, of the administration's position. They supported greater collective bargaining rights for employees than they thought the law provided.  149 Cong. Rec. 10988 (November 7, 2003) (Statement of Rep. Waxman); 149 Cong. Rec. 10997 (November 7, 2003) (Statement of Rep. Hoyer); 149 Cong. Rec. 10988 (November 7, 2003) (Statement of Rep. Jackson-Lee).

or member of committee from which law came more reliable than statement of other legislator; court relies on statements of "members of Congress most familiar with the legislation").[14]

For these reasons, the foundation of the Agencies' position is incorrect. As a result, the additional points that Agencies urge in elaborating their position, addressed below, also fail.[15]

First, the Agencies contend that, "[a]s the text of the statute makes clear, the Agencies are empowered to waive and/or modify the requirements of Chapter 71 insofar as authorized by *all* of § 9902(m), not just the two subsections that plaintiffs would have the Court focus upon." (Defs.' Mem. at 20.) As we have seen, however, § 9902(m) authorizes the Agencies to waive or

---

[14] On February 25, 2004, one of the Representatives who spoke November 7, 2003, Representative Waxman, acknowledged that his views expressed November 7, 2003 were erroneous. Joining Senators Levin, Lieberman, and others, he signed a letter to Defendant Rumsfeld (attached) saying that the law "passed by Congress … provided that DoD could not waive Chapter 71 [and] allowed DoD to set up a new labor system for the next six years 'to address the unique role [of DoD employees].' Through these two provisions, … Congress intended that DoD protect the basic employee rights contained in Chapter 71, yet allowed DoD to *modify the procedures for resolving labor-management disputes for the next six years.*" (Emphasis added.) Referring to "the DoD proposal stat[ing] that the new labor relations system 'will not employ any provisions of 5 USC Chapter 71,'" the authors stated "the recent DoD proposal abrogates the essential principles of Chapter 71 and goes well beyond what Congress intended." *See* February 25, 2004 letter to Sec'y Rumsfeld from Congressmen Waxman, Lieberman, Skelton, Levin, Durbin, Alaka and Davis, attached hereto as Exhibit A.

[15] This is true with four inconsequential exceptions. The Agencies state two points with which the Plaintiffs agree and two others with which the Plaintiffs agree in part. The Agencies observe that, "Subsection … (m)(5) … authorize[s] the Secretary to … 'bargain at an organizational level above the level of exclusi[ve] recognition' and this is "inconsistent with the customary role of a labor organization which, under Chapter 71, is recognized as the '*exclusive* representative of the employees in the [bargaining] unit it represents.' 5 U.S.C. § 7114(a)(1) (emphasis added)." (Defs.' Mem. at 25.) They further note, "Subsection (m)(6) authorizes the Agencies … to modify those provisions in Chapter 71 which designate the FLRA as the 'third party' authorized to resolve … disputes." *Id.* The Plaintiffs agree with these observations The Agencies continue, however, by stating, "Subsection (m)(6) authorizes the Agencies . . . to modify those provisions in Chapter 71 which designate arbitrators as the 'third party' authorized to resolve 'grievances.'" (Defs.' Mem. at 25.) This statement is not entirely correct. Subsection (m)(6) applies to "labor relations system . . . decisions," not subsection (h) employee "appeals." Section 9902(h) gives defendants no authority to waive any chapter 71 provision. *See* 5 U.S.C. § 9902(h)(7) ("[n]othing in this subsection shall be construed to authorize the waiver of any provision of law … that is not otherwise waivable under subsection (a)"). Thus, the authority of arbitrators set forth in §§ 7121(d)-(g), in cases that are § 9902(h) "appeals," cannot be waived, modified, or affected by the Agencies' regulation. 5 U.S.C. § 9902(b)(3)(D) and (d)(2). Finally, the Agencies observe, "Section 9902(m)(8) provides additional authority to the Agencies to waive and/or modify provisions in Chapter 71" because it states "that the LR system 'shall be binding on all bargaining units within [DoD] . . . and shall supersede all other [CBAs] for bargaining units within the [DoD] . . . except as otherwise determined by the Secretary.'" (Defs.' Mem. at 26.) This is correct only in part, and in a narrow sense. Subsection (m)(8) does not provide additional general authority to waive or modify Chapter 71 provisions in regulatory subject areas other than those addressed by subsections (m)(5) and (m)(6). Rather, (m)(8) simply grants the Secretary discretion to implement the labor relations regulation immediately (including those parts that waive or modify chapter 71 in ways authorized by (m)(5) and (m)(6)). As previously noted, this statutory discretion overrides § 7116; but (m)(8) confers no other authority to depart from Chapter 71.

modify Chapter 71 only to the extent that § 9902(m) conflicts, and cannot be harmonized, with Chapter 71. *Illinois Nat'l Guard*, 854 F.2d at 1403-05. The only regulatory subject areas in which § 9902(m) conflicts with Chapter 71 are those stated in (m)(5) and (m)(6).

Second, quoting §9902(b)(4), the Agencies assert that their system must "'ensure that employees may … bargain collectively *as provided in this chapter*, and … *subject to the provisions of this chapter* and any exclusion from coverage or limitation on negotiability established pursuant to law"; and they assert that "the italicized language reflects [that] Congress clearly intended that the scope of … collective bargaining rights are to be delimited by provisions within Chapter 99." (Defs.' Mem. at 22.) The Agencies' apparent implication that the scope of collective bargaining is to be more limited than that provided by Chapter 71 is incorrect. "[T]he provisions of this chapter"—Chapter 99—include §§ 9902(b)(3)(D) and (d)(2). Under these provisions, the scope of bargaining is delimited by Chapter 71, because no provision of Chapter 99 specifies any departure from the scope of bargaining delimited by Chapter 71.

Third, the Agencies incorrectly argue that, "[i]f Congress had intended the prohibition against waiver of Chapter 71 to apply to the subsection (m) labor relations system, … it is inconceivable that Congress would have authorized the Agencies to establish an LR system 'notwithstanding' that 'prohibition.'" (Defs.' Mem. at 24 (brackets and internal quotation marks omitted).) The prohibition stated in the law is a prohibition against any departure from Chapter 71 not "specified" by another Title 5 provision, § 9902(d); and the "notwithstanding" clause in § 9902(m) results in the overriding of Chapter 71 provisions only if and to the extent Chapter 71 provisions conflict, and cannot be harmonized, with the terms of § 9902(m). *Illinois Nat'l Guard*, 854 F.2d at 1403-05. The only regulatory subject areas in which § 9902(m) conflicts with Chapter 71 are third party review and national level bargaining. Further, what the

13

Agencies' deem "inconceivable" is precisely what the authors of the law did conceive, and expressly said they had conceived. 149 Cong. Rec. S14439 (November 11, 2003) (statement of Senator Levin) ("the unique labor relations system established by the Secretary must be consistent with the requirements of Chapter 71," with "exceptions to the applicability of Chapter 71" that are "specifically provide[d]," namely, "independent third party review of decisions" and matters concerning "national level collective bargaining").[16]

Fourth, the Agencies contend that, "[t]he broad delegation … [to] establish and adjust an LR system for DoD to address the 'unique role that [DoD's] civilian workforce plays in supporting the Department's national security mission' forecloses plaintiffs' contention that Congress intended to authorize only two narrow changes to the labor relations scheme created by Chapter 71." (Defs.' Mem. at 24.) To the contrary, as noted above, the authors of the law expressly intended that defendants' unique system be consistent with Chapter 71 except to the extent otherwise specified in § 9902(m)(5) and (6). 149 Cong. Rec. S14439 (November 11, 2003) (statement of Senator Levin). The two specified exceptions respond to the only two problems with the Chapter 71 system that DoD identified in testimony before the committee chaired by Senator Collins. Secretary Rumsfeld identified the first problem as the inefficiency of "dealing with more than 1,300 different union locals" instead of being able to "negotiate with national unions." *Transforming the Department of Defense Personnel System: Finding the Right Approach*: Hearing Before the United States Senate Committee on Government Affairs, 108th Cong. 21 (2003) (Government Affairs Hearing) (statement of Donald Rumsfeld, Secretary of Defense). Secretary Rumsfeld desired to "bring collective bargaining to the national level" in

---

[16] Rather, it is the Agencies' interpretation of the prohibition against waiver of Chapter 71 which is "inconceivable", because it would result in Chapter 71 – a chapter that concerns only labor relations – being applied only to those aspects of the personnel system which do not address labor relations. (Pl. Mem. at 17.) Defendants' interpretation of the statute is unreasonable under *Chevron* analysis. *See Griffin v. Oceanic Contractors,* 458 U.S. at 575.

order to solve this problem, *id.*; and granting Secretary Rumsfeld's request, Congress enacted §

9902(m)(5). *See also*, 5 U.S.C. § 9902(g). Under Secretary Chu identified the second problem

as the need "to get the bargaining [process] to come to a conclusion." Government Affairs

Hearing at 27 (statement of David Chu, Under Secretary of Defense). Senator Collins remarked

that to "ensure that bargaining comes to a conclusion" it is not necessary for DoD to have

"authority to waive the entire chapter governing collective bargaining." *Id.* at 28 (statement of

Senator Collins). To resolve the second problem the Senate Committee passed a bill that set

time limits for Federal Labor Relations Authority to resolve DoD labor disputes. S. 1166 at 28-

30. In the Conference Committee, however, Senators Collins and Levin agreed with the House

conferees to give DoD a broader provision, one allowing the Department to establish entirely

new "independent third party review of decisions, including … standards for that review." 5

U.S.C. § 9902(m)(6). The changes made by § 9902(m)(5) (incorporating § 9902(g)) and §

9902(m)(6) are major reforms that respond directly to the only two problems that DoD said

needed to be solved.[17]

    Fifth, the Agencies observe that, "[t]he statute does not specify what types of changes in

the Chapter 71 LR scheme are to be made to address the 'unique role' of DoD's civilian

workforce, and thus commits that determination to the discretion and expertise of the Agencies."

