**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
                                )
AMERICAN FEDERATION OF          )
GOVERNMENT EMPLOYEES,           )
AFL-CIO, et al.,                )
                                )
              Plaintiffs,       )
                                )
        v.                      )    Civ. No. 05-2183 (EGS)
                                )
                                )
DONALD H. RUMSFELD,             )
SECRETARY, UNITED STATES        )
DEPARTMENT OF DEFENSE, et al.,  )
                                )
              Defendants.       )
                                )
                                )
```

<u>**MEMORANDUM OPINION**</u>

Plaintiffs, thirteen labor organizations that represent more than 350,000 employees of the Department of Defense ("DoD"), filed this lawsuit challenging final regulations implemented by defendants, the DoD and the Office of Personnel Management ("OPM"). The challenged regulations were promulgated in response to the National Defense Authorization Act for Fiscal Year 2004 ("NDAA"), which authorized defendants to develop a new human resources management system known as the National Security Personnel System ("NSPS"). 5 U.S.C. § 9902.

Plaintiffs raise five challenges to the regulations under *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). First, plaintiffs argue that defendants did not comply with the statutory mandate that defendants act "in

collaboration with, and in a manner that ensures the
participation of, employee representatives in the development and
implementation of [a] labor management relations system." 5
U.S.C. § 9902(m)(3).

Second, plaintiffs claim that the regulations establish a
labor relations system that unlawfully departs from 5 U.S.C. §§
7101 *et. seq.* ("chapter 71"), which governed labor-management
relations at DoD prior to the passage of the NDAA.  Plaintiffs
contend that the statute permits only two narrow deviations from
chapter 71: (1) the Secretary may bargain at a level above the
level of exclusive recognition (commonly called "national level
bargaining"); and (2) if the Secretary establishes a new labor
relations system, the system must provide for "independent third
party review" of labor relations decisions.  5 U.S.C. §
9902(m)(5) and (m)(6). Plaintiffs maintain that because only
these two provisions directly conflict with chapter 71, they are
the only circumstances in which the Secretary may depart from
chapter 71.

Third, plaintiffs maintain that the labor relations system
established by the new rule violates Congress' requirement that
the NSPS "ensure that employees may organize, bargain
collectively as provided for in this chapter. . . ."  5 U.S.C. §
9902(b)(4).

Fourth, plaintiffs argue that the National Security Labor

Relations Board ("NSLRB") established by the new rule does not satisfy Congress' requirement that the new labor relations system provide for an "independent third party" to review labor relations decisions.  5 U.S.C. § 9902(m)(6).

Finally, plaintiffs maintain that, contrary to the statute, the regulations establishing an appeals process for disciplined employees fails to provide for "fair treatment" and "due process" as required by 5 U.S.C. § 9902(h)(1)(A) and (B)(i).

Pending before the Court are plaintiffs' Motion for Summary Judgment and defendants' Motion to Dismiss for lack of jurisdiction and failure to state a claim.[1]  A hearing on the motions was held on January 24, 2006.  Upon careful consideration of the parties' cross motions, the response and reply thereto, oral arguments, supplemental briefing filed by the parties,[2] the

---

[1]The parties had originally filed a stipulation setting forth a briefing schedule that was intended "to eliminate any need for plaintiffs to seek a temporary restraining order and to establish a schedule that will lead to the expeditious resolution of the issues raised by plaintiffs in this action."  Stipulation and Order (November 17, 2005).  At a status hearing held on November 21, 2005, the parties agreed that the case was predominantly a facial challenge to defendants' rule, that neither party sought compilation of the administrative record and, therefore, the Court could make a final decision on the merits.

[2]After the motions hearing, the Court requested supplemental briefing on two issues.  On February 7, 2005, the Court issued a minute order directing the parties to address the applicability or not of the legislative history discussion in part II of the D.C. Circuit's recent decision in *Holly Sugar Corporation, et al. v. Michael Johanns*, Civil No. 05-5067 2006 WL 276945 (D.C. Cir. 2006).  On February 13, 2006, the Court issued a minute order

governing statutory and case law, and the entire record, the
Court concludes: (1) defendants satisfied their statutory
obligation to collaborate with plaintiffs; (2) defendants
lawfully departed from chapter 71 in establishing a labor
relations system; (3) the new rule fails to ensure that employees
can bargain collectively; (4) the NSLRB does not meet Congress'
requirement for "independent third party review" of labor
relations decisions; and (5) the process for appealing adverse
actions fails to provide employees with "fair treatment" as
required by statute.

Accordingly, plaintiffs' Motion for Summary Judgment is
**GRANTED IN PART** and **DENIED IN PART** and defendants' Motion to
Dismiss is **GRANTED IN PART** and **DENIED IN PART.**

I.        BACKGROUND

Plaintiffs are thirteen labor organizations that represent,
collectively, more than 350,000 employees in the DoD(the
"Unions").  Defendants are Donald H. Rumsfeld, the Secretary of
the DoD and Linda M. Springer, Director of the OPM (the
"Agencies").  Ms. Springer succeeded Kay Coles James, who was the
OPM Director when the proposed regulations in this case were
promulgated.

directing the parties to address the binding and persuasive
authority that should govern the Court's interpretation of
"independent third party review" as used by Congress in 5 U.S.C.
§ 9902(m)(6).

4

In the federal sector, bargaining takes place regarding the impact and implementation of an agency's management rights, negotiated procedures, and arrangements for adversely affected employees.  Plaintiffs engage in impact and implementation, negotiated procedure, and appropriate arrangement negotiations. The American Federation of Government Employees, AFL-CIO ("AFGE"), for example, has negotiated agreements on the procedures DoD uses when determining which employees will work overtime; the procedures DoD will use when making staffing decisions, such as determining which employees will be transferred to new posts of duty or assigning work shifts; the procedures conducting a reduction-in-force ("RIF") such as buyouts, early retirement, placement in other positions within DoD, or placement in positions in other agencies; and appropriate arrangements for employees who are exposed to safety or health hazards on the job.  These areas are also governed, in part, by government-wide procedures.  Before Congress passed the NDAA, labor-management relations at DoD were governed by chapter 71 of Title 5 ("chapter 71").  5 U.S.C. §§ 7101 *et. seq.*

The parties do not dispute that the issues of overtime, the changing of work schedules over an employee's objections, and safety and health concerns are important to DoD employees.  Some or all of the plaintiffs have negotiated agreements addressing overtime, procedures for determining whose work schedules should

be changed and how, and arrangements on behalf of employees who perform hazardous or dangerous work, including workplace safety practices, personal protective equipment, training, and improved ventilation.  Plaintiffs have also been permitted to be present at any examination of a bargaining unit employee by an agency representative in connection with an investigation, if the employee reasonably believes the examination may result in disciplinary action against the employee and the employee requests representation.  Plaintiffs have also represented DoD employees at formal discussions between management and bargaining unit employees.  Some of the Unions, such as AFGE and National Association of Government Employees ("NAGE"), have represented certain employees of Non-Appropriated Fund Instrumentalities ("NAFIs") within the DoD and negotiated contracts on their behalf.

## II.        STATUTORY AND REGULATORY FRAMEWORK

### A.    *The National Defense Authorization Act for Fiscal Year 2004*

As part of the NDAA, Congress authorized the DoD and OPM to establish a human resources management system for organizational units of DoD.  5 U.S.C. § 9902(a)("Notwithstanding any other provision of this part, the Secretary may, in regulations prescribed jointly with the Director, establish, and from time to time adjust, a human resources management system for some or all of the organizational or functional units of the Department of

Defense."). The system, embodied in final regulations published at 70 Fed. Reg. 66116-66220 (Nov. 1, 2005), is known as the National Security Personnel System ("NSPS"). The statute also authorizes defendants to establish and adjust a labor relations system for the Department of Defense. 5 U.S.C. § 9902(m)(1). The parties do not dispute that the labor system authorized by § 9902(m) is a part of the human resources management system authorized by § 9902(a). Motions Hr'g Tr. 9, 63, Jan. 24, 2006 ("Tr. 1/24/06").

1.   **Requirements of the Human Resources Management System**

Section 9902(b) details six system requirements. Among other requirements, the human resources management system must:

> (1) be flexible; (2) be contemporary; . . . (4) ensure that employees may organize, bargain collectively as provided for in this chapter, and participate through labor organizations of their own choosing in decisions which affect them, subject to the provisions of this chapter and any exclusion from coverage or limitation on negotiability pursuant to law; . . . and (6) include a performance management system that incorporates . . . [a] pay for performance evaluation system to better link individual pay to performance, and provide an equitable method for appraising and compensating employees.

5 U.S.C. § 9902(b)(1), (2), (4), and (6).

Section 9902(b)(3) states that the human resources management system "shall not waive, modify, or otherwise affect" a list of provisions. The list includes provisions that establish "merit systems principles," (5 U.S.C. § 2301) and "prohibited personnel practices" (5 U.S.C. § 2302). *See* 5 U.S.

§§ 9902(b)(3)(A)-(C).  Section 9902(b)(3) further provides that
the system shall not waive, modify, or otherwise affect "any
other provision of this part (as described in subsection (d))."
5 U.S.C. § 9902(b)(3)(D).  Subsection (d), entitled "Other
nonwaivable provisions," lists five specified subparts and 11
chapters within Title 5 that are nonwaivable "to the extent not
otherwise specified in this title."  5 U.S.C. § 9902(b)(3)(D) and
(d).  The provisions listed in § 9902(d)(2) include chapter 71.

## 2.    The Labor Relations System

A key provision in this dispute is § 9902(m), in which
Congress authorized the establishment of a new labor relations
system for DoD.  Entitled "Labor management relations in the
Department of Defense," Subsection (m) provides, "Notwithstanding
section 9902(d)(2), the Secretary, together with the Director,
may establish and from time to time adjust a labor relations
system for the Department of Defense to address the unique role
that the Department's civilian workforce plays in supporting the
Department's national security mission."  5 U.S.C. § 9902(m)(1).
Congress required that the new system "allow for a collaborative
issue-based approach to labor management relations." 5 U.S.C. §
9902(m)(2).

The statute also provides for collaboration and bargaining
with employee representatives at a level "above the level of
exclusive recognition" of labor organizations, §§ 9902(g) and

9902(m)(4) and (m)(5), and requires that the labor relations system "provide for independent third party review of decisions, including what definitions are reviewable by the third party, what third party would conduct the review, and the standard or standards for that review," 5 U.S.C. § 9902(m)(6).

The statute further requires that the new labor relations system "shall be binding on all bargaining units within the [DoD], all employee representatives of such units, and the [DoD] and its subcomponents, and shall supersede all other collective bargaining agreements for bargaining units within the [DoD] . . . except as otherwise determined by the Secretary." 5 U.S.C. § 9902(m)(8).

Unless extended, the labor relations system created under subsection (m) will sunset six years after the enactment of this subsection, "at which time the provisions of chapter 71 will apply." 5 U.S.C. § 9902(m)(9).

**3.  Collaboration Requirements for the Labor Relations System**

The NDAA sets forth several requirements that the Secretary and the Director must observe "to ensure that the authority [to establish NSPS] is exercised in collaboration with, and in a manner that ensures the participation of, employee representatives in the development and implementation of the labor management relations system. . . ."  5 U.S.C. § 9902(m)(3). The Secretary and the Director must "afford employee

representatives and management an opportunity to have meaningful discussions concerning the development of the new system," they must permit employee representatives 30 days to review any proposal and make recommendations, and they must "give any recommendations received full and fair consideration."  5 U.S.C. § 9902(m)(3)(A).  If defendants do not accept the recommendations, they must meet and confer for an additional 30-day period "in an attempt to reach agreement on whether or how to proceed with those parts of the proposal . . . ."  5 U.S.C. § 9902(m)(3)(B).  However, no agreement is ultimately necessary. "If the Secretary, in his discretion, determines that further consultation and mediation is unlikely to produce an agreement," the statute authorizes him to implement "any or all" of the disputed provisions, including any modifications made in response to the Unions' recommendations "the Secretary deems advisable." 5 U.S.C. § 9902(m)(3)(C)(ii).

