# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 11, 2006        Decided May 18, 2007

No. 06-5113

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,
AFL-CIO, ET AL.,
APPELLEES

v.

ROBERT M. GATES,
SECRETARY OF DEFENSE, IN HIS OFFICIAL CAPACITY AND
LINDA M. SPRINGER, DIRECTOR, IN HER OFFICIAL CAPACITY,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv02183)

———

*William G. Kanter*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Peter D. Keisler*, Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, *Gregory G. Katsas*, Deputy Assistant Attorney General, *Thomas M. Bondy*, *Lewis S. Yelin*, and *Eric Fleisig-Greene*, Attorneys, *Frank R. Jimenez* and *Michael E. Reheuser*, Attorneys, Department of Defense, and *David B. Scholl* and *Robin M. Richardson*, Attorneys, Office of Personnel Management. *Joseph W. LoBue* and *Tara L. Grove*, Attorneys, U.S. Department of Justice, entered appearances.

2

Joe Goldberg argued the cause for appellees. With him on the brief were *Mark D. Roth*, *Susan Tsui Grundmann*, *Sally M. Tedrow*, *Keith R. Bolek*, and *Daniel M. Schember*. *Charles A. Hobbie* entered an appearance.

*Gregory O'Duden*, *Elaine Kaplan*, *Larry J. Adkins*, and *Robert H. Shriver III* were on the brief for *amicus curiae* National Treasury Employees Union in support of appellees. *Barbara A. Atkin* entered an appearance.

Before: TATEL and KAVANAUGH, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, in which *Senior Circuit Judge* WILLIAMS joins.

Dissenting opinion filed by *Circuit Judge* TATEL.

KAVANAUGH, *Circuit Judge*: This case arises out of a contentious dispute over the collective bargaining rights of hundreds of thousands of civilian employees of the Department of Defense. Our limited judicial task is to determine whether the Department of Defense has acted consistently with its statutory authority in promulgating certain regulations. The primary legal question we must decide is whether the National Defense Authorization Act for Fiscal Year 2004 authorizes DoD to curtail collective bargaining rights that DoD's civilian employees otherwise possess under the Civil Service Reform Act of 1978. We hold that the National Defense Authorization Act grants DoD *temporary* authority to curtail collective bargaining for DoD's civilian employees. By its terms, the Act authorizes DoD to curtail collective bargaining through November 2009. But after November 2009, with certain specified exceptions, DoD again must ensure collective bargaining consistent with the Civil Service Reform Act of

3

1978. We reverse the District Court's judgment, and we uphold the DoD regulations at issue in this appeal.

I

1. To put together the pieces of the statutory puzzle in this case, one must first appreciate the difference between Chapter 71 and Chapter 99 of Title 5 of the U.S. Code.

Chapter 71 of Title 5 codifies the Civil Service Reform Act of 1978 and establishes the right of federal civilian employees, including civilian employees at the Department of Defense, "to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees." 5 U.S.C. § 7102(2). The Act generally requires agency management to "meet and negotiate" in good faith with recognized unions over conditions of employment "for the purposes of arriving at a collective bargaining agreement." *Id.* § 7114(a)(1), (a)(4). The Act exempts various matters from collective bargaining, such as hiring, firing, suspending, paying, and reducing the pay of employees. *See id.* §§ 7103(a)(14)(C), 7106(a). Therefore, the Civil Service Reform Act ensures collective bargaining for federal employees, albeit more limited than the collective bargaining rights for private employees. *See Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 860-61 (D.C. Cir. 2006).

Chapter 99 of Title 5 codifies a section of the National Defense Authorization Act for Fiscal Year 2004 and sets out a new labor relations framework for Department of Defense employees. Chapter 99 differs from the Chapter 71 model in several respects. In particular, Section 9902(a) of Chapter 99 establishes procedures for DoD, in coordination with the Office of Personnel Management, to "establish, and from time to time adjust, a human resources management system for some or all

4

of the organizational or functional units of the Department of Defense." 5 U.S.C. § 9902(a). (Hereafter, for ease of reference, we will refer only to DoD and not also to OPM.) The "human resources management system" is called the "National Security Personnel System." *Id.* Within the National Security Personnel System, the Act authorizes DoD to establish a "labor relations system" to structure bargaining between management and employees. *Id.* § 9902(m)(1).

Section 9902 of Chapter 99 in turn contains a complicated set of authorizations and requirements for DoD to follow in establishing the National Security Personnel System and the labor relations system, many of which are important to this case:

- *General Requirements for National Security Personnel System – Subsections (b)(3), (b)(4), and (d)(2).*

Subsection 9902(b) lists general "system requirements" for the National Security Personnel System. Of relevance here, subsection (b)(3)(D) states that the system "shall . . . not waive, modify, or otherwise affect . . . any other provision of this part (as described in subsection (d))." Subsection (d)(2) in turn says that the "provisions of this part referred to in subsection (b)(3)(D) are (*to the extent not otherwise specified in this title*) . . . [Chapter] 71 . . . and this chapter" (emphasis added).

Taken together, therefore, subsections (b)(3) and (d)(2) mean that DoD's National Security Personnel System may not waive or modify Chapter 71, which is the provision codifying the Civil Service Reform Act of 1978's limited collective bargaining rights for federal civilian employees, unless the authority to waive or modify Chapter 71 is "otherwise specified" in the statute.

5

Subsection (b)(4) of Section 9902 similarly requires DoD to "ensure that employees may organize, bargain collectively *as provided for in this chapter*, and participate through labor organizations of their own choosing in decisions which affect them, *subject to the provisions of this chapter*" (emphases added). Therefore, subsection (b)(4) requires that DoD's National Security Personnel System ensure collective bargaining, but only "as provided for in" and "subject to the provisions of" the statute.

● *Authorization to Create Labor Relations System – Subsections (m)(1) and (m)(8).*

Subsection (m) of Section 9902 authorizes DoD to create a new labor relations system within the National Security Personnel System. Specifically, subsection (m)(1) states: "Notwithstanding section 9902(d)(2), the Secretary . . . may establish and from time to time adjust a labor relations system for the Department of Defense to address the unique role that the Department's civilian workforce plays in supporting the Department's national security mission."

The "notwithstanding" clause in subsection (m)(1) indicates that the generally non-waivable provisions listed in subsection (d)(2) – including Chapter 71 and its protection of limited collective bargaining rights – do not constrain DoD's authority to develop a labor relations system under subsection (m).

Furthermore, subsection (m)(8) broadly states that the labor relations system developed and from time to time adjusted by DoD under subsection (m) "shall be binding on all bargaining units within the Department of Defense" and "shall supersede all other collective bargaining agreements for bargaining units in the Department."

6

Subsection (m)(9) provides, however, that the authority under subsections (m)(1) and (m)(8) runs out in November 2009: "Unless it is extended or otherwise provided for in law, the authority to establish, implement and adjust the labor relations system developed under this subsection shall expire six years after the date of enactment of this subsection [that is, six years after November 2003], at which time the provisions of chapter 71 will apply."

- *Additional Authorization – Subsection (k)(1).*

Subsection (k) of Section 9902 provides additional specific authority for DoD to act in certain specified areas of labor relations. Subsection (k)(1) states: "Notwithstanding subsection (d), the Secretary of Defense . . . shall not be limited by any provision of this title or any rule or regulation prescribed under this title in establishing and implementing regulations relating to – (A) the methods of establishing qualification requirements for, recruitment for, and appointments to positions; (B) the methods of assigning, reassigning, detailing, transferring, or promoting employees; and (C) the methods of reducing overall agency staff and grade levels . . . ."

Subsection (k)(1) is not subject to the sunset date of subsection (m)(9). Therefore, DoD will retain the targeted authority conferred by (k)(1) even after the broader general authority under subsection (m) runs out in November 2009.

2. After Congress enacted the National Defense Authorization Act in November 2003, DoD began developing the National Security Personnel System. On February 14, 2005, DoD published a proposed system in the Federal Register. *See* National Security Personnel System, 70 Fed. Reg. 7552. After various DoD employee representatives submitted comments, DoD held several meetings with employee representatives in the

7

spring of 2005. On November 1, 2005, DoD promulgated final regulations setting up the National Security Personnel System. *See* Department of Defense Resources Management and Labor Relations System, 70 Fed. Reg. 66,116.

The regulations curtail the scope of Chapter 71 collective bargaining in several ways relevant to this appeal:

- The regulations permit certain DoD officials to issue "implementing issuances" to abrogate any provision of an existing collective bargaining agreement or effectively take any topic off the table for future bargaining purposes. 5 C.F.R. §§ 9901.905(a), 9901.917(d)(1). DoD may also promulgate "issuances" that take topics off the table. *Id.* § 9901.917(d)(1). (Issuances and implementing issuances are documents issued to carry out DoD policies; implementing issuances relate to the National Security Personnel System, while issuances relate to any DoD policy. *See id.* § 9901.903.) Under the regulations, both issuances and implementing issuances can have prospective effect, but only implementing issuances can abrogate existing collective bargaining agreements. *See id.* §§ 9901.905(a), (c), 9901.917(d)(1).