(Defs.' Mem. at 24.) To the contrary, the authors of the law expressly intended that the "unique

role" clause produce no departure from Chapter 71. 149 Cong. Rec. S14439 (November 11,

2003) (statement of Senator Levin) ("the unique labor relations system established by the

Secretary must be consistent with the requirements of Chapter 71"). The Agencies' admission

that the "unique role" clause "does not specify" any "changes in … Chapter 71" is fatal to their

---

[17] These exceptions to Chapter 71 are "narrow" only in comparison to the Agencies' claim of unlimited authority to
waive Chapter 71. Viewed in their proper light, both exceptions are major departures from Chapter 71.

argument, because § 9902(d) requires that any departures from Chapter 71 be "specified." Any regulatory departure from Chapter 71 not specified is contrary to law.[18]

Sixth, the Agencies assert that, "[s]ubsection (m)(2) provides that the LR system 'would allow for a collaborative issue-based approach to labor management relations,'" and "that subsection has no counterpart in Chapter 71." (Defs.' Mem. at 24.) Defendant's point is of no consequence. That Chapter 71 has "no counterpart" to subsection (m)(2) does not mean that (m)(2) conflicts with Chapter 71. Nothing in Chapter 71 prohibits "a collaborative issue-based approach to labor management relations." Further, (m)(2), written in the subjunctive mood, does not conflict with Chapter 71, or any other law, because it states no requirement at all.[19]

Seventh, the Agencies erroneously argue that, "[s]ubsection (m)(3) establishes procedures to ensure the participation of employee representatives in the development of the LR system…. If there were to be only two narrow changes from Chapter 71, as plaintiffs allege, elaborate procedures to develop the system would seem unnecessary."[20] (Defs.' Mem. at 24-25.) The Agencies' argument incorrectly assumes that mandatory use of collaborative procedures to

---

[18] Further, the Agencies' argument that they may presume a grant of power to, *e.g.,* make changes in the LR scheme because the statute does not specify <u>limits</u> on those changes is fundamentally erroneous as a matter of law. *See., e.g., American Bar Assn v. FTC,* 2005 U.S. App. LEXIS 26524, *19 (D.C. Cir. Dec. 6, 2005)(stating "plainly, if were to presume a delegation of power from the absence of an express withholding of such power, agencies would enjoy virtually limitless of hegemony")(internal citations omitted).

[19] Instead, 5 U.S.C. § 9902(m)(2) merely predicts that a labor relations system unique to DoD, but "consistent with the requirements of Chapter 71," 149 Cong. Rec. S14439, except as specified in §§ 9902(m)(5) and (m)(6), "would allow for a collaborative issue-based approach to labor management relations." Further, a lawful subsection (m) system could promote increased collaboration. Under § 9902(m)(3), the system itself must be established and adjusted collaboratively by labor and management. Collaborative creation of the system likely would create a system that is more collaborative. In addition, § 9902(m)(6), allowing new "independent third party" dispute resolution, would allow dispute resolution through the collaborative means of mediation and arbitration. If adopted, mediation and arbitration would be a more collaborative approach. Also, national level bargaining under § 9902(m)(5), by national level representatives, resolving matters appropriate for consistent national implementation, certainly would focus on "issues"; and the process of national level bargaining likely would be more collaborative if established through labor management collaboration at the national level, pursuant to §§ 9902(m)(3) and (m)(4).

[20] In reply to the Agencies response to the Union's procedural challenge regarding the collaboration required by 5 U.S.C. § 9902(m) in the development of the NSPS (Defs' Mem. at 65-70), the Plaintiffs respectfully rely upon the arguments in their Memorandum in Support of their Motion for Summary Judgment (Pls.' Mem. at pgs. 37-44).

develop a unique labor relations system is unnecessary unless the system will depart from Chapter 71.[21]  The authors of the law, however, in enacting the collaboration requirement, expressly determined that collaborative development of a "unique labor relations system … consistent with … Chapter 71," 149 Cong. Rec. S14439, was warranted.  In addition, collaborative development of the two changes from Chapter 71—national level bargaining and new independent third party dispute resolution—also is fully warranted.  The latter, in particular, requires resolution of many issues, including "what decisions are reviewable by the third party, what third party would conduct the review, and the standard or standards for that review."  § 9902(m)(6).  Collaborative resolution of these matters is appropriate, as Congress provided.

Eighth, the Agencies incorrectly assert that, "[s]ubsection (m)(4) … authorize[s] the Secretary to engage in 'collaboration activities … at an organizational level above the level of exclusive recognition'" and this is "inconsistent with the customary role of a labor organization which, under Chapter 71, is recognized as the '*exclusive* representative of the employees in the [bargaining] unit it represents.'  5 U.S.C. § 7114(a)(1) (emphasis added)."  (Defs.' Mem. at 25.)  Under Chapter 71, the "level of exclusive recognition" determines the level at which bargaining occurs, but not the level at which all labor management communication occurs.  Section 7113 of Chapter 71 provides "national consultation rights" that occur at the national level and that are separate from bargaining.  The creation of new national level "collaboration activities" to

---

[21] In discussing the collaboration required by subsection (m)(3), the Agencies also say that this provision "authorizes the Secretary to implement [the] system . . . without collective bargaining that might otherwise be required by Chapter 71."  (Defs.' Mem. at 24-25.)  The Agencies offer no explanation of or support for this statement.  Nor do they indicate its relevance to the issue addressed by the passage in which the statement appears--whether collaborative development of a labor relations system consistent with Chapter 71 except for national level bargaining and new independent third party dispute resolution "would seem unnecessary."  In any event, nothing in subsection (m)(3) states that the Secretary is authorized to implement the labor relations system "without collective bargaining that might otherwise be required by Chapter 71."

supplement bargaining and § 7113 national consultation is not inconsistent with, and does not conflict with, Chapter 71.

Finally, the Agencies argue that, "[s]ection "9902(m)(9) provides that … the LR system …. 'shall expire [in] six years, … *at which time* the provisions of chapter 71 will apply.'"  The Agencies add that "by necessary implication," Chapter 71 "will *not* apply prior to the expiration of that six-year period to the extent that it has been waived and/or modified by the Agencies pursuant to the authority granted in subsection (m)" and that the "text of § 9902(m) … compels the conclusion that Congress conferred broad authority on the Agencies to … depart[] from Chapter 71."  (Defs.' Mem. at 26 (emphasis in original).)  The Agencies' reliance on § 9902(m)(9) is misplaced.  Section 9902(m)(9) merely indicates that Chapter 71 will apply in its entirety after subsection (m) expires; it does not state which provisions of Chapter 71 apply before subsection (m) expires.  While § 9902(m)(9) implies that Chapter 71 will apply before the expiration of subsection (m) except to the extent that the Agencies *lawfully* waive or modify Chapter 71 provisions, § 9902(m)(9) does not say what waivers or modifications are lawful.  Nor does it say that the Agencies' authority to depart from Chapter 71 is broad.  Other provisions in the Act address these subjects and, contrary to the Agencies' argument, their text and legislative history show that the Section 9902(m) labor system regulation may modify Chapter 71 only in two specified subject areas—independent third party review and national level bargaining.

The Agencies' claim of unlimited authority to waive Chapter 71 must be rejected, as the Section 9902(m) labor system regulation may depart from Chapter 71 only as specified in § 9902(m)(5) and (6).  Accordingly, the Plaintiffs respectfully request that the Court reject the Agencies' argument.