**4.   The Appeals Process for the Human Resources Management System**

Subsection (h) addresses appellate procedures for employees governed by the human resources management system.  It authorizes the Secretary to "establish an appeals process that provides employees . . . fair treatment in any appeals that they bring in decisions relating to their employment."  5 U.S.C. § 9902(h)(1)(A).  The system also must "ensure that employees . . . are afforded the protections of due process."  5 U.S.C. §

9902(h)(1)(B)(i).

"Regulations implementing the appeals process may establish legal standards and procedures for personnel actions, including standards for applicable relief, to be taken on the basis of employee misconduct or performance that fails to meet expectations."  5 U.S.C. § 9902(h)(2).  "Legal standards and precedents applied before the effective date of [§ 9902] by the [MSPB] and the courts under chapters 43, 75, and 77 of [Title 5]" are applicable to NSPS employees "unless such standards and precedents are inconsistent with the legal standards established under [§ 9902(h)]."  5 U.S.C. § 9902(h)(3).  However, "[n]othing in [subsection (h)] shall be construed to authorize the waiver of any provision of law . . . that is not otherwise waivable under subsection (a) [of § 9902]."  5 U.S.C. § 9902(h)(7).

Employees subject to certain major personnel actions (*e.g.*, removal, suspension for more than 14 days, or reduction in pay), who are not serving under a probationary period, and "who would otherwise be eligible to appeal a performance-based or adverse action under pre-existing provisions in chapter 43 or 75" of Title 5 have "the right to petition the full [MSPB] for review of the record of [DoD's] decision pursuant to regulations established under [§ 9902(h)(2)]."  5 U.S.C. § 9902(h)(4).  The MSPB may, in turn, order "corrective action" only if it determines that DoD's decision was "(A) arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule or regulation having been followed; or (C) unsupported by substantial evidence."  5 U.S.C. § 9902(h)(5).  An employee who is adversely affected by a final order or decision of the MSPB may obtain judicial review of the decision in the Federal Circuit, as provided for by 5 U.S.C. § 7703.  5 U.S.C. § 9902(h)(6).

**B.    *Legislative History***

The issue of whether the Secretary may waive chapter 71 when establishing the labor relations system for the NSPS was addressed by Congress at length.  The language for Section 9902 was derived from section 1111 of H.R. 1588, passed by the House of Representatives on May 21, 2003.  H.R. 1588, 108th Cong. (2003).  Three aspects of this bill are particularly pertinent here.  First, the bill incorporated a provision with language identical to § 9902(b)(4), which requires the HR system to "ensure that employees may organize, bargain collectively as provided for in this chapter . . . ." 149 CONG. REC. H4417 (May 21, 2003).  Second, in contrast to the legislation ultimately enacted, chapter 71 was not included in the list of "other nonwaivable provisions" contained in the House-passed bill.  § 9902(c)(2).  Third, the House-passed bill did not contain § 9902(m).  149 CONG. REC. H4461 (May 21,2003).

After the House passed the bill, the Senate amended H.R.

1588 by substituting its own version of the NDAA that did not
include any provision analogous to chapter 99.  149 CONG. REC.
S7297 (June 4, 2003).  On June 2, 2003, Senators Collins, Levin,
Voinovich, and Sununu introduced S. 1166, which was similar to
chapter 99 and listed chapter 71 as a nonwaivable provision.  S.
1166, 108th Cong. § 9902(c) (2003).  The bill was referred to the
Senate Committee on Governmental Affairs.  Although S. 1166 was
not passed by the Senate, the Committee on Governmental Affairs
approved it by a 10-1 vote.  149 CONG. REC. S14490 (Nov. 12,
2003).

On June 4, 2003, the Senate Committee on Governmental
Affairs held a hearing at which Senators expressly discussed the
issue.  Secretary Rumsfeld testified:

> [T]he National Security Personnel System we are
> proposing . . . will not end collective bargaining. . .
> . To the contrary, the right of defense employees to
> bargain collectively would be continued. What it would
> do is bring collective bargaining to the national level
> so that the Department could negotiate with national
> unions instead of dealing with more than 1,300
> different union locals, a process that is inefficient.

*Transforming the Department of Defense Personnel System: Finding
the Right Approach*: Hearing Before the United States Senate
Committee on Government Affairs, 108th Cong. 21 (2003) (statement
of Donald Rumsfeld, Secretary of Defense).  Senator Levin,
however, noted that the legislation sought by DoD and passed by
the House went "way beyond" bargaining at the national level.
*Id*. at 27 (statement of Senator Carl Levin, Member, Senate

Committee on Government Affairs).  He expressed concern that the bill desired by DoD would allow the Secretary to eliminate "bargaining rights in general" because it would authorize the Secretary to waive all of chapter 71.  *Id*.  Undersecretary Chu then testified that the reason the Department wanted authority to waive all of chapter 71 was "to get the bargaining [process] to come to a conclusion."  *Id*. (statement of David Chu, Undersecretary of Defense).

Senator Collins, Chair of the Committee, rejected Undersecretary Chu's reasoning, explaining, "I think there are other ways to ensure that bargaining comes to a conclusion than having the authority to waive the entire chapter governing collective bargaining." *Id*. at 28 (statement of Senator Susan Collins, Chair, Senate Committee on Governmental Affairs). Senator Voinovich concurred, saying "Our bill [S. 1166] would provide that you would remain in chapter 71, as explained by our Chairman."  *Id*. at 29 (statement of Senator George Voinovich, Member, Senate Committee on Governmental Affairs).

In what Senator Collins called "an extremely challenging conference with the House of Representatives," the Conference Committee forged a compromise between the House and Senate bills. 149 CONG. REC. S14428 (Nov. 11, 2003).  The Conference Committee added chapter 71 to the list of "nonwaivable provisions" in § 9902(d), but also added § 9902(m), which authorized the

14

defendants to establish a new labor relations system.

While commenting on the conference report, Senator Collins admitted the product "was not the one I would have preferred," but she nevertheless stated that it did not waive chapter 71:

> Another very important provision in this bill has to do with the collective bargaining rights of the Department's employees. The Department of Defense has repeatedly claimed it has no desire to waive the collective bargaining rights of its employees. Indeed, the bill before the Senate specifically states the Department does not have the authority to waive the chapter of Title 5 that governs labor-management relations. Thus, I fully expect the labor relations system developed by the Department will abide by the principles enumerated in chapter 71, such as the duty to bargain in good faith—a duty that applies to both labor and management, incidentally—and the prohibition against unfair labor practices.

149 Cong. Rec. S14428-29 (Nov. 11, 2003) (statement of Senator Susan Collins, Conference Committee Member, Chair, Senate Committee on Governmental Affairs).

Senator Levin, who also described the outcome on collective bargaining issues as a "mixed bag" echoed Senator Collins' statement and described the Conference Committee bill in greater detail:

> This conference report does not include any authority to waive the requirements of chapter 71.  On the contrary, as the Chairman of the House Government Reform Committee pointed out on the House floor last week, this bill specifically lists the provisions of chapter 71 as being non-waivable. . . . .
>
> The conference report also states that, notwithstanding the provision preserving the full force and effect of chapter 71, the Secretary "may establish and from time to time adjust a labor relations system for the

15

Department of Defense to address the unique role that the Department's civilian workforce plays in supporting the Department's national security mission."

These two provisions must be read together and both must be given meaning. The first provision states that chapter 71 may not be waived or modified. The second provision states that the Secretary may establish a unique labor relations system. For both provisions to have meaning, the unique labor relations system established by the Secretary must be consistent with the requirements of chapter 71. . . .

Unfortunately, the conference report does provide for exceptions to the applicability of chapter 71. In this regard, the conference report specifically provides that the labor relations system established by the Secretary "shall provide for independent third party review of decisions, including defining what decisions are reviewable by the third party, what third party would conduct the review, and the standard or standards for that review." It also states that national level collective bargaining shall "be subject to review by an independent third party only to the extent provided" under this process.  This language appears to preclude the appeal of such issues to the Federal Service Impasses Panel under section 7119 of Title 5.

149 CONG. REC. S14428, 14439 (Nov. 11, 2003) (statement of Senator Carl Levin, Member, Conference Committee and Ranking Member of the Senate Armed Services Committee).

Speaking on the Senate floor on November 12, 2003, Senator Lieberman, a member of the Conference Committee, also noted that the bill drafted by the Conference Committee "included the provision of S. 1166 stating that the Secretary of Defense has no authority to waive chapter 71."  He said the bill "overrides chapter 71 only where" the bill "and chapter 71 are directly inconsistent with each other" and "that the Secretary of Defense has no authority" to depart from chapter 71 in any other area.

149 CONG. REC. S14490 (Nov. 12, 2003) (statement of Senator Joseph Lieberman, Member, Conference Committee and Ranking Member of the Senate Committee on Government Affairs).

**C.   *Process leading to Publication of the Final Rule***

Prior to the publications of the challenged regulations, the final version of which is the subject of these proceedings, the Unions and the Agencies held several meetings to discuss the establishment of a new labor relations system.  No representative from OPM attended the first of these meetings, which was the only meeting held within the 60-day period after enactment of the statute.  *See* 5 U.S.C. § 9902 (m)(3)(D)("The process for collaborating with employee representatives provided for under this subsection shall begin no later than 60 days after the enactment of this subsection.").  At some of these meetings, the Unions objected to the Agencies' concept for a new labor relations system.  During the meetings, DoD presented documents to the Unions outlining some new concepts for the labor relations system, but they were not proposed rules.

During the summer of 2004, the Unions learned that the Agencies had convened working groups to draft proposed regulations for a new labor relations system.  Plaintiffs requested the opportunity to participate in these groups and information about the groups' progress, including preliminary draft proposals or other work products seen or produced by the

17

groups.  The Agencies did not provide or agree to provide the requested information.

On February 14, 2005, defendants published the proposed regulations in the Federal Register.  70 Fed. Reg. 7552. Plaintiffs submitted comments which contained objections to various provisions of the regulations.  The parties met to discuss the proposed regulations in April, May, and June of 2005. Plaintiffs continued to press their objections to the regulations and presented packages of their own proposals.  Defendants responded by informing plaintiffs that the Agencies are entitled to modify the provisions of chapter 71 pursuant to 5 U.S.C. § 9902.

The last meeting before the final regulations were issued took place on June 16, 2005.  At that meeting, plaintiffs contend, they were advised that defendants had no intention of changing any portion of the proposed labor-management regulations to accommodate plaintiffs' objections.  Defendants note that the Agencies made numerous changes to the proposed regulations in response to objections and comments from plaintiffs.

On November 1, 2005, the DoD Secretary and OPM Director jointly promulgated final regulations establishing a labor relations system and a human resources management system for DoD. 70 Fed. Reg. 66116-66220 (Nov. 1, 2005).

**D.      *Regulations Governing Labor Management Relations System (Subpart I)***

Subpart I, 70 Fed. Reg. 66210-66220 (§§ 9901.901-9901.928), contains the regulations that establish DoD's labor-management relations system under 5 U.S.C. § 9902(m).  The regulations purport to satisfy the NDAA's requirements that the new labor relations system "address[] the unique role that the Department's civilian workforce plays in supporting the Department's national security mission," "promote[] a collaborative issue-based approach to labor management relations," and to "recognize the rights of DoD employees to organize and bargain collectively, as provided for in 5 U.S.C. 9902." *Id.*

**1.   Duty to Bargain and Consult**

The rule provides that "[e]ach employee has the right to form, join, or assist any labor organization . . . freely and without fear of penalty or reprisal . . . [and] [t]o engage in collective bargaining with respect to conditions of employment through representatives chosen by employees . . . ."  5 C.F.R. § 9901.906.  DoD must "meet and negotiate in good faith . . . for the purpose of arriving at a [collective bargaining agreement]," 5 C.F.R. § 9901.917(a).  In addition, it is an unfair labor practice ("ULP") for DoD to "refuse . . . to negotiate in good faith or to consult with a labor organization as required by [subpart I of the rule]." 5 C.F.R. § 9901.916(a)(5).