- The regulations broaden the scope of "management rights" – that is, actions that management can take without collective bargaining – beyond the management rights already provided in Chapter 71. In particular, the regulations permit DoD "to take whatever other actions may be necessary to carry out the Department's mission." *Id.* § 9901.910(a)(2).

- The regulations curtail bargaining over (i) the procedures DoD must follow when exercising management rights and (ii) the "appropriate arrangements" that DoD must make for

8

employees affected by exercises of management rights. *Id.* §§ 9901.910; 9901.914(a)(2).

● The regulations limit collective bargaining rights over pay and benefits for employees of certain DoD units known as "non-appropriated fund instrumentalities." These employees' compensation is not set by statute and is therefore traditionally subject to collective bargaining. *See id.* § 9901.305.

3. After the regulations were issued, several unions of DoD civilian employees filed suit in the U.S. District Court for the District of Columbia. They argued that the DoD regulations exceeded its statutory authority – a case of "rulemaking overreach," as the Unions have put it. Tr. of Oral Arg. 25. The District Court accepted the Unions' argument in relevant part. In particular, the District Court held that DoD's regulations violated subsection (b)(4)'s requirement that the National Security Personnel System ensure employees can bargain collectively. *See Am. Fed'n of Gov't Employees v. Rumsfeld*, 422 F. Supp. 2d 16, 40-45 (2006). The District Court found that subsection (b)(4) means "the new system must ensure that the principles of collective bargaining are not totally eviscerated." *Id.* at 40. The District Court therefore enjoined several components of the regulations (subparts G, H, and I of 5 C.F.R. § 9901), including the expansion of management rights and the authority of the Secretary to issue implementing issuances and issuances. *See id.* at 41-45.

II

This case centers on interpretation of the National Defense Authorization Act. The Unions argue that various DoD regulations "conflict with the Act's plain language." Unions' Br. at 17.

9

We initially explain the roadmap that guides our analysis. If the relevant statutory language is plain and supports the challenged DoD regulations, we must uphold the regulations. *See Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 415 (D.C. Cir. 1994). If the relevant statutory language is plain but is inconsistent with the DoD regulations, we must hold the regulations invalid. *See Brown v. Gardner*, 513 U.S. 115, 122 (1994); *cf. Dodd v. United States*, 545 U.S. 353, 359 (2005); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004); *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000). To the extent a challenged provision of the statute is ambiguous, we give deference to DoD's authoritative interpretation so long as that interpretation is reasonable. *See Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 855-56 (D.C. Cir. 2006) (citing *United States v. Mead Corp.*, 533 U.S. 218 (2001), and *Chevron U.S.A. Inc. v. Natural Res. Def .Council, Inc.*, 467 U.S. 837 (1984)).

1.  At first glance, the relevant provisions of the National Defense Authorization Act may seem contradictory. After all, the five subsections primarily at issue in this case – (b)(3), (b)(4), (d)(2), (m)(1), and (m)(8) – initially appear to work at cross-purposes. Subsections (b)(3), (b)(4), and (d)(2) seem to bestow a right to collective bargaining as traditionally provided under Chapter 71 of the Civil Service Reform Act of 1978, while subsections (m)(1) and (m)(8) simultaneously appear to snatch it away. But upon closer examination, the statutory pieces come together and form a relatively coherent whole, at least for purposes of this case.

The key to solving the statutory puzzle is the fact that subsections (b)(3), (b)(4), and (d)(2) together contemplate that collective bargaining under Chapter 71 is generally available, but only to the extent not otherwise exempted by separate provisions of the statute.

10

Subsection (d)(2) – which is a system requirement as a result of a cross-reference in subsection (b)(3) – states that Chapter 71's protection for collective bargaining is nonwaivable "*to the extent not otherwise specified in this title*" (emphasis added). This qualification indicates that subsection (d)(2) can be overridden by an exception in another provision of the statute.

Subsection (b)(4) similarly states that the Government must permit employees to "organize, bargain collectively *as provided for in this chapter*, and participate through labor organizations of their own choosing in decisions which affect them, *subject to the provisions of this chapter*" (emphases added). The first italicized phrase – "as provided for in this chapter" – indicates that subsection (b)(4)'s guarantee of collective bargaining is contingent on collective bargaining being provided by other subsections, such as subsection (d)(2)'s incorporation of the collective bargaining framework of Chapter 71. In addition, the further qualification in subsection (b)(4) – "subject to the provisions of this chapter" – indicates that, like subsection (d)(2), subsection (b)(4) can be overridden by other provisions of the statute.

To summarize so far, subsections (b)(3) and (d)(2) (which incorporate Chapter 71 bargaining) and subsection (b)(4) may be overridden by other provisions of the statute; furthermore, subsection (b)(4) ensures collective bargaining in the first place only insofar as another subsection of the statute provides for it. At this point in our summary of the statutory puzzle, however, we pause to note an important point: If the National Defense Authorization Act contained no provisions relevant to collective bargaining other than subsections (b)(3), (b)(4), and (d)(2), the Act would require DoD to adhere to the traditional collective bargaining framework of Chapter 71, just as the Unions have argued.

11

Enter subsections (m)(1) and (m)(8). Subsection (m)(1) states: "*Notwithstanding section 9902(d)(2)*, the Secretary . . . may establish and from time to time adjust a labor relations system for the Department of Defense to address the unique role that the Department's civilian workforce plays in supporting the Department's national security mission." (emphasis added). Subsection (m)(8) adds that "[t]he labor relations system developed or adjusted under this subsection shall be binding on all bargaining units within the Department of Defense" and "shall supersede all other collective bargaining agreements."

The "notwithstanding" clause in (m)(1) expressly states that the authority to establish a labor relations system overrides subsection (d)(2). So subsection (d)(2) by its terms may be overridden where "specified," and subsection (m)(1) provides just such a specification. Therefore, when it crafts its labor relations system, DoD need not follow Chapter 71's collective bargaining framework, which otherwise would be required by subsection (d)(2) (as cross-referenced by subsection (b)(3)). It is important to note, however, that DoD's authority under subsection (m)(1) is temporary: Under subsection (m)(9), DoD's authority to establish a labor relations system expires in November 2009 – at which point subsection (d)(2) will require that DoD again follow Chapter 71 (subject to certain targeted exceptions such as in subsection (k)(1)).

The guarantee of collective bargaining in subsection (b)(4) also does not apply until November 2009. Recall that collective bargaining under subsection (b)(4) applies insofar as it is "provided for in this chapter." Collective bargaining is in fact provided for in subsection (d)(2), which refers back to Chapter 71 and thus requires collective bargaining. Collective bargaining is not, however, provided for in the text of subsection (m)(1). And because subsection (m)(1) expressly permits DoD to disregard subsection (d)(2), subsection (m)(1) also means that

12

– until November 2009 – nothing in the statute "provide[s] for" collective bargaining for purposes of subsection (b)(4). As a result, like subsection (d)(2), subsection (b)(4) does not constrain DoD's authority to establish a labor relations system until November 2009. After November 2009, collective bargaining is "provided for" in the statute – in subsection (d)(2) – and again must be ensured by DoD.

The dissenting opinion contends that the statutory phrase "as provided for in this chapter" means only "that other provisions of the bill modify Congress's traditional understanding of the term 'bargain collectively.'" Dissenting Op. at 4. But that interpretation distorts the plain meaning of the phrase "as provided for," reading it to mean "unless otherwise provided for" – its polar opposite. That interpretation also renders redundant the second, independent qualification in subsection (b)(4) – "subject to the provisions of this chapter" – and would essentially read both qualifications in (b)(4) the same way, a highly disfavored interpretive result. *See, e.g.*, *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643-44 (D.C. Cir. 2000). By contrast, our reading gives each phrase independent meaning: The first qualification requires an affirmative grant of collective bargaining elsewhere in the statute (such as in (d)(2)), while the second qualification says that even where there is such an affirmative grant, it may be overridden by other provisions. The dissent's strained reading appears to be sparked in part by its analysis of a hypothetical statute of the dissent's own creation, which would use the phrase "bargain collectively as provided for in this chapter" without anywhere else actually providing for collective bargaining. But the real statute in this case does provide for collective bargaining – in subsection (d)(2) – and we thus have no need to speculate about such hypothetical interpretive puzzles.

13

Even if the dissent were correct that both provisions in subsection (b)(4) essentially mean that collective bargaining applies unless otherwise excepted, however, we would reach the same result. The "subject to the provisions of this chapter" qualification (which the dissenting opinion glosses over) means that any right to collective bargaining that otherwise exists under subsection (b)(4) (whether as a result of the reference to collective bargaining in (b)(4) itself or because of (d)(2)'s reference to Chapter 71) is subject to and may be overridden by other provisions of the statute. And subsections (m)(1) and (m)(8) by their terms plainly qualify as such exceptions through November 2009.