2.    *The Regulations are Contrary to Law Because They Are Inconsistent With Chapter 71 and Not Authorized by Sections 9902(m)(5) or 9902(m)(6)*

   a.    **The Regulation, 5 C.F.R. § 9901.917(d)(1) Improperly Allows the Agencies to Use "Issuances" to Eliminate the Statutory Right to Bargain**

The Agencies do not dispute that under Chapter 71, an agency rule or regulation does not limit the scope of bargaining unless the Federal Labor Relations Authority determines that a "compelling need" exists for that rule or regulation.  5 U.S.C. §§ 7117(a)(2) and (3).  (*See also* Defs.' Mem. at 32.)  Nor do they dispute that the "compelling need" restriction is inapplicable to a union that represents a majority of the employees to whom the rule or regulation applies.  *Id*. From these undisputed points it follows that § 9901.917(d)(1) is contrary law, because it bans bargaining on any matter that is inconsistent with any agency regulation or "issuance."

The Agencies erroneously argue (Defs.' Mem. at 34) that § 9902(m)(6) authorizes them to eliminate the "compelling need" standard and the inapplicability of even this restriction to unions that represent a majority of the employees affected by an agency regulation or "issuance." Section 9902(m)(6) authorizes the Agencies to establish new "independent third party review of decisions" and "standards for that review," not substantive changes to the Chapter 71 scope of bargaining.  149 Cong. Rec. S 14490 (November 12, 2003) (statement of Senator Lieberman) (stating "[t]he Secretary may use this provision to expedite the review of decisions, but not to alter the statutory rights, duties, and protections established in chapter 71").  Standards for "review" by a "third party" are not the standards that govern the initial determination of the matter by the party whose decision is reviewed.  Rather, they are standards that govern review of the initial decision.  *See* 5 U.S.C. § 706 ("Scope of Review"; stating standards for review of agency action).  Section 9902(m)(6) does not authorize the Agencies to change the substantive §

7117 standards that (a) make negotiable the subjects of agency rules for which there is no "compelling need"; and (b) for unions representing a majority of employees affected by an agency rule, make negotiable the subjects of the rule regardless whether the agency claims a compelling need.   149 Cong. Rec. S 14490 (November 12, 2003) (Statement of Senator Lieberman) (stating subsection (m) "does not conflict with the statutory rights duties, and protections of employees, agencies, and labor organizations set forth in chapter 71, including … the duty to bargain in good faith … and [this duty] will remain fully applicable at the department"); 149 Cong. Rec. S14439 (November 11, 2003) (statement of Senator Carl Levin) ("Section 7114 . . . requires an agency to bargain in good faith. . . . The unique labor relations system established by the Secretary must preserve this right").

The Agencies do not dispute, nor could it be disputed, that their regulation places no limit on the subjects that, under § 9901.917(d)(1), may be eliminated from bargaining by agency "issuances."  For this reason, the Agencies' regulation entirely eliminates the *statutory* right to bargaining.  Under the Agencies' system, no statute protects plaintiffs from total elimination of bargaining, by issuance.  This total elimination of the Chapter 71 statutory right to collective bargaining violates § 9902(b)(3)(D), (d)(2); and, the § 9902(b)(4) requirement that the Agencies' system "ensure that employees may … bargain collectively as provided for in this chapter and … subject to the provisions of this chapter."  Given § 9901.917(d)(1) allows for the elimination of bargaining by issuance, the regulation does not "ensure" that any bargaining will occur.

The Agencies' erroneously argue that the § 9902(b)(4) phrases "as provided for in this chapter" and "subject to the provisions of this chapter" authorize the Agencies to use issuances to totally eliminate collective bargaining.  (Defs.' Mem. at 33-34 and n. 13.)  The Agencies' position is erroneous because it gives no meaning to the phrase "shall … ensure …

bargain[ing]." Such a position impermissibly claims that, because the § 9902(b)(4) obligation to ensure bargaining is "subject to" the Agencies' § 9902(m)(1) authority to establish a labor relations system, the Agencies, in establishing the system, need not "ensure" collective bargaining at all. *See Whitman v. American Trucking Associations*, 531 U.S. 457, 477-485 (2001) (holding agency's statutory interpretation of one provision may not completely nullify another applicable provision). Contrary to the Agencies' position, the phrase "bargain collectively as provided for in this chapter" indicates that collective bargaining *is provided for* by the chapter, not eliminated by the chapter. This is further confirmed by the phrase "shall . . . ensure . . . bargain[ing]." Section 9901.917(d)(1) therefore is contrary to § 9902(b)(4).

> **b.      The Regulation, 5 C.F.R. § 9901.910, Improperly Expands Management Rights to Eliminate Almost All Negotiated Procedures and Appropriate Arrangements**

The Agencies admit that 5 C.F.R. § 9901.910 of their regulation restricts the scope of bargaining provided by Chapter 71. (*See*, *e.g.*, Defs.' Mem. at 37 (referring to "departure from Chapter 71").) However, in restricting the scope of bargaining provided by Chapter 71, the regulation not only violates 5 U.S.C. §§ 9902(b)(3)(D) and (d)(2), but also fails to satisfy the system requirement in 5 U.S.C. § 9902(b)(4).

The regulation also fails to satisfy the statutory requirement that any system "ensure that employees may organize, bargain collectively as provided in this chapter, and participate through labor organizations of their own choosing in decisions which affect them, subject to the provisions of this chapter and any exclusion from coverage or limitation on negotiability established pursuant to law." 5 U.S.C. § 9902(b)(4). The regulation eliminates all bargaining over "permissive" subjects of bargaining, *i.e.*, subjects over which the agencies could bargain their discretion. *Compare* 5 C.F.R. § 9901.910(a)(2) *with* 5 U.S.C. § 7106(b)(1). The Agencies

have also severely restricted bargaining over "impact and implementation." Given the already broad management rights clause found in Chapter 71, *see* 5 U.S.C. § 7106(a), much of the bargaining in the federal sector involves the "impact and implementation" of agencies' exercise of their management rights. Under Chapter 71, whenever an agency exercises a management right, it is required to bargain with the union over "procedures" that the agency will observe and "appropriate arrangements" for employees adversely affected by the exercise of the management right. This requirement balances "the non-negotiable substantive rights of management and the negotiable procedures to be followed when management exercises its rights." *NFFE v. FLRA*, 581 F.2d 886, 892 (D.C. Cir. 1982).

The Agencies disrupt this balance by vitiating the right to bargain over procedures and arrangements in §§ 9901.910(c) & 9910.910(f). These regulations reserve bargaining over procedures to the exclusive discretion of the Secretary, 5 C.F.R. § 9901.910(c), and, if the Secretary decides to bargain, he is only required to provide notice concurrently with the exercise of the management right. 5 C.F.R. § 9901.910(e). With respect to appropriate arrangements, the Agencies carve out any negotiations over arrangements involving "assignment to specific duties, shifts, or work on a regular or overtime basis except when the Secretary in his or her sole, exclusive, and unreviewable discretion authorizes such bargaining. Moreover, the binding nature of any procedure or arrangement is wholly illusory. While the product of negotiations may initially be binding, the Agencies expressly reserve the right to deviate from any negotiated agreement when, for instance, "it is necessary to carry out the Department's mission." Final Rule, 70 Fed. Reg. at 66181. *See also* 5 C.F.R. §§ 9901.910(h) & (i).

Bargaining at the sole discretion of one of the parties is hardly "collective bargaining" as the "mutual obligation" is defined by the Agencies or by Chapter 71. *See* 5 U.S.C. § 7114(a)(4);

5 C.F.R. § 9901.903. Rather, the "mutual obligation" of two parties has become a benevolent dispensation by the Secretary in his or her sole, exclusive and unreviewable discretion. Even when the Secretary indulges the unions by bargaining, the product of the negotiations ultimately may prove to be worthless, given the Secretary retains the right to unilaterally excuse himself or herself from any agreement on procedures or arrangements in order to perform his or her functions under the labor-management section. 5 C.F.R. § 9901.910(i) Under the circumstances, the Agencies have failed to ensure collective bargaining by restricting the scope of bargaining, as well as and by rendering bargaining futile in allowing for the subsequent deviation from any agreement reached under the regulations by the Secretary. *See NTEU*, 385 F. Supp.2d at 25-26.

  **c. The Regulations, 5 C.F.R. § 9901.305 & 903, Impermissibly Restrict Collective Bargaining over NAFI Employees' Pay**

  The Agencies contend that the Plaintiffs' challenge to regulations restricting the rights of employees of non-appropriated fund instrumentalities ("NAFIs") "is foreclosed by the explicit terms of § 9902." (Defs.' Mem. at 41.) The Agencies cite to four such terms of Section 9902: 5 U.S.C. §§ 9902(a), (b)(6)(I), 9902(f), and § 9902(m)(7).

  Beginning with "5 U.S.C. § 9902(a) and (b)(6)(I)" (*id.*), the Agencies assert that they "are authorized … to create a new 'pay-for performance system to better link individual pay to performance, and to provide an equitable method for appraising and compensating employees.'" (*Id.*) This contention is simply disingenuous. 5 U.S.C. § 9902(b)(6)(I) provides in pertinent part: "any system established under subsection (a) [which provides for the establishment of the NSPS'] shall— … (6) include a performance management system that incorporates the following elements: … (I) [a] pay for performance *evaluation* system to better link individual pay to performance, and provide an equitable method for appraising and compensating employees." *Id.* (emphasis added). The Agencies omit the word "evaluation" from their contention, which

changes the subsection's meaning. Section 9902(b)(1)(6) refers to the general aspects of a *performance management system*, not to the specific methods of determining compensation.