As in chapter 71, the term "collective bargaining" is

19

defined as "to consult and bargain in a good faith effort to reach agreement . . . with respect to the conditions of employment affecting such employees . . . ."  5 C.F.R. § 9901.903; 5 U.S.C. § 7103(a)(12).  The new rule defines "conditions of employment" to include "personnel policies, practices and matters affecting working conditions – whether established by rule, regulation or otherwise . . . ."  5 C.F.R. § 9901.903.  Management is prohibited from bargaining over "policies, practices, and matters" relating to, among other things, "[t]he pay of any employee or for any position, including any determinations regarding pay or adjustments thereto under subpart C of [the regulations]."  *Id.*

Consistent with chapter 71, the duty to bargain does not extend to "matters that are inconsistent with law or the regulations in [Part 9901], Governmentwide rules and regulations."  *Id.*, 5 U.S.C. § 7117(a)(1).  In a departure from chapter 71, the new regulations also exclude from the duty to bargain "issuances and implementing issuances."  *Id.* at 66217 (§ 9901.917(d)(1)); 5 U.S.C. § 7117(a)(1)-(3).  Management also "has no obligation to bargain or consult over a change to a condition of employment unless the change is otherwise negotiable . . . and is foreseeable, substantial, and significant in terms of both impact and duration on the bargaining unit . . . ."  *Id.* (§ 9901.917(d)(2)).

### 2.    Management Rights

The regulations further limit DoD's general obligation to bargain with respect to "conditions of employment" by designating certain categories of agency actions as "management rights," *i.e.*, actions that DoD management retains the right to take without engaging in collective bargaining.  5 C.F.R. § 9901.910(a) and (b).  Consistent with chapter 71, management retains the right to determine the agency's "mission, budget, organization, number of employees, and internal security practices," "to hire, assign and direct employees," to contract out functions, "to determine the personnel by which [] operations may be conducted," and to lay off, retain, discipline, reduce in pay, and promote employees.  5 C.F.R. § 9901.910(a)(1)-(3)); 5 U.S.C. § 7106(a)(1), (a)(2), and (b)(1).  The new regulations further expand management rights to permit DoD to "take whatever other actions may be necessary to carry out the Department's mission."  5 C.F.R. § 9901.910(a)(2).  The new rule substantially changes the corresponding provision in chapter 71, which prohibits bargaining on "whatever actions may be necessary to carry out the agency mission *during emergencies*." 5 U.S.C. § 7106(a)(2)(A)-(D)(emphasis added).

Chapter 71 also requires bargaining over procedures which management officials will observe when exercising any authority under 5 U.S.C. § 7106(a).  In contrast, the new regulations

expressly limit negotiation of procedures except those for hiring, layoff, or discipline, unless the Secretary determines otherwise.  5 C.F.R. § 9901.910(b),(c),(f)(1)(i).  Notwithstanding this prohibition, the Secretary may authorize bargaining over such procedures if he determines, in his discretion, that bargaining is "necessary to advance the Department's mission or promote organizational effectiveness."  5 C.F.R. § 9901.910(c).  In the absence of such a determination, management is only required to "consult" with an exclusive representative over such procedures.  5 C.F.R. § 9901.910(d).

Prior to the new rule, management and labor organizations were required to negotiate appropriate arrangements for employees adversely affected by the exercise of management rights.  5 U.S.C. § 7106(b)(3).  The new rule narrows the definition of "appropriate arrangements" by removing from the duty to bargain "proposals on matters such as the routine assignment to specific duties, shifts, or work on a regular or overtime basis," unless the Secretary authorizes such bargaining.  5 C.F.R. § 9901.910(f)(2).

The new regulations also provide that "mid-term agreements" with respect to the management rights identified in paragraphs (a)(1) and (a)(2) of the new rules are not "precedential or binding on subsequent acts . . . ." 5 C.F.R. § 9901.910(h).

If an obligation exists to bargain regarding the exercise of a management right, management must "provide notice to the

exclusive representative concurrently with the exercise of that authority," but "*may* provide notice . . . of its intention to exercise [a management right] as far in advance as practicable." 5 C.F.R. § 9901.910(e)(emphasis added).  However, "[n]othing will delay or prevent the Secretary from exercising his or her authority under [subpart I of the rule]." 5 C.F.R. § 9901.910(i).

### 3.    Resolution of Labor Disputes

The new regulations also create the National Security Labor Relations Board ("NSLRB"), 70 Fed. Reg. 66212 (§§ 9901.907, 9901.908), which adjudicates certain matters previously decided by the Federal Labor Relations Authority ("FLRA") in the first instance.[3] 5 C.F.R. § 9901.908(b) *with* 5 U.S.C. §§ 7105, 7118.[4] NSLRB decisions concerning certain ULPs, exceptions to arbitration awards, and negotiability of disputes may be appealed to the FLRA, but the FLRA must sustain the NSLRB's decision unless it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, based on a procedural error, or unsupported by substantial evidence.  5 C.F.R. § § 9901.908(b), 9901.909(a)(4) and (c).  Other matters, including

---

[3]The Board has authority to "conduct investigations and resolve allegations of unfair labor practices," to "resolve issues relating to the scope of bargaining and the duty to bargain in good faith," to "resolve exceptions to arbitration awards," and to "resolve negotiation impasses."  5 C.F.R. § 9701.908(b).

[4]Plaintiffs have never contended that this rule is an unlawful departure from chapter 71.

the determination of appropriate bargaining units, supervision of elections, and disputes regarding national consultation rights, will be heard in the first instance by the FLRA.  5 C.F.R. § 9901.909(a)(3).

Members of the NSLRB will serve terms of three years, although the Secretary may extend the term "to provide for an orderly transition and/or appoint the member for up to two additional one-year terms."  5 C.F.R. § 9901.907(b)(1).  Board members are appointed by the Secretary "at his or her sole and exclusive discretion"; he need only "consider" any lists of nominees submitted by labor organizations."  5 C.F.R. § 9901.907 (d)(1).  Board members must be "independent, distinguished citizens of the United States who are well known for the integrity, impartiality, and expertise in labor relations, and/or the DoD mission and/or related national security matters. . . " *Id.* at (b)(2).  If "the Secretary determines that additional members are needed," he may appoint additional members, provided they meet the criteria of (b)(2).  *Id.* at (e).  Members may be removed "by the Secretary only for inefficiency, neglect of duty, or malfeasance in office."  *Id. At* (b)(2).  NSLRB decisions regarding unfair labor practices, arbitral awards, and negotiability disputes are subject to review by the FLRA.  5 C.F.R. § 9901.909(a)(4).

**4.    Impact of the Regulations on Existing Collective
        Bargaining Agreements**

Chapter 71 states that it is a ULP for an agency to "enforce
any rule or regulation. . . which is in conflict with any
applicable collective bargaining agreement ("CBA") if the
agreement was in effect before the date the rule or regulation
was prescribed."  5 U.S.C. § 7116(a)(7).  The new regulations, in
contrast, provide, "[a]ny provision of a [CBA] that is
inconsistent with this part and/or implementing issuances is
unenforceable."  5 C.F.R. § 9901.905(a).  The term "implementing
issuance" is defined as a document issued by the Secretary or
certain other designated DoD officials to "carry out a policy or
procedure implementing [the NSPS regulations]."  5 C.F.R. §
9901.103 (definition of "implementing issuance").  As
distinguished from implementing issuances, an "issuance" is
defined as a document issued by these same officials to "carry
out a policy or procedure of the Department" other than
implementation of the NSPS regulations.  5 C.F.R. § 9901.903
(definition of "issuance").  Under the new regulations, it is a
ULP to "enforce any issuance (other than an implementing
issuance), or Governmentwide regulation, which is in conflict
with an applicable [CBA] if the agreement was in effect before
the issuance or regulation was prescribed." 5 C.F.R. §
9901.916(a)(7).  This same distinction is reflected in §
9901.914(d)(5) of the rule:

> Provisions in existing [CBAs] are unenforceable if they
> are contrary to Federal law, Presidential issuance
> (*e.g.*, Executive order), the regulations in this part,
> or implementing issuances. Provisions in existing
> [CBAs] that are inconsistent with Government-wide
> regulations or issuances (other than implementing
> issuances), are unenforceable upon expiration,
> extension, renewal, or renegotiation of the [CBA],
> whichever occurs first.

5 C.F.R. § 9901.914(d)(5). Union representatives may appeal a DoD

determination that any provision in a CBA is unenforceable to the

NSLRB and ultimately to the FLRA. 5 C.F.R. §§ 9901.905(a),

9901.908(b)(2) and (b)(4), 9901.909(a)(4), and 9901.920.

## E.   *Regulations Governing Adverse Actions and Appeals (Subparts G and H)*

The new regulations also modify certain standards and

procedures governing adverse personnel actions and appeals.  70

Fed. Reg. 66205-207 (Subpart G – Adverse Actions) and 66208-210

(Subpart H – Appeals).  An employee must be given 15 days advance

written notice of a proposed adverse action, an opportunity to

reply, and a decision notice specifying the reasons for any

adverse action taken.  5 C.F.R. §§ 9901.713-9901.726.  If the

employee files an appeal, the MSPB is required to refer the

matter to an administrative judge ("AJ") for adjudication.  5

C.F.R. § 9901.807(a)(2)(ii).  The AJ must render an initial

decision within 90 days after the appeal is filed, 5 C.F.R. §

9901.807(f)(1), and must sustain the action if it is supported by

a preponderance of the evidence unless the employee demonstrates

26

a harmful procedural error, or that the action was based on a prohibited personnel practice or not in accordance with law.  5 C.F.R. § 9901.807(e)(1).[5]  If the action is sustained, the new rule provides that the AJ may not modify the penalty imposed by the agency unless it is found to be "totally unwarranted in light of all pertinent circumstances." 5 C.F.R. § 9901.807(f)(2).

The AJ's initial decision will become DoD's final decision 30 days after it is issued unless either party files a request for reconsideration ("RFR").  5 C.F.R. § 9901.807(g)(1). If an RFR is filed, the AJ's decision will become DoD's final decision 30 days after the request is filed unless DoD notifies the parties that it will act on the RFR.  5 C.F.R. § 9901.807(g)(2). If DoD decides to act on the RFR, the other party will be provided an opportunity to respond.  *Id.*

After receipt of a timely response, DoD can either remand the matter, or modify or reverse the AJ's initial decision if it determines that there has been a "material error of fact" or that there is "new and material evidence that, despite due diligence, was not available when the record was closed." 5 C.F.R. § 9901.807(g)(2)(ii)(A).  DoD can also modify or reverse the AJ's

---

[5]The regulations also provide that neither the AJ nor the full MSPB may reverse an action "based on the way in which the charge is labeled or the conduct characterized, provided that the employee has sufficient notice to respond to the charge," 5 C.F.R. § 9901.807(f)(3), or "based on the way a performance expectation is expressed, provided that the expectation would be clear to a reasonable person." *Id.* (§ 9901.807(f)(4)).

initial decision if DoD determines that the decision has a "direct or substantial adverse impact on the Department's national security mission or is based on an erroneous legal interpretation." 5 C.F.R. § 9901.807(g)(2)(ii)(B). Alternatively, DoD can issue a final DoD decision affirming the AJ's initial decision. 5 C.F.R. § 9901.807(g)(2)(C).

After DoD's decision becomes final, the employee can file a petition for review of DoD's final decision by the full MSPB, which can order corrective action only if it determines that the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, obtained without procedures required by law or regulation having been followed, or unsupported by substantial evidence. 5 C.F.R. § 9901.807(h)(2). Final decisions of the MSPB are subject to judicial review in the Federal Circuit. 5 C.F.R. § 9901.807(i).

The rule also creates a category of "mandatory removal offenses" (MROs), which are offenses that the Secretary has determined "have a direct and substantial adverse impact on the Department's national security mission" and, according to the rule, require mandatory removal of the employee from his or her position. 5 C.F.R. § 9901.712(a). The appeals process for MROs differs in three key ways from the general appeals process established by the new regulations. First, the Secretary has "sole, exclusive, and unreviewable authority" to review and

approve of the issuance of an MRO.[6]  5 C.F.R. § 9901.712(a).