In sum, subsection (m) of Section 9902 grants DoD expansive authority to curtail collective bargaining through November 2009. Subsection (m)'s authority to curtail collective bargaining is entirely consistent with – not in conflict with – subsections (b)(3), (b)(4), and (d)(2) of Section 9902, given the express qualifications in those subsections. After November 2009, however, the authority in subsection (m) runs out, and collective bargaining under Chapter 71 again will structure the Department's labor relations (apart from targeted statutory exceptions, such as subsection (k)(1)).

2. In response to this straightforward reading of the plain language of the statute, the Unions have advanced three primary arguments. None is persuasive.

*First*, the Unions argue that subsections (b)(3), (b)(4), and (d)(2) of Section 9902 would have no purpose if subsections (m)(1) and (m)(8) give DoD broad authority to curtail collective bargaining. We disagree with the Unions on this point. The labor relations system authorized under subsection (m) expires in November 2009, at which point the important Chapter 71 collective bargaining requirements of (b)(3), (b)(4), and (d)(2)

14

will generally apply. In effect, therefore, the Act sets up a temporary, experimental period through November 2009 during which DoD has broad leeway to restructure its labor relations system. But after November 2009, assuming that Congress has not amended the statute in the meantime, the Chapter 71 collective bargaining requirements referenced in subsections (b)(3), (b)(4), and (d)(2) again will apply and govern labor relations for DoD's civilian workers (subject to targeted exceptions such as subsection (k)(1)).

This kind of experimental program is common. To test new policies or try out novel approaches to difficult issues, Congress often enacts temporary legislation that sunsets at a certain point. *See, e.g.*, USA PATRIOT Act, Pub. L. No. 107-56, § 224(a), 115 Stat. 272, 295 (2001); Ethics in Government Act of 1978, Pub. L. No. 95-521, § 601(a), 92 Stat. 1824, 1873 (former independent counsel statute). As in other situations where Congress has acted to establish a temporary or experimental program, Congress no doubt will continue to carefully study the experience under this Act and use it to guide further legislation governing labor relations at DoD. In short, contrary to the Unions' argument, subsections (b)(3), (b)(4), and (d)(2) play a critical role by generally providing collective bargaining for DoD's civilian employees after November 2009.

*Second*, the Unions relatedly argue that subsection (m), when interpreted according to its plain terms, allows DoD to effectively negate collective bargaining through November 2009. The Unions strenuously contend that this cannot possibly be a correct interpretation of the Act because Congress does not "hide elephants in mouseholes." Unions' Br. at 18 (internal quotation omitted).

We agree with the Unions that subsection (m) is a statutory elephant (in the sense of having a huge impact), but the

15

additional premise of the Unions' contention is inaccurate: Subsection (m) was not hidden. To be sure, subsection (m) was ushered into the legislative arena at a late hour. Indeed, neither the initial House-passed nor Senate-passed bills (nor the separate bill on DoD labor relations approved by the Senate Committee on Governmental Affairs) included subsection (m); the bills preserved collective bargaining at DoD. *See* 149 Cong. Rec. H4460-61 (daily ed. May 21, 2003); 149 Cong. Rec. S14,490 (Nov. 12, 2003) (statement of Senator Lieberman); *Am. Fed'n of Gov't Employees v. Rumsfeld*, 422 F. Supp. 2d 16, 25 (D.C. Cir. 2006). But the conference negotiations took a rather dramatic turn in a different direction. The conferees decided to add subsection (m), and subsection (m) by its terms gives DoD expansive authority to curtail collective bargaining through November 2009. *See Am. Fed'n of Gov't Employees*, 422 F. Supp. 2d at 26.

With subsection (m) added, the conference agreement sparked pointed objections from several Members of Congress. Their reactions show (contrary to the Unions' elephants-in-mouseholes suggestion) that Members of Congress clearly recognized subsection (m) for what it is – broad authority for DoD to curtail collective bargaining for six years from the date of enactment, that is, through November 2009. For example, Congressman Waxman stated: "At the same time that the bill claims to protect collective bargaining, it allows DoD to waive these requirements for the next 6 years." 149 Cong. Rec. H10,988 (daily ed. Nov. 7, 2003). Congresswoman Jackson Lee added: "This bill claims to protect collective bargaining rights but removes all of the protections provided under the current law. . . . During the 6-year period, the Secretary of Defense will have the authority to decide what issues will be bargained . . . ." *Id.* at H10,998. Congressman McGovern stated: "This Conference Report removes all collective bargaining protections contained in current law . . . ." *Id.* at H11,006. Congressman

16

Cardin explained his view that "more than 700,000 civilian workers in the Defense Department will lose fundamental protections . . . . . [T]his provision empowers . . . Secretaries of Defense to create an entirely new personnel system for DoD civilians." *Id.* at H11,003. Congressman Abercrombie said: "[S]ome 700,000 federal employees will be stripped of their rights and protections in the current civil service system and placed at the mercy of political appointees in DoD." *Id.* at H11,004. Congressman Hoyer, responding to another Representative's hope that Chapter 71 was non-waivable, explained: "That is technically true, but the bill allows [Chapter 71] to be suspended for the next [six years]." *Id.* at H10,997. And in opposing this provision of the statute, Senator Kennedy stated his understanding in frank terms: "Defense employees deserve civil service and collective bargaining rights" and this statute, Senator Kennedy stated, is a "vehicle to deny these workers their basic rights." 149 Cong. Rec. S14,486 (daily ed. Nov. 12, 2003). Other Members of Congress likewise objected to subsection (m) while attempting to construct an interpretation that could require DoD to retain some core of collective bargaining even before November 2009. *See, e.g.*, *id.* at S14,490 (statement of Senator Lieberman); *id.* at S14,428 (statement of Senator Collins).

Although the snippets of legislative history are largely in accord with our reading of the statutory text, we do not rely on them to shape our interpretation; the Supreme Court has cautioned against such use of this kind of legislative history. *See Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 29 (1988) (courts do "not usually accord much weight to the statements of a bill's opponents"). We cite these various Member statements simply to show that the enormous significance of subsection (m) was well understood by Members of Congress when the Act was passed in 2003, contrary to the

17

premise of the "elephants-in-mouseholes" interpretive objection put forth by the Unions.

*Third*, the Unions have pointed to our recent decision in *Chertoff*. In that case, we held that the Department of Homeland Security's regulations establishing a labor relations system were inconsistent with the DHS statute that Congress enacted in 2002. The Unions here have candidly (and correctly) acknowledged that the statutory language governing DoD's labor relations system is quite different from the statutory language governing DHS's labor relations system. *See* Tr. of Oral Arg. 42-43 ("We acknowledge that the organic act that *Chertoff* is based upon is different than the organic act we're arguing [about] here today. . . . We acknowledge that the language of the statute is different. We are not suggesting that *Chertoff* makes the question stare decisis.").

The DHS statute provides, without any relevant qualification, that DHS must "ensure that employees may . . . bargain collectively." 5 U.S.C. § 9701(b)(4). By contrast, the DoD statute states that DoD must ensure that employees may "bargain collectively as provided for in this chapter" and makes clear that Chapter 71 defines the scope of such collective bargaining. The statute then expressly qualifies the Chapter 71 collective bargaining default by stating that it applies "subject to the provisions of this chapter" or except as "otherwise specified" in the statute. The DoD statute in turn includes subsections (m)(1) and (m)(8), which give DoD broad authority to create a new labor relations system and to supersede collective bargaining through November 2009. By contrast, the DHS statute contains no provision remotely equivalent to subsection (m) of the DoD statute. As we noted earlier, without subsection (m) (and without subsection (k)'s targeted limits on collective bargaining), this case would be decided the same way as *Chertoff*. But because of the multiple – and critical –

18

differences in the DHS and DoD statutes, our decision in *Chertoff* does not provide any meaningful guidance for our interpretation of the very different DoD statute. In other words, we do not believe, contrary to the Unions and the dissent, that *Chertoff*'s interpretation of the undefined phrase "bargain collectively" in the DHS statute can somehow alter the language of the DoD statute, which expressly indicates that collective bargaining means the collective bargaining provided for in subsection (d)(2).