To be sure, the National Defense Authorization Act permits the Agencies to waive the General Schedules, the Wage Grades and almost any other pay statute except, coincidentally, the statutes setting the compensation for those who serve in an Executive Schedule position under subchapter II of Chapter 53.[22] However, as the Government concedes, statutes such as those that establish the General Schedules or Wage Grades do not specifically provide the wage rates or compensation paid to NAFI employees. (Defs.' Memo. at 41-42.) Thus, the fact that the Agencies can waive statutes that are inapplicable to NAFI employees does not mean that they can waive the statutes that apply to these employees.

The Agencies then claim that Section 9901(f)(4) gives them the authority to unilaterally establish and adjust compensation programs for NAFI employees, going so far as to, in the Agencies' view, "displace any collective bargaining requirement that might otherwise apply." (Defs.' Mem at 43.) Section 9901(f)(4) provides, "[t]he procedures under this subsection are the exclusive procedures for the participation of employee representatives in the planning, development, or adjustment" of the NSPS. 5 U.S.C. § 9902(f)(4) (emphasis added). The reference to "procedures under this subsection" is to Section 9901(f)(1)(A) through (D), which Congress enacted "[i]n order to ensure that the authority of this section is exercised in collaboration with, and in a manner that ensures the participation, of employee representatives in the planning, development and implementation" of the NSPS…." 5 U.S.C. § 9902(f)(1).

---

[22] *See* 5 U.S.C. § 9902(e)(1). Subchapter II of chapter 53 refers to 5 U.S.C. §§ 5311-5318, which sets forth the compensation for individuals such as those who drafted the final regulation, *e.g.*, the Secretary of Defense and the Deputy Secretary of Defense. These officials are excluded from the efforts "to better link individual pay with performance…." 5 U.S.C. § 9902(b)(6)(I).

There is a substantial difference between the *procedures* for establishing a system and the *substance* of that system. While Section 9902(f) may govern the procedures for planning, developing and implementing the NSPS, Sections 9902(a) and (b) govern the substance of the NSPS. Section 9902(b)(4) provides that "*any system* established under subsection (a) shall … ensure that employees may organize, bargain collectively as provide in this chapter, and participate through labor organizations of their own choosing in decisions which affect them, subject to the provisions of this chapter and any exclusion from coverage or limitation on negotiability established pursuant to law." 5 U.S.C. § 9902(b)(4) (emphasis added). Section 9902(b)(3)(D) and Section 9902(d)(2) further provide that the system cannot waive Chapter 71 "to the extent not otherwise specified in this title." Nothing in Sections 9902(a), (b) or (f) "otherwise specifies" that Chapter 71, as the source of the method for determining compensation of NAFI employees, is waivable. Thus, while the Agencies can eliminate the General Schedules or Wage Grades as the means by which the compensation for most Department employees is determined, they cannot waive Chapter 71 as the means for determining NAFI employees' pay.

Setting aside Sections 9902(a), (b) and (f), the Agencies are left with Section 9902(m)(7) as the justification for eliminating the Chapter 71 as the means for determining NAFI employees' pay. Section 9902(m)(7) provides, that "[n]othing in this section, including the authority provided to waive, modify or otherwise affect provisions of law not listed in subsections (b) and (c) as nonwaivable, shall be construed to expand the scope of bargaining under Chapter 71 or this subsection with respect to any provision of this title that may be waived, modified or otherwise affected under this section." 5 U.S.C. § 9902(m)(7). This provision is not implicated because (1) the Agencies cannot waive Chapter 71 under the circumstances described above and

(2) even if they could waive Chapter 71, the waiver would not expand the scope of bargaining given that the NAFI employees already negotiate over their pay.

For the foregoing reasons, to the extent the Agencies' final regulations deny NAFI employees the right to bargain over their compensation, as 5 C.F.R. §§ 9901.305 and 9901.903 clearly do, those sections violate the enabling statute. Accordingly, the Unions respectfully request that the Court enjoin these provisions of the final regulations.

> **d.    The Regulations, 5 C.F.R. § 9901.103, 905 & 916(a)(7), Unlawfully Permit the Immediate Invalidation of Collective Bargaining Agreements through Implementing Issuances**

If a new agency regulation is non-negotiable under § 7117 because it serves a "compelling need," § 7116 still prohibits immediate enforcement of the regulation to the extent it conflicts with applicable pre-existing collective bargaining agreements.[23] As the Agencies admit (Defs.' Mem. at 43-44) Sections 9901.905(a) and .916(a)(7) of the Final Rule provide that certain agency regulations, called "implementing issuances," *see* 5 C.F.R. § 9901.103, immediately supersede applicable pre-existing collective bargaining agreements. These regulatory provisions conflict with § 7116. Because no Chapter 99 provision specifies this departure from § 7116, these provisions are contrary to § 9902(b)(3)(D) and (d)(2).

The Agencies erroneously argue that § 9902(m)(8) authorizes immediate enforcement of "implementing issuances" that conflict with applicable pre-existing collective bargaining agreements. (Defs.' Mem. at 44.) To the contrary, § 9902(m)(8) authorizes only immediate enforcement of the labor system regulation that is developed through the § 9902(m)(3) collaborative process. Immediate enforcement of any other agency regulation that conflicts with an applicable pre-existing collective bargaining agreement is not authorized by (m)(8), and

---

[23] Enforcement of the regulation must await the expiration of the agreement.

immediate enforcement of such a regulation impermissibly would evade the procedural requirements of (m)(3).

The Agencies also argue erroneously that the § 9902(f)(1)(A)-(C) procedures for collaborative development of the subsection (a) human resources management system allow the Agencies to enforce immediately implementing issuances that conflict with an applicable pre-existing collective bargaining agreement. (Defs.' Mem. at 44-45.) The procedures in § 9902(f)(1)(A)-(C), however, apply only to a "proposed system or adjustment" to the system, § 9902(f)(1)(A)(i), not to an "implementing issuance." An implementing issuance is a regulation issued to implement the system after the system already is in place (except a regulation so groundbreaking that it is a §9902(f)(1)(A)(i) "adjustment" to the system). 5 C.F.R. § 9901.103. The procedures for collaborative "planning [and] development" of implementing issuances, see 5 C.F.R. § 9901.106, do not comply with, and are not derived from, the procedures of 5 U.S.C. §§ 9902(f)(1)(A)-(C) that are applicable to a "proposed system or adjustment." Rather, as the regulatory comments indicate, 70 Fed. Reg. at 66134, the collaborative development procedures for implementing issuances are derived from 5 U.S.C. § 9902(f)(1)(D), which concerns "further planning or development which might become necessary" to implement the system.

Nothing in 5 U.S.C. § 9902(f)(1)(D) overrides Chapter 71 collective bargaining rights. The right that § 9902(f)(1)(D) gives employee representatives to participate "in any further planning or development which might become necessary" to implement the system is a new and additional right, not a right that substitutes for collective bargaining. Collective bargaining under Chapter 71 does not involve "participat[ion]" of employee representatives in agency "system … planning or development." Nor does collective bargaining under Chapter 71 involve participation of employee representatives in the agency's implementation of its previously

27

established legal obligations (whether created by law, regulation, or collective bargaining agreement).[24]  Rather, collective bargaining under Chapter 71 is the process that determines whether particular conditions of employment will be established as binding contractual obligations.  5 U.S.C. § 7103(a)(12) and (14).  Under Chapter 71, once working conditions are established by contract, the agency unilaterally implements its contractual obligations.[25]  Agency violation of its contractual obligations may be adjudicated through the grievance procedure in 5 U.S.C. § 712.  The new § 9902(f)(1)(D) right of employee representatives to participate in agency "system planning or development" and agency "system … implementation" plainly supplements Chapter 71 collective bargaining rights.  For this reason, the agency's authority under § 9902(f)(4) to determine "the exclusive procedures for the participation of employee representatives in [agency system] planning, development, [or] implementation" is not authority to eliminate Chapter 71 collective bargaining rights because collective bargaining under Chapter 71 is *not* a procedure for the participation of employee representatives in [agency system] planning, development, [or] implementation."  Because Chapter 71 collective bargaining does not concern the matters addressed in 5 U.S.C. §§ 9902(f)(1)(D) and (f)(4), the Agencies' theory that these provisions eliminate Chapter 71 collective bargaining rights is unsupported by the text of any statute, and is flatly contrary to the statements by the authors of law, already quoted above, that the law preserves the Chapter 71 scope of bargaining.  The Agencies' theory, if accepted, would allow total elimination of collective bargaining, because, if bargaining were deemed to be a procedure for system planning, development, or implementation, the Agencies' (f)(4) authority to determine the exclusive procedures for this planning, development, and

---

[24] Under 5 U.S.C. § 7106(a)(2)(B), management has a nonnegotiable right to "determine the personnel by which agency operations shall be conducted."