Second, only the Secretary can mitigate the penalty for an MRO.

5 C.F.R. § § 9901.712(c); 9901.808(b)-(c).  Finally, although

MROs can be reviewed by the full MSPB under the same standards

for other offenses, if the employee prevails, the regulations

allow DoD to propose a subsequent adverse action, which is not an

MRO, based in whole or in part on the same or similar evidence

that it used in the MRO.  5 C.F.R. § § 9901.808(d), 9901.712(d).

In that case, the employee must defend the subsequent charge

again at the beginning of the appeals process.  *Id.*

## III.        STANDARDS OF REVIEW

Summary judgment is appropriate when "the pleadings and

evidence 'show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a

matter of law.'" Fed R. Civ. P. 56(c).  *See Beverly Enter., Inc.*

*v. Herman*, 119 F. Supp. 2d 1, 3-4 (D.D.C.2000).  Dismissal for

failure to state a claim is appropriate when it is established

"beyond doubt that the plaintiff[s] can prove no set of facts in

support of [their] claim which would entitle [them] to relief."

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  The parties agree

that there are no genuine material facts that preclude judgment

in this matter.

---

[6]The offenses will be identified through the previously
discussed "implementing issuances."  *Id.*

Reviewing an agency's interpretation of a statute it is charged with implementing is a two step process. *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The Court must first ask "whether Congress has spoken directly . . . to the precise question at issue." *AFL-CIO v. FEC*, 333 F.3d 168, 172-73 (D.C. Cir. 2003).  If so, "that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.  If the statute is silent or ambiguous, however, the Court must undertake step two of the analysis and determine whether the agency's interpretation is reasonable.  The Court must uphold an agency's interpretation, even if that interpretation is not the only one the agency permissively could have adopted.  *See Rust v. Sullivan*, 500 U.S. 173, 184 (1991) (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778 n. 11).  However, the agency's interpretation must not be "flatly contradicted" by the plain language of the statute.  *IRS v. Fed. Labor Relations Auth.*, 494 U.S. 922, 928 (1990).

IV.     **JUSTICIABILITY**

A.   *Standing*

At the outset, defendants argue that plaintiffs do not have standing to challenge the appeals process and portions of the labor relations system because they have not alleged any injury in fact that is fairly traceable to the challenged regulations.

To satisfy the case or controversy requirement of Article III of the Constitution, a plaintiff must show (1) that it has suffered a concrete and particularized injury that is actual or imminent, not merely conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that injury is redressable by a favorable decision of this Court.  *See, e.g., Friends of the Earth v. Laidlaw Environmental Services,* 528 U.S. 167, 180-81 (1992); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

An organization can assert standing on behalf of its members.  *See United Food & Commercial Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 553 (1996) ("[A]n association has standing to sue on behalf of its members 'when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'").  An injury that "affects the organization's noneconomic interests" may be sufficient to establish standing.  *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990), *cert. denied* 498 U.S. 980 (1990).  Federal-sector unions have standing to challenge regulations that affect their abilities to represent the interests of their members in collective bargaining.  *NTEU v. Devine*, 577 F. Supp. 738, 743-45 (D.D.C.

31

1983), *aff'd*, 733 F.2d 114 (D.C. Cir. 1984).

Defendants argue that plaintiffs do not have standing to challenge the implementing issuances, §§ 9901.905(a) and 9901.917(d)(1); the restrictions on conduct of union representatives, § 9901.914(a); the "formal discussion" provisions, § 9901.914(a)(2); and the employee representatives' access to information from DoD management, § 9901.914(c)(2). Defendants also contend that plaintiffs have no standing to challenge the NSPS appeals process because no employee has suffered or will imminently suffer a "particularized injury" that is fairly traceable to these regulatory provisions.

Judge Collyer has analyzed this issue extensively in *Nat'l Treasury Employees Union v. Chertoff*, 385 F. Supp. 2d 1 (D.D.C. 2005) ("*Chertoff I*").  In that case, the Court found that the unions had standing to challenge regulations promulgated by the Department of Homeland Security before they were implemented. The Court held, "the harm to the Plaintiff Unions and to their members constitutes a real injury that is fairly traceable to the Regulations and a favorable decision would redress this injury." *Id.* at 19.

Despite their extensive briefings, defendants have not distinguished the facts of the present case from the facts in *Chertoff I*, and this Court is not persuaded that there are distinctions in the factual predicates.  Like the plaintiffs in

32

*Chertoff I*, the plaintiffs in this case are federal employee labor organizations directly affected by the challenged regulations.  Like the plaintiffs in *Chertoff I*, the plaintiff unions face significant changes to their collective bargaining rights, including the possibility that a collective bargaining agreement could be declared null and void.  *See id*.  Like the plaintiffs in *Chertoff I*, the proposed changes to the appeals process will be immediate and material.  *See id.* at 21.  Thus, substantially for the reasons articulated by Judge Collyer, the Court finds that plaintiffs have standing for all of their challenges.

**B.    *Ripeness***

Defendants also raise the same ripeness argument in this case as was raised in *Chertoff I*.  Citing *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 808 (2003), the defendants argue that the regulations have had no concrete effect on the plaintiffs and that the Court should reserve judgment until the regulations have been applied to an individual employee.

To determine whether an administrative action is ripe for review, courts must "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *National Park Hospitality Ass'n*, 538 U.S. at 808.

This Circuit has recently reiterated the high threshold required for a Court to find a challenge unripe for review. Under the first prong, the Court must "look to see whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, No. 04-5221, 04-5222, 04-5223, 04-5224, 2006 WL 250234, at * 3 (D.C. Cir. Feb. 3, 2006)(internal quotations omitted). If the issues raised are purely legal, then, in the context of a facial challenge, a claim is "presumptively reviewable." *Id.* at * 4. Under the second prong, the Court must consider "not whether [the parties] have suffered any 'direct hardship,' but rather whether postponing judicial review would impose an undue burden on them or would benefit the court." *Id.* at * 3. To reach the second prong, the Court must have "doubts about the fitness of the issue for judicial resolution." *Id.* Even if the Court did have such doubts, if the Court sees no "significant agency or judicial interests militating in favor of delay" then "[lack of] hardship cannot tip the balance against judicial review." *Id.*

There is no dispute that this is a facial challenge to the legality of the regulations under the NDAA. The question here, as in *Nat'l Ass'n of Home Builders*, is not whether the agency will exercise its discretion lawfully under the regulations, but

rather whether "its *faithful* application would carry the agency beyond its statutory mandate."  *Id.* (emphasis in original). Plaintiffs contend that the challenged regulations exceed the authority granted by Congress in the NDAA and that even if the Agencies implemented the regulations to the letter, the Agencies' actions would violate the statute.  Under these circumstances, the ripeness doctrine is "inapplicable."  *Id.*

Given the purely legal nature of plaintiffs' facial challenge to the regulations, the Court is persuaded that the issue is fit for judicial resolution and that plaintiffs' claims are ripe for review.

**V.      THE AGENCIES COMPLIED WITH THE PROCEDURAL REQUIREMENTS FOR COLLABORATION WITH LABOR ORGANIZATIONS IN THE DEVELOPMENT AND IMPLEMENTATION OF THE LABOR RELATIONS SYSTEM**

Plaintiffs argue that defendants ignored the statutory mandate that defendants act "in collaboration with, and in a manner that ensures the participation of, employee representatives in the development and implementation of [a] labor management relations system."  5 U.S.C. § 9902(m)(3). Plaintiffs maintain that defendants failed to give "full and fair" consideration to plaintiffs' recommendations.  5 U.S.C. § 9902(m)(3)(A)(iii).  In addition, plaintiffs contend that defendants failed to "meet and confer" with plaintiffs about areas in which defendants did not accept plaintiffs' recommendations, in violation of 5 U.S.C. § 9902(m)(3)(B)(i).

35

Defendants respond that they have met all of their statutory obligations.

The terms "meet and confer" mean something less than collective bargaining, but they do require that the parties meet in good faith. *See Chertoff I*, 385 F. Supp. 2d at 24 (finding that under the Homeland Security Act, "[w]hen Congress intended to deny collective bargaining rights and provide only advisory roles to employee representatives, it used different language"); *Va. R. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 547-48 (1937) (Railway Labor Act "requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable efforts to compose [their] differences").  The reduced obligations contemplated by "meet and confer" is also supported by the statute's provision that if the parties do not reach an agreement, the Secretary may implement any or all of the dispute parts of the proposal.  5 U.S.C. § 9902(m)(3)(C)(ii).  The statute makes clear that the Agencies' only duty is to conduct meetings in good faith.

The Court finds that there is no evidence that the Agencies acted in bad faith.  Although plaintiffs were understandably frustrated when defendants waited until the 60th day to begin the collaboration process, defendants nevertheless did comply with the statute.  *See* 5 U.S.C. § 9902(m)(3)(D).  Plaintiffs also contend that every meeting they attended prior to the publication

of the rule in February of 2005 was devoid of substance, and that
they were barred from the truly substantive meetings.  Although a
specific proposed system had not been developed at the meetings
held in the spring and early summer of 2004, however, plaintiffs
were provided with materials that focused on "the design
elements, options, and proposals under consideration for NSPS."
Again, although plaintiffs might have wished to provide input on
drafts of the regulations, the statute does not require that.
Rather, defendants were only required to "afford employee
representatives and management the opportunity to have meaningful
discussions concerning the development of the new system," 5
U.S.C. § 9902(m)(3)(A)(i), and give the recommendations "full and
fair consideration."  5 U.S.C. § 9902(m)(3)(D)(iii).

The notice and comment period provided plaintiffs with an
additional opportunity to provide input on the proposed
regulations.  Plaintiffs contend that when Congress required
"meaningful collaboration," it contemplated a more substantive
role for plaintiffs than notice and comment.  The notice and
comment process, however, was only a starting point for
collaboration with plaintiffs.  After the publication of the
rule, the parties met at face-to-face meetings nineteen times
during the period from April 18, 2005 to June 2, 2005.  At those
meetings the plaintiffs provided their recommendations on the
proposed rules.  Plaintiffs claim that they were told by

Undersecretary Charles Abell at a May 9, 2005, meeting that "it served little purpose to discuss the Unions' proposals . . . because the proposed regulations represented the Administrations' position on labor relations . . ." Roth Decl. ¶ 20 at 341.  Even presuming Mr. Abell made this comment, however, the parties proceeded to conduct eight additional meet and confer sessions.

In sum, while defendants' may not have met Congress' requirements with enthusiasm, the Court finds no evidence that defendants acted in bad faith and, therefore, is satisfied that the statute's requirements that they collaborate with plaintiffs have been satisfied.  The Court suspects, however, that more substantive meetings with plaintiffs could have helped defendants avoid the shortcomings of these regulations in providing for collective bargaining, as discussed below.

VI.      **THE STATUTE CLEARLY EXPRESSES CONGRESS' INTENT TO AUTHORIZE DEFENDANTS TO ESTABLISH A LABOR RELATIONS SYSTEM FOR DOD THAT MODIFIES THE REQUIREMENTS OF CHAPTER 71**

Neither party disputes that Congress conferred upon defendants some discretion to depart from chapter 71. Plaintiffs, however, contend that the statute unambiguously permits defendants only two narrow departures.  Plaintiffs maintain that because only two provisions directly conflict with chapter 71, they are the only provisions overridden by the "notwithstanding" clause of subsection (m)(1).  For all other provisions of subsection (m), chapter 71 remains in full force

and effect.   Plaintiffs argue that the legislative history in this case clearly supports this interpretation.   Defendants respond that the plain language of the statute clearly expresses Congress' intent that the Agencies be unconstrained by chapter 71 in establishing a new labor relations system.[7]

The Court must begin with the statute's language.   Section 9902(m)(1) provides:

> Notwithstanding section 9902(d)(2), the Secretary, together with the Director, may establish and from time to time adjust a labor relations system for the Department of Defense to address the unique role that the Department's civilian workforce plays in supporting the Department's national security mission.