In sum, we hold that the plain language of the National Defense Authorization Act authorizes DoD to curtail collective bargaining for DoD's civilian employees through November 2009. For purposes of our analysis, we find the relevant statutory terms plain. But even if we found ambiguity in the relationship of (b)(3), (b)(4), and (d)(2) on the one hand to (m)(1) and (m)(8) on the other, we would defer to DoD's reasonable interpretation and application of the statute as articulated in the preamble to the regulations. *See* 70 Fed. Reg. at 66,117-20, 66,128-30, 66,134, 66,176-85; *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 845 (1984). DoD reasonably concluded that "the law provides the Department and OPM – in collaboration with employee representatives – authority to establish a flexible and contemporary system of civilian human resources management for DoD civilians." 70 Fed. Reg. at 66,118. DoD explained that "Congress specifically authorized the Secretary, together with the Director, to establish and adjust this labor relations system in support of the overall HR management system notwithstanding the provisions of the current system as set forth in chapter 71." *Id.* at 66,128. DoD further stated that the statute did not require that actions to implement the labor relations system "be subject to collective bargaining or the meet-and-confer process." *Id.* at 66,134. DoD reasonably concluded that its regulations "fulfill" the (m)(1) statutory authorization –

19

namely, that DoD's labor relations system address the "unique role that the Department's civilian workforce plays in supporting the Department's national security mission" – while also "providing employees with the rights envisioned by Congress." *Id.* at 66,129. No doubt realizing that DoD's interpretation and approach is perfectly reasonable *if* the statute is considered ambiguous, the Unions do not even attempt to make such a "*Chevron* step 2" argument. Instead, the Unions try to demonstrate that DoD's regulatory interpretations are inconsistent with the clear meaning of the statute. For the reasons explained above, however, we see no conceivable way to conclude that DoD's regulations violate the unambiguous terms of the statute. *See Am. Fed'n of Gov't Employees*, *Local 446 v. Nicholson*, 475 F.3d 341, 354-55 (D.C. Cir. 2007); *Ass'n of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1251 (D.C. Cir. 1998).

Because we conclude that the National Defense Authorization Act authorizes DoD to curtail collective bargaining, we reverse the contrary judgment of the District Court.

3. One additional point warrants mention with respect to the so-called "implementing issuances" contemplated by the DoD regulations (those are the documents that enforce DoD labor relations policies and may curtail collective bargaining). Section 9902 sets out two different sets of procedural requirements that DoD must follow when taking action under the statute: (i) one set of procedural requirements for adopting or amending regulations issued under the statute, and (ii) another set of procedural requirements for taking certain action under those regulations.

First, subsections (f)(1)(A)-(C) and (m)(3) define stringent "meet and confer" requirements that DoD must follow when (i)

20

proposing a *new system* by adopting regulations or (ii) making an *adjustment* to the existing system by amending regulations. Those requirements include: a 30-day period for employee representatives to make recommendations regarding any DoD proposal (absent extraordinary circumstances), full and fair consideration of any such recommendations, a 30-day meet-and-confer period with employee representatives regarding any rejected recommendations, and notice to Congress when recommendations by the employee representatives are rejected. (In this court, it is not disputed that DoD complied with these requirements in promulgating the regulations at issue here.)

Second, subsection (f)(1)(D) sets out less rigorous "continuing collaboration" requirements that DoD must follow for taking certain actions under the regulations. In particular, subsection (f)(1)(D) requires that DoD "develop a method for the employee representatives to participate" and "give the employee representatives adequate access to information to make that participation productive."

When the Secretary promulgates an implementing issuance under the regulations, however, the Unions suggest that DoD must follow the full meet-and-confer procedures of subsections (f)(1)(A)-(C) and (m)(3). By contrast, DoD believes that only the "continuing collaboration" requirements of (f)(1)(D) instead apply. As DoD explained in the preamble to the final regulations, "we did not adopt the [Unions'] suggestion to require that implementing issuances be subject to collective bargaining or the meet-and-confer process. Collective bargaining is inappropriate for the development of HR system implementing issuances, since it is inconsistent with the requirements of Section 9902(f)(4). . . . The continuing collaboration process [in the regulations] does meet the requirements of 5 U.S.C. 9902(f)(1)(D) . . . ." 70 Fed. Reg. at 66,134.

21

We agree with DoD on this point. The most natural reading of the statute is that the more stringent meet-and-confer requirements apply only when DoD adopts regulations to establish the new system or amends those regulations to adjust the existing system. *See* 5 U.S.C. § 9902(a) ("[T]he Secretary may, in *regulations* . . ., *establish*, and from time to time *adjust*, a human resources management system . . . .") (emphases added). Put another way, meet-and-confer requirements apply to promulgating regulations or to revising existing regulations. But the less stringent statutory requirement of "continuing collaboration" applies when DoD takes actions pursuant to regulations – such as implementing issuances. This reading of the statute is buttressed by the fact that requiring the full panoply of meet-and-confer obligations when the Department takes actions under the regulations would tie the system in knots and greatly hinder (if not prevent) the Department's exercise of any discretionary authority set forth by the regulations. *Cf. Time Warner Cable v. Doyle*, 66 F.3d 867, 877 (7th Cir. 1995) (permitting agency to take into account how burdensome one interpretation of a statute would be).

Even if we assume that the statute is ambiguous as to which kind of procedural requirements apply to implementing issuances, however, we could not say that DoD's interpretation of these ambiguous provisions is an unreasonable way of harmonizing the two statutory provisions. Therefore, under the deferential *Chevron* framework for reviewing agency interpretation of ambiguous statutes, we would uphold this particular regulation even if it were unclear which statutory collaboration requirement applied to implementing issuances. *See Nicholson*, 475 F.3d at 353-55; *Ass'n of Bituminous Contractors, Inc.*, 156 F.3d at 1251.

22

III

Next, we address three miscellaneous challenges by the Unions relating to: the National Security Labor Relations Board, the standard of conduct for employee representatives, and the appeals process.

1. Under § 9902(m)(6), the labor relations system established by the Secretary must "provide for independent third party review of [labor relations] decisions, including defining what decisions are reviewable by the third party, what third party would conduct the review, and the standard or standards for that review." Under that subsection, DoD by regulation has created the National Security Labor Relations Board, which must decide issues related to unfair labor practices, the scope of bargaining, the duty to bargain in good faith, exceptions to arbitration awards, and negotiation impasses. *See* 5 C.F.R. §§ 9901.907, 9901.908(b). The regulations authorize the Secretary to appoint the members of the Board who serve for three-year terms. *Id.* § 9901.907(b)(1). Under the regulations, the members must be "independent, distinguished citizens of the United States who are well known for their integrity, impartiality, and expertise in labor relations, and/or the DoD mission and/or other related national security matters." *Id.* § 9901.907(b)(2). The Secretary will consider nominees submitted by labor organizations that represent Department employees. *Id.* § 9901.907(d)(1).

The Unions argue that the regulations do not ensure that the Board members are independent. We disagree. Under the regulations, members of the Board "may be removed by the Secretary only for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 9901.907(b)(2). This language mirrors the key feature of federal statutes that create what are commonly referred to as "independent" federal agencies. *See, e.g.*, 5

23

U.S.C. § 1202(d) (Merit Systems Protection Board); 15 U.S.C. § 41 (Federal Trade Commission); 42 U.S.C. § 5841(e) (Nuclear Regulatory Commission); 49 U.S.C. § 701(b)(3) (Surface Transportation Board); *see also Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935). So too, the Federal Labor Relations Authority, which handles labor disputes, is considered independent because of its similar good cause removal constraint. In light of the good cause removal provision in the regulations, DoD's Board meets the statutory requirement of independent review.

The Unions offer two counter-arguments. First, they assert that the Board is not independent because the Board can "both investigate and adjudicate labor disputes." Unions' Br. at 33. Yet the Unions do not explain how the separation of these functions would make the Board more independent from DoD. Nothing in the statute or in logic requires a separation of functions within the "independent third party." *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1215 n.28 (D.C. Cir. 1980). What is more, many independent federal agencies combine these functions. *See, e.g.*, 15 U.S.C. §§ 45(b), 46 (Federal Trade Commission); 47 U.S.C. §§ 204, 208 (Federal Communications Commission). Second, the Unions claim that the Board is not independent because it possesses unreviewable authority to decide negotiation impasses (in contrast to its other decisions, which are reviewed by the Federal Labor Relations Authority). *See* Unions' Br. at 34. But insulating the Board from review by another government body does not render the Board itself any less independent.

In sum, the Unions have not shown that the Board lacks independence for purposes of the statute, and we therefore reject the Unions' challenge to the regulation establishing the Board.

24

2.    The Unions have challenged the DoD regulation providing that "[e]mployee representatives employed by the Department are subject to the same expectations regarding conduct as any other employee, whether they are serving in their representative capacity or not." 5 C.F.R. § 9901.914(a)(4). The Unions believe that this regulation will prevent employee representatives from engaging in "vigorous advocacy" on behalf of DoD employees, as is required to ensure effective bargaining. Unions' Br. at 28-29. In response, DoD explained that "[t]he only conduct the revised standard is intended to stop is the rare, but utterly unacceptable use of vulgar or sexually explicit language, as well as physical intimidation by union officials." Department of Defense Human Resources Management and Labor Relations System, 70 Fed. Reg. 66,116, 66,182 (Nov. 1, 2005). According to this explanation, the Department's intent was "not to prevent honest and open discussion, but rather to ensure that such discussions are undertaken in a professional and courteous manner." *Id.* We accept and defer to DoD's reasonable interpretation of its own regulation. As we have often stated, "an agency's interpretation of one of its own regulations commands substantial judicial deference." *Drake v. FAA*, 291 F.3d 59, 68 (D.C. Cir. 2002) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945)). The Department's proffered interpretation here is a reasonable construction of the regulation's text and represents the Department's "fair and considered" judgment, given that it was published in the Federal Register. *Id.* (internal quotation omitted); *cf. Auer v. Robbins*, 519 U.S. 452, 463 (1997). This regulation does not contravene any provision of the statute, and we uphold it.