[25] Under 5 U.S.C. § 7106(a)(2)(B), employee representatives have no right to personally participate in the conduct of agency operations.

implementation would empower the Agencies to eliminate bargaining entirely. Congress intended no such result.

Because nothing in 5 U.S.C. § 9902(f)(1)(D) and (f)(4) reduces the scope of bargaining from that provided by Chapter 71, the Agencies' argument that all implementing issuances may be enforced immediately, without regard to Chapter 71 rights and applicable pre-existing collective bargaining agreements, is erroneous.[26] Sections 9901.905(a) and .916(a)(7) of the Final Rule therefore violate 5 U.S.C. § 9902(b)(3)(D) and (d)(2).

>   **e.    The Regulations, 5 C.F.R. § 9901.907 & 908, do Not Create a Review Board that is a Third Party and Independent**

Contrary to the Agencies' Memorandum at 46, their § 9902(m)(6) authority to determine "what third party" will review labor system decisions does not imply authority unilaterally to appoint the individuals who will constitute the third party.[27] The phrase "what third party" means what type of third party, not which particular individuals.

The Agencies erroneously argue that the availability of FLRA and judicial review of the decisions of their in-house Board satisfies the requirement for independent third party review. The Agencies overlook that their regulation gives their in-house Board unreviewable authority to

---

[26] This does not mean that no implementing issuances may be enforced immediately. Chapter 71 collective bargaining rights apply only to implementing issuances that address negotiable working conditions. If defendants limit their implementing issuances to "necessary," "system … implement[ing]" regulations, the proper subject of implementing issuances under 5 U.S.C. § 9902(f)(1)(D), and do not abuse the (f)(1)(D) process to propose implementing issuances that address negotiable conditions of employment, then refinement through collaborative (f)(1)(D) procedures of the aspects of the system that are not subject to negotiation will proceed without controversy or violation of rights.

[27] Regarding the unilateral power of appointment provided by the regulation, it is noteworthy that the regulatory right of labor organizations to "submit lists of recommended nominees for two of the three members of the Board," (Defs.' Mem. at 47), actually restricts the right to recommend nominees that labor organizations otherwise would have. Absent the regulation, labor organizations could write letters recommending nominees for all three members. The regulatory right to recommend two members is not accompanied by any right to have the recommendations considered. Thus, the regulatory opportunity to submit recommendations for two members and have them considered or disregarded at the discretion of the Secretary is less valuable than the opportunity that otherwise would exist to submit recommendations for three members and have them considered or disregarded at the discretion of the Secretary.

decide negotiation impasses.  § 9901.908(b)(4) and .920(d).  This point also distinguishes Boards of Contract Appeals and other decision makers whose decisions are subject to judicial review.

Labor relations concern the ongoing, daily relationship between employees and their employer.  The Agencies have no answer to our point that, in this context, Congress always has required resolution of disputes by "truly neutral outsiders." *NTEU*, 385 F. Supp. 2d at 29 and 20 n. 13 (discussing legislative history of the 1947 Act); §§ 7104, 7105, and 7122 (Federal Labor Relations Authority); § 7119 (Federal Service Impasses Panel); § 7121 (arbitrators); § 7123 (courts).  As we stated in our opening memorandum, the meaning of "independent third party" must be determined in accordance with the concepts reflected in other provisions that apply in this context.  An in-house board appointed by the Secretary is not a truly neutral outsider.

> **f.     The Regulations, 5 C.F.R. §§ 9901.807(g), 807(h), 922(c)(4), 922(f)(2) & 923(a) Improperly Modify the Grievance and Arbitration Procedure**

The Agencies erroneously argue (Defs. Mem. at 48-49) that § 9902(m)(6) allows them to create a new grievance and arbitration procedure which waives Chapter 71.  This authority is nowhere in the text of the provision, which does not speak to a grievance/arbitration process at all, but merely requires the Agencies to provide "an independent third party review of decisions."

As discussed in our opening brief (at 22-23), DoD has exercised its authority under 9902(m)(6) in creating the NSLRB, which has authority to review and resolve, *inter alia,* negotiability disputes, unfair labor practice complaints, information request disputes and negotiation impasses.  5 C.F.R. §§ 9901.907 & 9901.908.  The government provides no support – in the legislative history or elsewhere – that it derives authority to establish a new, substantive grievance and arbitration procedure through § 9902(m)(6) as well.  Indeed, a different portion of the statute expressly authorizes the Agencies to establish a new employee appeals system.  5

U.S.C. § 9902(h).  Section 9902(h) gives the Agencies no authority to waive any Chapter 71 provision.  *See* 5 U.S.C. 9902(h)(7) ("[n]othing in this subsection shall be construed to authorize the waiver of any provision of law…that it not otherwise waivable under subsection (a)")  Thus, the authority of arbitrators as set forth in §§ 7121(d) – (g), in cases that are § 9902(h) "appeals," cannot be waived, modified or affected by the Agencies' regulation.  5 U.S.C. § 9902(b)(3)(D) and (d)(2).  To allow the Agencies to establish an entirely new grievance and arbitration procedure would render meaningless § 9902(h) of the statute as relates to all bargaining unit employees.  This is an unacceptable method of statutory interpretation.  *Whitman v. American Trucking Associations,* 531 U.S. 457, 477-485 (2001).

The Agencies do not dispute, nor could they, that §§ 9901.807(g), 807(h), 922(c)(4), 922(f)(2) and 923(a) depart from Chapter 71.  Their only argument is that these departures are authorized by § 9902(m)(6).  Because § 9902(m)(6) does not apply to § 9902(h) employee appeals, these regulatory departures from Chapter 71 violate § 9902(b)(3)(D) and (d)(2).

> **g.  The Regulation, 5 C.F.R. §§ 9901.914(a)(4), Improperly Infringes on the Conduct of Union Representatives**

Section 9901.914(a)(4) of the NSPS regulations provides that "Employee representatives employed by the Department are subject to the same expectations regarding conduct as any other employee, whether they are serving in their representative capacity or not."  As the Plaintiffs established in our opening brief (Pls.' Mem. at 26-29), this regulation, which restricts speech and expressive conduct of union representatives, does not satisfy either of the NDAA's requirements that (1) with two exceptions, Chapter 71 not be waived; and (2) employees' collective bargaining rights be preserved.

In response, the government asserts yet again that the statute allows it to waive Chapter 71.  (Defs.' Mem at 51).  For all of the reasons stated in our opening brief and *supra,* that

argument lacks merit.  Next, the government attempts to dismiss our second argument: that the right to vigorous advocacy is central to the ability to collectively bargain.  The sole case cited by the Agencies in purported support, however, expressly reaffirms no fewer than three of the cases we cited in our opening brief for the proposition that a union representative who is also an employee of an Agency has the right to engage in conduct – specifically the use of language – which would not be tolerated in other contexts.  *Department of the Air Force v. FLRA,* 294 F.3d 192, 200 (D.C. Cir. 2002)(citing with approval *Old Dominion Branch No. 496 v. Austin,* 418 U.S. 264 (1974); *Dep't of the Air Force, Grissom Air Force Base*, 51 FLRA 7 (1995); *Air Force Flight Test Ctr., Edwards Air Force Base,* 53 FLRA 1455 (1998)).  The case cited by the Agencies merely holds that employee representatives who engage in tortious and/or criminal conduct such as assault, battery and sexual harassment are not protected by law or by public policy.  (Defs.' Mem. at 50-51.)  The Agencies' apparent attempt to characterize the Unions' argument as one which supports criminal or tortious behavior at the workplace is both disingenuous and factually false – the Unions did not in our opening brief and do not now advocate such a position – and in addition bears no resemblance to the text of the regulation the Unions are challenging.  Section 9901.914(a)(4) does not restrict merely "vulgar or sexually explicit language, or physical intimidation" by union representatives, as the government misleadingly insinuates (Defs.' Mem. at 50); rather, it forbids employee representatives to engage in conduct which differs *in any way* from that of other employees.  Contrary to the government's claims, there is no precedent in this Circuit or anywhere else which upholds the kind of infringement on union advocacy that DoD attempts to implement via § 9901.914(a)(4) of their regulation.  There is a very good reason why not:  because it violates both the letter of federal labor law and the public policy behind the rights of employees to collectively bargain.[28]

---

[28] The other case the government cites in its brief – *Brown v. Glines,* 444 U.S. 348 (1980) – is entirely inapplicable