5 U.S.C. § 9902(m).   As noted above, § 9902(d)(2) provides:

> Other nonwaivable provisions.   The other provisions of this part referred to in subsection (b)(3)(D) are (to the extent not otherwise specified in this title) . . . chapter 71.

5 U.S.C. § 9902(d)(2).   Section 9902(b)(3)(D) states:

> Any system established under subsection (a) shall . . . not waive, modify, or otherwise affect . . . any other provision of this part (as described in subsection (d)).

---

[7]Defendants have never contended that subsection (m)(1) conveys unlimited authority to depart from chapter 71.  Rather, they recognize that any modification of chapter 71 is limited to specific parameters set by subsection(m)(1):
> [Subsection] (m)(1) says Congress expected that these agencies would take a system that was designed for the entire government and adapt it to the unique role of the DOD civilian work force place.  That they  would take this system and consider the particular mission of the DOD, its particular needs, how should we go about adapting this system to meet those needs.  That's the authority provided by (m)(1).
Tr. 1/24/06 at 70-71.

5 U.S.C. § 9902(b)(3)(D).

Plaintiffs insist that the "notwithstanding" language of subsection (m)(1) does not apply to the entirety of subsection (m), but only to two specific parts of the subsection that directly conflict with chapter 71.  First, plaintiffs acknowledge that, contrary to requirements of chapter 71, Congress granted the Secretary the "authority to bargain at a level above the exclusive level of recognition," commonly called national level bargaining.  5 U.S.C. § 9902(m)(5).  Second, plaintiffs admit that Congress allowed defendants to create a new labor relations system that would "provide for independent third party review of decisions, including defining what decisions are reviewable by the third party, what third party would conduct the review, and the standard or standards for that review." § 9902(m)(6).  These two provisions, plaintiffs contend, are the portions of subsection (m) that directly conflict with chapter 71 and, therefore, are the only provisions that Congress intended to be captured by the "notwithstanding" language of subsection (m)(1).

Plaintiffs' reading of the statute is contrary to its plain language.  As the D.C. Circuit explained, "'*Notwithstanding any other provision of law . . .*' [a] clearer statement is difficult to imagine: [the phrase] must be read to override any conflicting law in existence at the time the [] Act was enacted." *Illinois National Guard v. FLRA*, 854 F.2d 1396, 1403 (D.C. Cir. 1988)

(emphasis in original).  In this case, rather than generally
stating "notwithstanding any other provision of law," the phrase
directly references § 9902(d)(2), thereby eliminating any
confusion about which law may conflict with the new labor
relations system.  Moreover, Section 9902(d)(2) anticipates the
waiver in (m)(1), stating that chapter 71 is unwaivable "to the
extent not otherwise specified in this title."  Finally, the
"notwithstanding" language appears at the very beginning of the
section concerning the new labor relations system, and in
reference to the general requirements of the system.  The clear
meaning of "notwithstanding," the cross-referencing within the
statute, and the placement of the "notwithstanding" clause at the
beginning of the subsection, persuade the Court that Congress
expressly authorized defendants to establish a labor relations
system that departs from chapter 71 in numerous respects other
than the two areas identified by plaintiffs.  The language of the
statute "really could not be clearer."  *Illinois National Guard*,
854 F.2d at 1402.

Plaintiffs contend that this reading of *Illinois National
Guard* runs counter to the requirement that courts must do their
best to harmonize conflicting statutes.  *Id.* at 1405.  According
to plaintiffs, *Illinois National Guard* stands for the proposition
that "notwithstanding" overrides other laws only if, and to the
extent that, other laws conflict with the terms of the statutes.

The Court should first decide if there is a conflict at all, and if a conflict is identified, the Court should try to harmonize any conflicts in the statute as much as possible.

By properly harmonizing the statute, plaintiffs argue, sections 9902(m) and 9902(d)(2) do not conflict.  Section 9902(d) allows departures from chapter 71 only to the extent that departures are "specified" in § 9902.  5 U.S.C. § 9902(d).  Those specifications can be found only in § 9902(m)(5) and (m)(6), because only those two provisions directly depart from chapter 71.

Plaintiffs misread *Illinois National Guard*.  The language in that case was "notwithstanding any other law."  Therefore, the Court in *Illinois National Guard* was engaged in a general inquiry about what other laws the phrase might reference.  In the present case, by contrast, the language is "[n]otwithstanding § 9902(d)(2)."  Therefore, the Court need not conduct a general inquiry about what law might conflict with chapter 71.  Congress was crystal clear that § 9902(d)(2) conflicts with subsection (m)(1) and, therefore, is overridden.

Moreover, plaintiffs' interpretation leads to an absurd result.  Plaintiffs essentially ask the court to find that "[n]otwithstanding section 9902(d)(2)" only vaguely alludes to a waiver of chapter 71, while the provisions of (m)(5) and (m)(6) expressly permit the Agencies to waive chapter 71's requirements.

To the contrary, the more specific waiver of chapter 71 is found in the "notwithstanding" clause of (m)(1); subsections (m)(5) and (m)(6) do not even mention chapter 71.

The plain and most harmonious reading of the statute is that the conflict is not between (d)(2) and (m)(5)-(6), but between (d)(2) and its cross-reference in (m)(1).[8]  This reading gives full effect to every part of the statute.  *See Whitman v. Am. Truck Ass'n*, 531 U.S. 457, 477-85 (2001) (holding an agency's statutory interpretation unreasonable because it completely nullified another applicable provision of the Act and that the two provisions must be read together).

Under plaintiffs' interpretation, subsection (m)(9) would not make sense.  *See* 5 U.S.C. § 9902(m)(9) ("Unless it is extended or otherwise provided for in law, the authority to establish, implement and adjust the labor relations system developed under this subsection shall expire six years after the date of enactment of this subsection, at which time the provisions of chapter 71 will apply.").  Plaintiffs argue that this provision merely indicates that chapter 71 will apply in its entirety after the authority granted by subsection (m) expires;

---

[8]Plaintiffs make a related point that also draws the wrong comparison.  Plaintiffs argue that the Agencies' authority under (m)(1) does not conflict with any provision of chapter 71.  Pl. Opp. at 7.  Again, the relevant "conflict" in the statute is not between subsection (m)(1) and chapter 71, but between subsections (d)(2) and (m)(1).  This is no conflict at all; it is merely cross-referencing within the statute.

in other words, after six years, the two exceptions to chapter 71 set forth by (m)(5) and (m)(6) will no longer be in effect.

Again, plaintiffs' interpretation ignores the statute's plain language. Subsection (m)(9) refers to "the authority to establish, implement and adjust the labor relations system under this subsection." This language tracks the language of (m)(1), not (m)(5)-(m)(6). *See* 5 U.S.C. § 9901(m)(1)(providing that the Agencies, "may establish and from time to time adjust a labor relations system. . . ."). Moreover, subsection (m)(9) refers to "this subsection" which is, presumably, subsection (m). Had Congress intended to restrict the sunset provisions of (m)(9) to refer only to (m)(5) and (m)(6), Congress could have easily substituted the appropriate cross-references instead of using the more general term "subsection."

Plaintiffs also urge the Court to look to the legislative history in support of their interpretation. When a statute is unambiguous, however, the plain language will control absent "extraordinary circumstances." *Holly Sugar Corporation, et al. v. Michael Johanns*, Civil No. 05-5067 2006 WL 276945 at * 3 (D.C. Cir. Feb. 7, 2006). Moreover, "the conference committee report is the most persuasive evidence of congressional intent after [the] statutory text itself." *Moore v. District of Columbia*, 907 F.2d 165, 175 (D.C. Cir. 1990)(en banc).

Despite the Court's invitation to the parties to provide

**44**

additional briefing on this issue, plaintiffs have failed to set forth any circumstances, let alone extraordinary circumstances, that would persuade the Court to look to the legislative history upon which plaintiffs rely.  As in *Holly Sugar*, the statute here clearly exempts DoD's labor relations system from the requirements of chapter 71.  Moreover, the legislative history here "falls far short of the 'extraordinary circumstances' in which a statute's unambiguous language might not control."  *Id.*

Even if the requisite extraordinary circumstances were present, plaintiffs did not rely upon a single quotation from the Conference Report, the most persuasive evidence of legislative intent.  Instead, plaintiffs continue to argue that Senators Levin's and Collins' statements about the conference report "are the best evidence of the Conference Committee's intent . . . ."  Pl. Resp. to Ct.'s Feb. 7, 2006 Order at 2.

Given the clear language of the statute, the lack of extraordinary circumstances which might require the Court to look to the legislative history, and the lack of persuasive legislative history to which the Court can look, the Court has no need to refer to the legislative history.  Congress clearly authorized defendants to establish a labor relations system that modifies chapter 71 to the extent that those departures "address the unique role that the Department's civilian workforce plays in supporting the Department's national security mission."  5 U.S.C.

45

§ 9902(m)(1).

## VII.    THE STATUTE CLEARLY EXPRESSES CONGRESS' INTENT THAT THE NSPS ENSURE COLLECTIVE BARGAINING

Although Congress granted broad authority to the Agencies to develop a labor relations system, that authority is limited by requirements that the system be "flexible," "contemporary," and that it "ensure that employees may organize, bargain collectively as provided for in this chapter, and participate through labor organizations of their own choosing in decisions which affect them, subject to the provisions of this chapter and any exclusion from coverage or limitation on negotiability established pursuant to law."  5 U.S.C. § 9902(b)(1),(2), (4).  Plaintiffs argue that the new regulations violate subsection (b)(4) because they totally eliminate the statutory right to collective bargaining. Defendants respond that subsection (b)(4) contains the qualifying clause "as provided for in this chapter," thereby making the scope of the obligation subject to § 9902(m).

As discussed at length above, the plain language of subsection (m)(1) is crystal clear.  5 U.S.C. § 9901(m)(1) ("Notwithstanding section 9902(d)(2), the Secretary, together with the Director, may establish and from time to time adjust a labor relations system for the Department of Defense to address the unique role that the Department's civilian workforce plays in supporting the Department's national security mission."). Congress so closely cross-referenced subsections (d)(2) and

(m)(1) that there can be no confusion that the labor relations system need not be constrained by chapter 71, if it complies with other requirements of (m)(1).

The clarity of this language, however, is a double-edged sword for defendants. Although there is no doubt that (d)(2) is overridden by (m)(1), there is just as little doubt that (b)(4) is not overridden. Had subsection (m)(1) made the more general assertion "notwithstanding any other provision in this chapter" or "notwithstanding any other law," then defendants' interpretation would be correct. The language Congress used in this statute, however, is indicative of its more limited intent to override only subsection (d)(2).

Defendants' argument that "subject to the provisions of this chapter" means that the requirements of (b)(4) are limited by (m)(1) would render both provisions meaningless. First, as noted above, this reading ignores the specific language of (m)(1) that only (d)(2) is overridden. Second, even if the right to "bargain collectively" has a peripheral relevance to other parts of the statute, collective bargaining is a central issue to any labor relations system. It is difficult to understand the purpose of (b)(4) if it is inapplicable to the labor relations system.

The better reading, which gives meaning to all parts of the statute, is to interpret (b)(4) to acknowledge that chapter 71 may be modified but that despite the authorized modifications,

the new system must ensure that the principles of collective bargaining are not totally eviscerated.  By requiring that NSPS retain the core components of collective bargaining, subsection (b)(4) acts as a qualifier to (m)(1)'s override of (d)(2).