3.    Finally, we address the Unions' contention that the labor relations system does not comply with the "fair treatment" requirement of subsection (h)(1)(A) of Section 9902. That subsection provides that "[t]he Secretary . . . may establish an

25

appeals process that provides employees of the Department of Defense organizational and functional units that are included in the National Security Personnel System fair treatment in any appeals that they bring in decisions relating to their employment."

Under the regulations, an employee first appeals an adverse employment decision to an administrative judge. After the administrative judge issues an initial decision, the losing party may appeal to designated DoD officials. *See* 5 C.F.R. § 9901.807(a), (g). After this appeal to the Department, further appeal may be taken to the independent Merit Systems Protection Board. *Id.* § 9901.807(h). Finally, the decision of the Merit Systems Protection Board is subject to judicial review in the courts. *Id.* § 9901.807(i). The appeals scheme is very similar to that used in many other agencies, with the exception that these regulations add a level of Merit Systems Protection Board review.

The phrase "fair treatment" is not defined in the statute. We believe "fair treatment" is a quintessential example of a vague statutory standard that requires significant judicial deference to the agency's reasonable interpretation. *See Aurora Packing Co. v. NLRB*, 904 F.2d 73, 76 n.1 (D.C. Cir. 1990) ("*Chevron* presumes that Congress delegated primarily to executive branch agencies the interpretation of ambiguous terms . . . ."). Given that deferential standard of review, we conclude that the extensive review process outlined above easily qualifies as "fair treatment."

We do not consider the Unions' other "fair treatment" challenges because we agree with DoD that they are not yet ripe for judicial review under our decision in *Chertoff*. In *Chertoff*, a regulation prevented the Merit Systems Protection Board from mitigating a penalty that DHS imposed on an employee unless

26

the penalty was "wholly without justification." *Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 850 (D.C. Cir. 2006) (quoting 5 C.F.R. § 9701.706(k)(6)). We held that the challenge to that mitigation provision was unripe for review. *Id.* at 855. We stated that judicial review would benefit from a specific application of the "wholly without justification" mitigation standard. We also found important that the Unions would suffer no harm from delaying review because the mitigation standard did not have a "direct and immediate" impact on their "primary conduct." *Id.* (citing *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158 (1967), and quoting *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86 (D.C. Cir. 1986)). Here, the Unions challenge a similar mitigation standard established in the regulations, which permits an administrative judge to mitigate a penalty only if it is "totally unwarranted in light of all pertinent circumstances." 5 C.F.R. § 9901.807(f)(2)(ii). The Unions also object to the regulations that give the Secretary unreviewable discretion to define "[m]andatory removal offenses." *Id.* §§ 9901.712(a), 9901.808(c). And the Unions challenge the Secretary's discretion to modify interim relief ordered by the Merit Systems Protection Board. *Id.* § 9901.807(f)(5)(i). As in *Chertoff*, we do not know how the Secretary may choose to apply these particular regulations in specific cases. As in *Chertoff*, we lack a concrete factual context to consider these challenges. And as in *Chertoff*, the Unions will not be harmed by delayed review because the "disputed procedures do not have any direct and immediate impact on the Unions' primary conduct." *Chertoff*, 452 F.3d at 855 (internal quotations omitted). Therefore, in light of *Chertoff*, we find that these provisions of the regulations are not yet ripe for judicial review.

\*    \*    \*

27

We reverse the judgment of the District Court and uphold the DoD regulations at issue in this appeal.

*So ordered.*

TATEL, *Circuit Judge*, dissenting in part:  In authorizing the Secretary of Defense to establish a new personnel system, including a temporary labor-management relations subsystem, the National Defense Authorization Act for Fiscal Year 2004, codified in relevant part at 5 U.S.C. § 9901 *et. seq.* (Chapter 99), directs—in subsection (b)(4)—that any such system must "ensure that employees may . . . bargain collectively as provided for in this chapter."  5 U.S.C. § 9902(b)(4).  According to the court, despite this system requirement, subsection (m), which authorizes the Secretary to create the temporary labor relations subsystem, empowers him to abolish collective bargaining altogether—a position with which even the Secretary disagrees. Because I believe that subsection (m) does no such thing, I respectfully dissent from Parts I and II of the court's opinion.

## I.

Chapter 99 permits the Secretary to create a new "human resources management system."  5 U.S.C. § 9902(a).  Any new system the Secretary creates must comply with a series of "system requirements."  *Id.* § 9902(b).  For example, the new personnel system must be "flexible" and "contemporary," may not impinge on certain antidiscrimination and whistleblower protections, and must include a "performance management system" that incorporates a "fair, credible, and transparent employee performance appraisal system."  *Id.* § 9902(b)(1), (b)(2), (b)(3)(C), (b)(6)(B).  At issue here is subsection (b)(4)'s system requirement—that any new personnel system "ensure that employees may organize, bargain collectively as provided for in this chapter, and participate through labor organizations of their own choosing in decisions which affect them, subject to the provisions of this chapter and any exclusion from coverage or limitation on negotiability established pursuant to law."  *Id.* § 9902(b)(4).

Proceeding under *Chevron*'s first step, the court concludes (1) the phrase "bargain collectively as provided for in this

2

chapter" unambiguously "ensures collective bargaining in the first place *only insofar as another subsection of the statute provides for it*," Maj. Op. at 10 (emphasis added), and (2) the only other subsection that "provides for" collective bargaining is (d)(2), which prohibits the Secretary from waiving Chapter 71. *See* Maj. Op. at 10-12. Chapter 71, in turn, contains provisions relating to and protecting federal-sector collective bargaining. Given that subsection (m)(1) waives subsection (d)(2), the court holds that the Secretary may create a temporary labor relations subsystem free from subsection (b)(4)'s collective bargaining guarantee. For several reasons, I believe that this reading of Chapter 99 does not reflect the "unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

To begin with, subsection (b)(4) would be entirely superfluous if, as the court holds, it protects only the collective bargaining provided for in subsection (d)(2). Subsection (d)(2) incorporates Chapter 71, which declares that employees enjoy the right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter." 5 U.S.C. § 7102(2). If this is all subsection (b)(4) refers to, then its guarantee of collective bargaining "as provided for in this chapter" adds nothing to the statute. Given this surplusage, the court's interpretation runs afoul of a fundamental canon of statutory construction, i.e., that all language in a statute be given meaning. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). This surplusage, moreover, and the ambiguity it produces are fatal to the court's effort to resolve this case at *Chevron* step one. As we held in *NLRB v. FLRA*, 952 F.2d 523 (D.C. Cir. 1992), a *Chevron* step one analysis is not "plausibl[e]" where it yields statutory surplusage. *Id.* at 532; *see also Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006)

3

("[The statute] contains surplusage under either reading and, as a result, we cannot say that either proffered construction reflects the Congress's unambiguously expressed intent.").

Second, the court's interpretation produces a serious structural defect. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."). As the court acknowledges, the temporary labor relations subsystem authorized by subsection (m) is a component of the overall personnel system authorized by subsection (a). *See* Maj. Op. at 5 ("Subsection (m) of Section 9902 authorizes DoD to create a new labor relations system within the National Security Personnel System."). Each of subsection (b)'s requirements, including (b)(4)'s guarantee of collective bargaining, is a "system requirement" for the overall personnel system. Because the subsection (b) system requirements limit the Secretary's authority under Chapter 99, subsection (m)'s authorization to create a temporary labor relations subsystem cannot, by itself, empower the Secretary to create a subsystem free from the statute's system requirements. Congress could have exempted subsection (m)'s temporary labor relations subsystem from subsection (b)(4)'s system requirement by providing that the authority granted by subsection (m)(1) exists notwithstanding *both* subsection (d)(2) and (b)(4). But this Congress did not do.