### h.    The Regulations, 5 C.F.R. §§ 9901.903 & 914, Improperly Depart from Chapter 71

(i).    **Supervisor.**  The Agencies do not dispute that their definition of "supervisor" expands the Chapter 71 definition, thereby excluding more employees from bargaining unit membership.  (Defs.' Mem. at 52.)   The Agencies' only legal basis for this departure from Chapter 71 is their assertion that it is authorized by the "unique role" clause of § 9902(m)(1).  *Id.* at 53.  The Agencies are incorrect.  The "unique role" clause does not "specif[y]" any departure from Chapter 71, within the meaning of 5 U.S.C. § 9902(d); and the authors of the law expressly rejected the idea that the "unique role" clause authorizes any waiver or modification of Chapter 71.  149 Cong. Rec. S14439 (November 11, 2003) (statement of Senator Levin) ("the unique labor relations system established by the Secretary must be consistent with the requirements of Chapter 71").  To the extent § 9901.903 of the Agencies' regulation departs from 5 U.S.C. § 7103(a)(10), it is contrary to 5 U.S. C. §§ 9902(b)(3)(D) and (d)(2).[29]

(ii).    **Formal Meetings.**  The Agencies erroneously assert (Defs.' Mem. at 53-54) that their regulation does not restrict a union's right to attend "any formal discussion between one or more representatives of the agency and one or more employees in the unit or their representatives concerning any grievance or any personnel policy or practices or other general conditions of employment."  5 U.S.C. § 7114(a)(2)(A).  Their regulation, 5 C.F.R. § 9901.914(a)(2), clearly departs from the text of the statute.  The Agencies offer no defense at all of the part of their regulation that excludes unions from discussions held "for the purpose of discussing operational matters where any discussion of personnel policies, practices or working conditions

---

to the situation at hand. That case addresses the rights of uniformed military personnel to distribute anti-government petitions for signature on a military base.  It has nothing to do with verbal speech, and more important, nothing to do with collective bargaining.

[29] The Plaintiffs no longer challenge, however, the inclusion of "issued for the purpose of" in the § 9901.903 definition of "grievance."

"[c]onstitutes a reiteration or application of existing personnel policies, practices or working conditions"; is "incidental or otherwise peripheral to the announced purpose of the meeting"; or "[d]oes not result in an announcement of a change to, or a promise to change, an existing personnel policy(s), practice(s), or working condition(s)." The Agencies present no argument that these departures from § 7114(a)(2)(A) are authorized by any provision of law.

Contrary to Agencies' memorandum, they have not shown that case law construing § 7114(a)(2) warrants substitution of "management officials" for the statutory phrase "representatives of the agency." They have not shown that no meeting called by an agency "supervisor," can be a "formal discussion" under 5 U.S.C. § 7114(a)(2). Their substitution of "management officials" for "representatives of the agency" therefore is contrary to law.

Contrary to the Agencies' contention, *AFGE v. FLRA*, 865 F.2d 1283 (D.C. Cir. 1989), did not hold that a grievance "cannot exist" before it is filed. In *AFGE v. FLRA*, the Court sustained the FLRA's ruling that a grievance could not be deemed to be pending because the events giving rise to the complaint had not yet occurred. *Id*. at 1286. The Agencies' reliance on *Dept. of Veterans Affairs v. FLRA*, 16 F.3d 1526 (9th Cir. 1994), also is misplaced. That case did not concern whether a grievance can exist before it is filed. Rather, it held that a complaint is a grievance even if it filed with a board instead of submitted to the agency under the negotiated grievance procedure. *Id*. at 1534. Contrary to the Agencies' unsupported view, a grievance clearly can exist before the procedural step of filing it occurs. Also, nothing prohibits a grievance procedure from starting with an oral complaint. Grievances, moreover, include complaints filed with a board, not just those submitted to the agency. For these reasons, the Agencies' regulation substituting for the statutory phrase "any grievance" the more restrictive

34

phrase "any grievance filed under the negotiated grievance procedure," § 9901.914(a)(2)(ii), unlawfully departs from § 7114(a)(2)(A) and is contrary to § 9902(b)(3)(D) and (d)(2).

Contrary to the Agencies' assertions in their memorandum at 54, the Court's decision in *NTEU v. FLRA*, 774 F.2d 1181 (D.C. Cir. 1985), does not hold that unions may be excluded from formal discussions "in connection with a formal complaint of discrimination." 5 C.F.R. § 9901.914(a)(2)(iv). To the contrary, the Court said that such complaints are grievances within the meaning of 5 U.S.C. § 7114(a)(2)(A), and that unions can be excluded from formal discussions concerning them only if the complainant has a right (such as a right to remain anonymous at a particular stage of the proceedings) that directly conflicts with the union's right attend. *NTEU*, 774 F.2d at 1189 n.12. The Agencies' total exclusion of unions from all formal discussions of discrimination complaints departs from Chapter 71 and is contrary to 5 U.S.C. § 9902(b)(3)(D) and (d)(2).

Thus, no part of § 9901.914(a)(2) that departs from the text of § 7114(a)(2)(A) is valid.

**c. Unions' Right to Information.**—The same is true regarding the Agencies' regulatory evisceration of unions' right to information. Contrary to the Agencies' memorandum at 55, none of the Agencies' regulatory departures from the § 7114(b)(4) right to information "codif[ies] current caselaw." Nothing supports the authority of an agency to eliminate a union's § 7114(b)(4) right to information simply by writing an "issuance" that eliminates it, as the Agencies' regulation purports to allow. § 9901.914(c)(1). The Agencies point to nothing that authorizes an agency to withhold information that is subject to disclosure under § 7114(b)(4), "if adequate alternative means exist for obtaining the requested information, or if proper discussion, understanding, or negotiation . . . is *possible* without . . . the information." § 9901.914(c)(2) (emphasis added). Under the statute, a union is entitled to obtain the information, not elsewhere,

but from the agency, if the information "is normally maintained by the agency."  Agency provision of the information is required if it "is reasonably available and necessary for full and proper … negotiation," not just if negotiation would be impossible without it.  Finally, the Agencies point to nothing that states that an "authorized official" may block any disclosure of information if the official "has determined"—unreasonably or otherwise—that the disclosure "would compromise the Department's mission, security, or employee safety."  § 9901.914(c)(4).  All of the Agencies' regulatory departures from the text of § 7114(b)(4) are unlawful under § 9902(b)(3)(D) and (d)(2).

      **C.**        **<u>The Appeals Process is Unlawful under the Act</u>**

      As discussed in Plaintiffs' Motion for Summary Judgment, the challenged regulations governing the employee appeals process should be enjoined because the regulations fail to violate the statutory guarantees of meaningful MSPB participation as well as of fundamental fairness and due process, *viz.*,  5 U.S.C. §§ 9902(h)(1)(A), (h)(1)(B)(i), (h)(4) & (h)(5).  (*See* Pls.' Mem at 44-56.)   In addition, Plaintiffs provide the following in response to the Government's Opposition.

          *1.*      *The Agencies' Regulation Governing Employee Appeals is Invalid Under Step One of Chevron Review Because the Provisions at Issue Violate the Clear Language of the Act*

              **a.**    **The Regulation Violates § 9902(h)(2)'s Unambiguous Requirement that the NSPS Appeals Process Must be Consistent with the Public Employment Principles of Merit and Fitness**

      As explained in the Plaintiffs' opening brief, several provisions in the new appeals system violate the plain language of 5 U.S.C. § 9902(h).  In its Opposition, the Agencies defend the validity of its changes to the appeals process based on 5 U.S.C. § 9902(h)(2):

      Regulations implementing the appeals process may establish legal standards and procedures for personnel actions, including standards for applicable relief, to be

taken on the basis of employee misconduct or performance that fails to meet expectations. *Such standards shall be consistent with the public employment principles of merit and fitness set forth in section 2301.*

*Id.* (emphasis added) (*See also* Defs.' Mem. at 55, 59 at n. 24, 61)  However, the regulation plainly violates this provision of the Act.  The public employment principles of merit and fitness *explicitly require* that "employees should be protected against arbitrary action."  5 U.S.C. § 2301(b)(8)(A).  Contrary to the statutory mandate that DoD protect employees from arbitrary actions, the Agencies have adopted a process that encourages arbitrariness.

> **b.**    **The New Mitigation Standard, 5 C.F.R. § 9901.807(f)(2)(iii), Promotes  Arbitrary Action Against Employees**

As discussed in the Plaintiffs' opening brief, agency-imposed penalties have historically been reviewed under an arbitrary and capricious standard.  (Pl. Mem. at 46-48.)  The Department has removed that protection, replacing it with the much more deferential "totally unwarranted in light of all pertinent circumstances" standard of review.  As Judge Collyer has recognized, this standard is substantially different – and less protective of employees – than the arbitrary and capricious standard.  *NTEU,* 385 F. Supp. 2d at 35 (changing the standard of review from arbitrary and capricious to wholly without justification "put[s] the thumbs of the Agencies down hard on the scales of justice in their favor.")  The Act explicitly requires the Agencies to create an appeals system that will protect employees from arbitrary actions.  The Agencies have instead eliminated long-standing standards of review that provided this protection.  The new mitigation standard contravenes the plain language of the Act, and fails at step one of *Chevron* review.  467 U.S. 837, 842-43 (1984).