The scope and status of collective bargaining rights in this case, therefore, are very similar to scope and status of the collective bargaining rights addressed in *Chertoff I.  See Chertoff I*, 385 F. Supp. 2d at 6.  In that case, Congress created the Department of Homeland Security ("DHS") and authorized it to develop a human resources management system.  *Id.*  There, as here, Congress required that the system be "flexible" and "contemporary."  *Id.* at 9.  The statute at issue in *Chertoff I* also required that the system "ensure[] that employees may organize, bargain collectively, and participate in labor regulations of their own choosing. . . ."  *Id.*

Defendants are correct that the collective bargaining requirement in *Chertoff I* differs from the corresponding provision in this case, 5 U.S.C. § 9902(b)(4)(the human relations management system must "ensure that employees may organize, bargain collectively *as provided for in this chapter. . . .*")(emphasis added).  *Compare* 5 U.S.C. § 9902(b)(4) *with* 5 U.S.C. § 9701(b)(4).  The statutes as a whole are symmetrical, however, because the statute in *Chertoff I* did not list chapter 71 as unwaivable.  *Compare* 5 U.S.C. § 9902(d)(2) *with* 5 U.S.C. §

9701(c)(2).  Therefore, both statutes recognize a right to collective bargaining which need not conform to chapter 71 but still must retain its core components.  In both statutes, collective bargaining is an independent statutory requirement. Congress was clear that the Agencies cannot "sacrifice collective bargaining in the interests of flexibility."  *Chertoff I*, 385 F. Supp. 2d at 30.

Given the similarities in the status of collective bargaining rights in the two statutes, as well as the striking similarities between the regulations at issue in both cases, the Court finds the *Chertoff I* court's reasoning applicable in this case.  Specifically, as was the case in *Chertoff I*, this Court concludes that, contrary to the plain language of § 9902(b)(4), the new rule fails to ensure even minimal collective bargaining rights.

"The *sine qua non* of good-faith collective bargaining is an enforceable contract once the parties reach an agreement."  *See Chertoff I*, 385 F. Supp. 2d at 25.  As in *Chertoff I*, the regulations concerning management rights fail in this case because "any collective bargaining negotiations pursuant to its terms are illusory: the Secretary retains numerous avenues by which s/he can unilaterally declare contract terms null and void, without prior notice to the Unions or employees and without bargaining or recourse."  *Id.*  The Court will address plaintiffs'

challenges to these rights in turn.

**A.    *Actions to Necessary to Carry out the Department's Mission***

One such avenue referenced by the *Chertoff I* court, and identically worded in both the DHS and DoD regulations, is the right of any "management official or supervisor of the Department to take whatever other actions may be necessary to carry out the Department's mission." *Compare* 5 C.F.R. § 9701.511(a)(2) *with* 5 C.F.R. § 9901.910(a)(2).  Defendants argue, as they did in *Nat'l Treasury Employees Union v. Chertoff*, 394 F. Supp. 2d 137 (D.D.C. 2005)("*Chertoff II*"), that this regulation is only a minor modification of the provision under chapter 71, which permits agencies to take actions "necessary to carry out the agency mission during emergencies." *Chertoff II*, 394 F. Supp. 2d at 142-43.  The new regulations simply omit the phrase "in emergencies." *Id.*  The Court agrees with the *Chertoff II* court that this deletion is "no mere modification but, instead, the assertion of full authority to follow or ignore the terms of collective bargaining agreements almost at will." *Id.* at 143. Thus, these regulations fail to ensure collective bargaining rights.

**B.    *Issuances and Implementing Issuances***

The regulations in both *Chertoff I* and this case also permit the Agencies to take any matter off of the bargaining table with the issuance of department-wide directives. *Compare* 5 C.F.R. §

9701.518(d) ("Management may not bargain over any matters that
are inconsistent with law or the regulations in this part,
Governmentwide rules and regulations, Departmental implementing
directives and other policies and regulations, or Executive
orders.") *with* 5 C.F.R. § § 9901.905 ("Any provision of a
collective bargaining agreement that is inconsistent with this
part and/or implementing issuances is unenforceable.");
9901.917(d)(1)("Management may not bargain over any matters that
are inconsistent with . . . regulations in this part . . .
issuances and implementing issuances").  In both cases, the
regulations also permit management to breach any collective
bargaining agreement with an "implementing" issuance.

Defendants distinguish *Chertoff I* on the grounds that the
statute in that case did not contain an equivalent to 5 U.S.C. §
9902(m)(8), which expressly provides that the labor relations
system "shall be binding on all bargaining units in the
Department of Defense [and] all employee representatives of such
units . . . and shall supercede all other [CBAs] for bargaining
units in the Department of Defense."  Defendants contend that in
the present case, Congress, not the Agencies, made the judgment
that the labor relations system as a whole will supersede all the
existing collective bargaining agreements.

At the outset, the Court notes that 5 C.F.R. §
9901.917(d)(1) does not distinguish between issuances and

implementing issuances; either type could remove a matter from management's duty to bargain.  In this respect the regulations are similar to those in *Chertoff I,* in that both regulations give the Secretary "the power to take any matter off the bargaining table" with a simple issuance.  *See Chertoff I*, 385 F. Supp. 2d at 25.  Because the issuance need not be of an "implementing" variety, the power to restrict the duty to bargain is not conferred by § 9902(m)(8).

Second, the authority for an implementing issuance, as it is defined by regulations, is not derived from subsection § 9902(m)(8) but from § 9902(a) and (f)(1)(D).  *See* Preamble, 70 Fed. Reg. 66176 ("Congress authorized the Department to establish and implement the [human relations management] system by providing an alternative to collective bargaining for involving employee representatives in the planning, development, and implementation of that system and making this the exclusive process for their involvement."); 5 C.F.R. § 9901.103 (defining "implementing issuance" as "a document or documents issued by the Secretary, Deputy Secretary, Principal Staff Assistants (as authorized by the Secretary), or Secretaries of the Military Departments to carry out a policy or procedure implementing this part.").  The implementing issuance is a "tool" for the continuing development of the entire *human relations management system*, not just the labor relations system.  Implementing

issuances are subject to their own set of collaboration requirements under subsection (f).  *See* 5 U.S.C. § 9902(f)(1)(D). The implementing issuance, therefore, is distinguishable from the authority conferred by (m)(8), which governs only the initial establishment of the *labor relations system* through the collaboration requirements of § 9902(m)(3).

Defendants also argue that even if the authority for implementing issuances derives from subsection (f), because (f)(1) prescribes the "exclusive procedures" for employee representatives to participate in the development and implementation of the human resources management system, Congress did not intend to require adherence to the collective bargaining requirements of chapter 71.

As discussed at length above, however, Congress did require that the NSPS "ensure . . .  that employees may bargain collectively."  5 U.S.C. § 9902(b)(4).  The regulations related to implementing issuances are more than a small departure from chapter 71.  Rather, they permit DoD to continuously and completely eliminate collective bargaining.

Because the regulations allow DoD to take any matter off of the bargaining table with issuances and implementing issuances, and because the definition of "implementing issuance" places no limit on the collective bargaining agreements that can be nullified, the challenged regulations entirely eviscerate

collective bargaining, in violation of 5 U.S.C. § 9902(b).

## C.   *Procedures and Appropriate Arrangements*

The regulations regarding procedures and appropriate arrangements also suffer from the same deficiencies as those before the *Chertoff I* court.  As in *Chertoff I*, the regulations at issue here permit management to act without regard to notice or negotiations over the impact of its exercise of management rights or appropriate arrangements for employees affected by its actions.  *Chertoff I,* 385 F. Supp. 2d at 27. *Compare* 5 C.F.R.  § 9701.511(d) *with* 5 C.F.R. § 9901.910(f)(2).  *See also* 5 C.F.R. § 9701.511(e)(2)(ii) ("Appropriate arrangements within the duty to bargain do not include proposals on matters such as . . . [t]he routine assignment to specific duties, shifts, or work on a regular or overtime basis"); 5 C.F.R. § 9901.910(f)(2) ("Appropriate arrangements within the duty to bargain do not include proposals on matters such as the routine assignment to specific duties, shifts, or work on a regular or overtime basis except when the Secretary in his or her sole, exclusive, and unreviewable discretion authorizes such bargaining.").  Also as in *Chertoff I*, the regulations at issue in this case allow an exclusive bargaining representative to be present when management announces a new personnel policy but assures no prior notice or prior bargaining.  *Chertoff I*, 385 F. Supp. 2d at 27; 5 C.F.R. § 9901.914(a)(2).  Defendants have not provided, and the Court is

54

not aware of, any reason why these virtually identical regulations should be upheld and why this Court should not be persuaded by the decision of the *Chertoff I* court that identical regulations fail to ensure collective bargaining.

## D.    *Conduct of Employee Representatives*

One challenge not addressed by the *Chertoff I* court concerns § 9901.914(a)(4). 5 C.F.R. § 9901.914(a)(4)("Employee representatives employed by the Department are subject to the same expectations regarding conduct as any other employee, whether they are serving in their representative capacity or not."). Plaintiffs contend that this regulation puts a rhetorical muzzle on union representatives at the bargaining table and in other representative roles and will disable them from vigorously promoting the positions and interests of DoD employees.

In the comment section of the regulation, defendants explain that "the only conduct the revised standard is intended to stop is the rare, but utterly unacceptable use of vulgar or sexually explicit language, as well as physical intimidation by union officials." 70 Fed. Reg. at 6682. This comment, however, does not assure the Court that the rule will be implemented in such narrow circumstances. While defendants certainly have an interest in preventing assault of a supervisor, *Dept. of the Air Force v. F.L.R.A.*, 294 F.3d 192 (D.C. Cir. 2002), the regulations

at issue go far beyond that interest.

Defendants maintain that this regulation is a permitted departure from chapter 71, as authorized by subsection (m). Vigorous advocacy, however, is also central to the ability to collectively bargain.  The challenged regulation does not restrict merely "vulgar or sexually explicit language, or physical intimidation" by union representatives; rather, it prohibits employee representatives from engaging in conduct which differs in any way from that of other employees.  On its face, this regulation undercuts the very process with which collective bargaining is conducted, and conflicts with Congress' requirement that the human resources management system "ensure that employees may . . . bargain collectively as provided for in this chapter." 5 U.S.C. § 9902(b)(4).  Thus, the regulation is contrary to law.

**E.    *Non-Appropriated Fund Instrumentalities***

Plaintiffs also challenge regulations related to the payment of Non-Appropriated Fund Instrumentalities ("NAFIs").  *See* 5 C.F.R. § 9901.305 ("Pursuant to 5 U.S.C. § 9902(f)(4) and (m)(7), any pay program established under authority of this subpart is not subject to collective bargaining.  This bar on collective bargaining applies to all aspects of the pay program, including but not limited to coverage decisions, the design of pay structures, the settling and adjustment of pay levels, pay administration and rules and policies, and administrative

56

procedures and arrangements.").[9]  The regulations underscore that pay is exempt from collective bargaining in the definition of "conditions of employment," which excludes "the pay of any employee or for any position, including any determinations regarding pay or adjustments thereto."  5 C.F.R. § 9901.903.

In the final regulations, defendants explain that the rule was intended to avoid "expanding the scope of bargaining under NSPS to those matters not subject to bargaining today because they are governed by law or Governmentwide regulations."  70 Fed. Reg. 66138.  These regulations, however, could eliminate, rather than merely stop the expansion, of collective bargaining rights for NAFIs.

NAFIs provide a wide range of services including childcare facilities, food service facilities, post exchanges and other activities.  NAFIs are compensated with the revenue they generate rather than with funds from Congress.  While the compensation for the majority of DoD employees is established either in General Schedules, as provided in Chapter 51, or Wage Grades, as in chapter 53, NAFIs wages are not specifically provided for by statute.  Instead, labor organizations bargain over these matters under the provisions of chapter 71.  *Fort Stewart Schools v. FLRA*, 495 U.S. 641, 649 (1993).

---

[9]Plaintiffs note that this section was not included in the proposed regulations issued in February of 2005 and, therefore, no collaboration of any kind occurred under notice and comment or the provisions of 5 U.S.C. § 9902(f).

The parties agree that the NDAA permits defendants to waive the General Schedule and Wage Grades.  They also agree that *Fort Steward Schools* exempts NAFIs from the operation of General Schedules and that NAFIs were, up until the passage of the NDAA, entitled to negotiate pay under chapter 71.  Defendants also concede that for this group of employees, bargaining with respect to employee pay would not "expand the scope of bargaining under chapter 71" and is therefore not precluded by 5 U.S.C. § 9902(m)(7).