Third, subsection (b)(4) cannot refer only to the collective bargaining rights protected by subsection (d)(2)'s incorporation of Chapter 71 because Chapter 71's protections, including its protections of collective bargaining, were waived by the very House bill in which subsection (b)(4) originated. *See Bell Atl.*

4

*Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (noting the tools of statutory construction used in *Chevron* step one analysis "include examination of the statute's text, legislative history, and structure"). Subsection (b)(4) first appeared in the Civil Service and National Security Personnel Improvement Act, H.R. 1836, 108th Cong. § 102 (2003) (as introduced), which was later incorporated into the House version of the Defense appropriations bill, *see* National Defense Authorization Act for Fiscal Year 2004, H.R. 1588, 108th Cong. § 1121 (2003) (as passed by the House). Although each bill contained subsection (b)(4)'s protection of collective bargaining verbatim, including the phrase "as provided for in this chapter," neither included Chapter 71 in its list of nonwaivable provisions nor protected collective bargaining in any other way. *See* H.R. 1836 § 102 (listing nonwaivable provisions in proposed § 9902(c)(2) and failing to list Chapter 71); H.R. 1588 § 1121 (same). In other words, nothing in subsection (d)(2)'s earlier versions "provided for" collective bargaining in the way the court ascribes to those words.

What, then, did these predecessor bills mean by the phrase "bargain collectively as provided for in this chapter?" As I shall explain in more detail in Part II, and as we recently held in *National Treasury Employees Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006), the phrase "bargain collectively" is "a term of art with a well-established statutory meaning." *Id.* at 857. Because that term has meaning to Congress, it had no need to "provide for" collective bargaining elsewhere in the statute. Instead, the words "as provided for in this chapter" signal that other provisions of the bill modify Congress's traditional understanding of the term "bargain collectively." For example, although the duty to bargain normally attaches only at the level of exclusive recognition, *see, e.g.*, *United Elec., Radio & Mach. Workers v. NLRB*, 986 F.2d 70, 75 (4th Cir. 1993) (holding duty to bargain exists only with certified local bargaining unit, not its

5

uncertified international), each bill granted the Secretary authority to choose whether to bargain with national unions or their local affiliates, *see* H.R. 1588 § 1121 (proposed § 9902(f)(2), permitting the Secretary to choose to bargain at a level above the level of exclusive recognition); H.R. 1836 (same). Making this point explicit, the House Report states that the bill would "provide for collective bargaining at the national level in addition to local collective bargaining." *See* H.R. Rep. No. 108-106, at 367 (2003). Thus, as originally understood by the House, subsection (b)(4) "provided for" collective bargaining in ways having nothing at all to do with Chapter 71.

Taking a different approach, the Senate preserved greater protections for collective bargaining but granted the Secretary less flexibility in fashioning a new approach to labor relations. Although the Senate appropriations bill contained no similar provision establishing a new personnel system for the Department of Defense (DoD), *see* H.R. Rep. No. 108-354, at 758 (2003), the Senate Committee on Government Affairs had reported out the National Security Personnel System Act, S. 1116, 108th Cong. (2003), which became the Senate's starting point for its negotiations with the House, *see* 149 Cong. Rec. S14,419-20 (daily ed. Nov. 11, 2003) (statement of Sen. Warner). The Senate bill contained nothing comparable to subsection (b)(4). *See* S. 1116 § 9902(b). Instead, that bill retained the collective bargaining protections found in Chapter 71 by listing that chapter as one of several nonwaivable provisions. *Id.* § 9902(c).

Thus, both the House bill and the most comparable Senate legislation offered some protection for collective bargaining. The language that emerged from the Conference Committee incorporated elements of each bill by (1) listing Chapter 71 as a nonwaivable provision (as in the Senate bill), (2) waiving Chapter 71 for six years (as in the House bill), and (3) adding

6

the subsection (b)(4) language (from the House bill).  By the court's logic, when Congress *added* Chapter 71's protections to subsection (d)(2)'s list of nonwaivable provisions, thereby *strengthening* the House bill's protection of collective bargaining rights, it actually radically redefined subsection (b)(4), *confining* its system requirement to subsection (d)(2) and freeing the Secretary to eviscerate collective bargaining altogether—something Congress apparently accomplished without amending or even referencing subsection (b)(4).  I understand Chapter 99 quite differently.  By adding Chapter 71 to subsection (d)(2)'s list of nonwaivable provisions and then—in subsection (m)—promptly waiving that same chapter for six years, Congress indicated that the Secretary's authority to experiment with a new labor relations subsystem (as advocated by the House) was time-limited, not that the Secretary could exercise that authority without regard to Chapter 99's system requirements.

The court points to several floor statements in support of the proposition that Congress understood the conference report to have radically departed from both the House and Senate versions of the DoD personnel bill.  *See* Maj. Op. at 15-16.  The views of even these opponents of the bill, however, were far from unanimous.  Key senators made clear that although the conference report left the Department free to depart from some elements of Chapter 71, any temporary labor relations subsystem must still comply with core elements of that chapter.  For example, Senator Collins, the Senate bill's chief sponsor and the chief Senate Republican conferee on this issue, explained that while DoD had initially sought authority "to waive virtually all personnel laws and regulations," she was "pleased we have not included that authority" in the final bill and noted that she "fully expect[s] the labor relations system developed by the Department will abide by the principles enumerated in [C]hapter 71."  149 Cong. Rec. S14,428.

7

Agreeing, Senator Levin stressed that the compromise provided "substantially better [collective bargaining protections] . . . than comparable provisions included in the House bill." *Id.* at S14,439.

## II.

As mentioned above, our recent decision in *National Treasury Employees Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006), is critical to a proper understanding of the phrase "bargain collectively as provided for in this chapter." There, we held that "[i]n the context of federal sector labor-relations, collective bargaining is a term of art with a well-established statutory meaning." *Id.* at 857. In *Chertoff*, we dealt with a statute that, like Chapter 99, permits a federal agency—in that case, the Department of Homeland Security (DHS)—to create a new personnel system. Also like Chapter 99, the DHS statute requires that any new system "ensure that employees may . . . bargain collectively." 5 U.S.C. § 9701(b)(4); *see Chertoff*, 452 F.3d at 856-57. In determining the scope of this system requirement, we held that the meaning of the term "bargain collectively" derives from Chapter 71, which provides "the framework for basic collective bargaining for most federal sector employees." *Chertoff*, 452 F.3d at 843. We reached this conclusion despite the fact that the DHS statute permits DHS—just like Chapter 99 permits DoD—to modify Chapter 71's provisions regarding labor-management relations, including those having some relation to collective bargaining. We explained:

> The Government argues that the Department was free to "modify the collective bargaining provisions" of Chapter 71 in promulgating a new HR system pursuant to the [Homeland Security Act (HSA)]. This is undoubtedly correct. But nothing in the HSA

8

suggests that the meaning of "collective bargaining" under Chapter 71 could be disregarded by the Department in its promulgation of the HR system. There are many "provisions" relating to collective bargaining in Chapter 71—*e.g.*, resort to [the Federal Labor Relations Authority], determination of appropriate units, handling of refusal-to-bargain complaints, exceptions to arbitral awards, and use of an impasses panel—that the Department was free to ignore in its Final Rule. The core meaning of "collective bargaining" itself, however, could not be ignored or supplanted. Why? Because the HSA states explicitly that, in establishing a new HR system, the Department "shall"

> ensure that employees may organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them, subject to any exclusion from coverage or limitation on negotiability established by law.

5 U.S.C. § 9701(b)(4). This statutory obligation is mandatory, not optional. And if, as shown above, "collective bargaining" means the same thing under both the HSA and the FSLMS, then application of the term under the latter statute cannot possibly be irrelevant to an understanding of how the term applies under the former.

*Chertoff*, 452 F.3d at 858 (internal citation omitted).

Here we face a similar statute. *See also Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (noting "when Congress uses the same language in two statutes having similar purposes,

9

particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes"). Enacted just one year after the DHS statute, Chapter 99 protects collective bargaining in language that mirrors the DHS statute word for word, except that it adds the two emphasized phrases:

> (b) Any system established under subsection (a) shall . . .
>
> > (4) ensure that employees may organize, bargain collectively *as provided for in this chapter*, and participate through labor organizations of their own choosing in decisions which affect them, *subject to the provisions of this chapter* and any exclusion from coverage or limitation or negotiability established pursuant to law.

5 U.S.C § 9902(b)(4) (emphasis added); *see* 5 U.S.C. § 9701(b)(4). Congress added this new language not to give meaning to the term "bargain collectively" (as the court suggests), but rather to make clear that elsewhere in Chapter 99 it was modifying the "core meaning" of collective bargaining in order to give the Secretary additional flexibility. For example, in *Chertoff* we held that granting an employing agency unilateral authority to abrogate collective bargaining agreements conflicts with the core meaning of collective bargaining. *Chertoff*, 452 F.3d at 860. Yet subsection (m)(8), which provides that the temporary labor relations subsystem will "supersede all other collective bargaining agreements," 5 U.S.C. § 9902(m)(8), gives the Secretary just this power. Similarly, under Chapter 71, although employing agencies may not bargain over their authority to assign employees, *see* 5 U.S.C. § 7106(a)(2), they must negotiate over the procedures by which they exercise that authority, *see id.* § 7106(b)(2). Chapter 99, however, states that

10

no provision of Title 5 shall limit the Secretary's authority to create a personnel system that regulates "the methods of assigning, reassigning, detailing, transferring, or promoting employees." 5 U.S.C. § 9902(k)(1)(B). Through such provisions, Congress demonstrated just how collective bargaining "as provided for in this chapter" differs from collective bargaining's core meaning.