> **c.**    **The Sections of the Regulation which Allow the DoD to Unilaterally Modify or Reverse an Arbitrator's or AJ's decision, 5 C.F.R. §§ 9901.807(g)(2)(ii)(A) and (B), Further Expose Employees to Arbitrary Actions by the Department**

As the Plaintiffs noted in their opening brief, prior to the enactment of the new regulation, arbitrator decisions were appealed directly to the Federal Circuit while AJ decisions were immediately appealable to the MSPB. (Pls.' Mem. at 49-51.) The Agencies do not contest these facts. Now, however, the Agencies have injected an intermediate level of review: an internal DoD review. DoD may reverse, modify or remand the Arbitrator/AJ decision if it determines the decision contains an error of fact or law – essentially a *de novo* standard of review. The identity of the DoD personnel conducting the review is unknown. The form, substance or support required for any decision it would render is unknown. Any oversight of the panel is unknown. §§ 9901.807(g)(ii)(A) and (B). The new appeals procedure essentially boils down to this: the initial reviewer – the Arbitrator or AJ – may not mitigate a penalty even if it is arbitrary or capricious. In the unlikely event (s)he finds the penalty was "totally unwarranted", as the regulation requires, and reverses a DoD action, that decision is reviewed *de novo* by the very entity that issued the penalty to begin with.[30] This decision is the 'final decision,' which the MSPB must then review.[31] §§ 9901.807(h)(2)(ii). The arbitrary nature of the first level of the appeals process – the arbitrator/AJ decision, with its unreasonable mitigation standard – thus

---

[30] The Agencies' attempt to analogize the DoD review to "the normal agency adjudication process" is misplaced. The government cites to provisions of the APA governing substantive administrative determinations regarding an agency's area of expertise, then attempts to argue that the same procedures apply to internal employee disciplinary actions. (Defs.' Mem. at 57). They do not. An agency's decision-making process with respect to a rulemaking or other official agency action has no bearing on its process for disciplining its employees. *Compare* 5 U.S.C. § 556 *with* 5 U.S.C. § 7701, *et. seq.* By this analogy, the government would suggest that appeals from, *e.g.,* the National Labor Relations Board's finding that a private employer refused to bargain with a union would be decided by the MSPB. Obviously, this comparison cannot withstand the most cursory examination.

[31] This raises a host of other concerns relevant to a determination of whether the new process protects employees from arbitrary actions. If the MSPB reviews only the "final decision of the appeals process" as provided at 5 U.S.C. § 9902(h)(4)(A), than it may well be reviewing only DoD's decision, since under the regulation the Arbitrator/AJ decision is merely the 'initial decision', while the DoD decision is 'final'. §§ 9901.807(f) and (g). Would the MSPB decide whether DoD's *de novo* review of the AJ's decision was arbitrary and capricious? In doing so, would the MSPB take into account that the AJ was required to uphold the agency's penalty in the first instance, even if it found that penalty to be arbitrarily and capriciously imposed? Would the MSPB make its determination based on the entire record, or could DoD's decision limit the AJ's factual findings so that the whole record would not be before the MSPB? The regulation does not answer any of these questions. These issues illustrate the way the initial stages of the appeals process reverberate throughout each level of an employee's appeal, even if these levels are not directly modified by the regulation.

carries over and is amplified by the second level of the process, and by extension to each subsequent level of review. DoD's proposed appeals system would be analogous to a situation where all of this Court's decisions in criminal cases were automatically sent to the prosecutor for *de novo* review, modification and/or reversal. Only the prosecutor's decision would be appealable to the D.C. Circuit, which could not reverse absent a finding of 'arbitrary and capricious' action by the prosecutor's office. Such an analogy aptly reinforces how the appeals process fails to satisfy the unambiguous requirements of the Act, and, in addition, step one of the *Chevron* analysis.

> **2.    *Even if the Provisions at Issue Were to Pass Muster Under Chevron Step One, They Fail Under Chevron Step Two and/or Analysis Under the Administrative Procedure Act***

In order to find regulations valid under the Administrative Procedure Act and under *Chevron,* the Court must find not only that they comport with the language of the statute but also that they further the regulations' stated goals. *Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 726 (finding agency action will be deemed arbitrary and capricious unless the agencies "articulate a satisfactory explanation for [their] action between the facts found and the choice made"). The provisions at issue here fail both the first step of the test, as discussed in our original brief and above, as well as the second.

The Agencies claim repeatedly that the appeals system has been designed for two purposes. First, they assert the system was created to "streamline and simplify" appeals procedures. *See, e.g.,* 70 Fed. Reg. 66119, 66126, 66170, 66171, 66173. It is difficult to see, however, how inserting additional layers of review (thus elongating the process) or inserting differing standards of review at each layer (thus complicating the process) promotes these goals. Indeed, the provisions at issue work directly against them.

DoD's second stated rationale for its new appeals system relates to national security. "By its very nature, the Department's national security mission requires an exceptionally high level of workplace order and discipline…Because DoD retains full accountability for national security, it is in the best position to determine the penalty for poor performance and misconduct." *Id.* at 66171. The provisions at issue, however, do nothing to promulgate standards of conduct or order. They do nothing to adjust the actual substance of penalties for poor performance. They do not provide for tighter discipline by, for example, specifying conduct which might be tolerated elsewhere but, due to national security concerns at DoD, would result in a suspension from work. They do not enhance the Department's ability to make a penalty determination by, for example, specifying a 'one strike and you're out' rule for certain offenses, where employees had previously been allowed three. Rather than granting the Department enhanced authority on the front end of the disciplinary process, which would effectuate its stated goals, the provisions at issue shield the Department's actions from review on the back end, once it has acted. The only purpose this serves is in allowing DoD to discipline or discharge employees with no effective recourse. The challenged provisions do not enhance national security.

### 3.    *Conclusions with Respect to Fairness*

The Agencies spend a considerable amount of time trying to convince this Court that the new appeals system is 'fair' because the regulations provide the employee with eventual access to judicial review by the Federal Circuit "under legal standards that are unaffected by these regulations." (Defs' Mem. at 57-58.) According to the Agencies, given this judicial review would ultimately be available to employees, they are insured "fair treatment" as required by Act. (Id.) This view is utterly without merit: "when the [government] is engaged in what is fundamentally an adjudicative act, one which applies general legal standards to a particular case,

[it] must provide fundamentally fair procedures at *every level* of the process." *Katris v. City of Waukegan*, 498 F. Supp. 48, 54 (N.D. Ill. 1980) (emphasis added). Forcing employees who have been subject to adverse agency action to spend time and money navigating through an appeals system which is not fair at its initial levels so that they may ultimately, perhaps, receive a fair hearing with reasonable standards of review from an impartial adjudicator does not constitute fair treatment. The courts have "not … embraced the general proposition that a wrong may be done if it can be undone." *Fuentes v. Shevin,* 407 U.S. 67, 82 (1972).

The Agencies also contend the new appeals system is "fair" since the regulations provide the employee with "ample opportunity to make an adequate factual record prior to MSPB review…." (Defs'. Mem. at 58.) However, the argument obscures the fact that any record developed is biased in the Agencies' favor by virtue of the new "totally unwarranted" standard AJs must apply in order to reach the "initial decision". The Agencies do not dispute that the "totally unwarranted" standard favors DoD by allowing it to bring in evidence beyond the current standard. Hence, evidence which an AJ would currently exclude on the grounds of relevancy would now be admissible to prove that the employee's penalty is *not* totally unwarranted in light of pertinent circumstances. Further, the regulations now allow AJs to consider evidence which supports DoD's adverse actions as well as choice of penalty even though DoD has mislabeled or mischaracterized its charge. *See* 5 C.F.R. § 9901.807(f)(3). Again, evidence which would currently be precluded because such evidence is not related to the charge is now admissible under the new DoD appeals rules. Any record developed through this new system contains facts and evidence supporting DoD's action and choice of penalty. This result cannot constitute "fair treatment" as required by the Act.[32]

---

[32] Thus, assuming that the employee has the resources to support an appeal to the full MSPB, (Pls'. Memo at 48) and following any review, modification, or reversal made by the DoD in its "final decision", the MSPB must sift through

The provisions of the appeals system which (1) change the AJ's mitigation standard; (2) provide for an intermediate level of DoD review; and (3) restrict the authority of the MSPB neither comport with the governing statute nor do they advance the agencies' stated goals.  They should be invalidated.