Indeed, defendants do not even dispute plaintiffs' assertion that the new regulations could eliminate all bargained pay and benefits established through collective bargaining and written into annual and multi-year collective bargaining agreements. Rather, defendants' sole claim is that because § 9902(f) does not require collective bargaining with respect to the planning, development, and implementation of NSPS, and because the Agencies are authorized to implement even portions of NSPS to which employees object, Congress intended to displace any collective bargaining requirements that apply to NAFIs.

The new regulations contemplate changes to collective bargaining agreements much broader than the implementation of the system.  Rather, they could potentially nullify the collective bargaining rights of NAFIs once and for all.  While Congress did grant the Agencies broad authority to develop and implement NSPS,

it specifically required the NSPS to "ensure that employees may
bargain collectively. . ."  5 U.S.C. 9902(b)(4).  To the extent
that the authority for the regulations is derived from subsection
(m), the statute does not assure NAFIs that the same bargaining
procedures as provided for in chapter 71.  The statute, however,
does not sanction the total elimination of collective bargaining
rights of NAFIs or any other employee.  Therefore, it cannot be
upheld.

**F.   *Conclusion on Collective Bargaining Rights***

     "A contract that is not mutually binding is not a contract.
Negotiations that lead to a contract that is not mutually binding
are not true negotiations.  A system of 'collective bargaining'
that permits the unilateral repudiation of agreements by one
party is not collective bargaining at all."  *Chertoff I*, 385 F.
Supp. 2d at 28.  Defendants in this case have eviscerated
collective bargaining rights with regulations nearly identical to
those invalidated by the *Chertoff I* court, despite virtually
identical requirements by Congress that each human resources
management system ensure collective bargaining.  The regulations
are contrary to § 9902(b)(4) because they establish a labor
relations system that fails to provide for collective bargaining.

**VIII.   THE CHALLENGED REGULATIONS FAIL TO PROVIDE DOD
          EMPLOYEES WITH INDEPENDENT THIRD PARTY REVIEW OF LABOR-
          MANAGEMENT DISPUTES**

     DoD's labor relations system must provide for "independent

third party review of decisions."  5 U.S.C. § 9902(m)(6). DoD is authorized to define "what decisions are reviewable by the third party, what third party would conduct the review, and the standard or standards for that review."  *Id.*

Statutory terms must be interpreted within their context. *Textron Lycoming v. United Automobile*, 523 U.S. 653, 657 (1998). The Court should also look to how Congress has used similar language in related contexts.  *Chertoff I*, 385 F. Supp. 2d at 24, n.16 (citing*, inter alia, W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991)).

The Court's decision in *Chertoff I* is instructive.  In that case, the enabling statute did not have a provision requiring independent third party review of labor management decisions. DHS, however, promulgated regulations establishing the Homeland Security Labor Relations Board ("HSLRB"), which corresponded in many respects to the NSLRB.

While the *Chertoff I* court did not find that the HSLRB undermined the traditional concept of collective bargaining, it expressed doubt that the HSLRB could be "an outside neutral adjudicator" or a "truly neutral outside[r]."  *Id.* at 29.  The Court cited to the NLRB (and, by extension, the later-created FLRA) as Congress' model for a "neutral outsider," contrasting the NLRB with the HSLRB which – like the NSLRB – both investigates and decides labor-management disputes. *Id.* at 19-20

& n.13; 5 C.F.R. § 9901.908.  It was only because, in the Court's view, Congress deliberately allowed the DHS to establish a system which did not incorporate the NLRB/FLRA neutral adjudicative model that the Court deferred to the Agency's interpretation of the statute and upheld the HSLRB. *Id.* at 29-30.

Unlike *Chertoff I*, the Court in this case does not reach step two of *Chevron*.  Here, Congress clearly required the Agencies to establish an "independent third party" to review labor disputes.  5 U.S.C. § 9902(m)(6).

This Court shares the concerns of the *Chertoff I* court that the third party established by the regulations is not independent.  In labor law, "independent third party" often refers to an arbitrator – or another separate entity or person – jointly selected by labor and management.  *See*, *e.g.*, *Chicago Typographical Union No. 16 v. Chicago Newspaper Publishers' Ass'n*, 853 F.2d 506, 509 n.6 (7th Cir. 1988) (interest arbitration and grievance arbitration involve "submission of disputes . . . to an independent third party").  The regulations at issue in this case, in contrast, require the Secretary only to "consider" the nominees submitted by labor organizations before making his appointments.  5 C.F.R. 9901.907(d)(1).  In addition, as noted by the *Chertoff I* court, the power of the NSLRB to both investigate and adjudicate disputes was rejected by Congress as unfair when it passed the Taft-Hartley Act in 1947, which amended

61

the National Labor Relations Act to create the position of
General Counsel of the National Labor Relations Board as
prosecutory and members of the NLRB as neutral adjudicators.
*Chertoff I*, 285 F. Supp. 2d 20 at n.13.

Further, contrary to defendants' assertion, this type of
adjudicatory body shares few attributes with other "independent"
bodies in the Executive branch.  For example, Contract Appeals
Boards and Administrative Law Judges are appointed subject to 5
U.S.C. § 3105 and accompanying regulations, which *inter alia*
provide for strict controls on employing agencies, require
appointments to be made only under the oversight of OPM, confer
appointees with civil service protections and the expectation of
lifetime careers, and deny agencies the ability to do performance
reviews. *See, e.g.,* 5 U.S.C.S § 3105 (history, ancillary laws and
directives stating appointments are made subject to civil service
laws); 5 C.F.R § 930.203 (oversight of OPM); 5 C.F.R. § 930.211
(no agency power to conduct performance reviews). Perhaps most
importantly, these appointees serve as adjudicators only, not as
investigators.  5 U.S.C. §§ 553, 554, 556.

In contrast, NSLRB members are appointed and serve at the
"sole and exclusive discretion" of the Secretary, they enjoy no
civil service protections, they are subject to agency performance
reviews, and they have both investigative and adjudicatory
functions.  5 C.F.R. §§ 9901.907(b),(c),(d); 9901.908.  The NSLRB

stands in stark contrast to the adjudicators to which the defendants attempt to compare them.

Defendants contend that the Court must consider the context of subsection (m)(6).  That provision, in addition to requiring an "independent third party," permits the Agencies broad discretion to determine "what decisions are reviewable by the third party, what third party would conduct the review, and the standard or standards for that review."  5 U.S.C. § 9902(m)(6).  According to defendants, the power to establish the NSLRB is authorized by its power to determine "what third party would conduct the review" and the "standards for that review."  This power, however, is limited by Congress' express requirement that the party be independent.  As discussed above, the NSLRB fails to satisfy that requirement.

Defendants also argue, relying on *Mistretta v. United States*, 488 U.S. 361 (1989), that the NSLRB is independent because the Secretary may only remove a member for "inefficiency, neglect of duty or malfeasance in office." 5 C.F.R. § 9901.902(b)(2).  This one procedural safeguard, however, cannot cure NSLRB's remaining deficiencies.

Finally, defendants maintain that because NSLRB decisions regarding unfair labor practices, arbitral awards, and negotiability disputes are subject to review by the FLRA, any lack of independence in the NSLRB can be corrected by the FLRA.

63

Defendants overlook, however, that their regulation gives the NSLRB unreviewable authority to decide negotiation impasses. 5 C.F.R. §§ 9901.909(a), 9901.920(d). This is a crucial component of any third party's scope of review, and Congress required that it be conducted by an independent third party.

Because the NSLRB does not satisfy Congress' requirement for an "independent third party" to review labor-management disputes, plaintiffs' challenges to the regulations establishing it are sustained.

**IX.      THE CHALLENGED REGULATIONS FAIL TO PROVIDE DOD EMPLOYEES FAIR TREATMENT**

Section 9902(h)(1) requires the Secretary to establish an appeals process that provides employees "fair treatment in any appeals that they bring in decisions relating to their employment." 5 U.S.C. § 9902(h)(1). The system also must "ensure that employees . . . are afforded the protections of due process." 5 U.S.C. § 9902(h)(1)(B). Subsection (h)(2) also provides: "Regulations implementing the appeals process may establish legal standards and procedures for personnel actions, including standards for applicable relief, to be taken on the basis of employee misconduct or performance that fails to meet expectations. Such standards shall be consistent with the public employment principles of merit and fitness set forth in section 2301." Section 2301(b)(8)(A) requires that "employees should be protected against arbitrary action."

Plaintiffs argue that the regulations established by the Agencies do not provide fair treatment and due process, improperly depart from chapter 71, and improperly circumscribe the MSPB's authority.  Defendants respond that the appeals process is fair because the regulations only modify DoD's own internal process; once DoD's decision is final, that decision is subject to independent administrative review by the MSPB and judicial review by the Federal Circuit.

The Court finds that the eventual review by the MSPB and the Federal Circuit are insufficient to meet Congress' requirement that the appeals process provide employees with fair treatment. Indeed, each of the regulations challenged by the plaintiffs demonstrate that the appeals process is the antithesis of fairness.  Because the process violates Congress' clear intent, the regulations fail at *Chevron* step one.[10]

## A.   *The Sections of the Regulations which Allow DoD to Modify or Reverse an Administrative Judge's Decision Fail to Satisfy Congress' Fair Treatment Requirement*

Section 9901.807(g)(2)(ii)(A) and (B) authorize DoD to reverse an AJ's decision if it determines that there has been "a

---

[10]Plaintiffs argue that even if the regulations survive *Chevron* step one, they are arbitrary and capricious.  Given the multiple layers of review and multiple standards, plaintiffs question defendant's contention that the new regulations provide a "streamlined approach" to the appeals process.  *See* 70 Fed. Reg. 66119, 66126, 66170, 66171, 66173.  While the Court does not reach step two at the juncture, it notes that the new system appears anything but streamlined.

material error of fact" or that the decision "has a direct and
substantial impact on the Department's national security
mission."  5 C.F.R. § 9901.807(g)(2)(ii)(A) and (B).  These
regulations, in effect, allow one party in a proceeding the right
to unilaterally modify or reverse the decision of an independent
administrative law judge.  While this standard may satisfy
Congress' requirement that the human resources system be
"flexible," the Court fails to see how it can be considered
"fair."

        Congress required that any appeals process established under
the NSPS must "provide employees . . . fair treatment in any
appeals that they bring in decisions relating to their
employment."  5 U.S.C. § 9902(h)(1)(A).  The insertion of a DoD
level of review after the AJ's decision and before the MSPB's
review is, at best, an added delay for the aggrieved employee who
seeks Congressionally-mandated arbitrary and capricious review by
the MSPB.  At worst, the new process allows DoD, a party to the
dispute, to unilaterally influence what is required by Congress
to be a fair process.  Under the new regulations, the identity of
the DoD personnel conducting the review is unknown.  The form,
substance or support required for any decision it would render is
unknown.  The regulations state that DoD may modify or reverse
the AJ "[i]f a determination is made" or "[w]here it is
determined" that the AJ made an error.  5 C.F.R. §

9901.807(g)(2)(ii)(A) and (B).  The regulations state no standard for that determination.  Moreover, any oversight of the DoD panel is unknown.

Defendants argue that fair treatment is ensured because its role occurs within its own agency decision-making process, which is then subject to independent administrative and judicial review.  This argument, however, ignores Congress' requirement fair treatment must be provided for "any appeals."  5 U.S.C. § 9902(h)(1)(A).  The appeals process begins when the employee seeks review of a disciplinary action.  Congress did not divide the appeals process, as defendants seek to do, into appeals before and after DoD's "final decision."  The Court is not persuaded that an employee seeking review of a disciplinary action by an administrative law judge is anything less than an appeal.

Further, the courts have "not . . . embraced the general proposition that a wrong may be done if it can be undone." *Bonnor v. Coughlin*, 545 F.2d 565, 577 (7th Cir. 1976) (*quoting Fuentes v. Shevin*, 407 U.S. 67, 92 (1972)).  Principles of fairness are not satisfied if an employee must expend all of his or her time and resources navigating an unfair appeals process simply because at some later stage the DoD's decision can be reviewed under the still deferential arbitrary and capricious standard.