The court accuses me of "distort[ing] the plain meaning of the phrase 'as provided for,' reading it to mean 'unless otherwise provided for.'" Maj. Op. at 12. My reading, however, is driven by *Chertoff*, our obligation to avoid statutory surplusage, and Chapter 99's legislative history. To be sure, Congress could have written subsection (b)(4) to read "except as otherwise provided for" instead of "as provided for." But given *Chertoff*, the current language means exactly the same thing. Imagine a statute allowing sixteen-year-olds to "drive as provided for in this statute," but providing elsewhere that they may not do so without an adult in the car or after sunset. No one would say that because this statute fails to "provide for" an affirmative definition of driving, the DMV could issue regulations barring all driving by sixteen-year-olds. Nor would anyone fail to understand that the legislature instead used the words "as provided for" to clarify that the driving authorized for sixteen-year-olds differs from the normal rules of the road. The same is true here. Just as my imaginary legislature understood the term "drive," Congress, according to *Chertoff*, understood the term "bargain collectively," leaving it with no need to define the term elsewhere in Chapter 99. Likewise, just as my hypothetical statute modifies the common meaning of "driving" by requiring supervising adults and barring night-time driving, Chapter 99 modifies collective bargaining's core meaning by permitting national-level bargaining and prohibiting bargaining over the methods of assigning employees.

11

The court finds my hypothetical unhelpful because "the real statute in this case does provide for collective bargaining." Maj. Op. at 12. But this argument merely restates the court's conclusion, i.e., that the words "as provided for" make sense only if they refer to an affirmative definition elsewhere in the statute. As the hypothetical demonstrates, however, this is hardly the only plausible interpretation of "as provided for." Indeed, the House bill in which subsection (b)(4) first appeared contained no definition of collective bargaining, thus demonstrating that the House understood the phrase "as provided for" to refer not to an affirmative definition of collective bargaining rights, but rather to limitations on collective bargaining found elsewhere in the statute. *See supra* pp. 3-5.

That said, I recognize that my reading of the statute does create surplusage *within* subsection (b)(4) itself because that subsection also states that its requirements are "subject to the provisions of this chapter." *See* Maj. Op. at 12. Because such surplusage makes it impossible to resolve this case at *Chevron* step one, *see supra* pp. 2-3, I would proceed to *Chevron*'s next step, deferring to the Secretary's interpretation of the statute so long as it is "reasonable." *Chevron*, 467 U.S. at 844.

The Secretary's interpretation of the statute is quite clear: subsection (m)(1)'s waiver of Chapter 71 neither frees him from subsection (b)(4)'s system requirement nor permits him to abolish collective bargaining altogether. Describing the scope of his Chapter 99 authority to create the temporary labor relations subsystem, the Secretary stated in the preamble to the challenged regulation that the statute "requir[es] that employees be authorized to bargain collectively, as provided for in [C]hapter 99 (not as provided for in [C]hapter 71)." Department of Defense Human Resources Management and Labor Relations Systems, 70 Fed. Reg. 66,116, 66,177 (Nov. 1,

12

2005). Far from contending that subsection (b)(4) has no application to the temporary labor relations subsystem, the Secretary instead insisted that the subsystem fully complies with this system requirement:

> The labor relations system is consistent with the general parameters Congress provided, including the process for involving employee representatives (see 5 U.S.C. 9902(m)(3) and (4)). It mandated that the new system may not *expand* the scope of collective bargaining beyond the scope of bargaining available today under chapter 71, even where provisions of title 5 are waived or waivable (5 U.S.C. 9902(m)(7)), *and required that employees be authorized to organize and bargain collectively within the framework established in chapter 99*, that is, within the framework of a system that promotes a collaborative issue-based approach to labor relations and which is developed, established, and implemented to enable the Department's civilian workforce to better support the Department's national security mission (*5 U.S.C. 9902(b)(4)*).

*Id.* at 66,176 (second and third emphases added); *see also id.* at 66,177 ("Consistent with the enabling legislation, the labor relations system specifically recognizes the right of employees to organize and bargain collectively subject to limitations established by law . . . .").

Reiterating this view here, the Secretary argues that "*[t]he NDAA's requirement that NSPS* [the personnel system] *ensure collective bargaining* thus contemplates that DoD and [the Office of Personnel Management] should tailor their new labor relations system to DoD's national security mission, in ways that may differ from the manner in which 'collective bargaining' is

13

understood elsewhere." Appellants' Br. 30 (emphasis added). Similarly, at oral argument, DoD counsel stated that "[t]his labor relations system that Congress authorized to be crafted is not tied to Chapter 78 [*sic*], or any other collective bargaining system, because the statute provides that employees may bargain collectively as provided for in this chapter, and subject to the provisions of this chapter, Section 9902(b)(4)." Oral Arg. Tr. 3. Indeed, asked point blank whether the Secretary has authority to eliminate collective bargaining altogether, agency counsel answered no. *See* Oral Arg. Tr. 7-8. I would defer to this perfectly reasonable interpretation of Chapter 99.

### III.

Although the Secretary agrees with me that subsection (b)(4)'s protections apply to the temporary labor relations subsystem, he goes on to assert that in determining the extent of collective bargaining protected by this system requirement—a conceptually distinct question—we should look neither to Chapter 71 nor *Chertoff*, but rather to DoD's own regulation. Relying on subsection (m)(1), the Secretary argues that Congress granted him "broad authority to redefine collective bargaining within the framework of DoD." Appellants' Br. 31. Thus, according to the Secretary, the definition of "bargain collectively as provided for in this chapter" includes not only the substantive changes to the core meaning of collective bargaining found in Chapter 99, but also the temporary labor relations subsystem the Secretary himself creates. *See* 5 C.F.R. § 9901.903 (defining the word "collective bargaining" by adopting, nearly word for word, the definition of collective bargaining found in Chapter 71, but qualifying the obligation to bargain by adding that such obligation must be met "pursuant to 5 U.S.C. [§] 9902 *and this subpart*" (emphasis added)); *compare with* 5 U.S.C. § 7103(a)(12) (defining collective bargaining in Chapter 71).

14

As the unions correctly argue, the Secretary's interpretation runs counter to *Chertoff*, which also explains why the court's alternative *Chevron* step two holding fails. In *Chertoff*, DHS argued—much as the Secretary does here—that the mere authority to create a new human resources system freed it from the statute's system requirements, including protections for collective bargaining. *See Chertoff*, 452 F.3d at 856-57. Finding that argument "completely unconvincing," *Chertoff* explains that because Congress "specif[ied] 'system requirements' that DHS must follow in promulgating a [human resources] system," DHS "does not have a free hand to construct a [human resources] system entirely as it prefers." *Id.* So too here. Although Chapter 99 authorizes the Secretary to create a temporary labor relations subsystem that modifies Chapter 71 and "address[es] the unique role that the Department's civilian workforce plays in supporting the Department's national security mission," the Secretary may not create that subsystem free from Congress's overall system requirements, including subsection (b)(4)'s protection of collective bargaining. The addition of the phrases "as provided for in this chapter" and "subject to the provisions of this chapter" to subsection (b)(4)'s collective bargaining system requirement does not distinguish this case from *Chertoff*. As the Secretary agrees, those phrases refer to substantive restrictions on collective bargaining rights found elsewhere in the statute. Subsection (m)(1), however, contains no substantive modification of core collective bargaining rights. Just as the statute at issue in *Chertoff* gave DHS general authority to promulgate a new personnel system, subsection (m)(1) vests the Secretary with general authority to create the temporary labor relations subsystem; it says nothing at all about collective bargaining. *See Chevron*, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

15

The Secretary, however, is not without significant flexibility. In devising the temporary labor relations subsystem, the Secretary has no obligation to comply with any part of Chapter 71 that does not implicate the core meaning of collective bargaining. Moreover, he may, pursuant to subsection (b)(4), depart from the core meaning of collective bargaining to the extent authorized elsewhere in Chapter 99. Applying these principles, I would hold that most, but not all, of the challenged regulation complies with subsection (b)(4)'s system requirement. I'll begin with the provisions that comply.