### 4.     The Agencies' Defense of their Mandatory Removal Offense Process Lacks Any Semblance of Merit

Interwoven in the Agencies' defense of their appeals procedure is the Agencies' response to the Unions' challenge to the appeals process for those employees accused of Mandatory Removal Offenses ("MROs").   The Agencies contend that their mandatory removal offense provisions are lawful because (1) Congress authorized the Agencies to depart from Chapter 71 and the appeals process by virtue of Sections 9902(m) and 9902(h) respectively (Defs.' Mem. at 48-49, 58-60); and (2) Congress authorized the Agencies to develop "standards for applicable relief" in Section 9902(h)(2) (*id.* at 58-60).   As with almost every other defense proffered by the Agencies, their arguments overextend their authority, ignore their limitations, and cannot be justified under either step one or two of the *Chevron* standard.

Section 9902(h)(2) provides that the Agencies may establish an appeals process, which includes "legal standards and procedures for personnel actions, including standards for applicable relief."  5 U.S.C. § 9902(h)(2).   However, any such process must afford "fair treatment in any appeals that they bring in decisions relating to their employment" as well as "the protections of "due process."  5 U.S.C. §§ 9901(h)(1)(A) & (B)(i).  The phrase "fair treatment" is more than an exhortatory statement, it is a substantive limitation.

_____

evidence not relevant or necessary prior to applying the arbitrary and capricious standard found in § 9902(h)(5)(A). Reviewing evidence which may have a bearing on the "totally unwarranted" standard but is inconsequential to the standard set forth in 9901.807(h)(2)(iii) is neither "orderly" nor "streamlined" as the Agencies profess.

Moreover, it is a substantive limitation that has been practically ignored by the Agencies with respect to the mandatory removal process. Notably, the Agencies did not respond to the Unions' argument that the *steps in the MRO process* fail to provide fair treatment to employees. The Agencies emphasize that the MROs will involve "offenses that have a direct and substantial adverse impact on the Defendant's national security mission", 5 C.F.R. § 9901.712(a), and they further provide some examples, such as "aiding terrorism, engaging in sabotage that could lead to loss of life or adverse impact on military readiness or soliciting a bribe for an act that compromises national security." (Defs.' Mem. at 59-60.) A court should not accept the characterizations of agency heads or agency counsel of what a regulation *might* provide in the future; the courts look to the actual language in the regulation as written. The phrase "direct and substantial adverse impact on the Department's national security mission" is a hazy concept when used in a final regulation establishing "a key pillar in the Department of Defense's transformation" of the way in which it achieves its mission. *See* 70 Fed. Reg. at 66117. The characterizations of the Agencies notwithstanding, the definition of mandatory removal offense leaves open the possibility that employees may be subject to mandatory removal for more than just aiding terrorism, engaging in sabotage and/or partaking in bribery.

In addition to the hazy definition of "mandatory removal offense", there are significant aspects of the final regulation that simply bronze the procedure as a model of unfair treatment. As discussed in the Plaintiffs' Memorandum at pages 53-56, the employee is denied fair treatment at the initial levels of the process because the Agencies eliminate any possibility of mitigating the mandatory removal penalty due to mitigating circumstances. Both the AJ and the

"Department,"[33] which constitute the first two levels of review, are unable to mitigate the penalty.  Only the third level of review, *i.e.*, the full MSPB, can mitigate the mandatory removal penalty.  The requirement of fair treatment applies at every level of a process, *i.e.*, "fair treatment in *any appeal*", 5 U.S.C. § 9902(h)(1).

The Agencies nevertheless contend that "the fairness of mandatory removal (subject to possible mitigation by the Secretary or the full MSPB) for certain particularly serious offenses is confirmed by the fact that Congress has implemented a similar MRO system for the Internal Revenue Service."  (Defs.' Mem. at 60.)  The fact that Congress expressly established the MRO system for the Internal Revenue Service (*see* 26 U.S.C. § 7804 [note]) begs the question as to whether Congress authorized the Agencies to adopt their own version of an MRO system.  The Agencies cannot point to any express Congressional authorization in the National Defense Authorization Act to establish the MRO system.  The Agencies can only argue that Congress implicitly authorized the creation of an MRO system by virtue of generally worded provision allowing the Agencies to establish "an appeals process" in Section 9902(h)(2).  As evidenced by the procedure provided to the IRS, Congress knew how to draft an MRO process if it intended to give such a process to the Agencies.  Instead, Congress permitted the Agencies to adopt an appeals process, limiting the Agencies' authority to a process that provides "fair treatment" and are "afforded the protections of due process."  5 U.S.C. §§ 9902(h)(1)(A) & (B)(i).  The Agencies exceeded this authorization by creating an MRO process that lacks both fair treatment and the protections of due process.

Accordingly, for the foregoing reasons, the Agencies have failed to establish that the Unions are not entitled to judgment as a matter of law on the illegality of the MRO provisions in

---

[33] While the "Secretary" has the authority to mitigate the mandatory removal penalty, there is nothing in the applicable regulations—5 C.F.R. §§ 9901.807 & 9901.808—that equates "Department", as that term is used in the appeal process, with the Secretary.

the final regulation, *see* 5 C.F.R. §§ 901.712, 901.807, 9901.808 & 9901.922(c)(4).  The Unions

respectfully request that the Court deny the motion to dismiss and enjoin these provisions.

### III. CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court grant their

motion for summary judgment and deny the Agencies' motion to dismiss.

Respectfully submitted,

/s/ Joseph Goldberg\
JOSEPH GOLDBERG, Bar # 291096\
Assistant General Counsel\
MARK D. ROTH, Bar # 235473\
General Counsel\
Am. Fed'n of Gov't Employees, AFL-CIO\
80 F Street, N.W.\
Washington, DC  20001\
(202) 639-6426

/s/ Sally M. Tedrow\
SALLY M. TEDROW, Bar #938803\
O'Donoghue & O'Donoghue LLP\
4748 Wisconsin Avenue, N.W.\
Washington, DC  20016\
(202) 362-0041

/s/ Susan Tsui Grundmann\
SUSAN TSUI GRUNDMANN, Bar #433437\
General Counsel\
Nat'l Fed'n of Fed. Employees,\
    FD-1, IAMAW, AFL-CIO\
1016 16th Street, N.W.\
Washington, DC  20036\
(202) 862-4400

/s/ Daniel M. Schember\
DANIEL M. SCHEMBER, Bar #237180\
Gaffney & Schember, P.C.\
1666 Connecticut Avenue, N.W., Suite 225\
Washington, DC  20009\
(202) 328-2244

*Attorneys for Plaintiffs*

JEAN E. ZEILER\
Senior Counsel\
Nat'l Ass'n of Gov't Employees,\
    SEIU, AFL-CIO\
159 Burgin Parkway\
Quincy, MA  02169\
(617) 376-0220

JULIA AKINS CLARK, Bar #337493\
General Counsel\
Int'l Fed'n of Prof'l & Technical\
    Eng'rs, AFL-CIO\
8630 Fenton Street, Suite 400\
Silver Spring, MD  20910\
(301) 565-9016

PATRICK J. SZYMANSKI, Bar #269654\
General Counsel\
Int'l Bhd. of Teamsters\
25 Louisiana Avenue, N.W.\
Washington, DC  20001\
(202) 624-6945

*Of Counsel*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN FEDERATION OF GOVERNMENT | : | |
| EMPLOYEES, AFL-CIO, *et. al.*, | : | |
| | : | |
| Plaintiffs, | : | No. 1:05cv02183 (EGS) |
| | : | |
| v. | : | |
| | : | |
| DONALD H. RUMSFELD, SECRETARY OF | : | |
| DEFENSE**,** *et. al.*, | : | |
| | : | |
| Defendants. | : | |

**O R D E R**

On consideration of Defendants' Motion to Dismiss, the Opposition and Reply thereto, as

well as the arguments presented at the hearing on January 24, 2006 in this case,  it is this _____

day of _____, 2006, it is hereby,

**ORDERED** that the Defendants' Motion to Dismiss is denied.

Dated: _____, 2006

_____
**HONORABLE EMMET G. SULLIVAN**
United States District Judge

cc's listed next page:

Copies to:

JOSEPH GOLDBERG
Assistant General Counsel
MARK D. ROTH
General Counsel
AMERICAN FEDERATION OF
  GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, N.W.
Washington, DC  20001

SALLY M. TEDROW
ROBERT MATISOFF
KEITH R. BOLEK
O'DONOGHUE & O'DONOGHUE LLP
4748 Wisconsin Avenue, N.W.
Washington, DC  20016

SUSAN TSUI GRUNDMANN
General Counsel
NATIONAL FEDERATION OF FEDERAL
  EMPLOYEES, FD-1, IAMAW, AFL-CIO
1016 16th Street, N.W.
Washington, DC  20036

DANIEL M. SCHEMBER
GAFFNEY & SCHEMBER, P.C.
1666 Connecticut Avenue, N.W., Suite 225
Washington, DC  20009

JEAN E. ZEILER
Senior Counsel
NATIONAL ASSOCIATION OF
  GOVERNMENT EMPLOYEES, SEIU,
  AFL-CIO
159 Burgin Parkway
Quincy, MA  02169