Defendants maintain that its own level of review is necessary "to ensure that [AJ] decisions interpret NSPS and these regulations in a way that recognizes the critical mission of the Department."  70 Fed. Reg. 66174-75.  While this argument may satisfy Congress' flexibility requirement, Congress did not authorize the Agencies to hold flexibility above all other considerations.  To the contrary, although the statute sets forth the general requirement that the NSPS be "flexible," 5 U.S.C. 9902(b)(1), it also specifically requires that any appeals process established under the NSPS must "provide employees . . . *fair treatment* in any appeals that they bring in decisions relating to their employment." 5 U.S.C. § 9902(h)(1)(A)(emphasis added).

In sum, the regulations that permit DoD to modify or reverse an Administrative Judge's decision fail step one of *Chevron* review because they do not provide employees with "fair treatment" as contemplated by the statute.

**B.**   ***The Regulations Establishing the "Totally Unwarranted"
Standard and Requiring Arbitrators and MSPB Administrative
Judges to Impose the Maximum Justifiable Penalty Fail to
Provide Employees with Fair Treatment***

The new regulations also prohibit an AJ from modifying a penalty imposed by DoD "unless such penalty is totally unwarranted in light of all pertinent circumstances."  5 C.F.R. § 9901.807(f)(2)(ii).  If the AJ does mitigate the penalty, "the maximum justifiable penalty must be applied.  The maximum

68

justifiable penalty is the severest penalty that is not so disproportionate to the basis for the action as to be totally unwarranted in light of all pertinent circumstances." *Id.* at § 9901.807(f)(2)(iv).

Defendants argue that these standards are not contrary to Congress' "fair treatment" requirement because before the AJ reaches the mitigation phase, he or she must first determine that the adverse personnel action at issue is supported by a preponderance of the evidence.  5 C.F.R. § 9901.807(e)(1).  As detailed above, however, the regulations establish an appeals process in which DoD can modify or reverse either finding when the AJ's decision is appealed to the DoD level of review.

In assessing a similar standard promulgated by DHS, the *Chertoff I* court found that the regulations "put the thumbs of the Agencies down hard on the scales of justice in [the Agencies'] favor."  *Chertoff I*, 385 F. Supp. 2d at 35 (the regulations in that case provided that MSPB could not modify DHS's penalty "unless such penalty is so disproportionate to the basis for the action as to be wholly without justification." *Id.* at 14.).

Defendants distinguish the mitigation standard in the present case because it is imposed prior to DoD's final decision, rather than during the MSPB's final review, as in *Chertoff I.* Defendants, however, cannot use their intervening unfair level of

review to justify an unfair mitigation standard.   Two wrongs
cannot make a right.

Because this highly deferential standard exacerbates, rather
than corrects, the unfair appeals process established by the new
regulations, the "totally unwarranted" standard merely provides
further evidence that this process fails to provide employees
with fair treatment.

C.   **Contrary to law, the Regulations Concerning Interim Relief
Improperly Circumscribe the MSPB's Authority**

Section 9902(h)(4) of the NDAA provides that most DoD
employees who are removed, suspended, or furloughed by management
"shall have the right to petition the full Merit Systems
Protection Board for review. . . No personnel action shall be
stayed and no interim relief shall be granted during the pendency
of the Board's review unless specifically ordered by the Board."
5 U.S.C. § 9902(h)(4).   The final regulations provide that if the
Secretary, "in his or her sole, exclusive and unreviewable
discretion," determines that the employee's return is
"impracticable or unduly disruptive to the work environment," he
may place the employee in an alternative position or on an
excused absence.   5 C.F.R. § 9901.807(f)(5)(i).

Defendants argue that Section 9902(h)(4) is a limitation on,
not an expansion of, the MSPB's power to grant interim relief.
According to defendants, the statute simply states that MSPB must
exercise its power through specific orders, and not in any other

manner.  Moreover, the regulations, defendants maintain, do not restrict MSPB's power to grant interim relief, nor do they allow DoD to refuse to obey an MSPB order.  Rather, the rule merely enables the Secretary to reassign or place the employee on an excused absence if returning the employee to his or her prior position would be impractical or unduly disruptive.  The employee is still reinstated, will receive full pay and benefits, and is not charged any leave.

The Court cannot agree.  The new regulations permit the Secretary, in his "unreviewable discretion," to make a determination after the MSPB has made its own, independent decision regarding a personnel action.  There is no basis for this authority in the statute.  Congress said nothing about giving the Secretary unreviewable discretion to preclude an employee from returning to work by placing her in an alternate position or putting the her on paid leave.

Defendants argue that this regulation does not depart from chapter 77 in a meaningful way. *See* 5 U.S.C. § 7701(b)(2)(A)(ii)(permitting an employing agency to refuse to allow an employee who has received interim relief to return to the workplace if the agency, "determines that the return or presence of such employee . . . is unduly disruptive to the work environment.").  The similarities, however, are incomplete.  The new regulations also permit the Secretary to prevent an employee

71

to return if her presence would be "impracticable."  This is a substantial expansion of the Secretary's authority, despite Congress' clear intent that "no interim relief shall be granted" except by the Board.  Taken with the other shortcomings of the appeals process, the Court is not persuaded that this regulation ensures that employees will be treated fairly.

**D.  *The Regulations Establishing Mandatory Removal Offenses Fail to Satisfy the Fair Treatment Requirement***

Finally, the new regulations carve out a group of offenses called "Mandatory Removal Offenses" ("MROs").  5 C.F.R. § 9901.712.  This rule allows the Secretary, "in his sole, exclusive, and unreviewable discretion" to "identify offenses that have a direct and substantial adverse impact on the Department's national security mission."  *Id.* at (a).  An employee deemed to have committed one of these offenses would be removed from employment.

As described above, the appeals process for MROs differs in three key ways from the general appeals process established by the new regulations.  First, the Secretary must review and approve of the issuance of an MRO.[11]  5 C.F.R. § 9901.712(a). Second, only the Secretary can mitigate the penalty for an MRO. 5 C.F.R. §§ 9901.712(c); 9901.808(b)-(c).  Finally, even if the employee in an MRO proceeding prevails before the AJ or the full

---

[11]The offenses will be identified through the previously discussed "implementing issuances."  *Id.*

MSPB, the regulations allow DoD to propose a subsequent adverse action, which is not an MRO, based in whole or in part on the same or similar evidence that it used in the MRO.  5 C.F.R. § 9901.712(d).  If DoD pursues a subsequent action, the employee must begin the appeals process again under the "new" charges. *Id.*

Defendants argue that the MRO procedures are authorized by § 9902(h)(2) ("[r]egulations implementing the appeals process may establish legal standards and procedures for personnel actions, including standards for applicable relief, to be taken on the basis of employee misconduct or performance that fails to meet expectations.").  This authority, however, is discretionary; Congress used the word "may."  In contrast, the Agencies are required to ensure that any appeals process established under this subsection are provided "fair treatment."  If, therefore, new procedures are established, they *must* provide employees with fair treatment.

Defendants attempt to assure the Court that the standard for designating an MRO is high and, therefore, that these procedures will be reserved for the most serious offenses, such as aiding terrorism or engaging in sabotage.  Nothing in the definition of the MRO, or in the standard for its designation, however, restricts the Secretary in any such way.  Loss of life or even damage to property is not a required allegation; rather, the Secretary need only decide that a particular activity has "a

direct and substantial adverse impact on the Department's national security mission."  5 C.F.R. § 9901.712(a).  As discussed above, DoD has used the authority under § 9902(m) to severely restrict collective bargaining rights in the name of its "national security mission."  Given DoD's assumption up to this point that the "national security mission" need not provide for collective bargaining rights, the Court is troubled that nothing in the new regulations prevents routine acts of labor organizing to be considered contrary to the department's mission.

Defendants argue that Congress implemented a similar MRO system for the IRS.  The IRS procedure, however, demonstrates that Congress knew how to draft an MRO process if it wanted to authorize the DoD to implement one.  Rather, the statute in this case permits the Agencies to adopt an appeals process, as long as the process provides for "fair treatment."

In sum, the regulations establishing the appeals process for adverse actions clearly fail to provide employees with fair treatment and, therefore, are contrary to law.

**X.        SEVERABILITY OF SUBPART I**

"Whether the offending portion of a regulation is severable depends upon the intent of the agency and upon whether the remainder of the regulation could function sensibly without the stricken provision."  *MD/DC/DE Broadcasters Ass'n v. FCC* (*"MD/DC/DE Broadcasters Ass'n"*), 236 F.3d 13, 22 (D.C. Cir. 2001)

(citing *K-Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988)).
In evaluating agency intent, "[s]everance and affirmance of a
portion of an administrative regulation is improper if there is
'substantial doubt' that the agency would have adopted the
severed portion on its own." *Davis County Solid Waste Mgmt. v.
EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997)(per curium).  In
evaluating whether the remainder of the regulation could function
sensibly, the D.C. Circuit considers, for example, whether
severance would "impair the function of the remaining
regulations," *Davis County*, 108 F.3d at 1460, or "serve the goals
for which the regulation was designed." *MD/DC/DE Broadcasters
Ass'n*, 236 F.3d at 734.

The Court has substantial doubt that the agency would have
adopted Subpart I, which governs Labor-Management Relations,
without the offending provisions.  Taken as a whole, the design
of these regulations appears to rest on the mistaken premise that
Congress intended flexibility to trump collective bargaining
rights.[12]  The *Chertoff II* court, faced precisely this issue,

---

[12] The Government's argument at the motions hearing made this
presumption crystal clear:

> COUNSEL FOR THE GOVERNMENT: As explained in the
> preamble, the environment we're faced with today is
> much, much different than before.  We're not fighting
> conventional armies, we're fighting people that pop up
> here and there and wipe out a few civilians.
>
> The need to move people around quickly to deal with
> those situations is greater than its ever been before.

found it likely that "the remainder of the regulations would not have been passed but for the inclusion of the offending provisions." *Chertoff II,* 394 F. Supp. 2d at 144.

In view of the regulations' underlying goal to elevate flexibility over collective bargaining rights and the similarities between this case and *Chertoff I* and *II*, it is difficult to understand how the offending provisions can be severed from the remainder of the regulation.  Because the parties have not briefed this issue, however, defendants may submit a proposed order - which plaintiffs may address - that selectively enjoins Subpart I and is consistent with this Court's Memorandum Opinion.  Any proposed order must clearly distinguish the Court's reasoning in *Chertoff II.*

---

> You can't wait until the emergency arises because the act has already taken place, the people are dead, it's too late.  They have to be able to move right away, they have to be able to move quickly.
>
> So the agencies concluded that they have to be able to act not only during emergencies, but to prepare for and prevent emergencies.  And bear in mind what this provision authorizes is not anything and everything.
>
> THE COURT:  So then the workers rights, though, give way to that focus then?  That has to be what Congress intended, that the rights of the workers give way to that focus?
>
> COUNSEL FOR THE GOVERNMENT:  Absolutely.  And it's tied to the department's national security.  It's too important.

Tr. 1/24/06 at 90-91.

XI.        **CONCLUSION**

For the foregoing reasons, the Court concludes: (1) defendants satisfied their statutory obligation to collaborate with plaintiffs in the development of the labor relations system; (2) defendants lawfully departed from chapter 71 in establishing a labor relations system; (3) the new rule fails to ensure that employees can bargain collectively; (4) the NSLRB does not meet Congress' requirement for "independent third party review" of labor relations decisions; and (5) the process for appealing adverse actions fails to provide employees with "fair treatment" as required by the statute.

Therefore, plaintiffs' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART** and defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART.**  Because the regulations at issue are critical components to the entirety of Subparts G, H, and I, and the Court cannot determine whether other parts of the Subpart could operate independently of these infirmities, Subparts G, H, and I must be enjoined.  An appropriate Order accompanies this Memorandum Opinion.


Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **February 27, 2006**