First, as the court notes, the regulation imposes conduct restrictions on employee representatives, requiring them to meet the same standards imposed on all DoD civilian employees. *See* Maj. Op. at 24; 5 C.F.R. § 9901.914(a)(4). Union-appellants fear that such a requirement could unduly impede the vigorous advocacy essential to effective collective bargaining. I agree with the court, however, that we should defer to the Secretary's interpretation of the regulation as barring only "vulgar or sexually explicit language" and "physical intimidation." 70 Fed. Reg. at 66,182; *see, e.g.*, *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 52 (D.C. Cir. 1999) ("The agency's construction of its own regulation is controlling 'unless it is plainly erroneous or inconsistent with the regulation.'" (quoting *United States v. Larionoff*, 431 U.S. 864, 872 (1977))). So construed, the regulation intrudes not at all on the core meaning of collective bargaining because it is "preposterous" to think that "employees are incapable of . . . exercising their . . . statutory rights without resort to abusive or threatening language or without resort to a physical response." *Dep't of the Air Force v. FLRA*, 294 F.3d 192, 201 (D.C. Cir. 2002) (internal quotation marks and citation omitted).

Second, under the regulation, "implementing issuances"— directives that "carry out a policy or procedure implementing"

16

the new personnel system, 5 C.F.R. § 9901.103—supersede any conflicting provisions contained in collective bargaining agreements. 5 C.F.R. § 9901.905(a). In *Chertoff*, we found such authority to be flatly inconsistent with the core meaning of collective bargaining. *Chertoff*, 452 F.3d at 858-60. But unlike the statute at issue there, Chapter 99 expressly states that "the labor relations system developed or adjusted under this subsection . . . shall supersede all other collective bargaining agreements." 5 U.S.C. § 9902(m)(8). This provision represents a clear example of how Congress "provided for" collective bargaining differently than it had in the statute at issue in *Chertoff*.

Third, the challenged regulation expands the range of management rights issues not subject to collective bargaining to include procedures governing "hir[ing], assign[ing], and direct[ing] employees in the Department; . . . assign[ing] work, mak[ing] determinations with respect to contracting out, and . . . determin[ing] the personnel by which Departmental operations may be conducted." 5 C.F.R. § 9901.910(a)(2), (b). Under Chapter 71, procedures regarding such issues are negotiable. *See* 5 U.S.C. § 7106(b)(2). By contrast, Chapter 99 states that no provision of Title 5 may limit the Secretary's authority to promulgate regulations regarding the "methods of assigning, reassigning, detailing, transferring, or promoting employees." 5 U.S.C. § 9902(k)(1)(B). Although I think it not entirely clear whether Congress, by using the term "methods," intended to give the Secretary sole and nonnegotiable authority to determine the "procedures" for each of these employment actions, the Secretary's construction of that term seems quite reasonable, and the unions offer no basis for concluding otherwise. *See Chevron*, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

17

In certain other respects, however, I agree with the unions that the regulation's management rights provision runs counter to Chapter 99. For example, the regulation allows "any management official or supervisor . . . to take whatever other actions may be necessary to carry out the Department's mission." 5 C.F.R. § 9901.910(a), (a)(2). In *Chertoff*, we invalidated an identical regulation, explaining that it would "[p]resumably . . . empower[] DHS to take any matter off the bargaining table at any time, regardless of what concessions have already been made by union representatives." *Chertoff*, 452 F.3d at 862. As the Secretary wisely concedes, insofar as this provision extends beyond the authority granted in subsection (k)(1), the district court correctly determined that the regulation violates subsection (b)(4). *See* Appellants' Br. 33 n.1.

The new management rights provision also bars negotiation over the procedures through which management "determine[s] . . . the technology, methods, and means of performing work." 5 C.F.R. § 9901.910(a)(2), (b). This provision precludes bargaining over the procedures regarding many day-to-day operational matters, yet I see nothing in Chapter 71 recognizing such a broad management right, *see generally* 5 U.S.C. § 9701, nor can subsection (k)(1) be so construed. To be sure, subsection (k)(1) frees the Secretary from any duty to bargain over "assigning, reassigning, detailing, transferring, or promoting *employees*," 5 U.S.C. § 9902(k)(1)(B) (emphasis added), but the subsection says nothing at all about the methods and means of performing *work*.

The regulation restricts collective bargaining with respect to management rights in still another way: it limits the scope of bargaining over "appropriate arrangements" for employees adversely affected by the exercise of management rights. *See* 5

18

C.F.R. § 9901.910(f)(2). Under Chapter 71, such appropriate arrangements are always negotiable, *see* 5 U.S.C. § 7106(b)(3), and even under the challenged regulation, management must negotiate over appropriate arrangements for employees affected by the exercise of management rights protected by 5 C.F.R. § 9901.910(a)(3), including the authority "[t]o lay off and retain employees, or to suspend; remove; reduce in pay, pay band, or grade; or take other disciplinary action against such employees." *See* 5 C.F.R. § 9901.910(a)(3), (f)(1)(i). With respect to the exercise of other management rights, including the previously described rights to assign employees and determine the methods and means of work, the unions assert that the regulation requires negotiation regarding only "personal hardships and safety measures." Appellees' Br. 27 (quoting 5 C.F.R. § 9901.910(f)(1)(ii)). This is incorrect. The regulation states that the "[a]ppropriate arrangements within the duty to bargain *include* proposals on matters such as personal hardships and safety measures." 5 C.F.R. § 9901.910(f)(1)(ii) (emphasis added). By using the word "include," the Secretary made clear that this list of negotiable appropriate arrangements is by no means exclusive.

The regulation, however, goes on to narrow significantly the Secretary's duty to bargain over appropriate arrangements: "[T]he duty to bargain do[es] not include proposals on matters such as the routine assignment to specific duties, shifts, or work on a regular or overtime basis." *Id.* § 9901.910(f)(2). In *Chertoff* we held that a similar regulation conflicted with collective bargaining's core meaning, *see Chertoff*, 452 F.3d at 862 (invalidating regulation that similarly took these issues off the table, but also constrained negotiation over all appropriate arrangements to exercise of management rights that had "a significant and substantial impact on the bargaining unit, or on those employees in that part of the bargaining unit affected by the action or event"); *see also* 5 C.F.R. § 9701.511(e)(2)(i).

19

Nothing in Chapter 99 authorizes a different result here. Although subsection (k)(1) does expand management rights, neither that subsection nor anything else in Chapter 99 permits the Secretary to restrict the right to negotiate over arrangements designed to mitigate the effects of the exercise of management rights.

Finally, the regulation prohibits all employees from bargaining collectively regarding their pay. *See* 5 C.F.R. §§ 9901.305 (providing that pay system is not subject to bargaining), 9901.903 (barring bargaining regarding "[t]he pay of any employee or for any position"). Federal law prohibits U.S. government employees whose wages are set by statute from bargaining over their compensation. *See Fort Stewart Sch. v. FLRA*, 495 U.S. 641, 649 (1990) ("The wages and fringe benefits of the overwhelming majority of Executive Branch employees are fixed by law, in accordance with the General Schedules of the Civil Service Act, and are therefore eliminated from the definition of 'conditions of employment' [that are subject to a duty to bargain]." (internal citation omitted)). DoD's workforce, however, includes employees who work for what are known as non-appropriated fund instrumentalities (NAFIs), organizations whose funding comes from user fees and whose employees have historically bargained over their rate of pay. *See* Appellees' Br. 29. Such employees include those working in DoD schools, day care centers, and cafeterias. Under the challenged regulation, NAFI employees no longer enjoy the right to bargain over their pay. The Secretary offers two arguments in support of his authority to make this change, neither of which is convincing.

First, the Secretary cites his Chapter 99 authority to create a new "pay for performance evaluation system." 5 U.S.C. § 9902(b)(6)(I). Yet the Secretary nowhere explains how subsection (b)(4)'s collective bargaining system requirement

20

conflicts with a pay for performance system.  In fact, as the unions explain, the mechanics of how pay for performance would work, including the base level of pay, the evaluation criteria, and the degree to which employees are rewarded (or punished) for their job performance, all represent perfectly acceptable subjects of collective bargaining.  *See* Appellees' Br. 30.

Second, falling back on his general argument that subsection (m)(1) permits him to redefine collective bargaining, the Secretary asserts that since most federal employees may not bargain over their pay, nothing inherent in the term "collective bargaining" protects that right.  But this argument ignores the fact that "most" federal employees may not bargain over their wages because their compensation is set by statute.   The Secretary never explains how Chapter 99 permits him to prohibit collective bargaining over compensation by employees whose pay is *not* set by statute.

**IV.**

In sum, the court's *Chevron* step one analysis fails because nothing in Chapter 99 "unambiguously" permits the Secretary to abolish collective bargaining altogether.  I would defer to the Secretary's perfectly reasonable interpretation that subsection (b)(4) applies to subsection (m)'s temporary labor relations subsystem.  The Secretary's later conclusion that he may define subsection (b)(4)'s protections as he sees fit, however, runs counter to *Chertoff*.  Any departure from the core meaning of collective bargaining must be authorized by Chapter 99.  Applying this standard, I would vacate several aspects of the regulation's expansion of management rights, as well as its abolition of collective bargaining over NAFI pay.